Plaintiff Frank D. Dundee, of

7707 Amberwood Trail, Boardman, Ohio, 44512

alleges the following:

### NATURE OF THE ACTION

This is an action for relief from employment discrimination in violation of Title VII of the Civil Rights Act of 1964. Also, this is an action for relief from employment discrimination of Title I of the Americans with Disabilities Act of 1990.

Plaintiff Frank Dundee alleges that University Hospitals of Cleveland, Danialle Lynce, Jason Glowczewski, Shawn Osborne and Rachael Lerman unlawfully discriminated against him in retaliation, taking materially adverse actions as a result of the Plaintiff engaging in an EEO protected activity, opposition to sexual harassment in the workplace. These material adverse actions would deter a reasonable person from exercising their rights under Title VII.

Furthermore, the Defendants perceived the Plaintiff as having a disability, taking materially adverse action against the plaintiff by mandating counseling sessions in the UH Employee Assistance Program (EAP), that was to include a 3 hour psychiatric examination.  These EAP counseling sessions amounted to unlawful medical examinations under Title I the ADA.  UH regarded the Plaintiff as having a substantially limiting impairment when the Plaintiff no such impairment.  The EAP counseling sessions were neither job related nor consistent with business necessity.

The Plaintiff seeks injunctive and declaratory relief, compensatory damages, punitive

1

damages and reasonable attorneys' fees and costs as remedies for Defendants' violations of his rights.

## JURISDICTION AND VENUE

This Court has jurisdiction of Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court because Defendants maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. §

2000e-5(f)(3).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). On or around March 13, 2019, the EEOC issued the Plaintiff Notices of Right to Sue.

Plaintiff have timely filed this action and have complied with all administrative prerequisites to bring this lawsuit.

## FACTUAL ALLEGATIONS

At all times material to this action, Plaintiff Frank Dundee was employed by Defendant, University Hospitals, as a staff pharmacist at UH Geauga Medical Center.  Since his hiring in May, 2010, the Plaintiff was responsible for pharmacy operations on 3rd shift, working alone, covering UH Geauga Medical Center, UH Conneaut Medical Center, UH Geneva Medical Center and UH Andover Immediate Care Center.

At all times material to this action, the Plaintiff made use of the internal complaint mechanisms afforded employees within the University Hospitals (UH) System.

On **6/26/2016**, the Plaintiff filed a complaint of sexual harassment against his supervisor, Rachael Lerman, for making unwanted sexual advances.   The complaint was sent to Rebecca Besselman, UH Geauga Human Resources Officer, for investigation.  In a time period between **Spring of 2012** and **October of 2013**, on at least 3 occasions, the Plaintiff was subjected to unwelcome sexual harassment in the form of unwelcome sexual advances by Ms. Lerman.

The Plaintiff was reluctant to file charges against his supervisor for fear of retaliation and out of concern for her family.  By not responding to the advances in-kind, the Plaintiff was subjected to years of dealing with an abusive and hostile work environment.  The Plaintiff was singled out for specious corrective actions about manufactured and magnified infractions; infractions that were ignored in others on the pharmacy staff.  The Plaintiff

3

had a good faith belief that a violation occurred and decided that he had no alternative but to finally reveal the sexual harassment of his supervisor from years earlier in order to stop the abuse from not only his supervisor, Ms. Lerman, but also from the Head of HR, Ms. Danialle Lynce.

Out of concern that the investigation be unbiased, The Plaintiff requested that the investigators of his charge be independent and from outside of Geauga Hospital.  He specifically requested that Ms. Danialle Lynce recuse herself because of bias she demonstrated against the Plaintiff in past corrective actions and appeals.

That bias was confirmed during a meeting with the UH Compliance Department in **November, 2014**, reporting, for the second time, the hostile work environment the Plaintiff endured.  The meeting was with Atty. Ed Soyka, from the UH Compliance Department, and Atty. Katherine Perry, from UH legal.  This resulted in HR representative, Ms. Besselman, being appointed to be present in all meetings between Ms. Lerman and the Plaintiff; Ms. Lynce, prohibited.

