IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

**FILED**

**JAN 1 3 2020**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

)
)
)
)
\_\_Frank Dominic Dundee_____,    )
        Plaintiff            )    CASE NO. 1:19CV01141\_\_\_\_
)
)
          -vs-         )    JUDGE DAN AARON POLSTER
)
)
)
\_\_Danielle Lynce, et al_____,    )
    Defendant(s)       )
)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ALL, OR PART, OF

## THE CLAIM

NOW COMES plaintiff, Frank Dominic Dundee, and pursuant to Rule 56-C submits the following motion for summary judgment on all, or part, of the claim. The Plaintiff filed three complaints against the Defendants and University Hospitals Cleveland for violations of Title VII, under retaliation against a protected activity, under Title 1 of the ADA under perceived or regarded as disabled, and under Title I of the ADA for unlawful employer medical examinations that were neither job related nor consistent with business necessity. All charges were forwarded to the Cleveland EEOC Office who issued a right to sue letter to the Plaintiff/Pro Se Litigant.

## INTRODUCTION

Legal rights to non-discrimination in employment are guaranteed to everyone in the U.S. These rights are enforced through the legal system—and herein, lay the problem. The discrimination legal system has evolved in an adversarial struggle between well

1

resourced, repeat player employers and their representatives and aggrieved, but low-resourced individuals seeking moral and sometimes financial compensation. Employers tend to win.  Paradoxically, discrimination law, in practice, perpetuates the inequalities it was intended to redress.  Employer compliance becomes merely symbolic, with the legal system allowing guilty firms to escape justice.

Since employment in the U.S. is "at will," it is only in discrimination cases that employers are limited in their absolute ability to harass and/or fire with impunity. Discrimination law produces an exception to this "normal" rule of freedom to harass, fire or discipline.  Employers, however, are acutely aware of their own advantages within the legal system, perversely responding to discrimination complaints with increased managerial harassment and HR efforts to document or manufacture employment infractions.

Employers deny the reality of discrimination: because under the law, discrimination is a finding of guilt, which almost never occurs in a legal system stacked in the employer's favor and designed to dispose of charges long before a judge or jury examines the evidence.  It is estimate that only 0.13% of potential discrimination lawsuits ever occur, with about 60% settled by the employer's lawyers with a median settlement of $30,000. Virtually none of the cases (6%) actually go to court, and when they do, plaintiffs "win" only about a third of the time. There is, however, little evidence of plaintiffs "winning." What plaintiffs want is respect, moral vindication and employer accountability under the law.

The Plaintiff, Frank Dominic Dundee, has 66 years of life experience; he has 43 years of experience in hospital pharmacy; he also has 20 years of experience advocating for

2

worker-rights as an officer in a collective bargaining unit. He is before the court today fighting against workplace harassment and discrimination; not as an abstract principle but as a concrete effort to improve working conditions for employees everywhere, under the law. The Plaintiff is acting with the agility of a good problem solver; not as an outraged ideologue but instead as a human being, connected to other similarly situated human beings, seeking a better work environment, as the law, under Title VII and under Title I of the ADA, is intended to provide.

The Plaintiff was recruited and hired in May of 2010 by University Hospitals Geauga Community Hospital, where he has been employed, continuously, as a staff pharmacist and then as a clinical pharmacist. The Plaintiff came to UH Geauga Hospital in the twilight of his professional career as a pharmacist. UH Geauga Hospital averages less than 100 patients a day with a case mix that is uncomplicated; a perfect place to end a career, quietly. It was truly surprising and dismaying to find a toxic and hostile work environment that has the Plaintiff, reluctantly, before the Court today.

The Court should note that the Plaintiff did not ask for a jury trial. The court should also note that the Plaintiff is seeking a summary judgment. The reason being for both is that the Plaintiff does not wish to waste the Court's time or resources. The Plaintiff's complaint can be settled as a matter of law, without all the typical distractions of an employment discrimination complaint, such as the Defense attacking the Plaintiff's character as a means of justifying unlawful employer behavior. The Plaintiff has a track record that can withstand any attacks on his character or work performance, in any case (CV attached: Document "U"). Interestingly, the Court should note, however, that the Plaintiff did not have his record impugned with corrective action of any type in the years

3

prior to Ms. Lerman being his supervisor, nor has the Plaintiff been faced with any type of corrective action in the years after Ms. Lerman was transferred to another hospital.