However, Ms. Lynce did not recuse herself and conducted the investigation of sexual harassment with Ed Soyka, of the UH Compliance department, despite his knowledge of her bias towards the Plaintiff.  The two of them reached their conclusion over a period of about 5 weeks, with no finding, stating that it was "untimely."  *It is important to note that an employer cannot punish an applicant or employee for filing an EEO complaint, even if

4

the underlying discrimination allegation is unsuccessful or "untimely."

On **8/04/2016**, at approximately 10:00 pm, the Plaintiff was working his shift as a staff pharmacist at UH Geauga Medical Center when he received a phone call from his regional supervisor, Jason Glowczewski. Mr. Glowczewski asked if the plaintiff could attend a meeting with him and Danialle Lynce, at 7:00 am, on **8/05/2016**, in the HR offices. The plaintiff asked the topic of the meeting and Mr.Glowczewski said, "It is about the concern that you filed." The Plaintiff agreed to attend the meeting.   The Plaintiff had not been asked to testify during the investigation and he was very interested in how the investigators arrived at their conclusion, as the Plaintiff was consulting with an attorney in the next week.  The Plaintiff received an email from Ms. Lynce days before, closing the investigation with no finding.  Since Mr. Glowczewski was on speakerphone, his conversation was overheard by staff pharmacist Phil Snyder.

*It is of extreme importance to note that Mr. Snyder was witness to Mr. Glowczewski's call. FOIA records for the UH Position Statement sent to the EEOC investigator, completely omitted ANY mention of the meeting of **8/5/2016**.  The UH Position Statement was written by Ms. Lynce.  The retaliation that occurred during meeting of **8/5/2016** was the foundation of the Plaintiff's charge to the EEOC; a reasonable person would say Ms. Lynce incriminates herself with her omission.  Ms. Lynce could have easily sent an invitation to the meeting in the email announcing the end of the investigation, but that would have left a trail.  She had Mr. Glowczewski call, at 10:00 pm, a mere nine hours before the 7:00 am

5

meeting on **8/5/2016**, for which both of them had fully prepared, hiding the real topic of the meeting, which was retaliation.   Ms. Lynce had interrogated the Plaintiff's co-worker and was armed with various documents from the Plaintiff's personnel file, in order to threaten the Plaintiff with termination.  Without Mr. Snyder overhearing the phone call, there would be no record that there was a meeting on **8/5/2016**.

Once inside the HR office at 7:00 am, on **8/5/2016**, the Plaintiff was blind-sided by the tenor, as well as the subject, of the meeting.  A less than five minute discussion of the sexual harassment investigation was followed, immediately, by Ms. Lynce and Mr. Glowczewski devoting over 20 minutes threatening the Plaintiff with discharge.  The temporal proximity of these threats, coming just 5 weeks from filing the charge of sexual harassment and also being in a meeting that purported to be only a discussion of the investigation of sexual harassment, meets an EEO standard for proving retaliation against a protected activity.

Ms. Lynce, **against UH Policy**, had rifled the Plaintiff's personnel file, quoting documents from various files piled high on her desk; using sentences, taken out of context, from explanatory addendums the Plaintiff had written as attachments to disciplines and sub-standard performance reviews. She used the material to threaten the Plaintiff with termination if he ever expressed such sentiments in the future. [These explanatory addendums, attached to corrective actions or performance reviews, were allowed for all UH employees under UH Policy.]

The threats from Ms. Lynce and Mr. Glowczewski were overt, direct, vitriolic and emphatic. In no uncertain terms, the Plaintiff would be under intense scrutiny going forward in his employment with UH.  **By their own statements they acknowledged and betrayed their intention to deter the Plaintiff from engaging in protected activity.**  The Plaintiff recognized the Defendant's actions as retaliation for filing the sexual harassment charge against Ms. Lerman, saying as much to the Defendants and asking to leave at once. Ms. Lynce denied the request to leave.