## THE MATERIAL FACTS

The plaintiff is entitled to summary judgment when the evidence presents no genuine issue of material fact and he is entitled to judgment as a matter of law.  In the instant case, an examination of the pleadings and evidence presented shall demonstrate that there are no genuine issues as to any material facts, and the Plaintiff is entitled to judgment as a matter of law.

The material facts of this complaint are contained in the events surrounding the following seven dates.  Pertinent documents are noted under each date and are alphabetically indexed:

- 6/26/2016: On this date the Plaintiff filed a charged of sexual harassment against his immediate supervisor, Rachael Lerman, with HR representative Rebecca Besselman.  The charge is explanatory and is attached.
    - o  Document "A" is the sexual harassment charge against Ms. Lerman. [3 pages]
    - o  Document "B" is an email requesting Head of HR, Danialle Lynce, recuse herself from the investigation. [1 page]
    - o  Document "C" is an email sent from Danialle Lynce regarding the completed investigation.  [1 page]

4

- 8/5/2016: On the night of 8/4/2016, the Plaintiff was invited to a meeting, curiously by a phone call, a mere nine hours before the meeting at 7:00 a.m., on 8/5/2016, under the pretext of discussing the investigation surrounding his claim of sexual harassment.  This was days after the Plaintiff received an official notice of no finding, without ever interviewing the Plaintiff, from the principle investigator, Head of HR, Danialle Lynce.  The meeting on 8/5/2016 was with Ms. Lynce and Mr. Glowczewski in the HR offices at UH Geauga Medical Center.  The Plaintiff's contemporaneous notes and explanatory emails for the meeting are attached.
  - Document "D" are the actual, 19-hand-written notes, taken by the Plaintiff minutes after the meeting of 8/5/2016, in his car in the UH Geauga parking lot.  Note the time designated on the top of each page.  [5 pages]
  - Document "E" is an email containing a description of the meeting of 8/5/2016 and the transcribed 19-notes.  The email is to Rebecca Pace, secretary for Attorney Nancy Grim.  [2 pages]
  - Document "F" is an email titled, "An F.Y.I. to UH Compliance Department regarding EEOC recognized protected activities/retaliation." It is dated 8/8/2016, and addressed to Atty. Ed Soyka, who along with Ms. Lynce, conducted the investigation into the sexual harassment charge of 6/26/16.  The Court would please note that this is a key document.  [2 pages]
- 6/26/2017: Corrective action brought by Ms. Lerman and Ms. Lynce, against the Plaintiff for using the words, "You're a good kid," "He's a pup with little

5

experience" and "A nice boy, but," in two emails to Rebecca Besselman, discussing the implementation of cost saving suggestions that were submitted by the Plaintiff to benefit his employer, UH.  This corrective action was completely unexpected.  Copies of the corrective action, the two emails and their replies are attached.

o   Document "G" is the official UH corrective action against the Plaintiff, taken at approximately 9:10 p.m., 6/26/17, one year to the day of the Plaintiff's filing a charge of sexual harassment against Ms. Lerman.  This "coincidence" sent the desired message to the Plaintiff.

o   Document "H" is an email sent to the Plaintiff's coworkers that describes the Plaintiff's physical and emotional state caused by the corrective action of 6/26/17.  It also shows the Plaintiff's intention to fight the against the corrective action.  [1 page]

o   Document "I" contains copies of the actual emails to HR Representative Rebecca Besselman, containing the phrases cited in the corrective action of 6/26/2017.  [2 pages]

o   Document "J" contains copies of the 6/9/2017 replies from Ms. Besselman to the Plaintiff, in reverse chronological order.  **The Court should please note that Ms. Besselman's replies take no notice or offense at the phrases, "He's a pup with practically no experience. A nice boy, but…"** [1 page]

o   Document "K" contains emails from the Plaintiff to Wendy Henoch of UH Compliance seeking her help in obtaining background information for the

6

corrective action of 6/26/2017, from Ms. Lynce.  **The Court should note Ms. Lynce's evasive reply on 7/19/2017.**  [3 pages]

- 7/26/2017: Mandatory Employee Assistance Program counseling session with credentialed counselor, David Riccardi, lasting over two hours, during which the Plaintiff was mandated to attend a 3 hour psychiatric examination on 8/1/2017 with a Dr. Salkin.  A recording of the session will be provided to the Court if necessary.