Continuing the threats, Mr. Glowczewski produced a Pharmacy Time Exception form that had a humorous scribble written by the Plaintiff in the margin.  It said, "She forced me to sign this" on a line referring to Susan Thabit, a fellow pharmacist who requested to leave work early on a shift. The policy for leaving early just changed, requiring the permission of the arriving pharmacist in order to leave.  The Plaintiff was joking by not granting permission.  Ms. Thabit and Mr. Glenn Johnson were present in the room at the time the Plaintiff wrote the humorous scribble, all three of them laughing over the innocuous joke. The form was not an official UH document and there were often scribbles of various types in the margins. Mr. Glowczewski said that if the Plaintiff wrote any other notes like this, the Plaintiff would be discharged.  No other employee would be subject to a threat of termination for writing a similar comment.  The Plaintiff asked for a copy of the document and was refused by Ms. Lynce.

*Subsequently Ms. Susan Thabit revealed to the Plaintiff that she had been summoned to a

7

meeting in HR, sometime before the meeting on the morning of **8/05/2016**, during the time the sexual harassment investigation was going on.  She was summoned by Ms. Lynce and was "interrogated" (Ms. Thabit's characterization) about the meaning of the scribble. Ms. Thabit stated that she felt intimidated.  She said it was if Ms. Lynce was trying to turn the meaning of the scribble from something humorous into something actionable.  Ms. Thabit, who is of small stature, was asked how she could have forced the Plaintiff to sign the document. **The interrogation of Ms. Thabit is further proof that Ms. Lynce and others were in fact investigating the Plaintiff, instead of investigating the claim of opposition to sexual harassment.**  The preparation by the Defendants for the meeting of **8/5/2016**, rifling the personnel files and interrogating Ms. Thabit, confirms the complicity and conspiracy of Ms. Lynce, Mr. Glowczewski's and, most likely, others, in retaliating against the Plaintiff.  **A reasonable person would immediately recognize the demonstrated falsity of the Defendants' proffered reasons for the adverse action.**

The meeting ended and the Plaintiff returned to his car and immediately wrote nineteen contemporaneous notes on a pad, accurately describing the events of the meeting.

On Monday, **8/08/2016**, at 9:16 am, in order to memorialize the meeting of **8/5/2016**, the Plaintiff emailed Mr. Ed Soyka, of the UH Compliance Department. The email was titled, "An F.Y.I. to UH Compliance Department regarding EEOC recognized protected

activities/retaliation", explaining how the Defendants violated Title VII by threatening the Plaintiff.  This email was assembled by the Plaintiff with the contemporaneous notes taken minutes after the meeting of **8/05/2016**.  In the email, the Plaintiff cited EEO law regarding retaliation, materially adverse actions and protected activities.  The Plaintiff also cited his record, objectively and subjectively, as an exemplary UH employee who had been denigrated by false accusations.

The Plaintiff never received a reply from Mr. Soyka, nor from the UH Compliance Department, regarding the Title VII violation. The Plaintiff consulted an attorney and was advised to hold off filing a charge of retaliation with the EEOC at that time.  The Plaintiff continued to perform his job as 3rd shift staff pharmacist during the rest of 2016 and into 2017, under severe stress and anxiety arising from the Defendant's threats, waiting for the next shoe to drop.

Upon returning from a vacation, at approximately 9:05 pm on **6/26/2017**, one year to the day that the Plaintiff had filed his sexual harassment complaint, the Plaintiff was immediately called, by phone, to a corrective action hearing by Danialle Lynce. The Plaintiff had no idea that he had committed any infraction; he was conditioned to being blind-sided by such harassment in his years working for UH.   In fact it became a practice that the Plaintiff would call home, to his wife, upon arriving. He had to reassure his wife, nightly, that all was well and that he wasn't being called into a corrective action.

The Plaintiff was incredulous, stating that he had only arrived in the last five minutes from a week's vacation and he was being summoned to HR for some infraction? Ms. Lynce laughed upon hearing that.