  o Document "L" contains 5 forms; the first form titled, "Employee Assistance Program Conditions of Employment, Compliance Contract" in which the Plaintiff was forced to accept/sign a coercive contract for a "treatment plan" from EAP Counselor David Riccardi or be terminated. The contract included referral to a psychiatrist and 3 medical release forms; all with the understanding of agreeing to numerous, open-ended counseling sessions with Mr. Riccardi.   The second form was an authorization to release the Plaintiff's personal medical information to Mr. Riccardi.  [5 pages]

  o Document "M" is an email to Wendy Henoch of the UH Compliance Department making an ethics complaint regarding the forced medical examination with EAP Counselor David Riccardi and Psychiatrist Salkin. [1 page]

  o Document "N" is a follow-up email to Ms. Henoch regarding the ethics complaint and discussing the unlawful forced medical exam that violate Title I of the ADA.  [1 page]

7

- 11/1/2017: Ms. Lynce releases the UH Position Statement to EEOC Investigator Maria Colon. The Position Statement is attached.

  o Document "O" is the UH Position Statement filed with the EEOC by Ms. Lynce on 11/1/2017. *The Court should note Ms. Lynce's mistake is stating the Plaintiff's EEOC claim is filed "on the basis of disability," which is untrue. Ms. Lynce repeats the outrageous claim that the Plaintiff has violated the UH diversity policy by using the phrases, "You're a good kid," "He's a pup with practically no experience. A nice boy, but…" Lastly, but most damning of all, Ms. Lynce claims ignorance of "what 'protected activity' Mr. Dundee references in his Charge," even though she, herself was the chief investigator of the Plaitniff's "protected activity." Ms. Lynce also ignores the critical meeting of 8/5/2016 in which she and Mr. Glowczewski started the clock on the retaliation charge by threatening the Plaintiff with "increased scrutiny" before the Court, today. [5 pages]

- 11/22/2017: The Plaintiff received a letter to his home dated 11/6/2017, from Mr. Shawn Osborne, threatening the Plaintiff with termination if he did not attend mandatory EAP sessions with credentialed counselor Jill Fulton Royer, by the deadline of 12/7/2017. The letter is attached.

  o Document "P" is the letter written by Shawn Osborne to the Plaintiff on 11/6/2017. [2 pages]

  o Document "Q" are a series of emails in which the Plaintiff responds to Mr. Osborne's letter of 11/6/2017. The Court, once again should note the

8

evasiveness in answering specific questions regarding the specifics of the corrective actions taken against the Plaintiff with the phrase, "you were provided all relevant and appropriate information." The Court should also note that the final warning given to the Plaintiff on 6/26/2017 was outside the one year range from the last written warning of 6/14/2016 and should not have been a "final" warning. This fact reveals the desperation of the Defendants, Ms. Lynce and Ms. Lerman, to manufacture an infraction by any means possible, grasping at straws and finally manufacturing a transparent infraction leading to a final warning that any reasonable person would label as outrageous.  [6 pages]

- 1/10/2018 Mandatory EAP Session with Jill Fulton-Royer.  Emails of contemporaneous notes of the meeting attached.

  o Document "R" are a series of emails with or concerning Jill Fullton-Royer, the head of the UH EAP.  The Court should note that Ms. Fulton-Royer was unaware of the liability involved under Title I of the ADA, when an employer mandates an employee into counseling, under threat of termination.  The Court should also note Ms. Fulton-Royer's admission that EAP counselling sessions stigmatize, humliate and degrade the employee.  [4 pages]

  o Document "S" is an email from the Plaintiff to Andrea Herrmann of the OCRC regarding the charge against UH for the unlawful, mandatory EAP counseling session on 1/10/218.  The OCRC charge was combined with the other two charges with the EEOC.  [2 pages]

9

- o  Document "T" is the UH Policy and Procedure, HR-85-Employee
  Assistance Program under which the Plaintiff received a Mandatory
  Referral under header 4.2. The Court should note that the employee's
  supervisor makes the non-medical diagnosis that the employee is
  "perceived or regarded as disabled" and requires a "treatment plan" from
  an EAP Counselor. The Court should also note that under heading 3
  "Counseling and/or treatment will not be viewed as a substitute for
  receiving corrective action." Thus mandatory referrals to the EAP, under
  Title I of the ADA, do not give the employee immunity from termination,
  so as not consistent with business necessity for the simple reason the
  employer, UH, only need focus solely on the performance or conduct
  problems and take appropriate steps, under UH policy [HR-72-Corrective
  Action], to address them, making mandatory referrals in the EAP
  completely superfluous.