[It is important to note that this corrective action of **6/26/2017** was connected to the threats of increased scrutiny that were levied at the Plaintiff in the meeting of **8/5/2016**, by Ms. Lynce and Mr. Glowczewski.  The spurious and specious reasons for the written corrective action of **6/26/2017** reveals the depth of  desperation, complicity and conspiracy among the defendants in order to retaliate against the Plaintiff for his opposition to sexual harassment in the workplace, which a reasonable person would recognize as sending a chilling message to other UH employees contemplating filing an EEO protected action]

The Plaintiff arrived at the HR offices to find Ms. Danaille Lynce, Ms. Rachael Lerman and UH Security Guard, Adam Geiger. Upon seeing the security guard, the Plaintiff was shocked. He assumed he was going to be fired and led off UH property. Discovery will reveal why Mr. Geiger was asked to the meeting.

The security guard remained in the anteroom while the Plaintiff went into the HR office with Ms. Lynce and Ms. Lerman. Once inside, Ms. Lerman read from a UH document that this was a final step warning (even though it was over one year since a previous corrective

action and should have been a written warning, not a final step, under UH policy.) The stated reason for the corrective action was for violating UH policy on diversity, contributing to a "Conflictive Work Relationship."

The violations were in two emails that the Plaintiff sent to HR representative Rebecca Besselman regarding the implementation of cost-saving suggestions made by the Plaintiff and requested by UH Administration; one email dated **6/10/17**, in which the Plaintiff used the amicable phrase, "you're a good kid," to describe Ms. Besselman, with whom he was on friendly terms; the second email used empathetic phrases to describe a young supervisor as "He's a pup with practically no experience" and "A nice boy, but..."

The Plaintiff was not surprised, given the history of the varied workplace harassment and specious corrective actions he had endured over many years, to find those three innocuous phrases being used as a method to retaliate, one year to the day that he had filed his sexual harassment charge against Ms. Lerman.  Any reasonable person would find the actions by the Defendants transparent from the **demonstrated falsity of the Defendants' proffered reason for the adverse action.**   It reveals a desperate attempt to find any reason to place the Plaintiff in corrective action. The significance of the date was not lost on the Plaintiff, as it sent the message the Defendants intended to send; linking the adverse corrective action to the EEO protected activity from the year before, on **6/26/2016**.

*It must be noted that, at its essence, the corrective action of **6/26/2017** demonstrates

11

fully and conclusively the nature of the abusive hostile work environment that the Plaintiff endured since October of 2013.  The scrutiny that the Plaintiff was under meant that any interaction, any phone conversation, any email could be magnified by Ms. Lynce and Ms. Lerman to create a false narrative that would eventually lead to a constructive discharge or to the Plaintiff resigning under the sheer anxiety and stress inflicted upon him and his family.  The job of a hospital pharmacist, working alone, in charge of three hospitals requires a clear mind to perform his duties safely, accurately and in a timely fashion.  The Plaintiff never had the luxury of a clear mind in the hostile work environment created by Ms. Lynce, Ms. Lerman and others who were complicit in the conspiracy that will be revealed during discovery.

The key to revealing the complicity and conspiracy among the Defendants and others is to discover how those emails, **that were sent to Ms. Besselman,** herself an HR representative, found their way into the hands of Ms. Lynce and Ms. Lerman?

A review of the actual email exchanges between the Plaintiff and Ms. Bessleman show that Ms. Besselman, like any reasonable person, did not find any of those phrases offensive or worthy of corrective action.  If, in fact, Ms. Besselman found the phrases, "You're a good kid," "He's a pup with little experience," and "A nice boy, but...," offensive, as an HR representative, she could have handled the corrective action herself, with no involvement by Ms. Lynce, her immediate supervisor.

Any reasonable person reading actual the email exchanges, in their entirety, would see that Ms. Besselman took no offense, if she even noticed the phrases at all.  Ms. Lynce, Ms. Lerman and later, Mr. Shawn Osborne, were all asked how the Plaintiff's emails came to their attention. An answer was never given.  Once again, the Defendants' own statements acknowledge and betray their intention to deter an employee from engaging in protected activity.