## DISCUSSION

The Pro Se litigant set out the facts that encompass each of the above dates in the
original complaint submitted to the Court on May 20, 2019. There are three issues before
the Court: 1. A violation of Title VII for retaliation against a protected activity. 2. A
violation of Title I of the ADA in which the Plaintiff was forced to have an unlawful
medical exam that was neither job related nor consistent with business necessity. 3. A
violation of Title I of the ADA for the Plaintiff being "perceived" or "regarded" as
disabled.

10

The Plaintiff used email correspondence as a strategy. He engaged various UH representatives over his years of being scrutinized and harassed as a method of documentation, redress and as a means of defense against termination while he was being retaliated against. It was a way to both occupy UH representatives and make them think twice before taking action that would lead them to terminate the Plaintiff, causing economic and emotional harm to the Plaintiff and his family.

The Position Statement (Document "O") issued by Ms. Lynce on 11/1/2017 is a key document in the Plaintiff's complaint. The Position Statement, once again, consistently continues the false narrative by listing manufactured and embellished corrective actions. Each and every infraction cited by Ms. Lynce is refuted by the many responses and addendums written, in real time, by the Plaintiff and attached to the list of infractions in his personnel file. Ms. Lynce did not include those real-time rebuttals in the Position Statement.

Regardless, what stands out to any reasonable observer is the fact that Ms. Lynce never mentions the critical meeting of 8/5/2016 in the Position Statement, in which the Plaintiff was threatened as a method of retaliation for filing a charge of sexual harassment on 6/26/16. Although it was of prime importance during the meeting, Ms. Lynce never lists the humorous comment written on a time and attendance document as another example of the Plaintiff's intransigence, over which she and Mr. Glowczewski threatened the Plaintiff with corrective action in an overt and vitriolic threat. One would think that would make her list.

Most damning of all is that Ms. Lynce states, "It is unclear to UH what 'protected activity' Mr. Dundee references in his Charge, but UH has upheld our policies and

11

procedures according to law." What "protected activity" indeed; there is only one "protected activity" that resides in the Plaintiff's personnel file at UH and that would be the relatively recent sexual harassment charge filed with HR on 6/26/2016. Considering Ms. Lynce starts her list of infractions back to October, 2013, a reasonable person would think the "protected activity" might have bit her on the nose as she thumbed through the file.

Of course, if Ms. Lynce would overlook completely the meeting on 8/5/2016, the "purported" purpose of which was discussion of the investigation into the "protected activity" in order to both lure the Plaintiff to attend the meeting and mislead him on the real purpose, Ms. Lynce would be forced to overlook the "protected activity Mr. Dundee references in his charge." Once again, a reasonable person would surmise that a planned meeting which turned out to be the start of the severe revenge Ms. Lynce promised in opposition to the legal protections for his charge of 6/26/16, would be top-of-mind for Ms. Lynce and therefore part of the official record in the Position Statement to the EEOC.

### Violation of Title VII for Retaliation Against a Protected Activity

The Supreme Court has defined retaliation as an intentional act in response to a protected action. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005). Citing Jackson, the court in Gutierrez underscored the intentional nature of a retaliation complaint: "Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment." Gutierrez, 2005 WL 2346956, at *5. The complained of matter need not be a complaint; it can be any lawful conduct that an individual engages in connected with a protected

12

right. "The very concept of retaliation is that the retaliating party takes action against the party retaliated against after, and because of, some action of the latter." Fed. Mar. Bd. v. Isbrandtsen Co., 356 U.S. 481, 514 (1958). It carries with it the notion of "getting even."

The Supreme Court in *Meritor* did not address what conduct is sufficiently "severe" or "pervasive" to transform the workplace into a hostile work environment. In 1993, in *Harris v. Forklift Systems, Inc.*, however, the Supreme Court held that Title VII is violated when the workplace is permeated by discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of a victim's employment and create an abusive working environment.

Retaliation is a deliberate action used to send a clear message that complaining is unwelcome and risky. It is employed to instill fear in others who might consider making a complaint in the future. Those with cause for complaining are frequently among the most vulnerable in an institution. Once they complain, they are labeled "troublemakers." Retaliation, and the fear of retaliation, becomes a potent weapon used to maintain the power structure within the institution.