**[In a curious twist, within a week or so, Ms. Besselman resigned her position with UH]**

Discovery will reveal how the Plaintiff's emails found their way into the hands of Ms. Lynce and Ms. Lerman, whether others were complicit and also if that had anything to do with the reason Ms.Besselman resigned. As a result of the corrective action, the Plaintiff filed charges of retaliation in violation of Title VII with the EEOC on **7/10/2017**.

As the upshot of the discipline procedure of **6/26/2017**, the plaintiff was mandated into counseling sessions in the UH Employee Assistance Program. The Plaintiff attended the first session, lasting over 2 hours, with David Riccardi, at UH Ahuja Medical Center, at 9:00 am, **7/26/2017**.

[The Plaintiff has a complete audio recording of the counseling session.  **EEO law places strict limits on employers when it comes to asking employees to answer**

**medical questions, take a medical exam, or identify a disability.** The recording reveals that Mr. Riccardi violated EEO law with his questions and requests during that session]

Any reasonable person would conclude that the employer, UH, perceived the Plaintiff as having a personality disorder or mental condition that interfered with the Plaintiff's ability to perform his duties as staff pharmacist and was therefore being remanded into counseling and a psychiatric evaluation. Any reasonable person might experience humiliation and degradation from such a mandate. A reasonable person would recognize that Mr. Riccardi, from his line of questioning, held the perception that the Plaintiff had some sort or mental impairment or personality disorder as the reason for the counseling.

Mr. Riccardi told the Plaintiff that he faced any number of future counseling sessions, with no set limit. Mr. Riccardi stated that the Plaintiff also was mandated to attend a 3 hour psychiatric examination with a Dr. Sulkin, at his Beachwood Office, on **8/1/17**. [The Plaintiff was so upset at this news that he discussed resigning his position with his wife, before he would subject himself to the humiliation of a psychiatric examination and unlimited EAP sessions]

*The Plaintiff suffers from a neuromuscular disorder called Hereditary Spastic Paraplegia (HSP), in which the muscles of his lower abdomen and legs suffer hyper-reflexive spasms.

14

The intensity and frequency of these spasms increase in periods of anxiety and stress. The intensity of the spasms affects the Plaintiff's ability to walk, balance himself and drive a car; the spasms also affect excretory functions as well, making urination and defecation difficult. The EAP session with Mr. Riccardi aggravated the symptoms of HSP in the Plaintiff. Mr. Riccardi and Wendy Henoch, of the UH Complince Department, were apprised of this medical situation after the EAP session

On **7/31/2017**, at 3:31 pm, the Plaintiff emailed Mr. Riccardi that he had informed Ms. Henoch, of the UH Compliance Department, that mandatory EAP counseling violated Title I of the ADA and that the Plaintiff had filed charges with the EEOC.  EEO law states that once a person is hired and has started work, an employer generally can only ask medical questions or require a medical exam if the employer needs medical documentation to support an employee's request for an accommodation or if the employer believes that an employee is not able to perform a job successfully or safely because of a medical condition. The Plaintiff was never restricted in any way from performing his job duties, despite being perceived by the Defendants as having a disability that required EAP counseling and a psychiatric evaluation.  The Plaintiff continued to report to work as scheduled and carried out his duties as usual.

The Plaintiff also asked Ms. Henoch, from Compliance, to hold future EAP sessions and the psychiatric evaluation in abeyance until the EEOC had ruled on the charge.  Ms. Henoch never replied to his request.

The Plaintiff did not attend any further EAP counseling sessions nor did he attend the appointment with a UH psychiatrist.  Months went by and two days before Thanksgiving the Plaintiff received a letter by US Mail on **11/22/2017**. The letter was dated **11/06/2017**, from Shawn Osborne, VP of Pharmacy Services. The letter stated that the Plaintiff had until **12/07/2017** to meet with the head of the EAP, Jill Fulton, for a counseling session. This was under threat of termination. The letter also expressed a false narrative about the nature of the Plaintiff's character in the workplace; this false narrative being supplied to Mr. Osborne second-hand, after being cultivated by Ms. Lynce and Ms. Lerman, possibly with the help of others.