Simply put, The Supreme Court decided years ago that "adverse employment action" was virtually anything that would deter a reasonable person in the Plaintiff's shoes from engaging in protected activity. In layman's terms, that means "just about anything bad," as long as it isn't really trivial. That would include threats of increased surveillance and micromanagement, especially scrutiny of work performance or attendance.

When a private employer or a state/local government is the employer, the employee must meet the "but-for" causation standard. This means that the employee must show that

13

"but-for" the employer's intent to retaliate, the materially adverse action would not have taken place. In other words, if it weren't for the employee's protected activity, the employer wouldn't have taken a materially adverse action against the employee.

While this is a relatively high standard to meet, the employee doesn't need to prove the *only* reason for the retaliation was because of participation in a protected activity—just that it was at least *one* of the reasons for the retaliation.

The Court determined that whether a work environment is "hostile" or "abusive" depends upon a number of factors including the frequency of the discriminatory conduct, its severity, whether the conduct is physically threatening or <u>humiliating and whether the conduct unreasonably interferes with an employee's work performance.  Furthermore, the Court determined that whether the harassment seriously affected the worker's psychological well-being or had led her to suffer injury was not necessary to a finding of actionable harassment</u>

For there to be "protected activity," the evidence must show that a person opposed a recipient's actions that the person reasonably and in good faith believed violated Title VII or participated in a matter that reasonably or in good faith alleged a violation. Peters, 327 F.3d at 320-21; Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir. 1990); Kimmel, 639 F. Supp. 2d at 43. Opposition or complaints can be oral or written. Kasten v. Saint-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1336 (2011).

The evidence does not have to establish that the underlying act violated Title VII, only that the complainant reasonably and in good faith believed that the acts were discriminatory. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69-70

(2006); Peters, 327 F.3d at 321; Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) ("plaintiff must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'").

A complainant or agency could establish retaliation under one of two methods, elements of each are part and parcel of the Plaintiff's complaint. Under the first, the direct method of proof, complainants must "offer evidence that [they] engaged in a statutorily protected activity, that the defendants subjected [them] to an adverse employment action, and that a causal connection exists between the two events." Gates v. Caterpillar, Inc., 513 F.3d 680, 686 (7th Cir. 2008) (citing Treadwell v. Office of Ill. Sec'y of State, 455 F.3d 778, 781 (7th Cir. 2006)). Under this evidence method, a plaintiff must present evidence of discriminatory intent that does not require support from inferences.

The second method, indirect proof, involves use of circumstantial evidence that the individual's protected activity led to an alleged adverse action, either wholly or in part, in response to the individual's protected conduct. Temporal proximity between the complainant's protected activity and the recipient's adverse actions often is relevant to a determination of causation. See, e.g., Loudermilk v. Best Pallet Co., 636 F.3d 312, 315 (7th Cir. 2011) ("an adverse action [that] comes so close on the heels of a protected act that an inference of causation is sensible"); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) ("the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); Palmer, 918 F. Supp. 2d at 199 (allegation that denial of tenure "swiftly followed" complaint about

15

discrimination supported claim of retaliation). There is no bright line rule, however; "the answer depends on context," Loudermilk, 636 F.3d at 315; and temporal proximity is not dispositive. See, e.g., Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 894 (3d Cir. 1993) ("mere passage of time is not legally conclusive proof against retaliation."). "When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." Krouse, 126 F.3d at 503-04.

A plaintiff suing under Title VII's *anti-retaliation* provision must demonstrate that the adverse employment action "might well dissuade a reasonable worker from making or supporting a charge of discrimination." The definition of adverse employment action under a Title VII retaliation claim is less demanding (and thus easier to meet for employees) than a claim of discrimination.

The retaliatory, adverse action taken against the Plaintiff by the Defendants, Danialle Lynce and Rachael Lerman, on 6/26/2017, must be recognized as being directly connected to the threats of adverse action issued on 8/5/2016, by Ms. Lynce and Mr. Glowczewski.

Ms. Lynce and Ms. Lerman, waited months after the meeting on 8/5/2016, to file an adverse employment action against the Plaintiff on the one-year anniversary date of the Plaintiff's filing of sexual harassment charges on 6/26/2016 against Ms. Lerman. This action was both transparent and too clever by half. The effort by Ms. Lynce and Ms. Lerman to allow as much time to elapse as possible, in order to disassociate the timing of the adverse action on 6/26/2017, from the threats of retaliation issued on 8/5/2016, as well from the protected activity, the sexual harassment charge of 6/26/2016, does not

16

nullify the causal link to prove retaliation; in fact it exposes their lack of sophistication and their abundance of hubris.