An email dated, **11/22/17**, at 4:33 pm, was sent by the Plaintiff to Mr. Osborne, detailing the illegality of UH mandated EAP sessions:

1. Employers should weigh the legal risks before sending an employee to counseling.  Generally, an employer who focuses on the employee's conduct is on safer legal grounds than an employer who tries to speculate on the cause of such conduct.

2. Requiring an employee to obtain counseling imposes a legal burden that employers can avoid by merely making all employees aware that EAP or other counseling resources are available should an employee determine that he or she needs counseling.

3. An employer's best intentions will carry little to no weight in determining whether sending an employee for counseling amounts to a medical exam under the ADA.  Even if the employer has no interest in obtaining a diagnosis of a mental health condition, courts

16

are now likely to view any type of psychological or emotional counseling as a medical exam

for purposes of the ADA.

4. Employers must have their "ducks in a row" to make sure any required counseling is job-

related and consistent with business necessity. Generally, employers should have sound

and documented justification that explains why a medical exam is needed for an employee

to perform his or her job. Thus, any decision to send out an employee for counseling now

must be carefully scrutinized.


The Plaintiff also disagreed with Mr. Osborne's characterizations of the Plaintiff's work

behavior, asking for specifics from past corrective actions, the specifics of which both Ms.

Lynce and Ms. Lerman refused to give the Plaintiff in order that he best be able to defend

himself in past UH corrective action hearings and the subsequent appeal. Mr. Osborne

deflected this request stating in an email dated, **11/29/17**, that the Plaintiff was provided

with "all relevant and appropriate information" concerning past corrective actions. A

reasonable person would not agree that all relevant and appropriate information was

provided to the Plaintiff, as will be revealed during discovery.


The Plaintiff contacted Jill Fulton, scheduling the mandatory EAP counseling session for

**01/10/18**, at 8:00 am, at UH Geauga Medical Center. [Prior to the meeting, security

guards were called to open the doors of the meeting room. Ms. Fulton suggested the

Plaintiff run around the corner and hide out of sight, so as not to be embarrassed in front of

the guards for being there for an EAP session; confirming that any reasonable person would

find mandated EAP sessions degrading.]

Prior to the counseling session with Ms. Fulton, the Plaintiff had asked for objective data on his job performance and how he compared with pharmacists across all UH facilities.  At the mandatory EAP session on **01/10/2018**, Ms. Fulton stated that she did not retrieve the data because **the Plaintiff's work performance wasn't in question**; which confirms to any reasonable person that the mandatory EAP sessions were neither job related nor consistent with UH business necessity.

After the counseling session on **1/10/2018**, Ms. Fulton asked the Plaintiff to schedule more EAP sessions and the Plaintiff declined. The Plaintiff stated that he only agreed to attend the session because of the coercive power of UH and under the threat of termination. The Plaintiff also provided Ms. Fulton with literature explaining how mandatory EAP sessions violate Title I of the ADA; that it is illegal to harass an employee by mandating counseling sessions because the employer perceives that an employee has a disability, whether he does or does not have such an impairment.

The Plaintiff then filed a complaint with the Ohio Civil Rights Commission regarding the **1/10/2018** EAP counseling session; the complaint, claiming a Violation of Title I of the ADA, was forwarded to the EEOC.

The Plaintiff has not been required by UH to attend any further EAP sessions since

18

**1/10/18**, nor has he been required to attend the psychiatric examination. At no time after the corrective action of **6/26/17** has the Plaintiff been required by UH to modify any aspect of his job performance, once again demonstrating to any reasonable person that the mandatory EAP sessions/psychiatric examination were neither job-related nor consistent with business necessity.

The Supreme Court has ruled that the causation standard requires that "but for" a retaliatory motive, the employer would not have taken the adverse action.  But for the Plaintiff filing a charge of sexual harassment against his supervisor on **6/26/2016**, the threats levied 5 weeks later, on **8/5/2016**, the threatened increased scrutiny for the next 10 months, the corrective action of **6/26/17,** and the subsequent mandatory medical examinations, on 7/26/17 and **1/10/2018**, would not have occurred without retaliation.