A reasonable person might ask, "When does a threat expire?" Once the overt and vitriolic threats of increased scrutiny, corrective action and termination were issued by Ms. Lynce and Mr. Glowczewski on 8/5/2016, the time limit on a "casual link between the activity and adverse action" became irrelevant. Any adverse action carried out by the Defendants against the Plaintiff, let alone the desperate, specious, manufactured reasons over the phrases "You're a good kid," "He's a pup with little experience. A nice boy, but," for the corrective action on 6/26/17, has to be viewed as a fulfillment of the promised threats of corrective action leading to termination, in retaliation for filing the sexual harassment charge.

Ms. Lynce and Mr. Glowczewski could only issue threats at the meeting on 8/5/2016. They could not take "official" action at the very meeting the Plaintiff was lured to under the impression it was to discuss the investigation into the Plaintiff's claim of sexual harassment against Ms. Lerman. Had they taken an "official" corrective action, it would be viewed as an "adverse action." In fact, Ms. Lynce and Mr. Glowczewski intended to keep the meeting a secret by phoning the Plaintiff at work around 10:15 p.m. on 8/4/2016, a mere nine hours before the 7:00 a.m. meeting on 8/5/2016.

Ms. Lynce and Mr. Glowczewski were too clever by half in their plans because Mr. Glowczewski was overheard on the night of 8/4/2016, at 10:15 p.m. by pharmacist Phillip Snyder, as the Plaintiff took the call on speakerphone. In addition, the promise of "increased scrutiny" going forward issued by both Ms. Lynce and Mr. Glowczewski on 8/5/2016, is in and of itself an "adverse action" in the law, viewed as retaliation. Since

17

this activity is harassment, the time limit according to the EEOC is waived, since claims of harassment, once filed, go from the most recent claim, back to the beginning of the harassment against the employee.

## ADA VIOLATIONS

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

The action,  42 U.S.C. § 12112(d)(4)(A), was enacted to ensure that employers do not require medical tests or make disability-related inquiries of employees that do not serve a legitimate business interest. *Ward v. Merck & Co.*, No. Civ. A. 04-CV-5996, 2006 WL 83114, at *8 (E.D. Pa. Jan. 9, 2006) (quoting 56 Fed. Reg. 35,726, 35,750 (July 26, 1991)). In light of the Sixth Circuit's decision, the Court must assume for purposes of WLAA's motion that the psychological counseling that Binns ordered constitutes an "medical examination" for purposes of § 12112(d)(4)(A).

Equal Employment Opportunity Commission (EEOC)  advises that an examination is permissible where the employer "has a reasonable belief based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition." EEOC, Enforcement Guidance: Disability-Related Inquiries and Med. Examinations of Employees Under the Americans With Disabilities Act, No. 915.002

18

(July 27, 2000) ¶ 5, available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html. (last visited May 15, 2013); *see also Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007) ("An employer's request for a medical examination is job-related and consistent with business necessity when: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others."). A medical examination is permissible only if there is "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999). Behavior that is "merely annoying or inefficient" cannot justify a request for an exam. *Id.*

The employer bears the burden of demonstrating job-relatedness and business necessity. *See Fredenburg v. Contra Costa Cnty. Dep't of Health Servs.*, 172 F.3d 1176, 1182 (9th Cir. 1999) (noting that the language of § 12112(d)(4)(A) "places the burden on the covered entity . . . to make the requisite showing"); *Miller v. Whirlpool Corp.*, 807 F. Supp. 2d 684, 687 (N.D. Ohio 2011) ("The employer has the burden of showing job-relatedness and business necessity.") (citing *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97-98 (2d Cir. 2003)).

The EEOC Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees defines "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health." R. 52–3 (EEOC, Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees, at 5–6).

The guidance further explains that "psychological tests that are designed to identify a mental disorder or impairment" are "medical examinations," while "psychological tests that measure personality traits such as honesty, preferences, and habits" are not. Id. This explanation is in keeping with the EEOC's recognition in its Enforcement Guidance on Psychiatric Disabilities that "[t]raits or behaviors are not, in themselves, mental impairments." EEOC, Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (1997), http:// www.eeoc.gov/policy/docs/psych.html.

Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111-12117, makes it unlawful for an employer to "require a medical examination" or to "make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  Id. § 12112(d)(4)(A). According to the Equal Employment Opportunity Commission ("EEOC"), this means that an employer should not make disability-related inquiries or require a medical examination of an employee unless the employer "has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition.  In addition, the courts have pointed out the dangers of requiring an employee to undergo a medical examination based on the subjective observations of a nonmedical supervisor, such as a supervisor of HR representative, EEOC v. McLeod Health, Inc., No. 17-2335, 2019 WL 385654 (4th Cir. Jan. 31, 2019).

In Painter v. IDOT,  the Seventh Circuit's decision began by noting an employer's high burden of establishing that compelled medical examinations are job-related and

consistent with business necessity, stating that "a medical examination is job related and consistent with business necessity if the employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform the essential job functions or that the employee will pose a threat due to a medical condition." Simply being "annoying" or "inefficient" would not justify an examination.

The United States Court of Appeals, Sixth Circuit, in Bates vs. Dura Automotive, an employer's emphasis on a diagnostic purpose aligns with the EEOC definition of medical-examination and links that term to its sister term, disability inquiries. See DRI & ME Guidance (looking to whether the "procedure or test seeks information about an individual's physical or mental impairments or health"); 42 U.S.C. § 12112(d)(4)(A) (prohibiting medical examinations and inquiries "as to whether such employee is an individual with a disability or as to the nature or severity of the disability"). The "uncovering of [health] defects at an employer's direction is the precise harm that § 12112(d)(4)(A) is designed to prevent." Kroll, 691 F.3d at 819.

University Hospitals Health Systems, Inc., in their Policy and Procedure handbook, has explicitly adopted, under HR-85-Employee Assistance Program (EAP), subheading 4.2 Mandatory Referral (see Document "T"), a policy in which the employee's supervisor's subjective opinion is the sole criteria needed to mandate an employee to meet with an EAP counselor, including a 3 hour psychiatric examination and to comply with all EAP counselor recommendations, including a "treatment plan," all of this under threat of termination. This policy of mandatory EAP counseling sessions and mandatory psychiatric examinations, is policy for all 28,000 employees across all UH campuses. The policy has been in effect since at least 2003 and remains unchanged to this moment,

despite UH being made aware the "required" EAP counseling sessions constitutes a medical exam under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111-12117

The Courts have decided in Kroll v. White Lake Ambulance, No. 13-1774 (6th Cir. Aug. 19, 2014), EEOC v. McLeod Health, Inc., No. 17-2335 (4th Cir. 2019),  Bingman v. Baltimore County, 4th Cir., No. 17-1525, Hannah P. v. Coats, No. 17-1943 (4th Cir. Feb. 19, 2019), that employers must have their "ducks in a row" to make sure any required counseling is job-related and consistent with business necessity.

Employers should have sound and documented justification that explains why a medical exam is needed for an employee to perform his or her job.  Thus, any decision to send an employee for counseling now must be carefully scrutinized.  UH, by having a mandatory policy, within their progressive discipline process, that results in an automatic referral into EAP counseling, reveals an "institutional perception" that assumes the employee must have issues, mental or physical, that require counseling by an EAP counselor.   The UH mandatory policy of EAP counseling thus ignores EEOC law concerning "perceived disabilities" as well as EEOC law on allowable medical examinations.

Generally speaking, the ADA protects individuals who meet the act's definition of being "disabled." Individuals may be considered "disabled within the meaning of the Act" and therefore qualify for ADA protection in three circumstances: if the individual (1) has "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is "being regarded as having such an impairment (as described in paragraph (3)." 42 U.S.C.

22

12102(1). But an employee need not be disabled in order to benefit from the medical examination provision. Subsection (d)(4) protects all employees from medical inquiries, regardless of whether they have a qualifying disability. UH's policies disregard the ADA protections.

The "regarded as disabled" test, is a particularly interesting facet of the ADA. The test focuses less on the extent of an individual's actual impairment and more on how others perceive the individual, as well as the effect of those perceptions on the attitudes toward, and assumptions about, the individual's abilities. The ADA regulations provide that an individual is "regarded as disabled" if she: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has none of the impairments specified in the ADA subsection,5 but is treated by an employer as having a substantially limiting impairment. Therefore, an individual will be "regarded as disabled" when others behave toward that individual as if she had a substantially limiting impairment, regardless of whether the individual actually has such an impairment.