The conduct by the Defendants was so severe and pervasive that a reasonable person in Plaintiff's position would find the Plaintiff's work environment to be hostile or abusive. Management level employees were made aware of the abusive conduct dating from **October, 2013**.  The Plaintiff has documents, addendums, emails, photos and recordings that will be introduced at trial to demonstrate both conspiracy and complicity between the defendants and possibly others in UH hierarchy.  The Plaintiff will also demonstrate the inaction on the part of UH administration after being made aware of the violations by the Defendants of the Plaintiff's civil rights under Title VII and Title I.

## CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

Retaliation in Violation of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)

The Plaintiff was subjected to harassment by the Defendant's agents and employees, including Ms. Lynce, Mr. Glowczewski, Mr. Osborne and Ms. Lerman, in retaliation of his filing opposition to sexual harassment, which is a protected activity under Title VII. The conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find the Plaintiff's work environment to be hostile or abusive.

The Plaintiff seeks compensatory and punitive damages, under EEOC guidelines for employers with more than 500 employees, of $300,000, as well as all other injunctive, declaratory, and monetary relief available for Title VII violations at trial, for all willful violations, prejudgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. §216(b).

SECOND CLAIM FOR RELIEF

Medical Exams in Violation of

Title I of the Americans with Disabilities Act, as amended, 42 U.S.C. § 2000e-2(a)

The Plaintiff was subjected to harassment by Defendant's agents and employees, including

Ms. Lynce, Ms. Lerman and Mr. Osborne, threatening the Plaintiff with discharge unless

the Plaintiff attend unlimited mandatory Employee Assistance counseling, that was to

include a mandatory psychiatric examination, which were neither job related nor consistent

business necessity, in violation of Title I of the ADA for allowable medical examinations.

The Plaintiff seeks compensatory and punitive damages, under EEOC guidelines for

employers with more than 500 employees, of $300,000, as well as all other injunctive,

declaratory, and monetary relief available for Title I violations at trial, for all willful

violations, prejudgment interest, attorneys' fees and costs, and other compensation

pursuant to 29 U.S.C. §216(b).

THIRD CLAIM FOR RELIEF

Disability Discrimination and Harassment in Violation of

Title I of the Americans with Disabilities Act, as amended, 42 U.S.C. § 2000e-2(a)

The Plaintiff was subjected to disability discrimination and harassment by Defendant's

agents and employees, including Ms. Lynce, Ms. Lerman and Mr. Osborne, threatening the

Plaintiff with discharge unless the Plaintiff attend unlimited mandatory Employee

Assistance counseling, that was to include a mandatory psychiatric examination, because

the Defendants perceived the Plaintiff to have a mental impairment.  The Plaintiff did not

have such an impairment.   EEO law places strict limits on employers when it comes to

asking employees to answer medical questions, take a medical exam, or identify a disability.

The Defendants' actions were in violation of Title I of the ADA. Disability Discrimination.


The Plaintiff seeks compensatory and punitive damages under EEOC guidelines for

employers with more than 500 employees, of $300,000, as well as all other injunctive,

declaratory, and monetary relief available for Title I violations at trial, for all willful

violations, prejudgment interest, attorneys' fees and costs, and other compensation

pursuant to 29 U.S.C. §216(b).


## INJUNCTIVE RELIEF ALLEGATIONS

No plain, adequate, or complete remedy at law is available to the Plaintiff to redress the

wrongs addressed herein.

If this Court does not grant the injunctive relief sought herein, the Plaintiff will be

irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for relief as follows:

For a declaration that Defendants' actions, policies, and practices as alleged herein are

22

unlawful;

For compensatory damages for the Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

For punitive damages in an amount to be determined at trial;

For an order enjoining Defendants from engaging in the unlawful acts complained of herein; For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e-5(k), and other laws; and For such other and further relief as this Court deems just and proper.