Under UH's Policy & Procedure HR-85, 4.2 Mandatory Referral (Document "T") into EAP counseling, it is implicit in any reasonable reading, that the employee is "perceived" or "regarded" as disabled by the immediate supervisor, requiring, in the supervisor's non-medical diagnosis, a mandatory intervention by an EAP counselor. This is regardless of the conduct or performance issue in question. The policy also ignores the fact that an employer may choose to focus solely on the performance or conduct

23

problems, under UH Policy, HR-72, Corrective Action, and take appropriate steps to address them, without a mandatory referral into counseling, making such a policy as UH HR-85, 4.2, completely unnecessary. Especially when the policy of mandatory EAP referral is easily abused, changing a seemingly benign idea like "employee assistance" into a weapon of harassment; a cudgel which is an affront to human dignity, by embarrassing and degrading the employee. A reasonable person could conclude that exposure to the indignities inherent in HR-85, 4.2, would cause the employee to resign or be terminated, rather than submit to a mandatory medical examination that "perceives" or "regards" the employee as defective in some capacity.

The Court should take note of an email, dated January 10, 2018, to Heather Harmon, VP, UH Human Resources, under the subject heading, "This really happened," attached (Document "R"). The email discusses the actions of the Head of the UH EAP Department, Jill Fulton-Royer, prior to a mandatory EAP counseling session with the Plaintiff. Ms. Fulton-Royer, *herself the head of the EAP*, exposed the stigma that is attached to mandatory EAP referrals. During Discovery, as the class membership is ascertained, the Court should note the number of class members who resigned or who were terminated BEFORE submitting to the humiliation of mandatory EAP counseling. A reasonable person might wonder if such humiliation might trigger thoughts of suicide in susceptible individuals.

UH Policy, HR-72, Corrective Action, has primacy over each and every scenario in which an employee can have performance or conduct problems; rendering Policy & Procedure HR-85, 4.2 Mandatory Referral into EAP counseling unnecessary. In fact, the policy states, under HR-85-3, "A request for EA services will not jeopardize an

24

employee's job security or employment opportunities. Counseling and/or treatment will not be viewed as a substitute for or a defense to receiving corrective action." The Court should note that this *explicit* language is an admission on the part of UH that no type of counseling, neither voluntary, nor mandatory, has any effect whatsoever in mitigating the consequences when an employee is in corrective action, under UH Policy, HR-72, Corrective Action.

The range of employee behavior that can land any UH employee into a Mandatory Referral under HR-85, 4.2 is without limit. Under Attachment A, the range is from violent behavior, to "other." All such behavior is addressed under UH Policy, HR-72, Corrective Action. Even when the ADA permits an employer to seek medical information or require a medical examination, it still may be difficult to determine if that is an appropriate course of action. It is advisable for employers to determine whether simply addressing the problem without such information will be effective. Yet institutional hubris on the part of UH, even when knowingly exposed to the legal consequences for violations of Title I of the ADA through EEOC complaints and recent court decisions that warn of the consequences of mandatory EAP referrals, insists on stubbornly maintaining a policy that thumbs its nose at Title I of the ADA.

## Conclusion

Retaliation itself may not be illegal. Retaliation is only illegal when the action that precedes the retaliation is protected by law. According to the law, even if an employee sues an employer for retaliation against a protected activity and the employer wins on the facts, the employer can still lose on the reported retaliation if the employer treated the complainant poorly. In the complaint before the Court, the employer is both in jeopardy

25

on the facts and on the poor treatment of the Plaintiff.  The Plaintiff in this complaint did not even have to use the magic words "sexual harassment," as the facts demonstrate that he did use before the UH department of Human Resources, to receive legal protection for his actions.  The employer's revenge against Mr. Dundee, including humiliating and degrading mandatory unlawful medical examinations, for making a claim of sexual harassment was severe and did, in fact, make Mr. Dundee's work life and personal life miserable.  For that reason, the Court should consider the maximum in punitive damages, for an employer that size of UH under EEOC guidelines, for each of the three violations, one under Title VII and two under Title I of the ADA, as awards in this complaint in order to serve as a wake-up call against the "institutional hubris" of well resourced, repeat player employers and their representatives who abuse the system of justice against employees.

Respectfully Submitted,

Frank Dominic Dundee

7707 Amberwood Trail

Boardman, Ohio 44512

330-398-8274  fdundee@gmail.com

26