Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4              ~~~~~~~~~~~~~~~~~~~~~~

5     FRANK DOMINIC DUNDEE,

6                 Plaintiff,

7          vs.          Case No. 1:19CV01141

8     UNIVERSITY HOSPITALS

9     CORPORATION, et al.,

10                Defendants.

11             ~~~~~~~~~~~~~~~~~~~~~~

12                 Deposition of

13                 FRANK D. DUNDEE

14

15

16

17

18              March 10, 2020

19                 9:30 a.m.

20

21              Taken at:

22          7707 Amberwood Trail

23             Boardman, Ohio

24

25          Cynthia Sullivan, RPR

Page 2

1    APPEARANCES:

2

3         On behalf of the Plaintiff:

4              FRANK D. DUNDEE, PRO SE

5              7707 Amberwood Trail

6              Boardman, Ohio  44512

7              (330) 398-8274

8              fdundee@gmail.com

9

10        On behalf of the Defendants:

11             Giffen & Kaminski, by

12             RACHAEL L. ISRAEL, ESQ.

13             1300 East Ninth Street

14             Suite 1600

15             Cleveland, Ohio  44114

16             (216) 621-5161

17             risrael@thinkgk.com

18

19                  ~ ~ ~ ~ ~

20

21

22

23

24

25

1                    TRANSCRIPT INDEX

2

3    APPEARANCES................................    2

4

5    INDEX OF EXHIBITS ........................    4

6

7    EXAMINATION OF FRANK D. DUNDEE:

8    By Ms. Israel............................    5

9

10   REPORTER'S CERTIFICATE....................  116

11

12   EXHIBIT CUSTODY

13   EXHIBITS RETAINED BY COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

```
                                          Page 4
 1                    INDEX OF EXHIBITS
 2     NUMBER              DESCRIPTION            MARKED
 3    Exhibit 1     A Document Bates Labeled .....   8
                    UH-Dundee 0108
 4
      Exhibit 2     The Defendant's First Set of .  59
 5                  Requests for Admission to
                    Plaintiff
 6
      Exhibit 3     The Defendant's First Set of .  62
 7                  Interrogatories to Plaintiff
 8    Exhibit 4     A Document Bates Labeled ..... 103
                    UH-Dundee 0036
 9
      Exhibit 5     A Document Bates Labeled ..... 104
10                  UH-Dundee 0204 through 0207
11    Exhibit 6     A Document Bates Labeled ..... 106
                    UH-Dundee 0208 through 0211
12
      Exhibit 7     A Document Bates Labeled ..... 107
13                  UH-Dundee 0212
14    Exhibit 8     A Document Bates Labeled ..... 108
                    UH-Dundee 0276 through 0279
15
      Exhibit 9     A Document Bates Labeled ..... 109
16                  UH-Dundee 0092
17    Exhibit 10    A Document Bates Labeled ..... 110
                    UH-Dundee 0117
18
      Exhibit 11    A Document Bates Labeled ..... 111
19                  UH-Dundee 0118
20    Exhibit 12    A Document Bates Labeled ..... 112
                    UH-Dundee 0152
21
22
23
24
25
```

Page 5

1          FRANK D. DUNDEE, of lawful age, called

2      for examination, as provided by the Federal

3      Rules of Civil Procedure, being by me first

4      duly sworn, as hereinafter certified, deposed

5      and said as follows:

6              EXAMINATION OF FRANK D. DUNDEE

7      BY MS. ISRAEL:

8          Q.    Good morning, Mr. Dundee.

9          A.    Good morning, Rachael.

10         Q.    As you know, I represent University

11     Hospitals Geauga Medical Center in the lawsuit

12     that you filed against that hospital, and I'm

13     going to be taking your deposition today.

14             Have you ever had your deposition

15     taken before?

16         A.    No.

17         Q.    Have you ever testified under oath

18     before in any format?

19         A.    Yes.

20         Q.    Tell me about that.

21         A.    It was in an arbitration hearing,

22     maybe several of them, that I had to testify

23     under oath.  I was an officer in a labor union.

24         Q.    The deposition that you're going to

25     be giving today is under oath as you know.  You

Page 6

1  were just sworn in.  It may look like a

2  conversation, but it's different than a normal

3  conversation in a few important ways.  One way

4  that it is different is that you must answer

5  verbally.  A shake of the head or uh-huh or

6  uh-uh is not easily transcribed by our court

7  reporter here, so try to remember to say yes,

8  no, or answer verbally.

9           Secondly, you are under oath, as I

10  mentioned, so that's different than a normal

11  conversation.  Thirdly, a normal conversation

12  is a two-way street.  This deposition is more

13  of a one-way street.  I'll ask questions, and

14  you will answer them.  Do you understand that?

15       A.    I do.

16       Q.    Do you have any questions before we

17  get started?

18       A.    No.

19       Q.    Do you currently have any

20  disabilities?

21       A.    Yes.

22       Q.    What is your disability?

23       A.    I have a motor -- upper motor

24  neuron disease called hereditary spastic

25  paraplegia.

Page 7

1          Q.     Is that disability a part of this

2     lawsuit?

3          A.     It is not.

4          Q.     Does this case here involve any

5     claims of discrimination relating to that

6     disability?

7          A.     It does not.

8          Q.     This case does not involve any

9     claims of failure to accommodate with regard to

10    that disability, correct?

11         A.     It does not.

12         Q.     There is no allegation in this case

13    that University Hospitals failed to engage in

14    the interactive process with regard to that

15    disability; am I right?

16         A.     Correct.

17         Q.     The first claim in your complaint

18    is for retaliation in violation of Title VII;

19    is that correct?

20         A.     Yes, that is.

21         Q.     What protected activity did you

22    engage in?

23         A.     I filed a sexual harassment charge

24    against my immediate supervisor.

25         Q.     Who was that?

```
                                          Page 8
 1          A.      Rachael Lerman.
 2          Q.      I'm going to hand you what I've
 3    marked as Defendant's Exhibit 1.
 4                         -   -   -   -   -
 5                  (Thereupon, Deposition Exhibit 1, a
 6                  Document Bates Labeled UH-Dundee
 7                  0108, was marked for purposes of
 8                  identification.)
 9                         -   -   -   -   -
10          A.      I'll take that.
11          Q.      Do you recognize that document?
12    Take a few minutes if you'd like to look over
13    it.
14          A.      I'm ready.
15          Q.      Do you recognize that document?
16          A.      Yes, I do.
17          Q.      What is it?
18          A.      It was my charge that I sent to HR
19    representative Rebecca Besselman.
20          Q.      That was of?
21          A.      Sexual harassment.
22          Q.      This email is dated June 23rd,
23    2016; is that correct?
24          A.      Yes, it is.
25          Q.      Does that fit your recollection of
```

Page 9

1    when you first reported your charge of sexual

2    harassment to University Hospitals HR?

3         A.    I'm not sure.  I'm not sure if that

4    is the exact first thing.

5         Q.    Do you think there might have been

6    a report that occurred prior to this email?

7         A.    I'm not sure.

8         Q.    You can set that aside.

9         A.    Sure.

10        Q.    Who retaliated against you for

11   reporting the sexual harassment?

12        A.    It was Jason Glowczeski and

13   Danialle Lynce.

14        Q.    Was there anyone else that you can

15   think of?

16        A.    Not at this moment I can't think of

17   anyone else.

18        Q.    What did Jason do to retaliate

19   against you for reporting the sexual harassment

20   complaint?

21        A.    He threatened me with discharge at

22   a meeting.

23        Q.    Do you recall the date of that

24   meeting?

25        A.    It was August 5th, 2016.

1        Q.    Did he actually discharge you?

2        A.    He did not.  He threatened me.

3        Q.    Did he do anything else that you

4 view as retaliation for engaging in your

5 protected activity?

6        A.    Could you clarify that statement,

7 please?

8        Q.    Sure.  You identified Jason and

9 Danialle as two people who retaliated against

10 you for engaging in protected activity.  I'm

11 asking what did Jason do that in your mind

12 constitutes retaliation.

13        A.    It was his threats.  It was his

14 threats that I perceived as being a material

15 adverse action.

16        Q.    He threatened to terminate you?

17        A.    That is correct.

18        Q.    What exactly did he say as best as

19 you can recall?

20        A.    I think that that is documented in

21 several documents as to what he said, and I

22 think that you have them already, and I would

23 say that those documents are the most accurate

24 description of what transpired at the time.

25        Q.    I understand that.  Can you tell me

1    as you sit here today what you recall?

2         A.    What I recall of that meeting?

3         Q.    What you recall regarding Jason's

4    threats to you.

5         A.    I recall Jason having a time and

6    attendance exception sheet, or at least I was

7    told that's what he had in his hand because I

8    was never presented with it, and he stated that

9    if I ever wrote another note on a sheet like

10   that or any type of note going forward, that I

11   would be subject to termination.

12        Q.    Did he specify the nature of the

13   note or the tone of the note that he did not

14   want you to make in the future?

15        A.    He did not.

16        Q.    What did Danialle Lynce do to

17   retaliate against you?

18        A.    Ms. Lynce had a pile of records

19   from my personnel file on her desk in front of

20   her, and she read from various statements that

21   I had made in past addendums to disciplines or

22   to evaluations that were substandard that were

23   realtime replies to my -- to whatever the

24   discipline was or the substandard evaluation,

25   and she picked sentences out of context, read

1    them to me, and said that if I ever made

2    statements like that again, I would be

3    terminated.

4         Q.    Other than that, did she do or say

5    anything else that you view as retaliation?

6         A.    Once again, the most accurate

7    description is in the documents that I did in

8    realtime.  As soon as the meeting was over, I

9    went out to my car, I had a notebook in there,

10   and I started writing down, and I think it was

11   19 points I came up with, each one of those

12   19 points, and I tried to put the exact time

13   that I put them in.

14             I came home with that, and I

15   immediately transcribed it to an email that I

16   sent to the attorney that I was consulting on

17   my sexual harassment charge.  So those are the

18   most accurate documents, and, once again, they

19   are in your possession.

20        Q.    I understand and appreciate that,

21   and I'm going to be asking you a number of

22   questions today without those documents in

23   front of you.  What I'd like you to do is try

24   to focus on what your best recollection is as

25   you sit here today.  I appreciate that there

1    are documents that we could consult and we may

2    consult, but unless I ask you to refer to a

3    document, what I'm just looking for is your

4    best recollection today.  Do you understand?

5            A.    Yes, I understand.

6            Q.    Is there anything else that you can

7    think of that Danialle Lynce did to retaliate

8    against you?

9            A.    It was just a promise of increased

10   scrutiny going forward, and at one point I had

11   asked to leave the meeting because the purpose

12   of the meeting, the purported purpose of the

13   meeting the night before when Jason Glowczeski

14   invited me to this meeting that was less than

15   12 hours away that I had no idea about was to

16   discuss my sexual harassment charge, and the

17   interesting thing about that was that all

18   during their investigation, no one ever spoke

19   to me about my sexual harassment charge, and I

20   expressed that to Jason when he called.  I

21   said, Yes, I'd be interested in going to a

22   meeting with you and Danialle Lynce in her

23   office.

24            When I went into her office,

25   Danialle Lynce spent about five minutes saying

1    to me that my charge wasn't timely, and I

2    should have come forward sooner with it.  Then

3    after those five minutes, for the approximately

4    next 15 to 20 minutes, she kept going through

5    documents that she had in front of her and

6    telling me that if I ever write anything like

7    whatever she read again, I'm going to be

8    subject to termination.

9            I said to her at the time, I said,

10   Those were addendums that I was allowed to

11   write under UH code of conduct.  I said, You're

12   telling me that I'm not allowed to write

13   something that's allowed, to write an addendum,

14   write my side of the story.  Then at that point

15   I said, I recognize this as pushback against me

16   for filing my charge of sexual harassment, and

17   I would like to leave.  She said, Sit down.

18   I'm not finished yet.

19            So it continued in a badgering

20   manner for the next, like I said, 15 minutes.

21   Mr. Glowczeski was silent during this time.  He

22   was sitting across from me.  Once again, he had

23   a document in his hand, and it was purported to

24   be the time and attendance exception form.  He

25   said that if I ever wrote on that again, that I

1    would be subject to termination.  I asked for a

2    copy of that, and Ms. Danialle Lynce said that

3    she would not give me a copy of it.

4              So the meeting lasted, like I said,

5    approximately 20, 25 minutes.  At the end of

6    it, I ran out to my car, and I made

7    contemporaneous notes.  I came home within the

8    hour, wrote to my attorney, transcribed the

9    contemporaneous notes, and that's it.

10        Q.    Other than comments that Danialle

11   made during that August 5th, 2016, meeting, did

12   she take any other action or make any other

13   statements that you view as retaliatory?

14        A.    I can't recall sitting here right

15   now all the statements that she made.  Her

16   demeanor was very threatening.  Just her

17   general demeanor was very threatening

18   especially when she told me that I was not

19   allowed to leave and to sit back down and she

20   wasn't through.

21        Q.    Mr. Dundee, maybe we should have

22   the court reporter read the question back

23   because I don't think you understood what I

24   asked.

25        A.    Go ahead.

1          (Record read.)

2          Q.    I'm looking for comments that she

3     made other than or evidence that you have other

4     than the comments that Danialle made during

5     that meeting.

6          A.    Once again, I'd refer to my

7     contemporaneous notes which I don't have in

8     front of me right now, so I can't be

9     100 percent sure if she didn't say something

10    else or she did.  I do recall what I just said.

11    So I'm not saying that my memory of the

12    occasion is as accurate as what my

13    contemporaneous notes say.  So whatever I tell

14    you now, I don't recall her saying anything

15    else, but she may have said something else that

16    I took down in contemporaneous notes.

17         Q.    Other than the August 5th, 2016,

18    meeting, which I'd like you to set aside for

19    this moment, did Danialle Lynce do or say

20    anything that you view to be retaliatory?

21         A.    Could you clarify that?  Like what

22    time period are we talking about?

23         Q.    Anytime after August 5th, 2016.

24         A.    Yes, she did.

25         Q.    What else did she do that was

1    retaliatory?

2          A.    On June 26th, 2017, she called me

3    to her office.  I had just returned from

4    vacation in Florida.  It was 9:00 p.m. at

5    night, and the phone rang.  I had just got off

6    an airplane about an hour earlier, and I had

7    rushed to work.

8              The phone rang, and it was human

9    resources, and Danialle Lynce said that -- once

10   again, I can't -- I may be paraphrasing.  She

11   said that could I come upstairs because I had

12   committed an infraction, and they were going to

13   have a discipline hearing at that time at 9:00

14   at night, and I went upstairs, and that was

15   that.  I went to the discipline hearing, and

16   that was the answer to your question.

17         Q.    What happened at the discipline

18   hearing that was retaliatory?

19         A.    I was disciplined in a final step

20   over words that I had written in an email to HR

21   representative Rebecca Besselman, in two emails

22   specifically, over phrases.  In the one email

23   referring to Ms. Besselman who was a friend of

24   mine I said you're a good kid, and in another

25   email in which I was referring to a young

Page 18

1   pharmacist who was assigned to help me

2   implement cost saving suggestions that -- three

3   cost saving suggestions that I had given to

4   University Hospital, and I was explaining to

5   Rebecca in that email that this young man

6   really didn't understand how to implement these

7   suggestions and could she help me.

8           I said he's -- and I didn't want to

9   get him in trouble for saying that.  I said,

10  He's a pup with little experience, a nice boy

11  but -- and they wrote me up for those three

12  phrases.  They said it violated their diversity

13  policy.

14      Q.   Is there anything else that

15  Danialle Lynce did that you view as

16  retaliatory?

17      A.   The promise of increased scrutiny

18  in the meeting of 8-5-16 was an open-ended

19  threat.  So for the entire time period going

20  forward, I felt I was under increased scrutiny

21  because it was promised that I would be under

22  increased scrutiny.

23           So Danialle Lynce didn't have to

24  actually in my opinion do anything to me.  She

25  had put this threat over my head going forward,

1    and it affected every day of my life going

2    forward on the job after that.

3           Q.    Is there anything else that you can

4    think of as you sit here today that Danialle

5    Lynce did or said that is retaliatory?

6           A.    Nothing else.

7           Q.    What about Jason?  Other than

8    statements made at the August 5th, 2016,

9    meeting, is there anything that Jason did or

10   said that you view as retaliatory?

11          A.    No.

12          Q.    We've talked about Jason.  We've

13   talked about Danialle.  Have you thought of

14   anyone else that did or said anything during

15   your employment that you view as retaliatory?

16          A.    Ms. Lerman was part of the

17   discipline hearing on June 26th, 2017, so for

18   her participation in that meeting, I would view

19   it as retaliation.

20          Q.    Is there anything else that Rachael

21   Lerman did other than participate in that

22   June 26th discipline meeting and issue the

23   corrective action to you that you view as

24   retaliatory?

25          A.    At this moment I can't think of

Page 20

1    anything.

2         Q.    With regard to Jason's conduct at

3    the August meeting, why do you believe that

4    there was a connection between your filing of a

5    sexual harassment claim and Jason's conduct?

6         A.    The purported meeting when he

7    called on August 4th, 2016, and he called

8    around 10:00 at night, and he asked if I

9    would -- and I had this on speaker phone, and

10   it was witnessed by a fellow pharmacist, Phil

11   Snyder.  He said, Frank, would you be able to

12   come to a meeting tomorrow morning with

13   Danialle Lynce?  I said, Yes.  I go, But what

14   is the meeting about?  He says, It's about the

15   charge that you filed.  I said, Yes, I would be

16   glad to attend a meeting because I've never met

17   with anybody over it.  I says, I understand

18   that they dismissed it.  Jason said that that

19   was what the meeting was about.

20              When I went in there, like I said,

21   five minutes of the meeting was about

22   discussing the untimeliness of my charge, and

23   then the rest of the meeting was spent

24   threatening me.

25         Q.    So other than the fact that those

1    two topics were discussed by Jason in the same

2    meeting, is there anything in your mind that

3    connects his actions with your protected

4    activity?

5           A.    It's all connected to the protected

6    activity because the basis of the meeting was

7    to discuss that protected activity.  So it's

8    all connected to that.  He never said we're

9    going to discuss -- we're going to have a

10   discipline hearing or anything like that.  He

11   just said the meeting was about discussing my

12   charge of sexual harassment against Ms. Rachael

13   Lerman.  There was no discussion at

14   this -- there was no preview that this was

15   going to be any type of meeting in which I was

16   going to be disciplined in any way.

17          Q.    With regard to Danialle Lynce, what

18   is it that creates a connection in your mind

19   between your protected activity and her conduct

20   and comments?

21          A.    I will repeat the same thing that I

22   repeated for Jason.  The meeting was supposed

23   to be about a discussion of my sexual

24   harassment charge, and it turned into for the

25   majority, the vast majority of the time, into a

1    meeting, a vitriolic meeting in which I was

2    threatened.

3         Q.    What about Rachael Lerman, what

4    connects her conduct with your protected

5    activity in your mind?

6         A.    Her participation in the June 26th,

7    2017, discipline hearing.

8         Q.    Why is her participation in that

9    meeting connected in your mind to your

10   protected activity?

11        A.    Why is it?  Because it wasn't a

12   coincidence that on June 26th, 2016, I filed

13   the charge of sexual harassment.  It was one

14   year to that date, and that wasn't lost on me.

15   It was also the preposterous nature of what I

16   was being disciplined for.

17        Q.    Now, we've just seen in Exhibit 1

18   that the first time you raised a sexual

19   harassment claim that we have documentary

20   evidence of was on June 23rd, 2016; is that

21   right?

22        A.    I wasn't sure of if that was first

23   or second or what.  I'm not sure of that, so I

24   can't say that for sure.  I know for sure my

25   complete charge was on June 26th where I really

Page 23

1    elaborated on what happened.

2         Q.    What is it about Danialle's

3    participation in the June 2017 discipline

4    meeting that connects to your protected

5    activity?

6         A.    Once again, it's connected to the

7    threats that were levied against me on 8-5-2016

8    and the preposterous nature of the discipline

9    on June 26th, 2017.

10        Q.    You've already addressed the three

11   comments that were documented in the June 2017

12   corrective action, correct?

13        A.    Yes.   I mean, I may not have given

14   them, I may have paraphrased them, but that's

15   what they were.

16        Q.    They were the two comments relating

17   to pharmacist Derek Frost and to HR staff

18   member Becky Besselman, correct?

19        A.    That is correct.

20        Q.    Did they also discuss with you at

21   that meeting prior comments that you had made

22   that were deemed inappropriate?

23        A.    In which meeting are you talking

24   about?

25        Q.    During the June 2017 meeting during

 1    which you got your corrective action.

 2         A.    No.   There was nothing else

 3    discussed as far as -- as far as anything

 4    beyond those three -- beyond those three

 5    phrases, not that I recall.

 6         Q.    But the corrective action itself

 7    dated June 26th, 2017, indicates that the

 8    comments we just discussed are "unwarranted and

 9    add no value in the working relationships.

10    You've made similar disparaging comments in the

11    past dating back to 2015, and this points to a

12    pattern of actions and behaviors that detract

13    from our values and policies."

14              Do you remember seeing that in your

15    corrective action?

16         A.    You just read it to me.  I do not

17    recall reading that in there.  I just remember

18    at the time, once again, I was ambushed, so I

19    had no time at all to -- to really get my

20    bearings.

21              The biggest things that I

22    understand were those three phrases.  That was

23    why I was there.  I thought it was preposterous

24    at the time.  I didn't say as much to them

25    because I think they wanted me to do something

Page 25

1    that was actionable, and I did not say a word
2    to them really.
3              I do not recall reading that at
4    that meeting because Ms. Rachael Lerman did all
5    the reading at that meeting, and whatever she
6    said that I had done previously or whatever,
7    I've addressed anything previously with
8    addendums to any type of discipline or
9    corrective action that they did to me in the
10   past that I was made aware of.
11        Q.   So Rachael and Danialle may have
12   discussed your similar prior comments during
13   that meeting, but you just don't recall as you
14   sit here today?
15        A.   I don't think that they did discuss
16   that.  I think that they discussed those three
17   things, and then they discussed the mechanics
18   of I was being mandated into the Employee
19   Assistance Program counseling sessions, and
20   they were talking about the mechanics and how
21   soon I had to contact the EAP personnel.  That
22   was -- that was what I really took away from
23   the meeting.
24        Q.   So in connection with your
25   retaliation claim, have we covered all of the

Page 26

1    actors, all of the people who engaged in

2    retaliation, and all of the conduct that you

3    believe was retaliatory?

4         A.    I'm not sure if we covered

5    everybody.  We've covered everybody that I have

6    in my motion for summary judgment.  There may

7    be other people who were involved behind the

8    scenes that may have been revealed in a

9    deposition.  However, I chose not to depose

10   anybody because I think that all that it would

11   add was noise.  So as far as my summary

12   judgment is concerned, we have discussed the

13   people.

14        Q.    Thank you.  I want to move next to

15   your ADA claim, specifically that your referral

16   to the Employee Assistance Program violates the

17   ADA.  Are you familiar with that claim?

18        A.    Yes, I am.

19        Q.    What is it about your referral to

20   the EAP that you find objectionable?

21        A.    Once again, you want me to state

22   something that's -- that's already stated in my

23   summary judgment and in other documents that I

24   stated more clearly than I'm capable of stating

25   right now.  So anything that I would say right

Page 27

1    now is not going to be as accurate as what I

2    wrote in my summary judgment and in various

3    documents that I had sent to the compliance

4    department, to the EAP counselor, to various

5    other people that I dealt with after that.

6              So my -- my reasons for filing that

7    claim are elucidated in all those documents,

8    and they are an accurate description, more

9    accurate than I can give you at this time.

10        Q.    I appreciate that.  I'm going to

11   ask you to answer that question today under

12   oath.

13        A.    Okay.

14        Q.    What is it about your referral to

15   EAP that you find objectionable?

16        A.    It's not that I find it

17   objectionable.  It's that it breaks the law.

18        Q.    What is it about your referral to

19   the EAP that breaks the law in your opinion?

20        A.    In my opinion my referral was not

21   for business necessity, nor was it job related.

22   Nothing changed in my working circumstances

23   after I was mandated to go into the EAP.  I

24   worked the same as I always worked.

25              I viewed my mandate into the EAP as

Page 28

1    a means to either terminate me or to have me

2    resign.  I viewed it as Rachael Lerman and

3    Danialle Lynce weaponizing the Employee

4    Assistance Program as a matter to denigrate me

5    and embarrass and humiliate me.

6              So once again, I will say they

7    violated the ADA because it was not job

8    related, nor was it out of business necessity.

9        Q.    What damages did you suffer as a

10   result of being referred to the EAP?

11       A.    What damages?  Damages to my

12   reputation, damages to my well-being,

13   embarrassment in front of my colleagues,

14   embarrassment in front of my family.  Once

15   again, I have upper motor neuron disease,

16   hereditary spastic paraplegia.  It is most

17   assuredly affected, and I stated that in many

18   documents and emails, most assuredly affected

19   by the increased stress that all of this put on

20   me.  It made my work life extremely difficult

21   because I was expecting to be terminated at any

22   moment going forward for not complying with the

23   EAP mandate.

24              I went to the first meeting, and

25   then I said that I didn't think that I could

1    endure physically the stress of another

2    meeting, and I asked for it to be held, the

3    meetings to be held in abeyance.  I never

4    received an answer.

5         Q.    Did you attend any other meetings

6    with David Riccardi after your first meeting

7    with him?

8         A.    I did not attend any other meetings

9    with David Riccardi.

10        Q.    You mentioned your reputation and

11   your embarrassment in front of your colleagues.

12   Did you discuss your referral to EAP with your

13   colleagues?

14        A.    My colleagues actually saw me I

15   think it was -- strike that because I can't be

16   sure of the date.  But when I came back from my

17   meeting on June 26th, 2017, when I came back

18   down after meeting with Danialle Lynce and

19   Rachael Lerman, I had to call the EAP because I

20   had to schedule this meeting within five days

21   or I was going to be terminated, so I wanted to

22   make sure I did that.  There were other people,

23   pharmacy technicians and another pharmacist

24   there, and I don't know if they overheard me or

25   they asked me what the situation was about, and

1    I told them that I had been mandated into the

2    Employee Assistance Program and that I had to

3    make an appointment with them or else I was

4    going to be terminated, and the embarrassment

5    of it was the supervisors had a perception or

6    the embarrassment of it is that my mental

7    health was in question.

8         Q.   To your knowledge did anyone at

9    University Hospitals discuss your referral to

10   EAP with your colleagues?

11        A.   Did anyone?

12        Q.   Else at University Hospitals

13   discuss your referral to EAP with your

14   colleagues?

15        A.   I have -- I have no idea if they

16   did or they did not.

17        Q.   Did anyone from University

18   Hospitals discuss your referral to EAP with

19   your family members?

20        A.   No, they did not.

21        Q.   You mentioned your well-being.  The

22   damage suffered to your well-being, is that the

23   increased stress that aggravated your

24   disability?

25        A.   Could you repeat that, please?

1         Q.    Let's try it a different way.  You
2    mentioned that your well-being was damaged by
3    the referral to EAP.  What were you referring
4    to?
5         A.    I was worried that I was going to
6    be terminated.  That was the effect it had on
7    my well-being.
8         Q.    Did you have to engage in
9    additional treatment for your disability after
10   your referral to EAP?
11        A.    I can't remember.  I had an
12   appointment.  I can't remember if I had to, but
13   I know that I suffered from the stress of being
14   in that EAP meeting for over two hours.  Once
15   again, the reason you both are here today is
16   because my disease affects me from the waist
17   down, hence paraplegia, and when I'm tense, as
18   I am in this situation and as I was in that
19   situation, it affects my ability to lift my leg
20   up and drive a car.  Also, what it also affects
21   is my excretory functions, the ability to
22   urinate and defecate, and it becomes quite
23   disruptive.
24              So I can't remember if I made an
25   appointment with my physician or if I had a

1    standing appointment already, but I did spell

2    out what was going on with me to Riccardi and

3    to Wendy Henoch in the compliance offices.

4         Q.    Who was this physician that you had

5    an appointment with?

6         A.    Denise Bobovnyik is my family

7    physician.

8         Q.    Can you spell her last name to the

9    best of your ability?

10        A.    B-O-B-O-V-N-Y-I-K, I think.

11        Q.    Where does she practice?

12        A.    She practices in Canfield, Ohio,

13   maybe about five miles from my house.

14        Q.    Is she in a private office or

15   affiliated with a hospital or clinic?

16        A.    At the time she may have been

17   private, but now she's affiliated with Humility

18   of Mary.

19        Q.    Did you seek treatment for the

20   aggravation of your disability with anyone

21   other than Denise Bobovnyik?

22        A.    No.

23        Q.    Did you seek any mental health

24   treatment associated with the EAP referral?

25        A.    I would have been embarrassed to

1   seek mental health treatment, and that was

2   probably why I didn't do that.

3        Q.    I'm going to ask you some very

4   specific and focused questions.

5        A.    Sure.

6        Q.    Did you suffer any damage as a

7   result of your appointment with David Riccardi

8   in July of 2017 other than what we have already

9   talked about?

10       A.    I wouldn't know.  It was long-term

11  damage.  I mean, I'm walking less well than I

12  walked then.  So I don't know if that

13  contributed to my current condition or making

14  my disease progress more, so I can't say one

15  way or the other there.  I know I'm worse off

16  than I am -- than I was then now.

17       Q.    What about with regard to your

18  appointment with Jill Fulton in January 2018,

19  did you suffer any damages as a result of that

20  appointment?

21       A.    It was the same situation where,

22  yes, I did.  I was affected.  My walking

23  ability was affected.  My ability to urinate

24  and defecate was definitely affected.  Those

25  were -- those were the two outcomes that I

1    would say that come to mind.

2         Q.    How long did those effects last

3    after each of your appointments?

4         A.    The one with David Riccardi lasted

5    pretty long, and I think it was -- I want to

6    say it was at least two weeks it took to really

7    mitigate all the circumstances.

8              Let me say this, too.  I know I

9    shouldn't expand on things.  All that I have to

10   do sometimes is to think about a traumatic

11   event like that was to me, and it causes me to

12   have difficulty walking, urinating, defecating.

13   The memory of it can cause me to tense up from

14   the waist down.

15        Q.    Have you sought any treatment to

16   assist with these difficulties that you just

17   described?

18        A.    I have sought treatment.  However,

19   with hereditary spastic paraplegia, there are

20   no treatments other than muscle relaxants,

21   exercise, those are the two primary ones,

22   laxatives.

23             I have to add right now at the time

24   that I met with David Riccardi, all that I was

25   aware of that I had was upper motor neuron

1   disease.  I had been to neurologists.  I had

2   been to sports medicine people, all directed

3   from Dr. Bobovnyik to these people.  I had been

4   to a thoracic specialist who thought I had

5   spinal stenosis.  No one could give me a

6   positive diagnosis.  All they could do is

7   eliminate things.

8           When I went to see the thoracic

9   surgeon, he thought for sure I had a narrowing,

10  and he said -- he took the MRI, and he said,

11  Your spinal cord is wider than most people's.

12  Then I asked him, Well, then what do I have?

13  He said, I do not know.

14          My doctor, Dr. Bobovnyik, didn't

15  know.  She knew that it manifested in

16  hyperreflexivity, where my muscles are always

17  tense and ready to go, but they couldn't put

18  anything together.  They knew I didn't have

19  multiple sclerosis because I didn't have

20  plaques, but I did not have a diagnosis at that

21  time.

22         I only received a diagnosis in 2018

23  in the spring, and that was because I have a

24  friend who is a geriatric specialist at UPMC in

25  Pittsburgh, and he got me a geneticist who

1    recommended that I get a test from 23andMe that

2    would map out my whole genome.  This disease

3    that I thought that maybe I had, HSP,

4    hereditary spastic paraplegia, had 80 markers,

5    80 genetic markers.  So he said once 23andMe

6    maps out your genetic makeup, you can go and

7    check all 80 of those things and see which one

8    you have.

9              Sure enough, I had Spc7, Spg7,

10   Spg11, Spg I think it was 20, 21, 22, but Spg7

11   and Spg11 had the most genetic markers, and

12   those are the most common forms of hereditary

13   spastic paraplegia.

14              When I went and told my doctor,

15   Dr. Bobovnyik, what I discovered, she had never

16   even heard of that disease because it's a rare

17   disease.  Sure enough, that's what I have.  So

18   I finally had a name to it, and there isn't any

19   cure for it.  There is only treatment, and it's

20   slowly progressive.

21        Q.    I'm going to refer to it as HSP.

22        A.    That's fine.

23        Q.    Has any provider ever diagnosed you

24   with having HSP?

25        A.    No, they did not.

1          Q.    Has your treatment plan changed

2     since 2018 when you performed the genetic test?

3          A.    No, it has not.

4          Q.    Who prescribes the muscle relaxants

5     that you use to treat your HSP?

6          A.    Dr. Bobovnyik.

7          Q.    Does she also prescribe

8     prescription level laxatives or any other

9     medications?

10         A.    No.  Pretty much the laxatives that

11    I would use are all over the counter.

12              MS. ISRAEL:  Off the record for a

13    minute.

14              (Discussion off record.)

15         Q.    During your appointment with David

16    Riccardi, did he perform any tests or

17    procedures on you?

18         A.    No, he did not.

19         Q.    What about during your appointment

20    with Jill Fulton, did she perform any tests or

21    procedures on you?

22         A.    No, she did not.

23         Q.    We talked about the increased

24    effects of your HSP on you after your

25    appointment with David Riccardi, and you

Page 38

```
 1    indicated that those lasted approximately two

 2    weeks; is that right?

 3         A.    Correct.

 4         Q.    Did you increase your medication or

 5    any other treatment during that two-week

 6    period?

 7         A.    At that time I was not on any

 8    muscle relaxants prescribed.

 9         Q.    When did you first receive a

10    prescription for muscle relaxants?

11         A.    Jeez, when was the last time I went

12    to Dr. Bobovnyik?  I would say that it was the

13    spring or fall of -- I'm getting confused on

14    the year -- of -- I'm confused on the year.  I

15    can't remember if it was 2018 or 2019.

16              I think it was 2018, and I will

17    make this -- I do not like to take the muscle

18    relaxants simply because, once again, they sort

19    of have like an antihistamine effect and make

20    you drowsy, so I take them rarely.  They don't

21    improve that much.  I've tried two or three

22    throughout all my years of being treated for

23    upper motor neuron disease, baclofen is

24    probably the most well known, but I couldn't

25    take it.  I was intolerant to it.  It made me
```

1    feel funny.  That was prescribed to me years

2    ago by a neurologist.

3              The doctor prescribed

4    cyclobenzaprine for me which seems to cause me

5    the least amount of side effects, but I really

6    don't think it really mitigates this very much.

7    So, you know, I can't take them when I go to

8    work obviously because it would affect my

9    mental acuity.  So what I mostly do is take

10   them on an as-needed basis during times when it

11   seems like my disease has flared up

12   essentially.

13        Q.    In July of 2017, were you taking

14   any medications to treat your HSP?

15        A.    I didn't even know I had HSP at

16   that time.

17        Q.    Or were you taking any medications

18   to treat any of the symptoms associated with

19   your disability?

20        A.    No.

21        Q.    What about in January 2018, which

22   is the time that you met with Jill Fulton, were

23   you taking any medications at that time?

24        A.    Any medications or any medications

25   for my disease?

Page 40

1          Q.    Any medications associated with the
2    symptoms of your disease.
3          A.    No, I was not taking any.
4          Q.    How long do you estimate that the
5    effects lasted after your meeting with Jill
6    Fulton in 2018?
7          A.    Jill Fulton's meeting, the meeting
8    with Jill Fulton had been tempered by Heather
9    Harmon who I had contacted.  She is a vice
10   president over human resources, and she has
11   helped me very much in trying to mitigate
12   different situations.  I was very happy to
13   have -- to have contacted her.  She has been an
14   honest broker.  She has helped me immensely,
15   and she mitigated that meeting with Jill Fulton
16   to make sure that it wasn't very long and it
17   really wasn't controversial, and so the
18   circumstances were different than the meeting
19   with David Riccardi.  So the effects of what
20   happened probably with Jill probably, you know,
21   I was probably better within seven days or so.
22         Q.    You indicated that your meeting
23   with Jill Fulton was not controversial.  What
24   do you mean by that?
25         A.    With David Riccardi, I had no idea

Page 41

1    what the counseling session was supposed to be

2    about, and he was a very nice gentleman.

3    Believe it or not, I'm a very naive person, and

4    I practice avoidance on a lot of things.  There

5    is -- you know, sometimes just not knowing

6    about something helps my condition.

7              So when I went to the meeting with

8    David Riccardi, I didn't expect anything

9    really -- I don't know.  I don't know what I

10   expected, but I was surprised at the end of the

11   meeting when he presented me with all these

12   forms, medical releases, all of these things

13   that I have -- that I have -- once again, you

14   have copies of them all.  They are all in the

15   FOIA documents, and they are all in my motion

16   for summary judgment.

17             But he really surprised me at the

18   end of our consultation by telling me that I

19   was going to have to come to more counseling

20   sessions.  I thought it was just going to be

21   one counseling session, and he said that -- and

22   I asked him how many more, and he goes, Well,

23   it all depends.  So it was open-ended there as

24   to how many more counseling sessions I was

25   going to have to endure.

Page 42

1              Then the biggest thing he hit me

2      with was the following week he had me set up

3      for a three-hour psychiatric evaluation, and

4      that floored me.  That, I was surprised that I

5      was able to even get up from the table after

6      that because it was such a shock to my system,

7      and I was just so surprised by it, and it just

8      like -- it just was really very traumatic to

9      hear that I'm going to a three-hour psychiatric

10     examination over those phrases.  I couldn't

11     believe it.

12          Q.    Did you ever attend the three-hour

13     psychiatric evaluation?

14          A.    I did not.

15          Q.    Did University Hospitals ever take

16     any action against you for your refusal to

17     attend the three-hour psychiatric evaluation?

18          A.    To this point University Hospitals

19     has not taken any action, but it hangs over my

20     head since then because they never said that

21     they won't take action.  So I am still

22     concerned about it, that they could say to me

23     at any time you didn't get to these sessions

24     and you didn't go to this psychiatric

25     evaluation.  So I am still concerned over that.

1    They never said, oh, you don't have to go to

2    these things.  They never said that.

3            Q.    So the two things that David

4    Riccardi presented you with at the end of your

5    meeting were continued counseling sessions and

6    the three-hour psychiatric evaluation; is that

7    right?

8            A.    And the release forms, yes.

9            Q.    Did you sign the release forms?

10           A.    I signed all the release forms but

11   the one that he wanted to -- once again, like

12   you want to do, he wanted to get my medical

13   release from my doctor, and I refused that.

14           Q.    Did University Hospitals take any

15   action against you for your refusal to sign the

16   medical release form?

17           A.    To this point they have not taken

18   any action against me.

19           Q.    You did not attend any further

20   counseling sessions with David; am I right?

21           A.    That is correct.

22           Q.    I want to turn now to your third

23   claim for relief which is discrimination under

24   the ADA.  Are you familiar with that claim?

25           A.    Yes, I am.

Page 44

1      Q.    Is your disability discrimination

2   claim based on a disability that you actually

3   suffer from?

4      A.    No, it is not.

5      Q.    In your complaint you allege that

6   University Hospitals regarded you as having a

7   disability and discriminated against you by

8   referring you to the EAP; is that right?

9      A.    That's correct.

10      Q.    Who regarded you as having a

11   disability?

12      A.    Under the EAP documents or code of

13   conduct under the EAP, there are two types of

14   referrals, a voluntary referral and a mandatory

15   referral, and under the mandatory referral, the

16   only person who can refer you is your immediate

17   supervisor in consultation with HR.  So my

18   immediate supervisor actually makes a diagnosis

19   before -- or any supervisor makes a diagnosis

20   of the person before they are mandated into EAP

21   sessions, counseling sessions.

22      Q.    Who in this case regarded you as

23   having a disability?

24      A.    Rachael Lerman.

25      Q.    You said she makes a diagnosis.

Page 45

1    What diagnosis did she make with regard to you?

2         A.    Well, she's making a broad

3    diagnosis that I must have some sort of a

4    mental health problem or disability.

5         Q.    Is it your opinion that you could

6    only be referred to mandatory EAP because of a

7    mental health problem or disability?

8         A.    No, that's not my opinion that's

9    the only thing you could be referred for, but

10   in my case that was what the referral was.

11        Q.    How do you know that Rachael Lerman

12   determined that you had a mental health problem

13   or disability?

14        A.    My referral to a psychiatrist.

15        Q.    That referral was made by David

16   Riccardi after your meeting with him in July?

17        A.    I don't know if David made the

18   referral or if that's just part of the process.

19        Q.    Did Rachael Lerman ever tell you

20   that she believed that you had a mental health

21   problem or disability?

22        A.    No, she did not say in those words.

23   However, in the documents that you have which

24   are referring to my past actions, as far as I

25   was concerned, the inference was that I must

1    have something wrong with me because I

2    continued to do these same untoward actions.

3         Q.    That was the inference that you

4    made based on what she wrote?

5         A.    Exactly.

6         Q.    Who discriminated against you with

7    regard to your perceived disability?

8         A.    Rachael Lerman.

9         Q.    Anyone else?

10        A.    I suppose you could say that

11   Danialle Lynce, since she was the HR person

12   involved, and the immediate supervisor must

13   discuss it with an HR rep, and they decided to

14   go forward with this mandatory referral, so I

15   would say Danialle Lynce was also involved.

16        Q.    Other than making the mandatory EAP

17   referral, did Rachael Lerman do or say anything

18   that you view as discrimination for your

19   perceived disability?

20        A.    I don't know if I understand that

21   question completely.

22        Q.    Sure.  I'm trying to understand the

23   factual basis for your discrimination under the

24   ADA claim, so I'm trying to determine what it

25   is that you believe was discriminatory, what

Page 47

1    actions or comments.

2         A.    Once again, that -- my argument is

3    contained in my motion for summary judgment and

4    in other documents that I have sent, other

5    emails that I have sent to people.  It's

6    intrinsic to the UH policy on EAP referrals

7    that the supervisor is the sole judge of who

8    should be mandated into EAP sessions.  So since

9    the EAP counseling session also included a

10   psychiatric evaluation -- I even forget where I

11   was going with this.  I'm sorry.

12        Q.    But your EAP counseling session did

13   not actually include a psychiatric evaluation;

14   am I right?

15        A.    Well, it did include a psychiatric

16   evaluation.  I just never went to it.

17        Q.    It included a referral that you did

18   not follow up on?

19        A.    That's correct.

20        Q.    So other than the referral to

21   mandatory EAP, did Rachael Lerman do anything

22   to discriminate against you with regard to the

23   perceived disability?

24        A.    No, she didn't, and that's part of

25   the reason why it wasn't a business necessity

Page 48

1    or job related, because there was no

2    difference, and I was able to come to work and

3    do my job every night.  So it obviously -- this

4    referral obviously wasn't for business

5    necessity of any means because I was allowed to

6    come to work just as I always came to work and

7    do my job just as I always did my job except

8    for the fact that I was under terrific stress

9    because I didn't know when the next shoe was

10   going to drop and because I was under the

11   threat of termination.

12        Q.    Did anything about your job duties

13   or responsibilities change after your referral

14   to EAP?

15        A.    My job duties became more difficult

16   because I was under the increased stress and

17   anxiety of the whole situation.  So I document

18   very well because of my old days when I was

19   involved in union activities.  Once this whole

20   EAP came up, I changed how I did a lot of my

21   things at work where I was documenting things

22   that no other pharmacist had to document.  So I

23   was doing timestamps on things.  I was making

24   sure to write anything down that I thought

25   might be used against me.

Page 49

1          Once again, I rarely if ever and
2    rarely if ever to this day have a clear mind
3    when I'm on the job, and that is very
4    disconcerting, to have these things weighing on
5    me that another shoe may drop here or there.
6    So, yes, it did change my working conditions
7    quite a lot because I was afraid I was going to
8    be terminated.
9          Q.    Did Rachael Lerman or anyone else
10   at University Hospitals ask you to do
11   additional documentation after the referral to
12   EAP?
13         A.    I did the additional documentation
14   on my own.
15         Q.    Other than the mandatory referral
16   to EAP, did Danialle Lynce do anything that you
17   perceived to be discriminatory with regard to
18   your perceived disability?
19         A.    I cannot think of anything at this
20   moment.
21         Q.    Thank you.  Have you sought any
22   medical treatment for any injury that you claim
23   was caused or exacerbated by the conduct of
24   University Hospitals?
25         A.    Well, I would say in going to my

Page 50

1    physician and getting the -- and getting the

2    muscle relaxant, I would say that, and I'm also

3    subject to panic attacks, so I have a

4    prescription for sertraline for panic attacks.

5    I don't use it all the time, but I use it under

6    times of stress, and I got that renewed when I

7    went in at the time that I got the muscle

8    relaxant.  In fact, I got several muscle

9    relaxants.  I think the other one was

10   tizanidine.  I couldn't tolerate the

11   tizanidine, but the cyclobenzaprine I could.

12        Q.    When did you first start to

13   experience panic attacks?

14        A.    Oh, I would say probably around

15   2003 or '04 was the first time I recognized

16   them.  I have had generalized anxiety, and it

17   wasn't diagnosed by anybody, but I've always

18   been an anxious person.  So I probably was

19   having panic attacks did didn't recognize them

20   for a while.  Then finally in 2003 it

21   just -- 2003 or '04 I started experiencing

22   them, and it wasn't going away.  I wasn't

23   obtaining relief.  So I went in, and the doctor

24   prescribed sertraline, and it kept them under

25   control.

Page 51

1            During times of stress like when my

2    oldest one was going away to college or my

3    youngest one was doing something else, I would

4    take it.  I'm not a very good patient even

5    though I'm a pharmacist.  I would take it

6    prophylactically for a couple of weeks just to

7    ease over the hump where I'm under a lot more

8    stress.

9            So when I went in to see her after

10   all this stuff that occurred, you know, I just

11   made sure to refill my sertraline, and I

12   started taking it a little more regularly at

13   that time.

14       Q.    Are you continuing to take it more

15   regularly up until today?

16       A.    Yes.  Actually, because this was

17   looming, yes, I started taking it maybe a

18   week-and-a-half or so again.

19       Q.    Between the time period of January

20   2018 when you met with Jill Fulton and your

21   deposition here today in 2020, tell me how

22   often you were taking the sertraline?

23       A.    You know, at that time it was

24   probably daily for that time period for

25   probably -- I would say probably for at least

Page 52

1    three to six months after that.

2         Q.    Then you tapered off to more

3    sporadic use like you described?

4         A.    Well, once again, you can't just

5    take it once.  I have to take it for like a

6    week or two, but yeah.  Other than that, yeah.

7    It was sporadic use until, once again, high

8    anxiety times of when I was filing the lawsuit,

9    high anxiety times, you know.  I've been, you

10   know, pretty much on it for the last probably

11   six months pretty much.

12        Q.    Has anyone other than Dr. Bobovnyik

13   prescribed sertraline for you?

14        A.    Sertraline, no, no one else.

15        Q.    Other than the muscle relaxant and

16   the sertraline, have you taken any other

17   prescription medications in the last five

18   years?

19        A.    No.

20        Q.    Have you sought any mental health

21   treatment for any injury that you claim was

22   caused or exacerbated by University Hospitals?

23        A.    No.

24        Q.    Have you applied for any other

25   employment since you began working for

Page 53

1    University Hospitals I think it was in 2010; is

2    that right?

3         A.    Yeah.  Yes, I -- I did for sure.

4    It looked like I was going to take the job.  I

5    live pretty far away from Geauga Community

6    Hospital, so with my condition being the way it

7    is, I was hoping to get work somewhere closer.

8    So I applied at St. Joe's in Warren, Ohio.  But

9    the pay cut and the benefits that I was going

10   to have to take, I just couldn't pull the

11   trigger on it, to tell you the truth, but I did

12   try to work somewhere else.

13        Q.    When approximately was it that you

14   were considering the St. Joe's job?

15        A.    I've been -- I would say

16   probably -- my bulldog has been dead for

17   probably five years now, so I would say

18   probably in the range of five years ago.

19        Q.    Around 2015, is that your best

20   guess?

21        A.    Yeah, probably around there.  I

22   can't for sure say that that was when.

23        Q.    Have you applied for any other

24   positions other than St. Joe's since 2010?

25        A.    I'm trying to think.  Probably

1    traveling pharmacist.  We get emails all the

2    time for traveling pharmacist.  So I probably

3    filled out some applications for them, but, you

4    know, I never really seriously pursued it, and

5    I think when my son Frank was at Marist College

6    in Poughkeepsie, New York, I thought of taking

7    a job in Poughkeepsie at a hospital up there,

8    and so I think I did apply there as well, but

9    those were just nothing as serious as the

10   St. Joe's position.

11         Q.    When was the New York application?

12         A.    Well, Frankie would have been up

13   there in 2011-2012, so it was probably 2011 or

14   2012.

15         Q.    What made you decide not to pursue

16   the traveling pharmacist positions?

17         A.    In discussions with my wife, it

18   just wasn't going to work out for our family,

19   you know.  I told her what it would probably

20   entail, and she just didn't like the idea of me

21   being away for, you know, periods at a time.

22   Like I said, it was just some of those things

23   were because I was afraid of maybe getting

24   fired or something.  I was concerned about

25   that, so I wanted to have something just in

Page 55

1    case, you know, just in case something untoward

2    would happen.

3         Q.    Have you ever applied for any other

4    positions within the University Hospitals

5    Health System?

6         A.    Well, you see, that's one of the

7    bad things about being under discipline is that

8    I can't apply, and I would have liked to have

9    applied.  There were many positions that came

10   open on the various times that I was written up

11   for one thing or another, and you are prevented

12   for a year from applying, so I couldn't apply.

13        Q.    What positions would you have

14   wanted to apply for?

15        A.    Well, they opened a specialty

16   pharmacy, and it was under Aleene Naples who

17   was a prn pharmacist at Geauga for a while, and

18   we got to become very good friends.  She was in

19   charge, and she wanted to know if I wanted to

20   come over to the specialty hospital, and I told

21   her that I couldn't because I was under -- you

22   know, I couldn't bid on it because I was under

23   this discipline situation.

24        Q.    When was that?

25        A.    Once again, I would say it could

Page 56

1    have been four years ago or five years ago.

2    Once again, however, I mean, from June of 2016

3    until June of 2018, no matter what came my way,

4    even though I was interested in it, I couldn't

5    bid on a job for that two-year period.

6         Q.    Have you applied for any positions

7    within the University Hospitals system since

8    June 2018?

9         A.    No, I have not.

10        Q.    Have you ever participated in any

11   kind of mental health counseling or treatment?

12        A.    No, I have not, except for the EAP

13   counseling session.

14        Q.    Have you ever participated in any

15   kind of marriage counseling or treatment or

16   coaching?

17        A.    With my first wife, I did go to

18   counseling with her, but that was 30 years ago.

19        Q.    Any other type of counseling that

20   you can think of or life coaching?

21        A.    None.

22        Q.    Have you ever had a diagnosis of

23   any kind of mental health issue?

24        A.    No, I have not.

25        Q.    Have you ever undergone any type of

Page 57

1    mental health treatment?

2          A.    No, I have not.

3          Q.    You've never been

4    institutionalized?

5          A.    No, I have not.

6          Q.    Have you ever been convicted of a

7    crime?

8          A.    No, I have not.

9          Q.    Ever pled guilty to a crime?

10         A.    No, I have not.

11         Q.    Have you ever filed a lawsuit

12   against any other person or entity?

13         A.    No, I have not.

14         Q.    What medication have you taken

15   within the last 30 days?

16         A.    Sertraline and cyclobenzaprine.

17         Q.    Do either of those medications

18   affect your ability to tell the truth today?

19         A.    No.

20         Q.    Do either of those medications have

21   a negative impact on your memory?

22         A.    Not that I know of.

23         Q.    Is there any other reason that your

24   ability to testify today might be impaired?

25         A.    The only other thing might be that

1    I'm a third-shift worker, and I've been on it

2    steady for ten years, and that imposes quite a

3    lot of stress on all areas of -- of life, and

4    it's well known if you look it up on Google

5    that people that work third shift long term

6    because of the disruption to their sleep

7    patterns could be affected.

8         Q.    During --

9         A.    Go ahead.

10        Q.    Are you finished with the answer?

11        A.    Yes.  I'm sorry.

12        Q.    That's okay.  During your

13   employment with University Hospitals, did you

14   ever request to be taken off the third shift?

15        A.    Yes, I have.

16        Q.    Tell me about that.

17        A.    Well, it was -- it's in my -- I

18   have been talking to them for the last two

19   years about an accommodation for my HSP, and

20   I've been asking them to allow me to work from

21   home, and if I work from home, it would have to

22   be on first shift or second shift, although I

23   could work third shift.  If they allow me to

24   work from home, I will work any shift.  But

25   that's the only reason why I've asked for the

1    other shifts is because you need a person there

2    on third shift because there is only one

3    pharmacist.  So as it stands right now, if I

4    work from home, I can only do it on the first

5    and second shift.

6         Q.   Were there any other requests that

7    you made to move off of third shift while still

8    being physically present at the hospital?

9         A.   No, no other request.

10        Q.   I'm going to start questioning you

11   about some documents again.  Do you want to

12   take a break?

13        A.   I'm okay if you two are okay.

14             -  -  -  -  -

15             (Thereupon, Deposition Exhibit 2,

16             the Defendant's First Set of

17             Requests for Admission to Plaintiff,

18             was marked for purposes of

19             identification.)

20             -  -  -  -  -

21        Q.   I'm going to hand you what's been

22   marked as Defendant's Exhibit 2.  Do you

23   recognize that document?

24        A.   Not right off, but let me take a

25   look, okay?  No, I haven't seen this before I

Page 60

1    don't think.

2          Q.    Let's take a look --

3          A.    I'm looking at the date.  So I must

4    have seen it, but I don't remember seeing it,

5    but go ahead.

6          Q.    Let's look at the first page.  If

7    you see under Requests for Admission, it lists

8    Request For Admission No. 1, and then below

9    that is a response in bold and underlined.

10         A.    Yes.

11         Q.    Does that response look familiar to

12   you?

13         A.    Yeah.  I just made that response

14   today.

15         Q.    What I mean is does that refresh

16   your recollection that these are the responses

17   that you drafted and provided to University

18   Hospitals in response to the Requests for

19   Admission?

20         A.    Yes.  Yes, I recognize that.

21         Q.    So I want to discuss some of these

22   responses with you.

23         A.    Sure.

24         Q.    These Requests for Admission are

25   asking you to either admit or deny what is

1    stated in the request.  If you look at Request

2    for Admission No. 4, the request says, "You

3    were not demoted following your complaint of

4    alleged sexual harassment by Rachael Lerman."

5    Your response was no.

6              Do you mean that you are denying

7    the truth of that or that, no, in fact you were

8    not demoted?

9         A.    No, in fact I was not demoted.  So

10   I guess it should have been yes.  I'm sorry.

11        Q.    That's fine.  That's what I

12   suspected.  I just want to clarify your answers

13   to make sure that I understand what you're

14   indicating.

15        A.    Yeah.

16        Q.    I want to look at Request for

17   Admission No. 6.  You did not experience a

18   reduction in pay or benefits following your

19   complaint of sexual harassment; is that

20   correct?

21        A.    That is correct.

22        Q.    With regard to No. 8, University

23   Hospitals has not restricted you in any way or

24   at any time from performing your job duties; is

25   that correct?

1        A.    That is correct.

2        Q.    That's it for that document.  Thank

3   you.  You can set them on a chair or whatever

4   is easiest for you.

5        A.    Thank you.  Do you want me to do

6   them face down?

7        Q.    No.  Next I'm going to hand you

8   what's been marked as Defendant's Exhibit 3.

9                   -   -   -   -   -

10              (Thereupon, Deposition Exhibit 3,

11              the Defendant's First Set of

12              Interrogatories to Plaintiff, was

13              marked for purposes of

14              identification.)

15                  -   -   -   -   -

16       Q.    Do you recognize that document?

17       A.    I kind of don't.

18       Q.    Again, I'll direct you to the

19   answers under each interrogatory in bold and

20   underlined.  Do those look like the answers you

21   provided on this document?

22       A.    Yes, they do look like my answers.

23       Q.    If you could turn the page to

24   Interrogatory No. 2 on page 2, if this case

25   proceeds to trial, what people do you

1    anticipate calling as witnesses to testify on

2    your behalf?

3         A.    I'm sorry.  None.

4         Q.    Are there any people that you can

5    identify for me today who have knowledge of the

6    facts alleged in your complaint other than

7    yourself?

8         A.    Knowledge of the facts?

9         Q.    Yes.

10         A.    I did mention Phil Snyder.  You

11    caught me.  I can't -- I guess I'm having a

12    hard time with the question.  Any other people

13    that know I filed a lawsuit?

14         Q.    Any other people that have

15    knowledge regarding the underlying facts; for

16    example, one of the facts that you allege are

17    that you were referred to EAP.

18         Can you identify people who might

19    have knowledge of that fact?

20         A.    Mary Williams, Fran Manning, Phil

21    Snyder, Susan Thabit -- let me think -- Marilyn

22    Gibbs, Tracey Thoms, T-H-O-M-S, John Long.  You

23    don't mean family members like my wife or my

24    brother or anybody like that, anything like

25    that, correct?

1          Q.     Other than your wife and your

2     brother, have you discussed the underlying

3     facts of your case with your family members?

4          A.     Yes, I have.

5          Q.     Which family members?

6          A.     My sons; my in-laws; my best

7     friend, Sergio Ciccone, in Charlotte, North

8     Carolina; his cousin who works for the federal

9     side of the EEOC in Washington.

10          Q.     What is his name?

11          A.     Oh, God.  I was going to say Mario,

12     but that's his cousin that's a tailor.  I can

13     get it for you.

14          Q.     So of these family members and

15     friends which include your wife, your brother,

16     your sons, your in-laws, your best friend, and

17     your best friend's cousin, do any of them have

18     firsthand knowledge relating to these facts?

19          A.     Firsthand knowledge?  My wife has

20     firsthand knowledge of when Rachael told me in

21     that chamber, the -- the air lock when I was

22     leaving and she was coming, when she said, Hey

23     sexy, and then she said, I could probably be

24     fired for saying this.

25                 You know, my drive home takes an

1   hour.  As soon as I came through the door, I

2   told my wife what had happened.  I said, You're

3   never going to believe this, but Rachael just

4   said, Hey sexy, and she said, I could probably

5   get fired for saying this.  So my wife was sort

6   of like a contemporaneous witness at the time.

7              I would also say Nancy Grimm,

8   attorney-at-law, I had consulted her.  I had

9   consulted her at the time I filed my sexual

10  harassment charge, and I had consulted her in

11  spring of 2019 about maybe engaging her as my

12  attorney when I filed this lawsuit, and then I

13  decided against it, that I would just handle it

14  myself.  So I have discussed things with her,

15  but I don't think she's like -- I mean,

16  she's -- my wife was a firsthand knowledge type

17  of thing.

18              I'm trying to think of other

19  people.  Like I said, Susan Thabit was there

20  the night I got --

21         Q.   Let's slow down just for a

22  minute --

23         A.   I'm sorry.

24         Q.   -- and make sure that we finish

25  with your wife.  When I use the phrase

Page 66

1    firsthand knowledge, I mean that a person

2    actually heard or observed something himself or

3    herself.

4           A.    I see what you're saying.

5           Q.    Do any of your family members or

6    friends have any firsthand knowledge?

7           A.    They do not.

8           Q.    I assume the answer is the same

9    with regard to Ms. Grimm.  She didn't actually

10   observe or hear anything?

11          A.    No, she did not.

12          Q.    Okay.  So then let's turn to the

13   list of people that you mentioned.  Phil

14   Snyder?

15          A.    Yes.

16          Q.    Other than overhearing the phone

17   call that you received from Jason setting up

18   the meeting, what knowledge does Phil have

19   about the facts alleged in your complaint?

20          A.    Well, Phil is a pharmacist and an

21   attorney, so I had discussed things with him

22   over a time period.  I mean, once again, they

23   weren't firsthand for him.

24          Q.    Other than things that you

25   discussed with Phil, does he have any other

Page 67

1   firsthand knowledge relating to the facts of

2   your complaint?

3           A.    He does not.

4           Q.    What about Mary Williams, who is

5   that?

6           A.    She's a pharmacist that I work

7   with.

8           Q.    What knowledge does she have

9   relating to the facts in your complaint?

10          A.    Firsthand knowledge again?  She has

11  no firsthand knowledge.

12          Q.    What other knowledge might she

13  have?

14          A.    She knows the general things

15  involved in my case.

16          Q.    Does she know them because you've

17  discussed them with her?

18          A.    Yes.

19          Q.    Does she have any other sources of

20  knowledge that you're aware of?

21          A.    Not that I'm aware of.

22          Q.    Same question with regard to Phil.

23  Other than overhearing that phone call and

24  discussing with you, are you aware of any other

25  sources of knowledge that Phil might have?

Page 68

1          A.    I am not aware of anything.

2          Q.    Fran Manning, who is that?

3          A.    She's a pharmacist.

4          Q.    Does she have any knowledge

5    regarding the facts alleged in your complaint?

6          A.    Just knowledge of the facts, yes,

7    she does.

8          Q.    Did she get that knowledge through

9    discussions with you?

10         A.    Yes, she has.

11         Q.    Do you know if she has any

12   firsthand observations that would be relevant?

13         A.    No.

14         Q.    Susan Thabit, who is that?

15         A.    A pharmacist.

16         Q.    What knowledge does she have

17   regarding the facts alleged in your complaint?

18         A.    Well, she does have firsthand

19   knowledge of an important incident that I

20   decided to leave out of my motion for summary

21   judgment because I just thought it was just

22   more noise.

23               In the time period between June

24   when I filed my charge of sexual harassment in

25   2016 and the August 5th meeting of 2016 with

Page 69

1    Jason Glowczeski and Danialle Lynce, at some

2    point in that time period, and I only found

3    this out fairly recently within the last maybe

4    18 months, Susan Thabit was requested to go up

5    to HR with Danialle Lynce, I don't know who

6    else was there, and Danialle Lynce presented

7    that time and attendance exception form on

8    which I had scribbled "she made me sign this"

9    next to Susan's name.  And once again, that was

10   just a joke between Susan and I and this tech

11   that was standing there.

12           She got interrogated about it,

13   about the intent of "she made me sign this,"

14   where Danialle Lynce according to Susan, and

15   I'm paraphrasing, Danialle Lynce said to her,

16   and she is small in stature, she said, How

17   could you force him to sign this?  How could

18   you force him to sign this?  Isn't he a lot

19   bigger than you are?  She just was completely

20   perplexed, and she said that she -- once again

21   paraphrasing, she said she felt as if she was

22   trying to get something sinister out of what

23   was a joke between the two of us.

24        Q.    You were not present during the

25   discussion between Susan and Danialle, correct?

1          A.     No.  Once again, I found out a year

2     to a year-and-a-half probably after it happened

3     she told me that.

4          Q.     Did Susan also discuss with you the

5     time card exception form on which you wrote

6     that she might be lying, you weren't standing

7     next to her at the time clock when she clocked

8     in?

9          A.     She might be lying?  I don't

10    remember that remark.  I don't remember that

11    remark at all.

12         Q.     Marilyn Gibbs, who is that?

13         A.     She's -- go ahead.  I'm sorry.

14         Q.     I'm sorry.  I didn't finish up with

15    Susan.  Is there any other knowledge that Susan

16    might have regarding your facts or allegations

17    in the complaint?

18         A.     She just understands the general,

19    you know, what's going on generally.

20         Q.     Again, that's through discussions

21    with you?

22         A.     Yeah.  Yes.

23         Q.     Tell me, who is Marilyn Gibbs?

24         A.     She is a pharmacy technician.

25         Q.     What knowledge does she have

1     regarding the allegations in your complaint?

2          A.     She happened to be rounding through

3     the hospital the day that I was meeting with

4     Jill Fulton, and she came across me and Jill

5     Fulton standing outside the HR offices, and she

6     later asked me, she goes, Were you in trouble?

7     What was going on?  I told her, I says, Well, I

8     had to attend an EAP session.

9          Q.     Does Marilyn know anything else?

10         A.     No, not really.

11         Q.     What about Tracey Thoms, who is

12    that?

13         A.     Tracey Thoms is a technician who

14    had been working with me on my shift I think it

15    was since June.  They changed job

16    responsibilities, and they shifted them around

17    so they had to add a tech to my shift.  She's

18    not there to help me.  She's there -- she has

19    assigned things that she's supposed to do.  So

20    Tracey, ever since I filed this has, you know,

21    been aware that I filed it, but she never

22    worked at Geauga prior to that, and she has no

23    firsthand knowledge of anything.

24         Q.     This change of job

25    responsibilities, did that have anything to do

1   with the protected activity that you engaged

2   in?

3          A.    No.

4          Q.    Did it have anything to do with

5   your filing of this lawsuit?

6          A.    No.

7          Q.    Did it have anything to do with

8   your job performance at all?

9          A.    No.

10          Q.    Is there anyone else that you can

11   think of other than the people we've discussed

12   that might have knowledge of the facts alleged

13   in your complaint?

14          A.    That's a good question.  I'll

15   probably think of somebody later tonight.  I

16   forget what his last name is, but I mentioned

17   him in -- in the motion that I made for class

18   action certification.  His name, his first name

19   is Jeff, and he works in maintenance, and he

20   was also remanded into the EAP mandatory, so he

21   is aware of -- he is aware of what's going on

22   with me.

23          Q.    Does he have firsthand knowledge of

24   what's going on with you, or he has knowledge

25   because of your discussions with him?

1        A.     Just because of my discussions.

2        Q.     Is there anyone else that you can

3    think of?

4        A.     Firsthand knowledge?  At this

5    moment I can't think of anyone else.

6        Q.     I'd like you to look now at your

7    response to Interrogatory No. 6.  That

8    interrogatory asks you to describe occurrences

9    of being subjected to a hostile work

10   environment.  In this answer you refer to your

11   personnel file and state, "Every

12   formal/informal discipline was a manufactured

13   event intended to harass the plaintiff."

14              Is it your contention that none of

15   the discipline that you've received while

16   employed at University Hospitals was warranted?

17       A.     I would say that none of it was

18   warranted.  I have to make that statement.

19   None of it was warranted.

20       Q.     Setting aside the formal and

21   informal discipline that you received, what

22   else can you tell me about the hostile work

23   environment that you experienced?  What made it

24   hostile?

25       A.     Well, the scrutiny that I was under

1  from a little before October 2013, it may have

2  been five to six months, sort of coincided with

3  when Rachael was elevated to department

4  supervisor.  Prior to that when Jason was

5  department supervisor, I never had any

6  disciplines, never had any -- anything, and in

7  the two years since Rachael has been gone, I

8  haven't had any disciplines, and I haven't had

9  anything untoward happen to me.

10         Q.    Is there anything else that you can

11  think of that made your work environment

12  hostile?

13         A.    Just the uncomfortableness.  When

14  Rachael would make remarks about my physical

15  appearance back somewhere in 2012, like I said,

16  on at least two occasions she would make some

17  remark about my hair, my body, my this, my

18  that, and then that was culminated with when I

19  ran into her in that airlock and she said, Hi

20  sexy, and then she laughed and says, I could

21  probably be fired for saying that, I

22  immediately changed my work routine so that

23  I -- she came in later, that I would never get

24  out late, and I was always fearful of running

25  into her.  I was always fearful of the next

1    shoe to drop.  I was always uncomfortable.  I

2    was always anxious because I would get ambushed

3    just like I did on June 26th, 2017, without any

4    formal warning, without anything.  I would come

5    into work, and all of a sudden I'm called into

6    the office, and I have no idea what it's about.

7              So it was a generalized -- it was

8    traumatic, and it still is traumatic to go in

9    that hospital because I still remember all the

10   memories and all the times that things

11   occurred.

12        Q.    Are there any things that occurred

13   other than what you and I have already talked

14   about today?

15        A.    That's kind of broad.

16        Q.    What I mean is, I'm using your

17   phrase, you were traumatized you say because of

18   things that occurred.  Are there any other

19   things that would go into that category of

20   events or experiences that you and I have not

21   talked about today?

22        A.    As of this moment, I can't think of

23   anything.  That doesn't mean that they didn't

24   occur.

25        Q.    I understand, and the whole purpose

Page 76

1    of this deposition is to take your testimony

2    based on your recollection.

3            A.    I understand.

4            Q.    I'm not intending to give you any

5    kind of trick questions, but just to explore

6    the limits of your knowledge.

7            A.    I appreciate that.

8            Q.    I'd like you to look now at

9    Interrogatory No. 8.  That interrogatory asks

10   you for the basis of your allegation that

11   others on the pharmacy staff committed

12   infractions that were ignored.  Are you

13   familiar with that allegation?

14           A.    Yes.

15           Q.    You identify several people here,

16   Susan Thabit being one of them.

17           A.    Yes.

18           Q.    George Brown?

19           A.    Yes.

20           Q.    Larry Schepps, S-C-H-E-P-P-S?

21           A.    Yes.

22           Q.    And Lisa Wojotowitz,

23   W-O-J-O-T-O-W-I-T-Z, if I pronounced that

24   correct.  Let's talk about each one of these

25   people.

1          What is it that you believe Susan

2     Thabit did that warranted discipline for which

3     she was not disciplined?

4          A.    Susan is an interesting person

5     there.  She has been I'm not going to say

6     accused, but she has had complaints lodged

7     against her for creating a hostile work

8     environment for pharmacy technicians.  Anna

9     Penko is a pharmacy technician, and if I'm

10    phrasing it correctly, she felt she was being

11    singled out and picked on by Susan, and it was

12    making the work environment hostile.

13         She went to Rachael Lerman and

14    complained about it and gave her the examples

15    of what she was talking about in her particular

16    case with Susan.  I'm paraphrasing this, but

17    it's pretty close to the quote that Anna told

18    me.  When she got done listing all the things

19    and why it was getting intolerable to work with

20    Susan Thabit, Rachael said, Oh, that's just

21    Susan.  Everyone has to take their turn.  Anna

22    was floored when she said that to her.

23         Q.    Do you know if Susan Thabit was

24    counseled at all regarding this complaint?

25         A.    I don't have firsthand knowledge,

1    but believe it or not, Susan and I are -- I'm

2    probably her best friend in the pharmacy, and I

3    would think that she probably would have said

4    something about it if she got counseled.

5           Q.    Do you know if Susan Thabit has

6    ever been disciplined during her employment at

7    University Hospitals?

8           A.    In my estimation I don't think

9    she's ever been disciplined as far as a formal

10   discipline.  I'm not aware of it.  Once again,

11   I'm only relying on the fact that we're fairly

12   good friends, and she tells me a lot of things.

13   But Susan was also -- it's sort of like her MO.

14   I don't know why she's like this because she's

15   like a good person, but I don't know -- this

16   has nothing to do with anything except that

17   pharmacists are -- a lot of pharmacists are

18   condescending towards pharmacy technicians, and

19   they don't treat them properly, and Susan goes

20   beyond that with some of the technicians, with

21   most of them.

22             Glenn Johnson, who has been with UH

23   for about 30 years, back when Jason -- I think

24   Jason was still a boss then or maybe Rachael.

25   No, it was when Jason was a boss.  He went to

1   Jason and asked to switch weekends because he

2   was on Susan's weekend, and he couldn't take

3   the environment she was creating for him, and

4   it got switched, and to my knowledge Susan

5   wasn't disciplined over that.

6              Who is the other?  Lacey Minnick

7   was another pharmacy technician who no longer

8   is employed at UH, but she told me that Susan

9   threw a stapler at her one night, and I can't

10  say for sure that Lacey reported that to

11  Rachael or not.  My memory isn't good of that

12  situation, but I remember her telling me that.

13             Then my firsthand knowledge with

14  Susan was this.  Early on in my career when I

15  started there, just like any new person, you

16  have to figure out the personalities and who is

17  what and who is this.  I follow Susan on my

18  shift.  Her shift ends around -- well, it used

19  to end at 11:00, but her shift ends around

20  10:30 or so.  So I come in at 9:00, and I would

21  always come into a mess.  The place would be

22  just out of control and everything.

23             Like I said, we overcame that.

24  She's way better than she used to be now.  I

25  don't run into that problem anymore.  Once

Page 80

1    again, I said that we're friends now.  We're

2    good friends.  I'm not going to say -- I think

3    I'm her best friend in there because most

4    people kind of shun her.

5             But one night a pharmacy technician

6    called in, and I always answer on speaker phone

7    simply because I have to multitask.  I'm the

8    only pharmacist on my shift, and I take care of

9    three hospitals, two by telework, Geneva and

10   Conneaut, along with Geauga, and then I also

11   take care of an Andover immediate care and then

12   an Ashtabula immediate care.  So I can't put

13   the phone up to my ear because I'm -- I'm

14   usually doing things at the same time.

15            So I answered the phone that

16   particular night, and this pharmacy technician

17   was worried about her brother-in-law, he was

18   missing, and she wanted to know if I could look

19   at the hospital census and tell her if he's

20   down in ER or if he got admitted.  I told her I

21   can't.  I said, That's HIPAA.  I said, I'm

22   sorry.  I can't tell you that.

23            Well, Susan, her workstation is

24   right beside of mine, and she heard that, and

25   she goes, Just give me the phone.  So she picks

                                          Page 81

1    up the phone, and she looks through the thing,

2    and she gives the information to that

3    technician.  I told her, I go, Susan, that's a

4    HIPAA violation.  You can't do that.  I said,

5    You can't do that.

6              Then it happened several times

7    further down the line where it would be a

8    friend of Susan's, and she's looking at that

9    patient's chart and diagnosis which is a HIPAA

10   violation.  Unless you have business in that

11   person's chart, you're not to be looking at it

12   whether it's a family member or anybody if

13   you're following the law.

14             So I had sent Rachael a note, and I

15   said I don't want Susan to be fired over this,

16   but I'm just telling you that she's violating

17   HIPAA, and as far as I knew, nothing was ever

18   done.

19        Q.   Do you know if Susan was ever

20   counseled or disciplined for maintaining a

21   messy or out-of-control work space on her

22   shift?

23        A.   I would say possibly recently she

24   was under the new supervisor.  I don't remember

25   it under Rachael Lerman.

Page 82

1        Q.    Did you ever report to anyone what

2    you viewed as Susan's inappropriate

3    interactions with pharmacy technicians?

4        A.    I may have over Glenn Johnson.  I

5    remember Anna Penko complaining to me about

6    Susan, that she was treating her unfairly.

7    Once again, I'm kind of an empathetic person.

8    I like Susan.  I don't know why in some cases,

9    but I like her, and I didn't want -- except for

10   me telling her about that HIPAA, I didn't want

11   to see her get into trouble.

12            So what I tried to act as was as an

13   in-between between the techs and her, not so

14   much going to her, but telling the techs how I

15   think they can mitigate their behavior to stay

16   out of her sights.  Like she would get upset if

17   the techs answered a phone even though it was

18   ringing off the hook and then relaying a

19   message to her.  She would get real upset.

20            I would tell the techs maybe

21   different ways to sort of mitigate that

22   circumstance or something.  I would try to

23   explain to them that there are just some

24   pharmacists who just -- I don't know why they

25   have it in for the technicians.  I don't

Page 83

1    understand it.

2              I did try to mitigate circumstances

3    because I kind of -- like I said, I empathize

4    with Susan, I know the way she is, but I also

5    know that she has helped a lot of technicians

6    there as well.  She's sort of a complex person.

7    I know she's given money to some techs.  The

8    tech that it's alleged she threw the stapler at

9    her, I know she gave money to her when she was

10   having problems.

11             So I can't condemn Susan because I

12   know she has a good heart and good side.  I

13   just don't know why she behaves in the way she

14   does.  I'm not a psychiatrist, so I don't know,

15   but that's all I have to say.

16        Q.   Did you report any of Susan's

17   conduct to anyone at University Hospitals?

18        A.   I had mentioned about coming into a

19   mess to various bosses.  I had mentioned it to

20   Jason for sure, I had mentioned it to Rachael

21   for sure, and I had mentioned it to my current

22   boss, Patricia Tumbush, that, you know, I can't

23   come walking into this mess all the time, it's

24   not necessary, and could she maybe mention or

25   could somebody maybe do something about it.

Page 84

1          For the longest time nothing was
2    done, but I think in the last, like I said, two
3    years that Patty has been there that she did
4    something because, like I say, Susan's work as
5    far as I'm concerned has improved tremendously.
6          Q.    These events with Anna Penko,
7    Glenn, and Lacey, what time frame did those
8    events occur?
9          A.    Well, Anna Penko's was during the
10   time Rachael was there, and Anna, I can't
11   remember when she came, so I would say probably
12   anywhere from 2014 to 2017 maybe.
13         Q.    What about Glenn Johnson?
14         A.    Well, Glenn was an ongoing thing,
15   so it could have been back around 2011 to 2016.
16   It could have been ongoing all that time.
17         Q.    You indicated with regard to Glenn
18   that he went to Jason?
19         A.    In 2011 he did.  He went to Jason
20   about switching weekends, and they switched
21   out, but he still had to work with Susan during
22   the week, and he still had difficulties.
23         Q.    What about Lacey Minnick?
24         A.    Lacey left to open a restaurant.
25   So I would say the time period was probably

Page 85

1    around the same time as Anna Penko, between

2    maybe like 2014 to 2015 maybe, because I think

3    Lacey has been gone for a few years now.

4         Q.    Is there anything else that you can

5    think of that Susan Thabit did for which she

6    was not disciplined that you know of?

7         A.    I can't think of anything.

8         Q.    What about George Brown, what did

9    George Brown do that warranted discipline in

10   your mind?

11        A.    I found out about this, and I

12   actually reported it to compliance, to Wendy

13   Henoch in compliance.  Rick Wise is a pharmacy

14   technician, and George Brown is a pharmacist.

15   George, once again, he had a tendency, and I'll

16   use the word pick on, to pick on Rick Wise, to

17   criticize his work, to criticize things he was

18   doing.  Rick had told me this I don't know how

19   long after it had occurred, that Rick was on a

20   counter near a printer, and George came up

21   behind him, grabbed him by both arms and

22   shoulders, and told him get out of my way and

23   tossed him aside.

24              Rick went to HR, and Rick, I think

25   he also went to compliance, and I assume -- I

1  mean, I don't assume.  To me that was a pretty

2  big infraction, to put your hands on somebody.

3  I always try to compare these things to things

4  that I've gotten accused of, and I can only

5  imagine if had I put my hands on somebody and

6  thrown them out of the way and said get out of

7  my way what would have happened to me.

8       Q.    Do you know if George Brown was

9  ever counseled or disciplined for that?

10       A.    He may have been counseled, but he

11  wasn't blocked from biding on another job

12  because he bid on a job downtown.  So if he was

13  counseled, he wasn't counseled in a manner that

14  if you look under UH policy, he really probably

15  should have been discharged for grabbing

16  another individual, and he's still working

17  there to this day.  Once again, I have nothing

18  against George Brown, I'm on a friendly basis

19  with George, but --

20       Q.    Is there anything else that George

21  Brown did that you believe warranted

22  discipline?

23       A.    Glenn Johnson reported him for the

24  very thing that Rick Wise reported him.  George

25  was in charge of monitoring aseptic technique,

1    how we made IV add mixtures, and he made it as

2    rough as he could on Glenn, and Glenn just

3    thought that what he was doing was abusive,

4    what he was making him do, and he reported him,

5    and I do not think that George was ever

6    formally disciplined.  He may have been talked

7    to and told to back off, but I remember Glenn

8    was very upset over the whole -- whole

9    incident.

10         Q.    Do you know the time frame of the

11    Glenn Johnson situation?

12         A.    You know, George has been gone for

13    a couple of years now, so I would say probably

14    2015 to 2017.

15         Q.    Is there anything else you can

16    think of related to George Brown?

17         A.    I know that many people complained

18    about him, about his personality.  I don't know

19    where they went with those complaints, but I

20    know that he wasn't -- he wasn't well liked.

21    Once again, he was a complex person, too, and I

22    saw maybe a different side because we were

23    peers.

24              So he didn't treat me -- he even

25    treated me in a manner like that one time, one

Page 88

1   or two times, but it wasn't like -- you know, I

2   sort of considered the source as far as things

3   go, and I think I did write an email to

4   somebody about the way he had conducted himself

5   that wasn't necessary around me.

6           But I remember George's brother

7   committed suicide, and I remember crying with

8   him, and George had two boys who were my sons'

9   ages, and so we used to talk about the boys a

10  lot, and I consider him a friend, but I know

11  that he -- a lot of people were glad when he

12  left, so I don't know if others complained

13  about him or not.

14      Q.    What about Larry Schepps,

15  S-C-H-E-P-P-S?

16      A.    Larry is a pharmacist, and he

17  worked part time at this stage of his career

18  when I knew him.  He had been there full time

19  for years.  He's in his 70s now.  I told you

20  Susan Thabit, a lot of people had issues with

21  her not doing work.

22          Because I work third shift, I'm not

23  aware of what goes on on first shift, the

24  relationships and things as much as other

25  people are.  One day everybody was all agog

Page 89

1   because Susan would usually come in around 1:00

2   or 2:00, and then she would get lost for a few

3   hours.  That was a really busy time, and they

4   needed somebody to help with the work.

5           So Larry, he used to get -- the

6   workload affected him greatly.  It would make

7   him nervous or whatever.  He was older and past

8   his prime and not used to the new systems that

9   were there, so naturally he was having

10  difficulty with it.

11          This was a day he needed some help

12  over there, and Susan was sitting across the

13  hall for like an hour-and-a-half when she came

14  in.  So Larry went across the hall, and he

15  swore at her.  He said, God damn it, Susan.

16  I'm paraphrasing.  I know he said God damn it.

17  I don't know how exactly he said it, but what

18  they told me was he said, God damn it, Susan.

19  You need to get off your lazy behind and get

20  over there because we're getting buried.

21          So I knew about that incident, and

22  I knew about other incidents from techs where

23  Larry would slam the phone down on nurses and

24  hang up on them.  Like I said, I'm not trying

25  to paint myself as a saint or anything like

Page 90

1    this, but once again, I only compare what other

2    people seem to get away with things -- I never

3    slam a phone receiver down because I'm never on

4    a phone receiver, I'm always on speaker phone,

5    so I never hang up on anybody or do anything

6    like that, but, you know.

7         Q.    Do you know if any of this conduct

8    by Larry was reported to anyone at University

9    Hospitals?

10        A.    I want to say that Rachael heard

11   him say that because it was over near her

12   office, and I want to say that people said he

13   got called into the office.  But as far as

14   formal counseling, it did not look like Larry

15   was ever formally counseled.

16        Q.    Do you know if he was or he wasn't?

17        A.    I do not know.

18        Q.    Is there anything else that you can

19   think of that Larry did that warranted

20   discipline?

21        A.    No.  Like I said, just yelling at

22   nurses on the phone or hanging up on them.

23        Q.    Tell me about Lisa.  How do you

24   pronounce her last name?

25        A.    You know what?  I'm not even sure.

Page 91

1    That's her maiden name.  I would say

2    Wojotowitz.  Lisa is a pharmacist who is a

3    saintly person.  She is a very good person, but

4    she tries too hard sometimes to please.  She is

5    my opposite.  I work seven days in a row on

6    third shift, Lisa works the opposite seven days

7    of me, so her and I never work together.

8              But one time, and I don't know how

9    many years ago this was, but I know Rachael was

10   in charge, and a nurse had an upset stomach, a

11   bad upset stomach, and there is a prescription

12   medicine called ondansetron which is for nausea

13   and vomiting, but it's a prescription, and Lisa

14   gave that nurse an ondansetron, and the reason

15   Lisa gave her the ondansetron was the nurse had

16   taken an ondansetron out of a patient's

17   medication drawer, so she wanted to replace the

18   one she had taken.

19              It turned into a really big deal

20   thing where the nurse was -- she was

21   given -- she was suspended for a very long

22   time.  I think that she was fired officially,

23   and then she appealed it somehow, and somehow

24   she got back in with a suspension, but she left

25   soon after that.  The pharmacy part of it ended

Page 92

1    up being a huge deal that Lisa gave her that

2    prescription medication even though it wasn't a

3    controlled substance or anything and she only

4    did it once.  But in this day and age with the

5    way everything is, it was a huge deal.

6              All the pharmacists got called up

7    to HR, and we all had to promise never to give

8    anything out, not even a Tylenol to somebody

9    with a headache.  At that time we all feared

10   that Lisa was going to get fired or suspended,

11   and she didn't, which I'm happy about.

12             But once again, the only thing that

13   I say is God help it if it was me that did that

14   because I would for sure think that it would be

15   handled differently.  That's my opinion.

16        Q.   Is there anyone else that you can

17   think of that committed similar infractions to

18   you, but those infractions were ignored?

19        A.   I think there might be one other

20   person, and I'm trying to think about it.  I

21   can't think of the person right now.

22             MS. ISRAEL:  Let's take a break and

23   go off the record.

24                  (Brief recess.)

25        Q.   Mr. Dundee, I want to direct your

Page 93

1    attention back to Exhibit 3 again.  In response

2    to Interrogatory No. 12, you indicated that

3    other staff members had written humorous asides

4    as well.  Do you recall any of those humorous

5    asides and who they were written by?

6         A.    The only humorous asides that I can

7    recall were ones that were written by me.  I

8    often wrote a little commentary.  I seem to

9    think I'm funny.  I don't know if other people

10   do, but I try to keep the banter going.

11            But when I drive into University

12   Hospital Geauga, I have to go through Route 168

13   which is in an Amish area, so they have buggies

14   out all the time, so it makes it kind of

15   difficult sometimes.  One night I don't know

16   what was going on, but there were buggies

17   everywhere, and I couldn't pass them because

18   they were all lined up.  I don't know if they

19   were having a festival, it was a funeral, or

20   what.

21            I remember when I went to work,

22   this girl, this tech, Gina, takes care of our

23   time exception logs, and so I remember writing

24   on there that it was like Amish Armageddon, and

25   I thought that was pretty funny, and I tried to

Page 94

1   explain why I couldn't pass these people and

2   stuff.  I would make other comments like that.

3               Susan and I had a regular thing

4   going on which was what we were continuing that

5   night.  She would ask me to do something or she

6   would ask to do something, and I would write

7   something on there.  She would just -- I would

8   say, well, is this okay, and what I wrote was

9   just humorous and positively false, and she

10  would just laugh like crazy, and then she would

11  usually scratch it out or something, but not

12  all the time.

13              So I know that I made numerous

14  comments probably on a pay period basis, that I

15  would make some sort of comment or draw a

16  little picture or something.  These sheets were

17  nothing formal.  They were just a sheet of

18  paper that it wasn't -- it was just our

19  department's way of handling this, and they

20  would just make copies of it and keep it going.

21              So it wasn't anything where, you

22  know, that it was an on-line time and

23  attendance thing.  It was just something

24  informal that if something untoward came up,

25  you forgot your badge or you did something,

Page 95

1    those were types of exceptions, or if you ran

2    late, whether it was because of weather,

3    because of the Amish, or because of whatever.

4    So you would write these things on there.  I

5    know that other people had written some

6    humorous things.

7                    In fact, Ms. Lerman, regardless of

8    me filing a suit, she had a good sense of

9    humor, too, and she used to enjoy posting

10   little things or writing little notes.  I can't

11   say that she wrote little notes on that for

12   sure, but I do seem to remember her

13   writing -- finding some of my notes that I put

14   on there when she was handling it humorous

15   because she would tell me about them or she

16   would, I don't know, write something or other

17   or a note, or she would tell me face to face

18   that it was funny or something like that.  Not

19   every interaction I had with her was terrible.

20   It just got terrible, but it wasn't terrible.

21   But, like I said, other people --

22                    But here's the thing about that

23   time and attendance situation, when we met on

24   8-5-16 and Jason was bringing that up, that

25   could have been my way out of there.  Why

Page 96

1   didn't they write me up for that?  I mean, were

2   they just being nice or what?  Because he could

3   have wrote me up.  He could have made it a

4   formal discipline and written me up, and I

5   would have been at the point that I was on

6   June 26th, 2017.  I would have been at the last

7   step.

8           But in my opinion the reason he

9   didn't write me up and the only reason he

10  threatened me was that he thought that that

11  meeting would go poof, that there was no proof

12  we ever met, that nothing ever happened, that

13  they intimidated me, did a materially adverse

14  action and they thought it was going to go

15  poof, but they didn't count on Phil Snyder

16  hearing him call me to that meeting.

17          Q.    What is the basis for your belief

18  that Jason intended to hide the existence of

19  that meeting?

20          A.    Well, the position statement

21  that -- that not just Jason, but Danialle

22  Lynce, the position statement, the two position

23  statements that Danialle Lynce wrote in

24  response to my EEOC filing make no mention of

25  that 8-5-2016 meeting, and in fact Ms. Lynce in

Page 97

1    her position statement states, paraphrasing

2    again, that she has no idea of what protected

3    activity I was referring to.

4                That's what makes me think that

5    they -- and I stated as much when on Monday,

6    that following Monday, two days later after

7    this meeting, I wrote to compliance, to Ed

8    Soyka, telling him that they had violated EEOC

9    rules against retaliation against a protected

10   activity, and I told him that I was threatened

11   with future action, but they didn't act on it

12   at that point because then it would have

13   confirmed what they were doing.

14               But once again, the increased

15   scrutiny that they promised was retaliation.

16   So regardless of what they did, they retaliated

17   against me by threatening me and promising

18   increased scrutiny going forward and

19   threatening me with termination.

20               I'm sorry.  I'm talking louder.  I

21   apologize.

22        Q.    No need to apologize.

23               In your complaint you mention

24   defendants' threats, and we've discussed today

25   the threats that you say were made during the

Page 98

1    August 2016 meeting by Jason and Danialle that

2    you would be subject to termination if you

3    engaged in similar behavior such as the notes

4    that were discussed with you; is that right?

5         A.    Correct.

6         Q.    Are there any other threats that we

7    haven't discussed today that UH or any of its

8    employees made towards you?

9         A.    Well, I was threatened by Shawn

10   Osborne in a letter that I received in November

11   of 2017, and it was a very direct letter that

12   said that unless I attended an EAP session by

13   12-7-2017 I could be terminated.  It was -- I

14   got the letter two days before Thanksgiving,

15   but I think it was written earlier, and he

16   threatened me with termination if I did not

17   attend that EAP session.

18        Q.    Any other threats that you can

19   think of?

20        A.    At this moment I can't think of any

21   other threats.

22        Q.    Also in your complaint when you're

23   talking about your hostile work environment,

24   you state that the hostile work environment was

25   created by Ms. Lynce, Ms. Lerman, and others

Page 99

1    who were complicit in the conspiracy.  What
2    conspiracy are you referring to?
3         A.    Once again, I go back to the fact
4    that I didn't depose anyone, and I think I
5    stated in that that things would be revealed
6    once I took depositions.  Jason Glowczeski, the
7    morning of that meeting I had to pull my car
8    around to the other side of the hospital, the
9    meeting of 8-5-2016.  As I'm pulling around,
10   Jason pulls in practically next to me.  Jason
11   is a nice guy.  Once again, I'm suing nice
12   people.  But he is a nice guy, and he was a
13   good boss.  He looked distraught to me when we
14   were walking in.  I mean, he looked like he was
15   walking the Green Mile when we were walking in
16   that morning together.  He hardly said a word.
17   He looked troubled to me.  He just wasn't
18   acting himself.
19            At that point he was pretty high up
20   in the -- he was still in the pharmacy chain of
21   command, but he was pretty high up.  Rachael
22   had taken his job, and he was a regional
23   manager now at this point.  So there aren't too
24   many people that could order him to do
25   something if he didn't want to, and Danialle

Page 100

1   Lynce I don't think could order him to attend

2   this meeting on 8-5-2016 on her own.  I don't

3   think she had the stature to do that.

4            In my estimation somebody higher up

5   had to be involved to compel Jason to come to a

6   meeting that he clearly didn't want to attend.

7   Even when he was in there threatening me, it

8   wasn't with the same vitriol that Danialle

9   Lynce was threatening me.  So I knew that he

10  didn't want to be there.

11           Then when I got that letter from

12  Shawn Osborne those few days before

13  Thanksgiving in 2017, I saw a co-signature on

14  there was Attorney Heather Harmon, UH HR.  I

15  said, boy, this got -- this whole thing is

16  pretty high up because I had never heard of

17  Ms. Harmon before, but she obviously was -- you

18  know, they threw her name on there to give it

19  some punch.  Here I've got an attorney's name

20  on this sheet from Shawn Osborne who is as high

21  up in the pharmacy chain of command that you

22  can get.

23           So for Shawn Osborne to write that

24  letter, he had to be compelled also by somebody

25  who was in the chain of command.  That was

Page 101

1    my -- that's what I surmised, and that's what I

2    thought I was going to find out deposing

3    people.

4              The other thing I thought I was

5    going to find out was about Rebecca Besselman

6    who was the HR rep that I wrote those two

7    emails that got me written up.  She was

8    assigned by compliance to sit in on every

9    interaction that I had with Rachael Lerman

10   because I had gone to compliance several times

11   about the hostile work environment.

12             So they said that this third-party,

13   supposedly neutral -- and I do say that Rebecca

14   Besselman was pretty neutral most of the time.

15   She sat in on an evaluation, she sat in on any

16   discipline hearing, and she and I got to be

17   friends because when I met her she had

18   bronchitis really bad, and she was coughing

19   when I was in there, and I told her, I go, You

20   got Flonase at home?  She said, Yeah.  I said,

21   Just get Flonase and use it for a few days

22   twice a day, I said, because sometimes this

23   affects this, so do that.  The next time that

24   we met she told me that that had worked for

25   her, and we had joked many times after that.

Page 102

1    We had had jokes many times after that.

2                  The thing that really made me think

3    that other people were complicit in this was

4    those two emails were sent to Rebecca

5    Besselman, and any reasonable person that would

6    read her responses to those emails, because she

7    didn't take note of those phrases at all, and

8    she just glossed over them.  In fact, she made

9    a joke with the first email that she sent back

10   to me about her office being so cold that she

11   couldn't type.

12                  That is where the complicity comes

13   in, too, because Rebecca Besselman quit about

14   two to three weeks after that June 26th, 2017,

15   write-up, and I want to know and I've always

16   wanted to know and I've asked it and it's in my

17   -- and it's in the exhibits that I put in my

18   motion for summary judgment, I want to know and

19   I've asked for many years who filed the

20   complaint against me for those phrases that I

21   made to Rebecca Besselman, and I can't get an

22   answer, and I don't know why Rebecca quit after

23   that, either.

24                  So once again, had I deposed

25   Rebecca Besselman and maybe had I deposed Steve

Page 103

1    Jones who was over everybody there and who I

2    had written to in the past about a hostile work

3    environment as well, I may have found out who

4    was complicit in this ever.

5              Once again, when I put my motion

6    for summary judgment in, I didn't want the

7    excess noise.  It didn't matter who was

8    complicit in it I had decided.  That would just

9    be extraneous noise.  I felt I had enough

10   evidence and based on the law that my motion

11   for summary judgment was enough without that

12   other stuff.

13        Q.    Other than the people that we've

14   talked about today, are you aware of anybody

15   else at University Hospitals who was

16   responsible for creating a hostile work

17   environment or retaliating against you?

18        A.    At this moment I'm not aware.

19                   -   -   -   -   -

20              (Thereupon, Deposition Exhibit 4, a

21              Document Bates Labeled UH-Dundee

22              0036, was marked for purposes of

23              identification.)

24                   -   -   -   -   -

25        Q.    I'm going to hand you next what's

1    been marked as Defendant's Exhibit 4.  Do you

2    recognize that document?

3         A.    When did I write this?  There were

4    so many things in the beginning.  Yes, I do

5    remember this.  I do remember this.

6         Q.    What is Exhibit 4?

7         A.    It's my charge of -- is this age

8    discrimination?  Yes.  It was an age

9    discrimination lawsuit that I filed -- not

10   lawsuit, an age discrimination complaint I

11   filed with the Cleveland EEOC.

12        Q.    Is that your signature at the

13   bottom?

14        A.    Yes, it is.

15        Q.    This indicates that you submitted

16   this charge on November 12th, 2013.  Is that

17   consistent with your recollection?

18        A.    Yes, it is.

19        Q.    This charge relates to a pamphlet

20   for EAP that you found in your locker in

21   October of 2013; is that right?

22        A.    Correct.  But it also spoke to the

23   hostile work environment as well.

24                    -  -  -  -  -

25                 (Thereupon, Deposition Exhibit 5, a

Page 105

1                Document Bates Labeled UH-Dundee

2                0204 through 0207, was marked for

3                purposes of identification.)

4                     -  -  -  -  -

5         Q.     I'm going to hand you Defendant's

6    Exhibit 5.  Do you recognize that document?

7         A.     I recognize it.  I just have to

8    find out when I wrote it.  Yes, I do recognize

9    it.

10        Q.     Is that your signature on the last

11   page?

12        A.     Yes, it is.  Well, it was a -- it

13   was a PDF signature, yes.

14        Q.     Your electronic signature?

15        A.     Yes, an electronic signature.

16        Q.     What is this document?

17        A.     This -- I have to make sure, my

18   eyes are kind of going a little goofy right

19   now, if this is the first one that I filed.  I

20   have to find the date on here.  I'm sorry.

21        Q.     The date is on the last page near

22   your signature, August 19th, 2017.

23        A.     Yes.  Okay.  This was -- this was

24   the first complaint I made about retaliation

25   against a protected activity.

Page 106

1        Q.    Do you know if this intake

2   questionnaire and complaint became an official

3   EEOC charge?

4        A.    Yes, it did.

5                       -  -  -  -  -

6               (Thereupon, Deposition Exhibit 6, a

7               Document Bates Labeled UH-Dundee

8               0208 through 0211, was marked for

9               purposes of identification.)

10                      -  -  -  -  -

11       Q.    I'm handing you Defendant's

12   Exhibit --

13       A.    Should I put these down?

14       Q.    Yes.  You can set those down.  I'm

15   handing you Defendant's Exhibit 6.  Do you

16   recognize that document?

17       A.    Yes, I think I do.  Let me see

18   here.  Yes.  This is -- this is my ADA, first

19   ADA complaint that I filed with the EEOC

20   Cleveland office.

21       Q.    Is that your electronic signature

22   on the last page?

23       A.    Yes, it is.

24       Q.    This indicates that you submitted

25   this intake questionnaire on August 23rd, 2017;

Page 107

1    is that right?

2          A.    That is correct.

3          Q.    Do you know if this intake

4    questionnaire became a formal EEOC charge?

5          A.    It did.

6          Q.    You can set that aside.

7                    -   -   -   -   -

8                (Thereupon, Deposition Exhibit 7, a

9                Document Bates Labeled UH-Dundee

10               0212, was marked for purposes of

11               identification.)

12                   -   -   -   -   -

13         Q.    Take a look at Defendant's

14   Exhibit 7, and let me know if you've seen that

15   document before.

16         A.    Yes, I have.

17         Q.    Is that your signature at the

18   bottom?

19         A.    Yes, it is.

20         Q.    What is this document?

21         A.    I filed with the Ohio Civil Rights

22   Commission a charge of discrimination, once

23   again, it's under the Title I of the ADA, for

24   being forced to submit to mandatory EAP

25   counseling sessions.

Page 108

1        Q.     Did you sign and submit this charge

2    of discrimination on September 14th, 2017?

3        A.     I don't think so.  Wait a second.

4    I don't think I did.  I thought this was more

5    in the spring of 2018.  Well, what's that say?

6    9-14-17.

7        Q.     If you want to read silently to

8    yourself so she doesn't have to try to take

9    down your mumbles, that would be helpful.

10       A.     I'm so sorry.  I must have filed

11   this at 9-14-17, yes.

12                    -   -   -   -   -

13              (Thereupon, Deposition Exhibit 8, a

14              Document Bates Labeled UH-Dundee

15              0276 through 0279, was marked for

16              purposes of identification.)

17                    -   -   -   -   -

18       Q.     I'm handing you Defendant's

19   Exhibit 8.  Do you recognize that document?

20       A.     Yes, I do.

21       Q.     What is it?

22       A.     Yeah.  This document doesn't have

23   anything to do with my lawsuit.  This is a

24   document I filed because I felt that the

25   hospital wasn't discussing an accommodation for

Page 109

1    my handicap in good faith, but this has nothing

2    to do with the lawsuit that we're discussing.

3         Q.    Is this your signature on the last

4    page?

5         A.    Yes, it is.

6         Q.    This is a charge of discrimination

7    for disability discrimination signed by you and

8    submitted on September 2nd, 2018; is that

9    right?

10        A.    Yes, but I withdrew this.

11        Q.    So no formal charges?

12        A.    No.  I withdrew that.  Heather

13   Harmon had made some inroads in our

14   discussions, and I told her because she had

15   shown such good faith that I would drop the

16   charge.

17             MS. ISRAEL:  Let's go off the

18   record for a minute.

19                  (Brief recess.)

20                  -  -  -  -  -

21             (Thereupon, Deposition Exhibit 9, a

22             Document Bates Labeled UH-Dundee

23             0092, was marked for purposes of

24             identification.)

25                  -  -  -  -  -

Page 110

1          Q.    I'm handing you Defendant's

2     Exhibit 9.  Do you recognize that document,

3     Mr. Dundee?

4          A.    Yes, I do recognize it.

5          Q.    The top portion of that document is

6     a copy of a handwritten note.  Is that your

7     handwriting?

8          A.    No, it's not my handwriting.

9          Q.    Do you know whose handwriting it

10    is?

11         A.    I know now.  I didn't know at the

12    time.  You know what?  I can't say that I know

13    now.  I don't know whose it is to tell you the

14    truth.

15         Q.    The bottom half of the page

16    includes some typewritten text.  Is that your

17    text?

18         A.    It certainly is.

19         Q.    And you wrote that message?

20         A.    Yes, I did.

21         Q.    You can set that aside.

22                    -   -   -   -   -

23                    (Thereupon, Deposition Exhibit 10, a

24                    Document Bates Labeled UH-Dundee

25                    0117, was marked for purposes of

```
 1              identification.)

 2                      -   -   -   -   -

 3         Q.    I'm handing you next Exhibit 10.  I

 4    want you to focus on the lower right-hand

 5    corner here.  There is a little bit of cutoff,

 6    but if you could tell me if you recognize this

 7    handwriting here and what does it say.

 8         A.    "She forced me to sign this.

 9    Help."

10         Q.    Whose handwriting is that?

11         A.    That's me.

12         Q.    You wrote that note on that

13    timekeeping exception log?

14         A.    Yes, I did.

15                      -   -   -   -   -

16                (Thereupon, Deposition Exhibit 11, a

17                Document Bates Labeled UH-Dundee

18                0118, was marked for purposes of

19                identification.)

20                      -   -   -   -   -

21         Q.    I'm going to hand you next

22    Defendant's Exhibit 11 and direct your

23    attention to this highlighted handwriting here

24    in the middle.  If you could take a look at

25    that, and let me know if you can read it.
```

Page 112

1          A.     Yes.   That's mine.

2          Q.     What did you write on that log?

3          A.     I said, "Not sure if she left then.

4    I wasn't at the time clock.  She may be lying."

5          Q.     Who were you referring to in that

6    note?

7          A.     Susan Thabit.

8          Q.     Okay.  Finally, I'm going to hand

9    you Defendant's Exhibit 12.

10                     -   -   -   -   -

11                (Thereupon, Deposition Exhibit 12, a

12                Document Bates Labeled UH-Dundee

13                0152, was marked for purposes of

14                identification.)

15                     -   -   -   -   -

16          Q.     There is a highlighted typed

17    section here.  If you could read that and let

18    me know if you answered that comment on the

19    log.

20          A.     Let's see what it says.  Where are

21    you showing me?  I'm sorry.

22          Q.     It's no problem.  Here, this

23    highlighted typed section right in the middle

24    of the exhibit (indicating).

25          A.     Yes.  Yes, that would be -- yes,

Page 113

1    because I couldn't write all of that on there.

2         Q.    What did you type onto that form?

3         A.    It says, "12-11-16 Frank, punch in

4    2116, extremely hazardous road conditions.  I

5    feel that UH should pay me for travel time

6    under these conditions."

7         Q.    Okay.  That's all the questions

8    that I have for you today.

9         A.    You are the best.

10        Q.    Say that on the record, please.

11             We talked about a number of topics

12   today, and you indicated that you would let me

13   know if you thought of any additional

14   information such as peoples' names or events.

15   Have you thought of anything during our breaks

16   or during the time that you've been deposed

17   today?

18        A.    I'll just find out that name of my

19   friend Sergio's cousin who works with the EEOC

20   because I have it, and I just can't believe I

21   can't think of it right now.

22        Q.    Is there anything else that you

23   would like to add to your testimony today?  I'm

24   not asking for a speech.  I'm just asking for

25   additional evidence or information that you

1   might have that's relevant for your claims.

2          A.    I don't have anything that I can

3   think of right now.

4               MS. ISRAEL:  Thank you.  I

5   appreciate your time, and this deposition is

6   concluded.

7               When this transcript is typed up,

8   you have an opportunity to read the transcript

9   and fill out what's called an errata sheet and

10  correct any errors, typos, mistakes that you

11  may have made in your testimony.  You can

12  choose to read the transcript and sign, or you

13  can waive that right and allow the transcript

14  to stand as it is.

15              Do you want to make a decision on

16  that today?

17              MR. DUNDEE:  You know, part of me

18  wants to just say it's all okay.  I've already

19  put in for a summary judgment.  I can waive

20  that.

21              MS. ISRAEL:  He'll waive, and we

22  will take a copy.

23         (Deposition concluded at 12:23 p.m.)

24

25

Page 115

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                     SIGNATURE:

6    It was agreed by and between counsel and the

7    parties that the reading and signing of the

8    transcript of said deposition, be and the same

9    is hereby waived.

10

11                TRANSCRIPT DELIVERY:

12   Counsel was requested to give instruction

13   regarding delivery date of transcript.

14              Ms. Israel ordered the original

15   transcript regular delivery.

16              Mr. Dundee did not order a copy.

17

18

19

20

21

22

23

24

25

Page 116

1               REPORTER'S CERTIFICATE

2    The State of Ohio,   )

3                        SS:

4    County of Cuyahoga.  )

5

6          I, Cynthia Sullivan, RPR, a Notary

7    Public within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, FRANK D. DUNDEE,

10   was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19          I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

Page 117

1            I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5            IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 19th day of

8    March, 2020.

9

10

11

12

13

14            Cynthia Sullivan, Notary Public

15            within and for the State of Ohio

16

17    My commission expires October 17, 2021.

18

19

20

21

22

23

24

25

[& - accommodate]

| & | | |
|---|---|---|
| **&** | 2:11 | |

**0**

**0036** 4:8 103:22
**0092** 4:16 109:23
**0108** 4:3 8:7
**0117** 4:17 110:25
**0118** 4:19 111:18
**0152** 4:20 112:13
**0204** 4:10 105:2
**0207** 4:10 105:2
**0208** 4:11 106:8
**0211** 4:11 106:8
**0212** 4:13 107:10
**0276** 4:14 108:15
**0279** 4:14 108:15
**04** 50:15,21

**1**

**1** 4:3 8:3,5 22:17
  60:8
**10** 1:18 4:17
  110:23 111:3
**100** 16:9
**103** 4:8
**104** 4:9
**106** 4:11
**107** 4:12
**108** 4:14
**109** 4:15
**10:00** 20:8
**10:30** 79:20
**11** 4:18 111:16,22
**110** 4:17
**111** 4:18
**112** 4:20
**116** 3:10
**11:00** 79:19
**12** 4:20 13:15 93:2
  112:9,11

**12-11-16** 113:3
**12-7-2017** 98:13
**12:23** 114:23
**12th** 104:16
**1300** 2:13
**14th** 108:2
**15** 14:4,20
**1600** 2:14
**168** 93:12
**17** 117:17
**18** 69:4
**19** 12:11,12
**19th** 105:22 117:7
**1:19cv01141** 1:7

**2**

**2** 3:3 4:4 59:15,22
  62:24,24
**20** 14:4 15:5 36:10
**2003** 50:15,20,21
**2010** 53:1,24
**2011** 54:13 84:15
  84:19
**2011-2012** 54:13
**2012** 54:14 74:15
**2013** 74:1 104:16
  104:21
**2014** 84:12 85:2
**2015** 24:11 53:19
  85:2 87:14
**2016** 8:23 9:25
  15:11 16:17,23
  19:8 20:7 22:12
  22:20 56:2 68:25
  68:25 84:15 98:1
**2017** 17:2 19:17
  22:7 23:3,9,11,25
  24:7 29:17 33:8
  39:13 75:3 84:12
  87:14 96:6 98:11
  100:13 102:14
  105:22 106:25

**108:2**
**2018** 33:18 35:22
  37:2 38:15,16
  39:21 40:6 51:20
  56:3,8 108:5
  109:8
**2019** 38:15 65:11
**2020** 1:18 51:21
  117:8
**2021** 117:17
**21** 36:10
**2116** 113:4
**216** 2:16
**22** 36:10
**2231** 117:13
**23andme** 36:1,5
**23rd** 8:22 22:20
  106:25
**25** 15:5
**26th** 17:2 19:17,22
  22:6,12,25 23:9
  24:7 29:17 75:3
  96:6 102:14
**2:00** 89:2
**2nd** 109:8

**3**

**3** 4:6 62:8,10 93:1
**30** 56:18 57:15
  78:23
**330** 2:7
**398-8274** 2:7

**4**

**4** 3:5 4:8 61:2
  103:20 104:1,6
**44114** 2:15
**44512** 2:6
**4th** 20:7

**5**

**5** 3:8 4:9 104:25
  105:6
**59** 4:4
**5th** 9:25 15:11
  16:17,23 19:8
  68:25

**6**

**6** 4:11 61:17 73:7
  106:6,15
**62** 4:6
**621-5161** 2:16

**7**

**7** 4:12 107:8,14
**70s** 88:19
**7707** 1:22 2:5

**8**

**8** 4:3,14 61:22
  76:9 108:13,19
**8-5-16** 18:18 95:24
**8-5-2016** 23:7
  96:25 99:9 100:2
**80** 36:4,5,7

**9**

**9** 4:15 109:21
  110:2
**9-14-17** 108:6,11
**9:30** 1:19

**a**

**a.m.** 1:19
**abeyance** 29:3
**ability** 31:19,21
  32:9 33:23,23
  57:18,24
**able** 20:11 42:5
  48:2
**abusive** 87:3
**accommodate** 7:9

[accommodation - assist]                                              Page 2

**accommodation**
58:19 108:25
**accurate** 10:23
12:6,18 16:12
27:1,8,9
**accused** 77:6 86:4
**act** 82:12 97:11
**acting** 99:18
**action** 10:15 15:12
19:23 23:12 24:1
24:6,15 25:9
42:16,19,21 43:15
43:18 72:18 96:14
97:11 117:4
**actionable** 25:1
**actions** 21:3 24:12
45:24 46:2 47:1
**activities** 48:19
**activity** 7:21 10:5
10:10 21:4,6,7,19
22:5,10 23:5 72:1
97:3,10 105:25
**actors** 26:1
**acuity** 39:9
**ada** 26:15,17 28:7
43:24 46:24
106:18,19 107:23
**add** 24:9 26:11
34:23 71:17 87:1
113:23
**addendum** 14:13
**addendums** 11:21
14:10 25:8
**additional** 31:9
49:11,13 113:13
113:25
**addressed** 23:10
25:7
**adjournment**
116:22

**admission** 4:5
59:17 60:7,8,19,24
61:2,17
**admit** 60:25
**admitted** 80:20
**adverse** 10:15
96:13
**affect** 39:8 57:18
**affiliated** 32:15,17
**affixed** 117:6
**aforesaid** 116:12
**afraid** 49:7 54:23
**age** 5:1 92:4 104:7
104:8,10
**ages** 88:9
**aggravated** 30:23
**aggravation** 32:20
**ago** 39:2 53:18
56:1,1,18 91:9
**agog** 88:25
**agreed** 115:6
**ahead** 15:25 58:9
60:5 70:13
**air** 64:21
**airlock** 74:19
**airplane** 17:6
**al** 1:9
**aleene** 55:16
**allegation** 7:12
76:10,13
**allegations** 70:16
71:1
**allege** 44:5 63:16
**alleged** 61:4 63:6
66:19 68:5,17
72:12 83:8
**allow** 58:20,23
114:13
**allowed** 14:10,12
14:13 15:19 48:5

**amberwood** 1:22
2:5
**ambushed** 24:18
75:2
**amish** 93:13,24
95:3
**amount** 39:5
**andover** 80:11
**anna** 77:8,17,21
82:5 84:6,9,10
85:1
**answer** 6:4,8,14
17:16 27:11 29:4
58:10 66:8 73:10
80:6 102:22
**answered** 80:15
82:17 112:18
**answers** 61:12
62:19,20,22
**anticipate** 63:1
**antihistamine**
38:19
**anxiety** 48:17
50:16 52:8,9
**anxious** 50:18
75:2
**anybody** 20:17
26:10 50:17 63:24
81:12 90:5 103:14
**anymore** 79:25
**anytime** 16:23
**apologize** 97:21,22
**appealed** 91:23
**appearance** 74:15
**appearances** 2:1
3:3
**application** 54:11
**applications** 54:3
**applied** 52:24 53:8
53:23 55:3,9 56:6

**apply** 54:8 55:8,12
55:14
**applying** 55:12
**appointment** 30:3
31:12,25 32:1,5
33:7,18,20 37:15
37:19,25
**appointments**
34:3
**appreciate** 12:20
12:25 27:10 76:7
114:5
**approximately**
14:3 15:5 38:1
53:13
**arbitration** 5:21
**area** 93:13
**areas** 58:3
**argument** 47:2
**armageddon**
93:24
**arms** 85:21
**aseptic** 86:25
**ashtabula** 80:12
**aside** 9:8 16:18
73:20 85:23 107:6
110:21
**asides** 93:3,5,6
**asked** 13:11 15:1
15:24 20:8 29:2
29:25 35:12 41:22
58:25 71:6 79:1
102:16,19
**asking** 10:11
12:21 58:20 60:25
113:24,24
**asks** 73:8 76:9
**assigned** 18:1
71:19 101:8
**assist** 34:16

**assistance** 25:19 26:16 28:4 30:2
**associated** 32:24 39:18 40:1
**assume** 66:8 85:25 86:1
**assuredly** 28:17 28:18
**attacks** 50:3,4,13 50:19
**attend** 20:16 29:5 29:8 42:12,17 43:19 71:8 98:17 100:1,6
**attendance** 11:6 14:24 69:7 94:23 95:23
**attended** 98:12
**attention** 93:1 111:23
**attorney** 12:16 15:8 65:8,12 66:21 100:14 117:2
**attorney's** 100:19
**august** 9:25 15:11 16:17,23 19:8 20:3,7 68:25 98:1 105:22 106:25
**avoidance** 41:4
**aware** 25:10 34:25 67:20,21,24 68:1 71:21 72:21,21 78:10 88:23 103:14,18

**b**

**b** 32:10,10
**back** 15:19,22 24:11 29:16,17 74:15 78:23 84:15 87:7 91:24 93:1

99:3 102:9
**baclofen** 38:23
**bad** 55:7 91:11 101:18
**badge** 94:25
**badgering** 14:19
**banter** 93:10
**based** 44:2 46:4 76:2 103:10
**basis** 21:6 39:10 46:23 76:10 86:18 94:14 96:17
**bates** 4:3,8,9,11,12 4:14,15,17,18,20 8:6 103:21 105:1 106:7 107:9 108:14 109:22 110:24 111:17 112:12
**bearings** 24:20
**becky** 23:18
**began** 52:25
**beginning** 104:4
**behalf** 2:3,10 63:2
**behaves** 83:13
**behavior** 82:15 98:3
**behaviors** 24:12
**belief** 96:17
**believe** 20:3 26:3 41:3 42:11 46:25 65:3 77:1 78:1 86:21 113:20
**believed** 45:20
**benefits** 53:9 61:18
**besselman** 8:19 17:21,23 23:18 101:5,14 102:5,13 102:21,25

**best** 10:18 12:24 13:4 32:9 53:19 64:6,16,17 78:2 80:3 113:9
**better** 40:21 79:24
**beyond** 24:4,4 78:20
**bid** 55:22 56:5 86:12
**biding** 86:11
**big** 86:2 91:19
**bigger** 69:19
**biggest** 24:21 42:1
**bit** 111:5
**blocked** 86:11
**boardman** 1:23 2:6
**bobovnyik** 32:6,21 35:3,14 36:15 37:6 38:12 52:12
**body** 74:17
**bold** 60:9 62:19
**boss** 78:24,25 83:22 99:13
**bosses** 83:19
**bottom** 104:13 107:18 110:15
**boy** 18:10 100:15
**boys** 88:8,9
**break** 59:12 92:22
**breaks** 27:17,19 113:15
**brief** 92:24 109:19
**bringing** 95:24
**broad** 45:2 75:15
**broker** 40:14
**bronchitis** 101:18
**brother** 63:24 64:2,15 80:17 88:6

**brown** 76:18 85:8 85:9,14 86:8,18,21 87:16
**buggies** 93:13,16
**bulldog** 53:16
**buried** 89:20
**business** 27:21 28:8 47:25 48:4 81:10
**busy** 89:3

**c**

**c** 76:20 88:15
**call** 29:19 66:17 67:23 96:16
**called** 5:1 6:24 13:20 17:2 20:7,7 75:5 80:6 90:13 91:12 92:6 114:9
**calling** 63:1
**canfield** 32:12
**capable** 26:24
**caption** 116:21
**car** 12:9 15:6 31:20 99:7
**card** 70:5
**care** 80:8,11,11,12 93:22
**career** 79:14 88:17
**carolina** 64:8
**case** 1:7 7:4,8,12 44:22 45:10 55:1 55:1 62:24 64:3 67:15 77:16
**cases** 82:8
**category** 75:19
**caught** 63:11
**cause** 34:13 39:4 116:12
**caused** 49:23 52:22

causes  34:11
census  80:19
center  5:11
certainly  110:18
certificate  3:10
  116:1
certification  72:18
certified  5:4
certify  116:8,19
  117:1
chain  99:20
  100:21,25
chair  62:3
chamber  64:21
change  48:13 49:6
  71:24
changed  27:22
  37:1 48:20 71:15
  74:22
charge  7:23 8:18
  9:1 12:17 13:16
  13:19 14:1,16
  20:15,22 21:12,24
  22:13,25 55:19
  65:10 68:24 86:25
  91:10 104:7,16,19
  106:3 107:4,22
  108:1 109:6,16
charges  109:11
charlotte  64:7
chart  81:9,11
check  36:7
choose  114:12
chose  26:9
ciccone  64:7
circumstance
  82:22
circumstances
  27:22 34:7 40:18
  83:2

civil  5:3 107:21
  115:3
claim  7:17 20:5
  22:19 25:25 26:15
  26:17 27:7 43:23
  43:24 44:2 46:24
  49:22 52:21
claims  7:5,9 114:1
clarify  10:6 16:21
  61:12
class  72:17
clear  49:2
clearly  26:24
  100:6
cleveland  2:15
  104:11 106:20
  117:7
clinic  32:15
clock  70:7 112:4
clocked  70:7
close  77:17
closer  53:7
coaching  56:16,20
code  14:11 44:12
coincided  74:2
coincidence  22:12
cold  102:10
colleagues  28:13
  29:11,13,14 30:10
  30:14
college  51:2 54:5
come  14:2 17:11
  20:12 34:1 41:19
  48:2,6 55:20 75:4
  79:20,21 83:23
  89:1 100:5
comes  102:12
coming  64:22
  83:18
command  99:21
  100:21,25

comment  94:15
  112:18
commentary  93:8
comments  15:10
  16:2,4 21:20
  23:11,16,21 24:8
  24:10 25:12 47:1
  94:2,14
commission
  107:22 117:17
commissioned
  116:8
committed  17:12
  76:11 88:7 92:17
common  36:12
community  53:5
compare  86:3 90:1
compel  100:5
compelled  100:24
complained  77:14
  87:17 88:12
complaining  82:5
complaint  7:17
  9:20 44:5 61:3,19
  63:6 66:19 67:2,9
  68:5,17 70:17
  71:1 72:13 77:24
  97:23 98:22
  102:20 104:10
  105:24 106:2,19
complaints  77:6
  87:19
complete  22:25
completed  116:22
completely  46:21
  69:19
complex  83:6
  87:21
compliance  27:3
  32:3 85:12,13,25
  97:7 101:8,10

complicit  99:1
  102:3 103:4,8
complicity  102:12
complying  28:22
concerned  26:12
  42:22,25 45:25
  54:24 84:5
concluded  114:6
  114:23
condemn  83:11
condescending
  78:18
condition  33:13
  41:6 53:6
conditions  49:6
  113:4,6
conduct  14:11
  20:2,5 21:19 22:4
  26:2 44:13 49:23
  83:17 90:7
conducted  88:4
confirmed  97:13
confused  38:13,14
conneaut  80:10
connected  21:5,8
  22:9 23:6
connection  20:4
  21:18 25:24
connects  21:3 22:4
  23:4
consider  88:10
considered  88:2
considering  53:14
consistent  104:17
conspiracy  99:1,2
constitutes  10:12
consult  13:1,2
consultation  41:18
  44:17
consulted  65:8,9
  65:10

[consulting - deposing]

consulting 12:16
contact 25:21
contacted 40:9,13
contained 47:3
contemporaneous
15:7,9 16:7,13,16
65:6
contention 73:14
context 11:25
continued 14:19
43:5 46:2
continuing 51:14
94:4
contributed 33:13
control 50:25
79:22 81:21
controlled 92:3
controversial
40:17,23
conversation 6:2,3
6:11,11
convicted 57:6
copies 41:14 94:20
copy 15:2,3 110:6
114:22 115:16
cord 35:11
corner 111:5
corporation 1:9
correct 7:10,16,19
8:23 10:17 23:12
23:18,19 38:3
43:21 44:9 47:19
61:20,21,25 62:1
63:25 69:25 76:24
98:5 104:22 107:2
114:10 116:17
corrective 19:23
23:12 24:1,6,15
25:9
correctly 77:10

cost 18:2,3
coughing 101:18
counsel 115:1,6,12
117:2
counseled 77:24
78:4 81:20 86:9
86:10,13,13 90:15
counseling 25:19
41:1,19,21,24 43:5
43:20 44:21 47:9
47:12 56:11,13,15
56:18,19 90:14
107:25
counselor 27:4
count 96:15
counter 37:11
85:20
county 116:4
couple 51:6 87:13
court 1:1 3:13 6:6
15:22
cousin 64:8,12,17
113:19
covered 25:25
26:4,5
crazy 94:10
created 98:25
creates 21:18
creating 77:7 79:3
103:16
crime 57:7,9
criticize 85:17,17
crying 88:7
culminated 74:18
cure 36:19
current 33:13
83:21
currently 6:19
custody 3:12
cut 53:9

cutoff 111:5
cuyahoga 116:4
cyclobenzaprine
39:4 50:11 57:16
cynthia 1:25 116:6
117:14

**d**

d 1:13 2:4 3:7 5:1
5:6 116:9
daily 51:24
damage 30:22
33:6,11
damaged 31:2
damages 28:9,11
28:11,12 33:19
damn 89:15,16,18
danialle 9:13 10:9
11:16 13:7,22,25
15:2,10 16:4,19
17:9 18:15,23
19:4,13 20:13
21:17 25:11 28:3
29:18 46:11,15
49:16 69:1,5,6,14
69:15,25 96:21,23
98:1 99:25 100:8
danialle's 23:2
date 9:23 22:14
29:16 60:3 105:20
105:21 115:13
dated 8:22 24:7
dating 24:11
david 29:6,9 33:7
34:4,24 37:15,25
40:19,25 41:8
43:3,20 45:15,17
day 19:1 49:2 71:3
86:17 88:25 89:11
92:4 101:22 117:7
days 29:20 40:21
48:18 57:15 91:5

91:6 97:6 98:14
100:12 101:21
dead 53:16
deal 91:19 92:1,5
dealt 27:5
decide 54:15
decided 46:13
65:13 68:20 103:8
decision 114:15
deemed 23:22
defecate 31:22
33:24
defecating 34:12
defendant's 4:4,6
8:3 59:16,22 62:8
62:11 104:1 105:5
106:11,15 107:13
108:18 110:1
111:22 112:9
defendants 1:10
2:10 97:24
definitely 33:24
delivery 115:11,13
115:15
demeanor 15:16
15:17
demoted 61:3,8,9
denigrate 28:4
denise 32:6,21
deny 60:25
denying 61:6
department 27:4
74:3,5
department's
94:19
depends 41:23
depose 26:9 99:4
deposed 5:4
102:24,25 113:16
deposing 101:2

**deposition** 1:12 5:13,14,24 6:12 8:5 26:9 51:21 59:15 62:10 76:1 103:20 104:25 106:6 107:8 108:13 109:21 110:23 111:16 112:11 114:5,23 115:8 116:20
**depositions** 99:6
**derek** 23:17
**describe** 73:8
**described** 34:17 52:3
**description** 4:2 10:24 12:7 27:8
**desk** 11:19
**determine** 46:24
**determined** 45:12
**detract** 24:12
**diagnosed** 36:23 50:17
**diagnosis** 35:6,20 35:22 44:18,19,25 45:1,3 56:22 81:9
**difference** 48:2
**different** 6:2,4,10 31:1 40:12,18 82:21 87:22
**differently** 92:15
**difficult** 28:20 48:15 93:15
**difficulties** 34:16 84:22
**difficulty** 34:12 89:10
**direct** 62:18 92:25 98:11 111:22
**directed** 35:2

**disabilities** 6:20
**disability** 6:22 7:1 7:6,10,15 30:24 31:9 32:20 39:19 44:1,2,7,11,23 45:4,7,13,21 46:7 46:19 47:23 49:18 109:7
**discharge** 9:21 10:1
**discharged** 86:15
**discipline** 11:24 17:13,15,17 19:17 19:22 21:10 22:7 23:3,8 25:8 55:7 55:23 73:12,15,21 77:2 78:10 85:9 86:22 90:20 96:4 101:16
**disciplined** 17:19 21:16 22:16 77:3 78:6,9 79:5 81:20 85:6 86:9 87:6
**disciplines** 11:21 74:6,8
**disconcerting** 49:4
**discovered** 36:15
**discriminate** 47:22
**discriminated** 44:7 46:6
**discrimination** 7:5 43:23 44:1 46:18 46:23 104:8,9,10 107:22 108:2 109:6,7
**discriminatory** 46:25 49:17
**discuss** 13:16 21:7 21:9 23:20 25:15 29:12 30:9,13,18

46:13 60:21 70:4
**discussed** 21:1 24:3,8 25:12,16,17 26:12 64:2 65:14 66:21,25 67:17 72:11 97:24 98:4 98:7
**discussing** 20:22 21:11 67:24 108:25 109:2
**discussion** 21:13 21:23 37:14 69:25
**discussions** 54:17 68:9 70:20 72:25 73:1 109:14
**disease** 6:24 28:15 31:16 33:14 35:1 36:2,16,17 38:23 39:11,25 40:2
**dismissed** 20:18
**disparaging** 24:10
**disruption** 58:6
**disruptive** 31:23
**distraught** 99:13
**district** 1:1,2
**diversity** 18:12
**division** 1:3
**doctor** 35:14 36:14 39:3 43:13 50:23
**document** 4:3,8,9 4:11,12,14,15,17 4:18,20 8:6,11,15 13:3 14:23 48:17 48:22 59:23 62:2 62:16,21 103:21 104:2 105:1,6,16 106:7,16 107:9,15 107:20 108:14,19 108:22,24 109:22 110:2,5,24 111:17

112:12
**documentary** 22:19
**documentation** 49:11,13
**documented** 10:20 23:11
**documenting** 48:21
**documents** 10:21 10:23 12:7,18,22 13:1 14:5 26:23 27:3,7 28:18 41:15 44:12 45:23 47:4 59:11
**doing** 48:23 51:3 80:14 85:18 87:3 88:21 97:13
**dominic** 1:5
**door** 65:1
**downtown** 86:12
**dr** 35:3,14 36:15 37:6 38:12 52:12
**drafted** 60:17
**draw** 94:15
**drawer** 91:17
**drive** 31:20 64:25 93:11
**drop** 48:10 49:5 75:1 109:15
**drowsy** 38:20
**duly** 5:4 116:7,10
**dundee** 1:5,13 2:4 3:7 4:3,8,10,11,13 4:14,16,17,19,20 5:1,6,8 8:6 15:21 92:25 103:21 105:1 106:7 107:9 108:14 109:22 110:3,24 111:17 112:12 114:17

115:16 116:9
**duties** 48:12,15
61:24

**e**

**e** 76:20 88:15
**eap** 25:21 26:20
27:4,15,19,23,25
28:10,23 29:12,19
30:10,13,18 31:3
31:10,14 32:24
44:8,12,13,20 45:6
46:16 47:6,8,9,12
47:21 48:14,20
49:12,16 56:12
63:17 71:8 72:20
98:12,17 104:20
107:24
**ear** 80:13
**earlier** 17:6 98:15
**early** 79:14
**ease** 51:7
**easiest** 62:4
**easily** 6:6
**east** 2:13
**eastern** 1:3
**ed** 97:7
**eeoc** 64:9 96:24
97:8 104:11 106:3
106:19 107:4
113:19
**effect** 31:6 38:19
**effects** 34:2 37:24
39:5 40:5,19
**either** 28:1 57:17
57:20 60:25
102:23 117:2
**elaborated** 23:1
**electronic** 105:14
105:15 106:21
**elevated** 74:3

**eliminate** 35:7
**elucidated** 27:7
**email** 8:22 9:6
12:15 17:20,22,25
18:5 88:3 102:9
**emails** 17:21 28:18
47:5 54:1 101:7
102:4,6
**embarrass** 28:5
**embarrassed**
32:25
**embarrassment**
28:13,14 29:11
30:4,6
**empathetic** 82:7
**empathize** 83:3
**employed** 73:16
79:8
**employee** 25:18
26:16 28:3 30:2
**employees** 98:8
**employment** 19:15
52:25 58:13 78:6
**ended** 18:18 41:23
91:25
**ends** 79:18,19
**endure** 29:1 41:25
**engage** 7:13,22
31:8
**engaged** 26:1 72:1
98:3
**engaging** 10:4,10
65:11
**enjoy** 95:9
**entail** 54:20
**entire** 18:19
**entity** 57:12
**environment**
73:10,23 74:11
77:8,12 79:3
98:23,24 101:11

103:3,17 104:23
**er** 80:20
**errata** 114:9
**errors** 114:10
**especially** 15:18
**esq** 2:12
**essentially** 39:12
**estimate** 40:4
**estimation** 78:8
100:4
**et** 1:9
**evaluation** 11:24
42:3,13,17,25 43:6
47:10,13,16
101:15
**evaluations** 11:22
**event** 34:11 73:13
117:3
**events** 75:20 84:6
84:8 113:14
**everybody** 26:5,5
88:25 103:1
**evidence** 16:3
22:20 103:10
113:25
**exacerbated** 49:23
52:22
**exact** 9:4 12:12
**exactly** 10:18 46:5
89:17
**examination** 3:7
5:2,6 42:10
**example** 63:16
**examples** 77:14
**exception** 11:6
14:24 69:7 70:5
93:23 111:13
**exceptions** 95:1
**excess** 103:7
**excretory** 31:21

**exercise** 34:21
**exhibit** 3:12 4:3,4
4:6,8,9,11,12,14
4:15,17,18,20 8:3
8:5 22:17 59:15
59:22 62:8,10
93:1 103:20 104:1
104:6,25 105:6
106:6,12,15 107:8
107:14 108:13,19
109:21 110:2,23
111:3,16,22 112:9
112:11,24
**exhibits** 3:5,13 4:1
102:17
**existence** 96:18
**expand** 34:9
**expect** 41:8
**expected** 41:10
**expecting** 28:21
**experience** 18:10
50:13 61:17
**experienced** 73:23
**experiences** 75:20
**experiencing**
50:21
**expires** 117:17
**explain** 82:23 94:1
**explaining** 18:4
**explore** 76:5
**expressed** 13:20
**extraneous** 103:9
**extremely** 28:20
113:4
**eyes** 105:18

**f**

**face** 62:6 95:17,17
**fact** 20:25 48:8
50:8 61:7,9 63:19
78:11 95:7 96:25
99:3 102:8

**facts**  63:6,8,15,16
64:3,18 66:19
67:1,9 68:5,6,17
70:16 72:12
**factual**  46:23
**failed**  7:13
**failure**  7:9
**fairly**  69:3 78:11
**faith**  109:1,15
**fall**  38:13
**false**  94:9
**familiar**  26:17
43:24 60:11 76:13
**family**  28:14 30:19
32:6 54:18 63:23
64:3,5,14 66:5
81:12
**far**  24:3,3 26:11
45:24 53:5 78:9
81:17 84:5 88:2
90:13
**fdundee**  2:8
**feared**  92:9
**fearful**  74:24,25
**federal**  5:2 64:8
**feel**  39:1 113:5
**fellow**  20:10
**felt**  18:20 69:21
77:10 103:9
108:24
**festival**  93:19
**figure**  79:16
**file**  11:19 73:11
**filed**  5:12 7:23
20:15 22:12 57:11
63:13 65:9,12
68:24 71:20,21
102:19 104:9,11
105:19 106:19
107:21 108:10,24

**filing**  14:16 20:4
27:6 52:8 72:5
95:8 96:24
**fill**  114:9
**filled**  54:3
**final**  17:19
**finally**  36:18 50:20
112:8
**find**  26:20 27:15
27:16 101:2,5
105:8,20 113:18
**finding**  95:13
**fine**  36:22 61:11
**finish**  65:24 70:14
**finished**  14:18
58:10
**fired**  54:24 64:24
65:5 74:21 81:15
91:22 92:10
**first**  4:4,6 5:3 7:17
9:1,4 22:18,22
28:24 29:6 38:9
50:12,15 56:17
58:22 59:4,16
60:6 62:11 72:18
88:23 102:9
105:19,24 106:18
116:10
**firsthand**  64:18,19
64:20 65:16 66:1
66:6,23 67:1,10,11
68:12,18 71:23
72:23 73:4 77:25
79:13
**fit**  8:25
**five**  13:25 14:3
20:21 29:20 32:13
52:17 53:17,18
56:1 74:2
**flared**  39:11

**flonase**  101:20,21
**floored**  42:4 77:22
**florida**  17:4
**focus**  12:24 111:4
**focused**  33:4
**foia**  41:15
**follow**  47:18 79:17
**following**  42:2
61:3,18 81:13
97:6
**follows**  5:5
**force**  69:17,18
**forced**  107:24
111:8
**foregoing**  116:16
116:21
**forget**  47:10 72:16
**forgot**  94:25
**form**  14:24 43:16
69:7 70:5 113:2
**formal**  73:12,20
75:4 78:9 90:14
94:17 96:4 107:4
109:11
**formally**  87:6
90:15
**format**  5:18
**forms**  36:12 41:12
43:8,9,10
**forward**  11:10
13:10 14:2 18:20
18:25 19:2 28:22
46:14 97:18
**found**  69:2 70:1
85:11 103:3
104:20
**four**  56:1
**frame**  84:7 87:10
**fran**  63:20 68:2
**frank**  1:5,13 2:4
3:7 5:1,6 20:11

54:5 113:3 116:9
**frankie**  54:12
**friend**  17:23 35:24
64:7,16 78:2 80:3
81:8 88:10 113:19
**friend's**  64:17
**friendly**  86:18
**friends**  55:18
64:15 66:6 78:12
80:1,2 101:17
**front**  11:19 12:23
14:5 16:8 28:13
28:14 29:11
**frost**  23:17
**full**  88:18
**fulton**  33:18 37:20
39:22 40:6,8,15,23
51:20 71:4,5
**fulton's**  40:7
**functions**  31:21
**funeral**  93:19
**funny**  39:1 93:9
93:25 95:18
**further**  43:19 81:7
116:19 117:1
**future**  11:14 97:11

**g**

**geauga**  5:11 53:5
55:17 71:22 80:10
93:12
**general**  15:17
67:14 70:18
**generalized**  50:16
75:7
**generally**  70:19
**genetic**  36:5,6,11
37:2
**geneticist**  35:25
**geneva**  80:9
**genome**  36:2

**gentleman** 41:2
**george** 76:18 85:8
85:9,14,15,20 86:8
86:18,19,20,24
87:5,12,16 88:8
**george's** 88:6
**geriatric** 35:24
**getting** 38:13 50:1
50:1 54:23 77:19
89:20
**gibbs** 63:22 70:12
70:23
**giffen** 2:11
**gina** 93:22
**girl** 93:22
**give** 15:3 27:9 35:5
76:4 80:25 92:7
100:18 115:1,12
**given** 18:3 23:13
83:7 91:21 116:13
116:18
**gives** 81:2
**giving** 5:25
**glad** 20:16 88:11
**glenn** 78:22 82:4
84:7,13,14,17
86:23 87:2,2,7,11
**glossed** 102:8
**glowczeski** 9:12
13:13 14:21 69:1
99:6
**gmail.com** 2:8
**go** 15:25 20:13
27:23 35:17 36:6
39:7 42:24 43:1
46:14 56:17 58:9
60:5 69:4 70:13
75:8,19 81:3 88:3
92:23 93:12 96:11
96:14 99:3 101:19
109:17

**god** 64:11 89:15
89:16,18 92:13
**goes** 41:22 71:6
78:19 80:25 88:23
**going** 5:13,24 8:2
11:10 12:21 13:10
13:21 14:4,7
17:12 18:19,25
19:1 21:9,9,15,16
27:1,10 28:22
29:21 30:4 31:5
32:2 33:3 36:21
41:19,20,25 42:9
47:11 48:10 49:7
49:25 50:22 51:2
53:4,9 54:18
59:10,21 62:7
64:11 65:3 70:19
71:7 72:21,24
77:5 80:2 82:14
92:10 93:10,16
94:4,20 96:14
97:18 101:2,5
103:25 105:5,18
111:21 112:8
**good** 5:8,9 17:24
51:4 55:18 72:14
78:12,15 79:11
80:2 83:12,12
91:3 95:8 99:13
109:1,15
**goofy** 105:18
**google** 58:4
**gotten** 86:4
**grabbed** 85:21
**grabbing** 86:15
**greatly** 89:6
**green** 99:15
**grimm** 65:7 66:9
**guess** 53:20 61:10
63:11

**guilty** 57:9
**guy** 99:11,12

## h

**h** 63:22 76:20
88:15
**hair** 74:17
**half** 51:18 70:2
89:13 110:15
**hall** 89:13,14
**hand** 8:2 11:7
14:23 59:21 62:7
103:25 105:5
111:4,21 112:8
117:6
**handicap** 109:1
**handing** 106:11,15
108:18 110:1
111:3
**handle** 65:13
**handled** 92:15
**handling** 94:19
95:14
**hands** 86:2,5
**handwriting**
110:7,8,9 111:7,10
111:23
**handwritten**
110:6
**hang** 89:24 90:5
**hanging** 90:22
**hangs** 42:19
**happen** 55:2 74:9
**happened** 17:17
23:1 40:20 65:2
70:2 71:2 81:6
86:7 96:12
**happy** 40:12 92:11
**harass** 73:13
**harassment** 7:23
8:21 9:2,11,19
12:17 13:16,19

14:16 20:5 21:12
21:24 22:13,19
61:4,19 65:10
68:24
**hard** 63:12 91:4
**harmon** 40:9
100:14,17 109:13
**hazardous** 113:4
**he'll** 114:21
**head** 6:5 18:25
42:20
**headache** 92:9
**health** 30:7 32:23
33:1 45:4,7,12,20
52:20 55:5 56:11
56:23 57:1
**hear** 42:9 66:10
**heard** 36:16 66:2
80:24 90:10
100:16
**hearing** 5:21
17:13,15,18 19:17
21:10 22:7 96:16
101:16
**heart** 83:12
**heather** 40:8
100:14 109:12
**held** 29:2,3
**help** 18:1,7 71:18
89:4,11 92:13
111:9
**helped** 40:11,14
83:5
**helpful** 108:9
**helps** 41:6
**henoch** 32:3 85:13
**hereditary** 6:24
28:16 34:19 36:4
36:12
**hereinafter** 5:4

**hereunto** 117:5
**hey** 64:22 65:4
**hi** 74:19
**hide** 96:18
**high** 52:7,9 99:19
  99:21 100:16,20
**higher** 100:4
**highlighted**
  111:23 112:16,23
**hipaa** 80:21 81:4,9
  81:17 82:10
**hit** 42:1
**home** 12:14 15:7
  58:21,21,24 59:4
  64:25 101:20
**honest** 40:14
**hook** 82:18
**hoping** 53:7
**hospital** 5:12 18:4
  32:15 53:6 54:7
  55:20 59:8 71:3
  75:9 80:19 93:12
  99:8 108:25
**hospitals** 1:8 5:11
  7:13 9:2 30:9,12
  30:18 42:15,18
  43:14 44:6 49:10
  49:24 52:22 53:1
  55:4 56:7 58:13
  60:18 61:23 73:16
  78:7 80:9 83:17
  90:9 103:15
**hostile** 73:9,22,24
  74:12 77:7,12
  98:23,24 101:11
  103:2,16 104:23
**hour** 15:8 17:6
  42:3,9,12,17 43:6
  65:1 89:13
**hours** 13:15 31:14
  89:3

**house** 32:13
**hr** 8:18 9:2 17:20
  23:17 44:17 46:11
  46:13 69:5 71:5
  85:24 92:7 100:14
  101:6
**hsp** 36:3,21,24
  37:5,24 39:14,15
  58:19
**huge** 92:1,5
**huh** 6:5
**human** 17:8 40:10
**humiliate** 28:5
**humility** 32:17
**humor** 95:9
**humorous** 93:3,4
  93:6 94:9 95:6,14
**hump** 51:7
**hyperreflexivity**
  35:16

**i**

**idea** 13:15 30:15
  40:25 54:20 75:6
  97:2
**identification** 8:8
  59:19 62:14
  103:23 105:3
  106:9 107:11
  108:16 109:24
  111:1,19 112:14
**identified** 10:8
**identify** 63:5,18
  76:15
**ignored** 76:12
  92:18
**imagine** 86:5
**immediate** 7:24
  44:16,18 46:12
  80:11,12
**immediately** 12:15
  74:22

**immensely** 40:14
**impact** 57:21
**impaired** 57:24
**implement** 18:2,6
**important** 6:3
  68:19
**imposes** 58:2
**improve** 38:21
**improved** 84:5
**inappropriate**
  23:22 82:2
**incident** 68:19
  87:9 89:21
**incidents** 89:22
**include** 47:13,15
  64:15
**included** 47:9,17
**includes** 110:16
**increase** 38:4
**increased** 13:9
  18:17,20,22 28:19
  30:23 37:23 48:16
  97:14,18
**index** 3:1,5 4:1
**indicated** 38:1
  40:22 84:17 93:2
  113:12
**indicates** 24:7
  104:15 106:24
**indicating** 61:14
  112:24
**individual** 86:16
**inference** 45:25
  46:3
**informal** 73:12,21
  94:24
**information** 81:2
  113:14,25
**infraction** 17:12
  86:2

**infractions** 76:12
  92:17,18
**injury** 49:22 52:21
**inroads** 109:13
**institutionalized**
  57:4
**instruction** 115:2
  115:12
**intake** 106:1,25
  107:3
**intended** 73:13
  96:18
**intending** 76:4
**intent** 69:13
**interaction** 95:19
  101:9
**interactions** 82:3
**interactive** 7:14
**interested** 13:21
  56:4 117:3
**interesting** 13:17
  77:4
**interrogated**
  69:12
**interrogatories**
  4:7 62:12
**interrogatory**
  62:19,24 73:7,8
  76:9,9 93:2
**intimidated** 96:13
**intolerable** 77:19
**intolerant** 38:25
**intrinsic** 47:6
**investigation**
  13:18
**invited** 13:14
**involve** 7:4,8
**involved** 26:7
  46:12,15 48:19
  67:15 100:5

**israel** 2:12 3:8 5:7
37:12 92:22
109:17 114:4,21
115:14
**issue** 19:22 56:23
**issues** 88:20
**iv** 87:1

**j**

**j** 76:23
**january** 33:18
39:21 51:19
**jason** 9:12,18 10:8
10:11 11:5 13:13
13:20 19:7,9,12
20:18 21:1,22
66:17 69:1 74:4
78:23,24,25 79:1
83:20 84:18,19
95:24 96:18,21
98:1 99:6,10,10
100:5
**jason's** 11:3 20:2,5
**jeez** 38:11
**jeff** 72:19
**jill** 33:18 37:20
39:22 40:5,7,8,15
40:20,23 51:20
71:4,4
**job** 19:2 27:21
28:7 48:1,3,7,7,12
48:15 49:3 53:4
53:14 54:7 56:5
61:24 71:15,24
72:8 86:11,12
99:22
**joe's** 53:8,14,24
54:10
**john** 63:22
**johnson** 78:22
82:4 84:13 86:23
87:11

**joke** 69:10,23
102:9
**joked** 101:25
**jokes** 102:1
**jones** 103:1
**judge** 47:7
**judgment** 26:6,12
26:23 27:2 41:16
47:3 68:21 102:18
103:6,11 114:19
**july** 33:8 39:13
45:16
**june** 8:22 17:2
19:17,22 22:6,12
22:20,25 23:3,9,11
23:25 24:7 29:17
56:2,3,8 68:23
71:15 75:3 96:6
102:14

**k**

**k** 32:10
**kaminski** 2:11
**keep** 93:10 94:20
**kept** 14:4 50:24
**kid** 17:24
**kind** 56:11,15,23
62:17 75:15 76:5
80:4 82:7 83:3
93:14 105:18
**knew** 35:15,18
81:17 88:18 89:21
89:22 100:9
**know** 5:10,25
22:24 29:24 31:13
33:10,12,15 34:8
35:13,15 39:7,15
40:20 41:5,9,9
45:11,17 46:20
48:9 51:10,23
52:9,10 54:4,19,21
55:1,19,22 57:22

63:13 64:25 67:16
68:11 69:5 70:19
71:9,20 77:23
78:5,14,15 80:18
81:19 82:8,24
83:4,5,7,9,12,13
83:14,22 85:6,18
86:8 87:10,12,17
87:18,20 88:1,10
88:12 89:16,17
90:6,7,16,17,25
91:8,9 93:9,15,18
94:13,22 95:5,16
100:18 102:15,16
102:18,22 106:1
107:3,14 110:9,11
110:11,12,12,13
111:25 112:18
113:13 114:17
**knowing** 41:5
**knowledge** 30:8
63:5,8,15,19 64:18
64:19,20 65:16
66:1,6,18 67:1,8
67:10,11,12,20,25
68:4,6,8,16,19
70:15,25 71:23
72:12,23,24 73:4
76:6 77:25 79:4
79:13
**known** 38:24 58:4
**knows** 67:14

**l**

**l** 2:12
**labeled** 4:3,8,9,11
4:12,14,15,17,18
4:20 8:6 103:21
105:1 106:7 107:9
108:14 109:22
110:24 111:17
112:12

**labor** 5:23
**lacey** 79:6,10 84:7
84:23,24 85:3
**larry** 76:20 88:14
88:16 89:5,14,23
90:8,14,19
**lasted** 15:4 34:4
38:1 40:5
**late** 74:24 95:2
**laugh** 94:10
**laughed** 74:20
**law** 27:17,19 65:8
80:17 81:13
103:10
**lawful** 5:1
**laws** 64:6,16
**lawsuit** 5:11 7:2
52:8 57:11 63:13
65:12 72:5 104:9
104:10 108:23
109:2
**laxatives** 34:22
37:8,10
**lazy** 89:19
**leave** 13:11 14:17
15:19 68:20
**leaving** 64:22
**left** 84:24 88:12
91:24 112:3
**leg** 31:19
**lerman** 8:1 19:16
19:21 21:13 22:3
25:4 28:2 29:19
44:24 45:11,19
46:8,17 47:21
49:9 61:4 77:13
81:25 95:7 98:25
101:9
**letter** 98:10,11,14
100:11,24

**level** 37:8
**levied** 23:7
**life** 19:1 28:20
  56:20 58:3
**lift** 31:19
**liked** 55:8 87:20
**limits** 76:6
**line** 81:7 94:22
**lined** 93:18
**lisa** 76:22 90:23
  91:2,6,13,15 92:1
  92:10
**list** 66:13
**listing** 77:18
**lists** 60:7
**little** 18:10 51:12
  74:1 93:8 94:16
  95:10,10,11
  105:18 111:5
**live** 53:5
**lock** 64:21
**locker** 104:20
**lodged** 77:6
**log** 111:13 112:2
  112:19
**logs** 93:23
**long** 33:10 34:2,5
  40:4,16 58:5
  63:22 85:19 91:21
**longer** 79:7
**longest** 84:1
**look** 6:1 8:12 58:4
  59:25 60:2,6,11
  61:1,16 62:20,22
  73:6 76:8 80:18
  86:14 90:14
  107:13 111:24
**looked** 53:4 99:13
  99:14,17
**looking** 13:3 16:2
  60:3 81:8,11

**looks** 81:1
**looming** 51:17
**lost** 22:14 89:2
**lot** 41:4 48:20 49:7
  51:7 58:3 69:18
  78:12,17 83:5
  88:10,11,20
**louder** 97:20
**lower** 111:4
**lying** 70:6,9 112:4
**lynce** 9:13 11:16
  11:18 13:7,22,25
  15:2 16:19 17:9
  18:15,23 19:5
  20:13 21:17 28:3
  29:18 46:11,15
  49:16 69:1,5,6,14
  69:15 96:22,23,25
  98:25 100:1,9

**m**

**m** 63:22
**maiden** 91:1
**maintaining** 81:20
**maintenance**
  72:19
**majority** 21:25,25
**makeup** 36:6
**making** 33:13 45:2
  46:16 48:23 77:12
  87:4
**man** 18:5
**manager** 99:23
**mandate** 27:25
  28:23
**mandated** 25:18
  27:23 30:1 44:20
  47:8
**mandatory** 44:14
  44:15 45:6 46:14
  46:16 47:21 49:15
  72:20 107:24

**manifested** 35:15
**manner** 14:20
  86:13 87:25
**manning** 63:20
  68:2
**manufactured**
  73:12
**map** 36:2
**maps** 36:6
**march** 1:18 117:8
**marilyn** 63:21
  70:12,23 71:9
**mario** 64:11
**marist** 54:5
**marked** 4:2 8:3,7
  59:18,22 62:8,13
  103:22 104:1
  105:2 106:8
  107:10 108:15
  109:23 110:25
  111:18 112:13
**markers** 36:4,5,11
**marriage** 56:15
**mary** 32:18 63:20
  67:4
**material** 10:14
**materially** 96:13
**matter** 28:4 56:3
  103:7
**mean** 23:13 33:11
  40:24 56:2 60:15
  61:6 63:23 65:15
  66:1,22 75:16,23
  86:1 96:1 99:14
**means** 28:1 48:5
**mechanics** 25:17
  25:20
**medical** 5:11
  41:12 43:12,16
  49:22

**medication** 38:4
  57:14 91:17 92:2
**medications** 37:9
  39:14,17,23,24,24
  40:1 52:17 57:17
  57:20
**medicine** 35:2
  91:12
**meeting** 9:22,24
  11:2 12:8 13:11
  13:12,13,14,22
  15:4,11 16:5,18
  18:18 19:9,18,22
  20:3,6,12,14,16,19
  20:21,23 21:2,6,11
  21:15,22 22:1,1,9
  23:4,21,23,25 25:4
  25:5,13,23 28:24
  29:2,6,17,18,20
  31:14 40:5,7,7,15
  40:18,22 41:7,11
  43:5 45:16 66:18
  68:25 71:3 96:11
  96:16,19,25 97:7
  98:1 99:7,9 100:2
  100:6
**meetings** 29:3,5,8
**member** 23:18
  81:12
**members** 30:19
  63:23 64:3,5,14
  66:5 93:3
**memories** 75:10
**memory** 16:11
  34:13 57:21 79:11
**mental** 30:6 32:23
  33:1 39:9 45:4,7
  45:12,20 52:20
  56:11,23 57:1
**mention** 63:10
  83:24 96:24 97:23

mentioned  6:10 29:10 30:21 31:2 66:13 72:16 83:18 83:19,20,21
mess  79:21 83:19 83:23
message  82:19 110:19
messy  81:21
met  20:16 34:24 39:22 51:20 95:23 96:12 101:17,24
middle  111:24 112:23
mile  99:15
miles  32:13
mind  10:11 21:2 21:18 22:5,9 34:1 49:2 85:10
mine  17:24 80:24 112:1
minnick  79:6 84:23
minute  37:13 65:22 109:18
minutes  8:12 13:25 14:3,4,20 15:5 20:21
missing  80:18
mistakes  114:10
mitigate  34:7 40:11 82:15,21 83:2
mitigated  40:15
mitigates  39:6
mixtures  87:1
mo  78:13
moment  9:16 16:19 19:25 28:22 49:20 73:5 75:22 98:20 103:18

monday  97:5,6
money  83:7,9
monitoring  86:25
months  52:1,11 69:4 74:2
morning  5:8,9 20:12 99:7,16
motion  26:6 41:15 47:3 68:20 72:17 102:18 103:5,10
motor  6:23,23 28:15 34:25 38:23
move  26:14 59:7
mri  35:10
multiple  35:19
multitask  80:7
mumbles  108:9
muscle  34:20 37:4 38:8,10,17 50:2,7 50:8 52:15
muscles  35:16

**n**

n  32:10
naive  41:3
name  32:8 36:18 64:10 69:9 72:16 72:18,18 90:24 91:1 100:18,19 113:18
named  116:9
names  113:14
nancy  65:7
naples  55:16
narrowing  35:9
naturally  89:9
nature  11:12 22:15 23:8
nausea  91:12
near  85:20 90:11 105:21

necessary  83:24 88:5
necessity  27:21 28:8 47:25 48:5
need  59:1 89:19 97:22
needed  39:10 89:4 89:11
negative  57:21
nervous  89:7
neurologist  39:2
neurologists  35:1
neuron  6:24 28:15 34:25 38:23
neutral  101:13,14
never  11:8 20:16 21:8 29:3 36:15 42:20 43:1,2 47:16 54:4 57:3 65:3 71:21 74:5,6 74:23 90:2,3,5 91:7 92:7 100:16
new  54:6,11 79:15 81:24 89:8
nice  18:10 41:2 96:2 99:11,11,12
night  13:13 17:5 17:14 20:8 48:3 65:20 79:9 80:5 80:16 93:15 94:5
ninth  2:13
noise  26:11 68:22 103:7,9
normal  6:2,10,11
north  64:7
northern  1:2
notary  116:6 117:14
note  11:9,10,13,13 81:14 95:17 102:7 110:6 111:12

112:6
notebook  12:9
notes  15:7,9 16:7 16:13,16 95:10,11 95:13 98:3
november  98:10 104:16
number  4:2 12:21 113:11
numerous  94:13
nurse  91:10,14,15 91:20
nurses  89:23 90:22

**o**

o  32:10,10 63:22 76:23,23,23
oath  5:17,23,25 6:9 27:12
objectionable  26:20 27:15,17
observations  68:12
observe  66:10
observed  66:2
obtaining  50:23
obviously  39:8 48:3,4 100:17
occasion  16:12
occasions  74:16
occur  75:24 84:8
occurred  9:6 51:10 75:11,12,18 85:19
occurrences  73:8
october  74:1 104:21 117:17
office  13:23,24 17:3 32:14 75:6 90:12,13 102:10 106:20 117:6

**officer** 5:23
**offices** 32:3 71:5
**official** 106:2
**officially** 91:22
**oh** 43:1 50:14
  64:11 77:20
**ohio** 1:2,23 2:6,15
  32:12 53:8 107:21
  116:2,7 117:7,15
**okay** 27:13 58:12
  59:13,13,25 66:12
  94:8 105:23 112:8
  113:7 114:18
**old** 48:18
**older** 89:7
**oldest** 51:2
**once** 12:6,18 14:22
  16:6 17:9 23:6
  24:18 26:21 28:6
  28:14 31:14 36:5
  38:18 41:13 43:11
  47:2 48:19 49:1
  52:4,5,7 55:25
  56:2 66:22 69:9
  69:20 70:1 78:10
  79:25 82:7 85:15
  86:17 87:21 90:1
  92:4,12 97:14
  99:3,6,11 102:24
  103:5 107:22
**ondansetron**
  91:12,14,15,16
**ones** 34:21 93:7
**ongoing** 84:14,16
**open** 18:18 41:23
  55:10 84:24
**opened** 55:15
**opinion** 18:24
  27:19,20 45:5,8
  92:15 96:8

**opportunity** 114:8
**opposite** 91:5,6
**order** 99:24 100:1
  115:16
**ordered** 115:14
**original** 115:14
**osborne** 98:10
  100:12,20,23
**outcomes** 33:25
**outside** 71:5
**overcame** 79:23
**overheard** 29:24
**overhearing** 66:16
  67:23

**p**

**p** 76:20,20 88:15
  88:15
**p.m.** 17:4 114:23
**page** 60:6 62:23,24
  105:11,21 106:22
  109:4 110:15
**paint** 89:25
**pamphlet** 104:19
**panic** 50:3,4,13,19
**paper** 94:18
**paraphrased**
  23:14
**paraphrasing**
  17:10 69:15,21
  77:16 89:16 97:1
**paraplegia** 6:25
  28:16 31:17 34:19
  36:4,13
**part** 7:1 19:16
  45:18 47:24 88:17
  91:25 114:17
**participate** 19:21
**participated** 56:10
  56:14
**participation**
  19:18 22:6,8 23:3

**particular** 77:15
  80:16
**parties** 115:7
**party** 101:12
  117:3
**pass** 93:17 94:1
**patient** 51:4
**patient's** 81:9
  91:16
**patricia** 83:22
**pattern** 24:12
**patterns** 58:7
**patty** 84:3
**pay** 53:9 61:18
  94:14 113:5
**pdf** 105:13
**peers** 87:23
**penko** 77:9 82:5
  84:6 85:1
**penko's** 84:9
**people** 10:9 26:1,7
  26:13 27:5 29:22
  35:2,3 47:5 58:5
  62:25 63:4,12,14
  63:18 65:19 66:13
  72:11 76:15,25
  80:4 87:17 88:11
  88:20,25 90:2,12
  93:9 94:1 95:5,21
  99:12,24 101:3
  102:3 103:13
**people's** 35:11
**peoples** 113:14
**perceived** 10:14
  46:7,19 47:23
  49:17,18
**percent** 16:9
**perception** 30:5
**perform** 37:16,20
**performance** 72:8

**performed** 37:2
**performing** 61:24
**period** 16:22
  18:19 38:6 51:19
  51:24 56:5 66:22
  68:23 69:2 84:25
  94:14
**periods** 54:21
**perplexed** 69:20
**person** 41:3 44:16
  44:20 46:11 50:18
  57:12 59:1 66:1
  77:4 78:15 79:15
  82:7 83:6 87:21
  91:3,3 92:20,21
  102:5
**person's** 81:11
**personalities**
  79:16
**personality** 87:18
**personnel** 11:19
  25:21 73:11
**pharmacist** 18:1
  20:10 23:17 29:23
  48:22 51:5 54:1,2
  54:16 55:17 59:3
  66:20 67:6 68:3
  68:15 80:8 85:14
  88:16 91:2
**pharmacists** 78:17
  78:17 82:24 92:6
**pharmacy** 29:23
  55:16 70:24 76:11
  77:8,9 78:2,18
  79:7 80:5,16 82:3
  85:13 91:25 99:20
  100:21
**phil** 20:10 63:10
  63:20 66:13,18,20
  66:25 67:22,25
  96:15

**phone**   17:5,8 20:9
66:16 67:23 80:6
80:13,15,25 81:1
82:17 89:23 90:3
90:4,4,22
**phrase**   65:25
75:17
**phrases**   17:22
18:12 24:5,22
42:10 102:7,20
**phrasing**   77:10
**physical**   74:14
**physically**   29:1
59:8
**physician**   31:25
32:4,7 50:1
**pick**   85:16,16
**picked**   11:25
77:11
**picks**   80:25
**picture**   94:16
**pile**   11:18
**pittsburgh**   35:25
**place**   79:21 116:20
**plaintiff**   1:6 2:3
4:5,7 59:17 62:12
73:13
**plan**   37:1
**plaques**   35:20
**please**   10:7 30:25
91:4 113:10
**pled**   57:9
**point**   13:10 14:14
42:18 43:17 69:2
96:5 97:12 99:19
99:23
**points**   12:11,12
24:11
**policies**   24:13
**policy**   18:13 47:6
86:14

**poof**   96:11,15
**portion**   110:5
**position**   54:10
96:20,22,22 97:1
**positions**   53:24
54:16 55:4,9,13
56:6
**positive**   35:6
**positively**   94:9
**possession**   12:19
**possibly**   81:23
**posting**   95:9
**poughkeepsie**   54:6
54:7
**practically**   99:10
**practice**   32:11
41:4
**practices**   32:12
**preposterous**
22:15 23:8 24:23
**prescribe**   37:7
**prescribed**   38:8
39:1,3 50:24
52:13
**prescribes**   37:4
**prescription**   37:8
38:10 50:4 52:17
91:11,13 92:2
**presence**   116:15
**present**   59:8 69:24
**presented**   11:8
41:11 43:4 69:6
**president**   40:10
**pretty**   34:5 37:10
52:10,11 53:5
77:17 86:1 93:25
99:19,21 100:16
101:14
**prevented**   55:11
**preview**   21:14

**previously**   25:6,7
**primary**   34:21
**prime**   89:8
**printer**   85:20
**prior**   9:6 23:21
25:12 71:22 74:4
**private**   32:14,17
**prn**   55:17
**pro**   2:4
**probably**   33:2
38:24 40:20,20,21
50:14,18 51:24,25
51:25 52:10 53:16
53:17,18,21,25
54:2,13,19 64:23
65:4 70:2 72:15
74:21 78:2,3
84:11,25 86:14
87:13 94:14
**problem**   45:4,7,12
45:21 79:25
112:22
**problems**   83:10
**procedure**   5:3
**procedures**   37:17
37:21
**proceeds**   62:25
**process**   7:14 45:18
**program**   25:19
26:16 28:4 30:2
**progress**   33:14
**progressive**   36:20
**promise**   13:9
18:17 92:7
**promised**   18:21
97:15
**promising**   97:17
**pronounce**   90:24
**pronounced**   76:23
**proof**   96:11

**properly**   78:19
**prophylactically**
51:6
**protected**   7:21
10:5,10 21:3,5,7
21:19 22:4,10
23:4 72:1 97:2,9
105:25
**provided**   5:2
60:17 62:21
**provider**   36:23
**psychiatric**   42:3,9
42:13,17,24 43:6
47:10,13,15
**psychiatrist**   45:14
83:14
**public**   116:7
117:14
**pull**   53:10 99:7
**pulling**   99:9
**pulls**   99:10
**punch**   100:19
113:3
**pup**   18:10
**purported**   13:12
14:23 20:6
**purpose**   13:11,12
75:25
**purposes**   8:7
59:18 62:13
103:22 105:3
106:9 107:10
108:16 109:23
110:25 111:18
112:13
**pursuant**   115:3
**pursue**   54:15
**pursued**   54:4
**pushback**   14:15
**put**   12:12,13 18:25
28:19 35:17 80:12

86:2,5 95:13
102:17 103:5
106:13 114:19

**q**

**qualified**  116:8
**question**  15:22
17:16 27:11 30:7
46:21 63:12 67:22
72:14
**questioning**  59:10
**questionnaire**
106:2,25 107:4
**questions**  6:13,16
12:22 33:4 76:5
113:7
**quit**  102:13,22
**quite**  31:22 49:7
58:2
**quote**  77:17

**r**

**rachael**  2:12 5:9
8:1 19:20 21:12
22:3 25:4,11 28:2
29:19 44:24 45:11
45:19 46:8,17
47:21 49:9 61:4
64:20 65:3 74:3,7
74:14 77:13,20
78:24 79:11 81:14
81:25 83:20 84:10
90:10 91:9 99:21
101:9
**raised**  22:18
**ran**  15:6 74:19
95:1
**rang**  17:5,8
**range**  53:18
**rare**  36:16
**rarely**  38:20 49:1
49:2

**read**  11:20,25 14:7
15:22 16:1 24:16
102:6 108:7
111:25 112:17
114:8,12
**reading**  24:17
25:3,5 115:7
**ready**  8:14 35:17
**real**  82:19
**really**  18:6 22:25
24:19 25:2,22
34:6 39:5,6 40:17
41:9,17 42:8 54:4
71:10 86:14 89:3
91:19 101:18
102:2
**realtime**  11:23
12:8
**reason**  31:15
47:25 57:23 58:25
91:14 96:8,9
**reasonable**  102:5
**reasons**  27:6
**rebecca**  8:19
17:21 18:5 101:5
101:13 102:4,13
102:21,22,25
**recall**  9:23 10:19
11:1,2,3,5 15:14
16:10,14 24:5,17
25:3,13 93:4,7
**receive**  38:9
**received**  29:4
35:22 66:17 73:15
73:21 98:10
**receiver**  90:3,4
**recess**  92:24
109:19
**recognize**  8:11,15
14:15 50:19 59:23
60:20 62:16 104:2

105:6,7,8 106:16
108:19 110:2,4
111:6
**recognized**  50:15
**recollection**  8:25
12:24 13:4 60:16
76:2 104:17
**recommended**
36:1
**record**  16:1 37:12
37:14 92:23
109:18 113:10
**records**  11:18
**reduced**  116:14
**reduction**  61:18
**refer**  13:2 16:6
36:21 44:16 73:10
**referenced**  116:13
116:18
**referral**  26:15,19
27:14,18,20 29:12
30:9,13,18 31:3,10
32:24 44:14,15,15
45:10,14,15,18
46:14,17 47:17,20
48:4,13 49:11,15
**referrals**  44:14
47:6
**referred**  28:10
45:6,9 63:17
**referring**  17:23,25
31:3 44:8 45:24
97:3 99:2 112:5
**refill**  51:11
**refresh**  60:15
**refusal**  42:16
43:15
**refused**  43:13
**regard**  7:9,14 20:2
21:17 33:17 45:1
46:7 47:22 49:17

61:22 66:9 67:22
84:17
**regarded**  44:6,10
44:22
**regarding**  11:3
63:15 68:5,17
70:16 71:1 77:24
115:2,13
**regardless**  95:7
97:16
**regional**  99:22
**regular**  94:3
115:15
**regularly**  51:12,15
**related**  27:21 28:8
48:1 87:16
**relates**  104:19
**relating**  7:5 23:16
64:18 67:1,9
**relationships**  24:9
88:24
**relative**  117:2
**relaxant**  50:2,8
52:15
**relaxants**  34:20
37:4 38:8,10,18
50:9
**relaying**  82:18
**release**  43:8,9,10
43:13,16
**releases**  41:12
**relevant**  68:12
114:1
**relief**  43:23 50:23
**relying**  78:11
**remanded**  72:20
**remark**  70:10,11
74:17
**remarks**  74:14
**remember**  6:7
24:14,17 31:11,12

**[remember - set]**

31:24 38:15 60:4
70:10,10 75:9
79:12 81:24 82:5
84:11 87:7 88:6,7
93:21,23 95:12
104:5,5
**renewed** 50:6
**rep** 46:13 101:6
**repeat** 21:21 30:25
**repeated** 21:22
**replace** 91:17
**replies** 11:23
**report** 9:6 82:1
83:16
**reported** 9:1 79:10
85:12 86:23,24
87:4 90:8
**reporter** 3:13 6:7
15:22
**reporter's** 3:10
116:1
**reporting** 9:11,19
**represent** 5:10
**representative**
8:19 17:21
**reputation** 28:12
29:10
**request** 58:14 59:9
60:8 61:1,1,2,16
**requested** 69:4
115:1,12
**requests** 4:5 59:6
59:17 60:7,18,24
**resign** 28:2
**resources** 17:9
40:10
**response** 60:9,11
60:13,18 61:5
73:7 93:1 96:24
**responses** 60:16
60:22 102:6

**responsibilities**
48:13 71:16,25
**responsible**
103:16
**rest** 20:23
**restaurant** 84:24
**restricted** 61:23
**result** 28:10 33:7
33:19
**retained** 3:13
**retaliate** 9:18
11:17 13:7
**retaliated** 9:10
10:9 97:16
**retaliating** 103:17
**retaliation** 7:18
10:4,12 12:5
19:19 25:25 26:2
97:9,15 105:24
**retaliatory** 15:13
16:20 17:1,18
18:16 19:5,10,15
19:24 26:3
**returned** 17:3
**revealed** 26:8 99:5
**review** 115:2
**riccardi** 29:6,9
32:2 33:7 34:4,24
37:16,25 40:19,25
41:8 43:4 45:16
**rick** 85:13,16,18
85:19,24,24 86:24
**right** 7:15 15:14
16:8 22:21 26:25
26:25 34:23 38:2
43:7,20 44:8
47:14 53:2 59:3
59:24 80:24 92:21
98:4 104:21
105:18 107:1
109:9 111:4

112:23 113:21
114:3,13
**rights** 107:21
**ringing** 82:18
**risrael** 2:17
**road** 113:4
**rough** 87:2
**rounding** 71:2
**route** 93:12
**routine** 74:22
**row** 91:5
**rpr** 1:25 116:6
**rules** 5:3 97:9
115:3
**run** 79:25
**running** 74:24
**rushed** 17:7

**s**

**s** 63:22 76:20,20
88:15,15
**saint** 89:25
**saintly** 91:3
**sat** 101:15,15
**saving** 18:2,3
**saw** 29:14 87:22
100:13
**saying** 13:25 16:11
16:14 18:9 64:24
65:5 66:4 74:21
**says** 20:14,17 61:2
71:7 74:20 112:20
113:3
**scenes** 26:8
**schedule** 29:20
**schepps** 76:20
88:14
**sclerosis** 35:19
**scratch** 94:11
**scribbled** 69:8
**scrutiny** 13:10
18:17,20,22 73:25

97:15,18
**se** 2:4
**seal** 117:6
**second** 22:23
58:22 59:5 108:3
**secondly** 6:9
**section** 112:17,23
**see** 35:8 36:7 51:9
55:6 60:7 66:4
82:11 106:17
112:20
**seeing** 24:14 60:4
**seek** 32:19,23 33:1
**seen** 22:17 59:25
60:4 107:14
**sense** 95:8
**sent** 8:18 12:16
27:3 47:4,5 81:14
102:4,9
**sentences** 11:25
**september** 108:2
109:8
**sergio** 64:7
**sergio's** 113:19
**serious** 54:9
**seriously** 54:4
**sertraline** 50:4,24
51:11,22 52:13,14
52:16 57:16
**session** 41:1,21
47:9,12 56:13
71:8 98:12,17
**sessions** 25:19
41:20,24 42:23
43:5,20 44:21,21
47:8 107:25
**set** 4:4,6 9:8 16:18
42:2 59:16 62:3
62:11 106:14
107:6 110:21
117:6

setting 66:17
73:20
seven 40:21 91:5,6
sexual 7:23 8:21
9:1,11,19 12:17
13:16,19 14:16
20:5 21:12,23
22:13,18 61:4,19
65:9 68:24
sexy 64:23 65:4
74:20
shake 6:5
shawn 98:9 100:12
100:20,23
sheet 11:6,9 94:17
100:20 114:9
sheets 94:16
shift 58:1,5,14,22
58:22,23,24 59:2,5
59:7 71:14,17
79:18,18,19 80:8
81:22 88:22,23
91:6
shifted 71:16
shifts 59:1
shock 42:6
shoe 48:9 49:5
75:1
shoulders 85:22
showing 112:21
shown 109:15
shun 80:4
side 14:14 39:5
64:9 83:12 87:22
99:8
sights 82:16
sign 43:9,15 69:8
69:13,17,18 108:1
111:8 114:12
signature 100:13
104:12 105:10,13

105:14,15,22
106:21 107:17
109:3 115:5
117:13
signed 43:10 109:7
signing 115:7
silent 14:21
silently 108:7
similar 24:10
25:12 92:17 98:3
simply 38:18 80:7
singled 77:11
sinister 69:22
sit 11:1 12:25
14:17 15:19 19:4
25:14 101:8
sitting 14:22 15:14
89:12
situation 29:25
31:18,19 33:21
48:17 55:23 79:12
87:11 95:23
situations 40:12
six 52:1,11 74:2
slam 89:23 90:3
sleep 58:6
slow 65:21
slowly 36:20
small 69:16
snyder 20:11
63:10,21 66:14
96:15
sole 47:7
somebody 72:15
83:25 86:2,5 88:4
89:4 92:8 100:4
100:24
son 54:5
sons 64:6,16 88:8
soon 12:8 25:21
65:1 91:25

sooner 14:2
sorry 47:11 58:11
61:10 63:3 65:23
70:13,14 80:22
97:20 105:20
108:10 112:21
sort 38:18 45:3
65:5 74:2 78:13
82:21 83:6 88:2
94:15
sought 34:15,18
49:21 52:20
source 88:2
sources 67:19,25
soyka 97:8
space 81:21
spastic 6:24 28:16
34:19 36:4,13
spc7 36:9
speaker 20:9 80:6
90:4
specialist 35:4,24
specialty 55:15,20
specific 33:4
specifically 17:22
26:15
specified 116:21
specify 11:12
speech 113:24
spell 32:1,8
spent 13:25 20:23
spg 36:10
spg11 36:10,11
spg7 36:9,10
spinal 35:5,11
spoke 13:18
104:22
sporadic 52:3,7
sports 35:2
spring 35:23 38:13
65:11 108:5

ss 116:3
st 53:8,14,24 54:10
staff 23:17 76:11
93:3
stage 88:17
stand 114:14
standing 32:1
69:11 70:6 71:5
stands 59:3
stapler 79:9 83:8
start 50:12 59:10
started 6:17 12:10
50:21 51:12,17
79:15
state 26:21 73:11
98:24 116:2,7
117:15
stated 11:8 26:22
26:24 28:17 61:1
97:5 99:5
statement 10:6
73:18 96:20,22
97:1
statements 11:20
12:2 15:13,15
19:8 96:23
states 1:1 97:1
stating 26:24
stature 69:16
100:3
stay 82:15
steady 58:2
stenosis 35:5
stenotypy 116:14
step 17:19 96:7
steve 102:25
stomach 91:10,11
story 14:14
street 2:13 6:12,13
stress 28:19 29:1
30:23 31:13 48:8

48:16 50:6 51:1,8
58:3
**strike** 29:15
**stuff** 51:10 94:2
103:12
**subject** 11:11 14:8
15:1 50:3 98:2
**subjected** 73:9
**submit** 107:24
108:1
**submitted** 104:15
106:24 109:8
**substance** 92:3
**substandard**
11:22,24
**sudden** 75:5
**suffer** 28:9 33:6,19
44:3
**suffered** 30:22
31:13
**suggestions** 18:2,3
18:7
**suicide** 88:7
**suing** 99:11
**suit** 95:8
**suite** 2:14
**sullivan** 1:25
116:6 117:14
**summary** 26:6,11
26:23 27:2 41:16
47:3 68:20 102:18
103:6,11 114:19
**supervisor** 7:24
44:17,18,19 46:12
47:7 74:4,5 81:24
**supervisors** 30:5
**suppose** 46:10
**supposed** 21:22
41:1 71:19
**supposedly** 101:13

**sure** 9:3,3,7,9 10:8
16:9 22:22,23,24
22:24 26:4 29:16
29:22 33:5 35:9
36:9,17 40:16
46:22 48:24 51:11
53:3,22 60:23
61:13 65:24 79:10
83:20,21 90:25
92:14 95:12
105:17 112:3
**surgeon** 35:9
**surmised** 101:1
**surprised** 41:10
41:17 42:4,7
**susan** 63:21 65:19
68:14 69:4,10,14
69:25 70:4,15,15
76:16 77:1,4,11,16
77:20,21,23 78:1,5
78:13,19 79:4,8,14
79:17 80:23 81:3
81:15,19 82:6,8
83:4,11 84:21
85:5 88:20 89:1
89:12,15,18 94:3
112:7
**susan's** 69:9 79:2
81:8 82:2 83:16
84:4
**suspected** 61:12
**suspended** 91:21
92:10
**suspension** 91:24
**switch** 79:1
**switched** 79:4
84:20
**switching** 84:20
**swore** 89:15
**sworn** 5:4 6:1
116:10

**symptoms** 39:18
40:2
**system** 42:6 55:5
56:7
**systems** 89:8

**t**

**t** 63:22 76:23,23
**table** 42:5
**tailor** 64:12
**take** 8:10,12 15:12
38:17,20,25 39:7,9
42:15,21 43:14
51:4,5,14 52:5,5
53:4,10 59:12,24
60:2 76:1 77:21
79:2 80:8,11
92:22 102:7
107:13 108:8
111:24 114:22
**taken** 1:21 5:15
42:19 43:17 52:16
57:14 58:14 91:16
91:18 99:22
116:20
**takes** 64:25 93:22
**talk** 76:24 88:9
**talked** 19:12,13
33:9 37:23 75:13
75:21 87:6 103:14
113:11
**talking** 16:22
23:23 25:20 58:18
77:15 97:20 98:23
**tapered** 52:2
**tech** 69:10 71:17
83:8 93:22
**technician** 70:24
71:13 77:9 79:7
80:5,16 81:3
85:14

**technicians** 29:23
77:8 78:18,20
82:3,25 83:5
**technique** 86:25
**techs** 82:13,14,17
82:20 83:7 89:22
**telework** 80:9
**tell** 5:20 10:25
16:13 45:19 51:21
53:11 57:18 58:16
70:23 73:22 80:19
80:22 82:20 90:23
95:15,17 110:13
111:6
**telling** 14:6,12
41:18 79:12 81:16
82:10,14 97:8
**tells** 78:12
**tempered** 40:8
**ten** 58:2
**tendency** 85:15
**tense** 31:17 34:13
35:17
**term** 33:10 58:5
**terminate** 10:16
28:1
**terminated** 12:3
28:21 29:21 30:4
31:6 49:8 98:13
**termination** 11:11
14:8 15:1 48:11
97:19 98:2,16
**terrible** 95:19,20
95:20
**terrific** 48:8
**test** 36:1 37:2
**testified** 5:17
**testify** 5:22 57:24
63:1 116:10
**testimony** 76:1
113:23 114:11

116:13,17

**tests** 37:16,20

**text** 110:16,17

**thabit** 63:21 65:19
68:14 69:4 76:16
77:2,20,23 78:5
85:5 88:20 112:7

**thank** 26:14 49:21
62:2,5 114:4

**thanksgiving**
98:14 100:13

**thing** 9:4 13:17
21:21 42:1 45:9
55:11 57:25 65:17
81:1 84:14 86:24
91:20 92:12 94:3
94:23 95:22
100:15 101:4
102:2

**things** 24:21 25:17
34:9 35:7 36:7
41:4,12 43:2,3
48:21,21,23 49:4
54:22 55:7 65:14
66:21,24 67:14
71:19 75:10,12,18
75:19 77:18 78:12
80:14 85:17 86:3
86:3 88:2,24 90:2
95:4,6,10 99:5
104:4

**think** 9:5,15,16
10:20,22 12:10
13:7 15:23 19:4
19:25 24:25 25:15
25:16 26:10 28:25
29:15 32:10 34:5
34:10 36:10 38:16
39:6 49:19 50:9
53:1,25 54:5,8
56:20 60:1 63:21

65:15,18 71:14
72:11,15 73:3,5
74:11 75:22 78:3
78:8,23 80:2
82:15 84:2 85:2,5
85:7,24 87:5,16
88:3 90:19 91:22
92:14,17,19,20,21
93:9 97:4 98:15
98:19,20 99:4
100:1,3 102:2
106:17 108:3,4
113:21 114:3

**thinkgk.com** 2:17

**third** 43:22 58:1,5
58:14,23 59:2,7
88:22 91:6 101:12

**thirdly** 6:11

**thoms** 63:22 71:11
71:13

**thoracic** 35:4,8

**thought** 19:13
24:23 35:4,9 36:3
41:20 48:24 54:6
68:21 87:3 93:25
96:10,14 101:2,4
108:4 113:13,15

**threat** 18:19,25
48:11

**threatened** 9:21
10:2,16 22:2
96:10 97:10 98:9
98:16

**threatening** 15:16
15:17 20:24 97:17
97:19 100:7,9

**threats** 10:13,14
11:4 23:7 97:24
97:25 98:6,18,21

**three** 18:2,11
23:10 24:4,4,22

25:16 38:21 42:3
42:9,12,17 43:6
52:1 80:9 102:14

**threw** 79:9 83:8
100:18

**thrown** 86:6

**time** 10:24 11:5
12:12 14:9,21,24
16:22 17:13 18:19
21:25 22:18 24:18
24:19,24 27:9
32:16 34:23 35:21
38:7,11 39:16,22
39:23 42:23 50:5
50:7,15 51:13,19
51:23,24 54:2,21
61:24 63:12 65:6
65:9 66:22 68:23
69:2,7 70:5,7
80:14 83:23 84:1
84:7,10,16,25 85:1
87:10,25 88:17,18
89:3 91:8,22 92:9
93:14,23 94:12,22
95:23 101:14,23
110:12 112:4
113:5,16 114:5
116:20

**timekeeping**
111:13

**timely** 14:1

**times** 39:10 50:6
51:1 52:8,9 55:10
75:10 81:6 88:1
101:10,25 102:1

**timestamps** 48:23

**title** 7:18 107:23

**tizanidine** 50:10
50:11

**today** 5:13,25 11:1
12:22,25 13:4

19:4 25:14 27:11
31:15 51:15,21
57:18,24 60:14
63:5 75:14,21
97:24 98:7 103:14
113:8,12,17,23
114:16

**told** 11:7 15:18
30:1 36:14 54:19
55:20 64:20 65:2
70:3 71:7 77:17
79:8 80:20 81:3
85:18,22 87:7
88:19 89:18 97:10
101:19,24 109:14

**tolerate** 50:10

**tomorrow** 20:12

**tone** 11:13

**tonight** 72:15

**top** 110:5

**topics** 21:1 113:11

**tossed** 85:23

**tracey** 63:22 71:11
71:13,20

**trail** 1:22 2:5

**transcribed** 6:6
12:15 15:8 116:16

**transcript** 3:1
114:7,8,12,13
115:3,8,11,13,15

**transcription**
116:17

**transpired** 10:24

**traumatic** 34:10
42:8 75:8,8

**traumatized** 75:17

**travel** 113:5

**traveling** 54:1,2
54:16

**treat** 37:5 39:14
39:18 78:19 87:24

**treated** 38:22
87:25
**treating** 82:6
**treatment** 31:9
32:19,24 33:1
34:15,18 36:19
37:1 38:5 49:22
52:21 56:11,15
57:1
**treatments** 34:20
**tremendously**
84:5
**trial** 62:25
**trick** 76:5
**tried** 12:12 38:21
82:12 93:25
**tries** 91:4
**trigger** 53:11
**trouble** 18:9 71:6
82:11
**troubled** 99:17
**true** 116:16
**truth** 53:11 57:18
61:7 110:14
116:11,11,12
**try** 6:7 12:23 31:1
53:12 82:22 83:2
86:3 93:10 108:8
**trying** 40:11 46:22
46:24 53:25 65:18
69:22 89:24 92:20
**tumbush** 83:22
**turn** 43:22 62:23
66:12 77:21
**turned** 21:24
91:19
**twice** 101:22
**two** 6:12 10:9
17:21 21:1 23:16
31:14 33:25 34:6
34:21 38:1,5,21

43:3 44:13 52:6
56:5 58:18 59:13
69:23 74:7,16
80:9 84:2 88:1,8
96:22 97:6 98:14
101:6 102:4,14
**tylenol** 92:8
**type** 11:10 21:15
25:8 56:19,25
65:16 102:11
113:2
**typed** 112:16,23
114:7
**types** 44:13 95:1
**typewritten**
110:16
**typos** 114:10

## u

**uh** 4:3,8,10,11,13
4:14,16,17,19,20
6:5,6,6 8:6 14:11
47:6 78:22 79:8
86:14 98:7 100:14
103:21 105:1
106:7 107:9
108:14 109:22
110:24 111:17
112:12 113:5
**uncomfortable**
75:1
**uncomfortablen...**
74:13
**undergone** 56:25
**underlined** 60:9
62:20
**underlying** 63:15
64:2
**understand** 6:14
10:25 12:20 13:4
13:5 18:6 20:17
24:22 46:20,22

61:13 75:25 76:3
83:1
**understands** 70:18
**understood** 15:23
**unfairly** 82:6
**union** 5:23 48:19
**united** 1:1
**university** 1:8
5:10 7:13 9:2 18:4
30:9,12,17 42:15
42:18 43:14 44:6
49:10,24 52:22
53:1 55:4 56:7
58:13 60:17 61:22
73:16 78:7 83:17
90:8 93:11 103:15
**untimeliness**
20:22
**untoward** 46:2
55:1 74:9 94:24
**unwarranted** 24:8
**upmc** 35:24
**upper** 6:23 28:15
34:25 38:23
**upset** 82:16,19
87:8 91:10,11
**upstairs** 17:11,14
**urinate** 31:22
33:23
**urinating** 34:12
**use** 37:5,11 50:5,5
52:3,7 65:25
85:16 101:21
**usually** 80:14 89:1
94:11

## v

**v** 32:10
**vacation** 17:4
**value** 24:9
**values** 24:13

**various** 11:20 27:2
27:4 55:10 83:19
**vast** 21:25
**verbally** 6:5,8
**vice** 40:9
**view** 10:4 12:5
15:13 16:20 18:15
19:10,15,18,23
46:18
**viewed** 27:25 28:2
82:2
**vii** 7:18
**violated** 18:12
28:7 97:8
**violates** 26:16
**violating** 81:16
**violation** 7:18 81:4
81:10
**vitriol** 100:8
**vitriolic** 22:1
**voluntary** 44:14
**vomiting** 91:13
**vs** 1:7

## w

**w** 76:23,23
**waist** 31:16 34:14
**wait** 108:3
**waive** 114:13,19
114:21
**waived** 115:9
**walked** 33:12
**walking** 33:11,22
34:12 83:23 99:14
99:15,15
**want** 11:14 18:8
26:14,21 34:5
43:12,22 59:11
60:21 61:12,16
62:5 81:15 82:9
82:10 90:10,12
92:25 99:25 100:6

100:10 102:15,18
103:6 108:7 111:4
114:15
**wanted**  24:25
29:21 43:11,12
54:25 55:14,19,19
80:18 91:17
102:16
**wants**  114:18
**warning**  75:4
**warranted**  73:16
73:18,19 77:2
85:9 86:21 90:19
**warren**  53:8
**washington**  64:9
**way**  6:3,12,13
21:16 31:1 33:15
53:6 56:3 61:23
79:24 83:4,13
85:22 86:6,7 88:4
92:5 94:19 95:25
**ways**  6:3 82:21
**we've**  19:12,12
22:17 26:5 72:11
97:24 103:13
**weaponizing**  28:3
**weather**  95:2
**week**  38:5 42:2
51:18 52:6 84:22
**weekend**  79:2
**weekends**  79:1
84:20
**weeks**  34:6 38:2
51:6 102:14
**weighing**  49:4
**wendy**  32:3 85:12
**went**  12:9 13:24
17:14,15 20:20
28:24 35:8 36:14
38:11 41:7 47:16
50:7,23 51:9

77:13 78:25 84:18
84:19 85:24,25
87:19 89:14 93:21
**whereof**  117:5
**wider**  35:11
**wife**  54:17 56:17
63:23 64:1,15,19
65:2,5,16,25
**williams**  63:20
67:4
**wise**  85:13,16
86:24
**withdrew**  109:10
109:12
**witness**  65:6 116:9
116:14,15,18
117:5
**witness's**  115:2
**witnessed**  20:10
**witnesses**  63:1
**wojotowitz**  76:22
91:2
**word**  25:1 85:16
99:16
**words**  17:20 45:22
**work**  17:7 28:20
39:8 48:2,6,6,21
53:7,12 54:18
58:5,20,21,23,24
58:24 59:4 67:6
73:9,22 74:11,22
75:5 77:7,12,19
81:21 84:4,21
85:17 88:21,22
89:4 91:5,7 93:21
98:23,24 101:11
103:2,16 104:23
**worked**  27:24,24
71:22 88:17
101:24

**worker**  58:1
**working**  24:9
27:22 49:6 52:25
71:14 86:16
**workload**  89:6
**works**  64:8 72:19
91:6 113:19
**workstation**  80:23
**worried**  31:5
80:17
**worse**  33:15
**write**  14:6,11,12
14:13,14 48:24
88:3 94:6 95:4,16
96:1,9 100:23
102:15 104:3
112:2 113:1
**writing**  12:10
93:23 95:10,13
**written**  17:20
55:10 93:3,5,7
95:5 96:4 98:15
101:7 103:2
**wrong**  46:1
**wrote**  11:9 14:25
15:8 18:11 27:2
46:4 70:5 93:8
94:8 95:11 96:3
96:23 97:7 101:6
105:8 110:19
111:12

**y**

**y**  32:10
**yeah**  52:6,6 53:3
53:21 60:13 61:15
70:22 101:20
108:22
**year**  22:14 38:14
38:14 55:12 56:5
70:1,2

**years**  38:22 39:1
52:18 53:17,18
56:1,1,18 58:2,19
74:7 78:23 84:3
85:3 87:13 88:19
91:9 102:19
**yelling**  90:21
**york**  54:6,11
**young**  17:25 18:5
**youngest**  51:3

**z**

**z**  76:23

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**From:** Dundee, Frank
**Sent:** Thursday, June 23, 2016 10:48 PM
**To:** Besselman, Rebecca  L
**Subject:** Sexual Harrassment

Dear Ms. Besselman,

Over a period of years, I have been subjected to unwelcome sexual conduct in the workplace by my supervisor, Ms. Rachael Lerman.  I have not reported her unwelcome sexual overtures for fear of retaliation.

I would like to make a formal complaint as I have been subjected to a pattern of harassing behavior from Ms. Lerman, resulting in a hostile work environment, which I believe is directly attributable to the fact that I have not acquiesced or responded in-kind to my supervisor's sexual overtures.  In addition, my supervisor is using the UH discipline policy in order to result in my constructive discharge, which I also believe is directly attributable to the fact that I have not acquiesced or responded in-kind to her unwelcome sexual overtures.

It is extremely stressful to have to file formal charges.  It is something I have been trying to avoid.  I was hoping over time that the situation would get better; it has not.  I am requesting your assistance with how to proceed.  I thank you for your consideration.

Frank Dundee R.Ph.

1



DEFENDANT'S
EXHIBIT
1

PENGAD 800-631-6989

UH-Dundee 0108

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FRANK DOMINIC DUNDEE,      )      CASE NO. 1:19CV01141

     Plaintiff,      )      JUDGE DAN AARON POLSTER

v.

UNIVERSITY HOSPITALS      )      **DEFENDANT UNIVERSITY HOSPITALS**
CORPORATION, et al.,      )      **HEALTH SYSTEM, INC.'S FIRST SET OF**
     )      **REQUESTS FOR ADMISSION TO**
     Defendants.      )      **PLAINTIFF**

NOW COMES Defendant University Hospitals Health System, Inc. ("University Hospitals"),

by and through undersigned counsel, and hereby requests that Plaintiff Frank Dominic Dundee

("Plaintiff") respond separately and fully and under oath, in accordance with Rule 36 of the Federal

Rules of Civil Procedure, to the following Requests for Admission within thirty (30) days after service.

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:**      University Hospitals has never failed to provide you with a
reasonable accommodation that you have requested.

**Response:  The Plaintiff never requested an accommodation in the time period relevant to the
claim.**

**Request for Admission No. 2:**      University Hospitals has always engaged in an interactive
process with you regarding any accommodations you have requested.

**Response:  The Plaintiff never requested an accommodation in the time period relevant to the
claim.**

**Request for Admission No. 3:**      The events that you allege were sexual harassment by Rachael
Lerman occurred between Spring 2012 and October 2013.

**DEFENDANT'S
EXHIBIT
2**

**Response:  those are contained in the document filed with UH HR and sent to Rebecca Besselman, the HR representative and are in the FOIA records of the EEOC complaint.**

**Request for Admission No. 4:**        You were not demoted following your complaint of alleged sexual harassment by Rachael Lerman.

**Response: No**

**Request for Admission No. 5:**        Your job duties and responsibilities were not altered following your complaint of sexual harassment by Rachael Lerman.

**Response: The alteration was that keeping a clear mind on the job was much more difficult. The stress also impaired the Plaintiff's ability to walk at work.  Both were a direct result the stress inflicted by being under threat of discharge from HR Represenative Danialle Lynce and Jason Glowczewski during the meeting on 8/5/2017 at 7:00 am.  The illegal retaliation by the two actually caused the harm that is alleged.**

**Request for Admission No. 6:**        You experienced no reduction in pay or benefits following your complaint of sexual harassment by Rachael Lerman.

**Response: No**

**Request for Admission No. 7:**        You have remained a full time employee of University Hospitals between January 1, 2012 and the present.
**Response: Yes.**

**Request for Admission No. 8:**        University Hospitals has not restricted you in any way or at any time from performing your job duties.

**Response: No.**

2

Respectfully submitted,

_____

Kerin Lyn Kaminski (0013522)
Donald C. Bulea (0084158)
GIFFEN & KAMINSKI, LLC
1300 East Ninth Street, Suite 1600
Cleveland, Ohio 44114
Telephone:     216-621-5161
Facsimile:     216-621-2399
E-mail:          kkaminski@thinkgk.com
                    dbulea@thinkgk.com
**_Counsel for Defendant University Hospitals Health
Systems, Inc._**

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2019, a true and correct copy of _University Hospitals

Health Systems, Inc.'s First Set of Requests for Admissions to Plaintiff_ was served:

Via Electronic Mail and Regular U.S. Mail, postage prepaid upon the following Parties:

Frank Dominic Dundee
7707 Amberwood Trail
Boardman, Ohio 44512
fdundee@gmail.com
**_Pro Se Plaintiff_**

_____

Donald C. Bulea (0084158)
**_Counsel for Defendant University Hospitals Health
Systems, Inc._**

3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FRANK DOMINIC DUNDEE, | ) | CASE NO. 1:19CV01141 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS | ) | **DEFENDANT UNIVERSITY HOSPITALS** |
| CORPORATION, et al., | ) | **HEALTH SYSTEM, INC.'S FIRST SET OF** |
| | ) | **INTERROGATORIES TO PLAINTIFF** |
| Defendants. | ) | |
| | ) | |

NOW COMES Defendant University Hospitals Health System, Inc. ("University Hospitals"),

by and through  undersigned counsel, and hereby requests that Plaintiff Frank Dominic Dundee

("Plaintiff") answer separately and fully and under oath, in accordance with Rule 33 of the Federal Rules

of Civil Procedure, the following Interrogatories within thirty (30) days after service.

**INTERROGATORIES**

**Interrogatory No. 1:**        Identify each and every person with whom you have consulted, or whom
you expect to call as an expert witness to testify on your behalf concerning the claims set forth in the
Complaint in this matter, and for each, what is the subject matter on which the expert is expected to
testify?

**Answer:  No one.**

1



**Interrogatory No. 2:**       Identify each and every person, other than experts, you anticipate calling as a witness to testify on your behalf concerning the claims set forth in the Complaint this matter, and for each, what is the subject matter on which the witness is expected to testify?

**Answer: None**

**Interrogatory No. 3:**       Identify each person, other than experts, who has knowledge of the facts alleged in your Complaint, the damages allegedly suffered by you, and any of the efforts you made to mitigate such damages.

**Answer:  None**

**Interrogatory No. 4:**       Identify the date and describe each occurrence of "unwelcome sexual advances by Ms. Lerman," as alleged in the Complaint [PageID# 12].

**Answer:  The question is not relevant to the claim.  However the answer is in the charge of sexual harassment filed on 6/26/2016 with HR representative Rebecca Besselman which is in your possession.**

**Interrogatory No. 5:**       What is the substance of any and all communications you have had with any current and/or former employee(s), independent contractor(s), agent(s) and/or representative(s) of University Hospitals regarding your allegations of sexual harassment, and for each communication what is the identity of the person with whom you communicated and the dates of the communication?

**Answer: None.  Once again, the Plaintiff's claim does not concern sexual harassment.  It is for retaliation against a protected activity.**

**Interrogatory No. 6:**       Describe each occurrence of your being subjected to a hostile work environment, as alleged in the Complaint [PageID# 3, 20], and for each occurrence, identify the date, place, the person or persons involved.

**Answer: That information is in the personnel file at UH Geauga.  Every formal/informal discipline was a manufactured event intended to harass the plaintiff.  Please read the addendums attached to each record in the Plaintiff's UH personnel files for explanations.**

**Interrogatory No. 7:**       Describe each occurrence of your being "singled out for specious corrective actions," as alleged in the Complaint [PageID# 12], and for each occurrence, identify your action and the corrective action, the date(s), and person or persons involved.

**Answer: That information is in the personnel file at UH Geauga.  Every formal/informal discipline was a manufactured event intended to harass the plaintiff.  Please read the addendums attached to each record in the Plaintiff's UH personnel files for explanations.**

**Interrogatory No. 8:**      What is the factual basis of your allegation that similar "infractions…[of] others on the pharmacy staff" were "ignored" [PageID# 3].

**Answer:  I was a member of the pharmacy staff and was aware of other staff members, including Susan Thabit, George Brown, and Larry Schepps, Lisa Wojotowitz, whose infractions were more significant than any of the manufactured violations attributed to the Plaintiff.**

**Interrogatory No. 9:**      Identify and describe the occurrence or occurrences of "abuse" by Ms. Lerman and Ms. Lynce that caused you to file a report alleging sexual harassment against Ms. Lerman from "years earlier," as alleged in the Complaint [PageID# 13].

**Answer: The question is not relevant to the claim of retaliation.  However, the complete description can be found in the Plaintiff's UH personnel files and in the sexual harassment complaint filed with HR represenative Rebecca Besselman.**

**Interrogatory No. 10:**      Identify the date and describe the substance of each report you filed with University Hospitals alleging harassment, hostile work environment, or retaliation and identify the University Hospital employee(s) with whom you filed the report.

**Answer:  See the attached emails to Attorney's Katherine Perry and Edward Soyka of Compliance and Attorney Heather Harmon of Human Resources.**

**Interrogatory No. 11:**      What is the substance of any and all communications you have had with any current and/or former employee(s), independent contractor(s), agent(s) and/or representative(s) of University Hospitals regarding your allegations of hostile work environment and retaliation, and for each communication what is the identity of the person with whom you communicated and the dates of the communication?

**Answer: None.**

**Interrogatory No. 12:**      Identify each University Hospital employee who wrote "similar comment[s]" in the margins of Pharmacy Time Exception forms, as alleged in the Complaint [Page ID# 16].

**Answer: The Plaintiff, himself, had written humorous comments many time on the Pharmacy Time Exception form and never been called out on them.  Other staff members had written humorous asides as well.  The records are in the possession of UH and should be readily available.**

**Interrogatory No. 13:**     What is the factual basis for your allegation that your June 26, 2017 meeting with Ms. Lynce and Ms. Lerman was "connected" to your August 5, 2016 meeting with Ms. Lynce and Mr. Glowczewski, as alleged in the Complaint [Page ID# 19]?

**Answer:  The factual basis for the direct relationship was that such action had been threatent in the critical meeting of 8/5/2016, at 7:00 am, by Danialle Lynce and Jason Glowczewski.  A reasonable person would examine the suspicious timing, manufactured and specious and outrageous reasons for the materially adverse action of the June 26, 2017 final warning as meeting the causation standard that requires that the evidence cleary demonstrates that "but for" a retaliatory motive, Ms. Lynce and Ms. Lerman would not have taken the adverse action.  June 26, 2017 was the one-year anniversary from the Plaintiff filing the charge of sexual harassment against Ms. Lerman.  That was not coincidental and sent a message to the Plaintiff.**

**Interrogatory No. 14:**     Identify the University Hospitals policy that precluded the warning issued to you on June 26, 2017 as alleged in the Complaint [Page ID# 19-20].

**Answer:  The policy is noted in the FOIA records of the EEOC investigation and is also noted on the actual discipline form from HR and in the Plaintiff's personnel file.**

**Interrogatory No. 15:**     Identify each University Hospital employee who engaged in "conspiracy and complicity" in retaliation against you or by creating a hostile work environment, as alleged in the Complaint [PageID# 28].

**Answer:  The Plaintiff has filed a Motion for Summary Judgement and in so doing will not be deposing anyone who may have been complicit.  The Plaintiff is relying on them material facts and feels that depositions will only create noise around those facts.**

**Interrogatory No. 16:**     Identify each person from whom you have obtained or solicited any written or recorded statement or affidavit relating to any of the facts or allegations set forth in your Complaint.

**Answer: None obtained. The identity of those solicited is listed in the Discovery exchanged earlier with your office and in the Plaintiff's request for production.**

**Interrogatory No. 17:** State the name, case caption, date and venue of all other claims, lawsuits, administrative charges, complaints or settlement agreements filed by or against you, or that involve you in any way including those in which you provided any type of testimony.

**Answer: None.**

**Interrogatory No. 18:** What is the type and specific amount of damages you seek in this matter and for each damage amount what is the method of calculation you used to determine the amount?

**Answer: The Plaintiff seeks the maximum award for punitaive damages under EEOC recommendations of $300,000 for employers with more than 500 employees for each of the three vioaltions in the claim: $300,000 for the retaliation claim under Title VII, $300,000 for unlawful medical examination for "perceived disability" under Title I of the ADA, and $300,000 for an unlawful medical examination under Title I of the ADA that was neither job-related nor consistent with business necessity, as well as any damages that the Court sees fit to apply.**

**Interrogatory No. 19:** Identify each and every health care provider (including physicians, psychiatrists, psychologists, therapists, mental health professionals, social workers, counselors, hospitals, clinics, and health care facilities of any type) consulted by you with respect to any allegation or item of damages you will claim in this lawsuit or with respect to any action or inaction by University Hospitals.

**Answer: None.**

Respectfully submitted,

_____

Kerin Lyn Kaminski (0013522)
Donald C. Bulea (0084158)
GIFFEN & KAMINSKI, LLC
1300 East Ninth Street, Suite 1600
Cleveland, Ohio 44114
Telephone:      216-621-5161
Facsimile:      216-621-2399
E-mail:         kkaminski@thinkgk.com
                dbulea@thinkgk.com
***Counsel for Defendant  University Hospitals Health Systems, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2019, a true and correct copy of *University Hospitals Health Systems, Inc.'s First Set of Interrogatories to Plaintiff* was served:

Via Electronic Mail and Regular U.S. Mail, postage prepaid upon the following Parties:

Frank Dominic Dundee
7707 Amberwood Trail
Boardman, Ohio 44512
fdundee@gmail.com
*Pro Se Plaintiff*

_____
Donald C. Bulea (0084158)
**Counsel for Defendant University Hospitals Health
Systems, Inc.**

STATE OF _____ )
                            )   SS:   **VERIFICATION**
COUNTY OF _____ )

I, Frank Dominic Dundee, being first duly sworn according to law, depose and state that I have carefully read the answers to the foregoing Interrogatories and that they are true and accurate to the best of my knowledge and belief.

_____
Frank Dominic Dundee

_____
Date

SWORN TO BEFORE ME, this _____ day of _____, 2019.

_____
NOTARY PUBLIC

7

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 532-2014-00108 |

| **Ohio Civil Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Frank Dundee** | **(330) 726-2662** | **08-17-1953** |

Street Address     City, State and ZIP Code
**7707 Amberwood Trail, Boardman, OH 44512**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **UNIVERSITY HOSPITALS** | **500 or More** | **(440) 285-6000** |

Street Address     City, State and ZIP Code
**13207 Ravenna Road, Chardon, OH 44024**

| Name  EEOC<br>CLRC CART UNIT | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address  NOV 1 3 2013  City, State and ZIP Code

**RECEIVED**

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☒ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **08-26-2013** Latest **10-04-2013**
☐ CONTINUING ACTION

THE PARTICULARS ARE *(if additional paper is needed, attach extra sheet(s)):*

I was hired as a Staff Pharmacist in April of 2010. In the last 18 months, managers have created culture of divisiveness within the department, based on age, that demeans and threatens the role and continued employment of the older, staff pharmacists, as providers of care.

On October 4, 2013, I discovered a pamphlet for the EAP in my locker. Ms. Lerman, with the approval of Ms. Lynce, was responsible. I viewed this action as a grievous personal affront to my dignity and character, and as a method of harassment. The action, along with a pattern of intimidating behavior, has been emotionally damaging. Ms. Lynce, as an agent of the human resource department of UH, was negligent by not stopping such behavior. Ms. Lerman, as my supervisor, is empowered to take tangible employment actions like hiring, firing, promoting, demoting or reassigning employees to significantly different responsibilities.

I believe I have been subjected to different terms and conditions of employment, due to my age, 60, in violation of the Age Discrimination in Employment Act of 1967 (ADEA), as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 11·12·13  *[signature]*<br>Date  Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |



DEFENDANT'S
EXHIBIT
4



## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### INTAKE QUESTIONNAIRE

Please immediately complete the entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, generally within 180 days or in some places 300 days of the alleged discrimination. Upon receipt, this form will be reviewed to determine EEOC coverage. **Answer all questions as completely as possible, and attach additional pages if needed to complete your response(s). If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "n/a." Please Print.**

### 1.  Personal Information

Last Name: Dundee                     First Name:  Frank                     MI: D

Street or Mailing Address:  7707 Amberwood Trail                     Apt Or Unit #:

City: Boardman           County: Mahoning           State:  Ohio           ZIP: 44512

Phone Numbers: Home: (  330  ) 7262662                     Work: (  440  )  2856000

Cell: (  330  ) 3988274           Email Address: fdundee@gmail.com

Date of Birth: ▓▓ 953    Sex: Male ☑  Female ☐   Do You Have a Disability?  ☑ Yes   ☐ No

**Please answer each of the next three questions.**    i.  Are you Hispanic or Latino?    ☐ Yes  ☑ No

ii.  What is your Race? Please choose all that apply.    ☐ American Indian or Alaska Native    ☐ Asian    ☑ White

☐ Black or African American    ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)?  USA

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name:  Patricia Ann Dundee                     Relationship: spouse

Address: 7707 Amberwood Trail           City: Boardman           State:  OH   Zip Code:   44512

Home Phone: (  330  ) 7262662     Other Phone: (  330  ) 5405995

### 2. I believe that I was discriminated against by the following organization(s): (Check those that apply)

☑ Employer   ☐ Union   ☐ Employment Agency   ☐ Other (Please Specify)  _____

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked.  If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

**Organization Name:**  University Hospitals Geauga Medical Center

Address: 13207 Ravenna Rd                     County:  Geauga

City: Chardon           State:  OH  Zip:     44024      Phone: (  440  ) 2856000

Type of Business:  Hospital System           Job Location if different from Org. Address:

Human Resources Director or Owner Name: Danialle Lynce                     Phone:  440285600

**Number of Employees in the Organization at All Locations**: Please Check (√) One

☐ Fewer Than 15   ☐ 15 - 100   ☐ 101 - 200   ☐ 201 - 500   ☑ More than 500

### 3.  Your Employment Data (Complete as many items as you can)   Are you a Federal Employee?  ☐ Yes  ☑ No

Date Hired: 05/02/2010           Job Title At Hire: Staff Pharmacist

Pay Rate When Hired: $55.00/hr           Last or Current Pay Rate: $64.00/hr

Job Title at Time of Alleged Discrimination:  Staff Pharmacist           Date Quit/Discharged:

Name and Title of Immediate Supervisor:  Racheal Lerman

DEFENDANT'S
EXHIBIT
5
PENGAD 800-631-6989
UH-Dundee 0204

2

**If Job Applicant,** Date You Applied for Job _____  Job Title Applied For _____

**4.  What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☐ Race  ☐ Sex  ☐ Age  ☐ Disability  ☐ National Origin  ☐ Religion  ☑ Retaliation  ☐ Pregnancy  ☐ Color (typically a difference in skin shade within the same race)  ☐ Genetic Information; choose which type(s) of genetic information is involved:

☐ i. genetic testing  ☐ ii. family medical history  ☐ iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: _____

If you checked genetic information, how did the employer obtain the genetic information? _____

_____

Other reason (basis) for discrimination (Explain). _____

**5.  What happened to you that you believe was discriminatory?**  Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you.  **Please attach additional pages if needed.**
*(Example: 10/02/06  - Discharged by Mr. John Soto, Production Supervisor)*

| A)  Date: 08/05/16 | Action:  Threatened with termination for demonstrably false reasons for filing a EEO protected activity oof sexual harrassment against my supervisor on 6/26/2016. |
|---|---|

Name and Title of Person(s) Responsible: Head of HR,Danialle Lynce; Regional Pharmacy Director Jason Glowczewski

| B)  Date: 06/26/17 | Action:  Called to HR and given final warning before termination for using the words, "you're a good kid", "he's a pup with little experience" and "he's a nice boy" in an email to HR rep |
|---|---|

Name and Title of Person(s) Responsible:  Head of HR,Danialle Lynce; Pharmacy Manager Rachael Lerman

**6.  Why do you believe these actions were discriminatory? Please attach additional pages if needed.**

Suspicious timing. The causal link between the adverse action and the protected activity; Oral or written statements made by the individuals recommending or approving the challenged adverse action revealed retaliatory intent by expressing retaliatory animus and by revealing inconsistencies, pre-determined decisions, and other indications that the reasons given for the adverse action are false; Inconsistent and shifting explanations; evidence of selective enforcement of the disciplinary process

**7.  What reason(s) were given to you for the acts you consider discriminatory?  By whom? His or Her Job Title?**

That reasons offered for the 8/5/2016 threats were sentences, out of context, culled from addendums, which are every employee's right, my replies to substandard evaluations and demonstrably false discipline charges, in a pattern of harrassment, over years, by Ms, Lynce and Mr. Glowczewski.  The reasons given at the 6/26/17 final warning were for innocuous words that no reasonable person would find offensive in two emails to an HR rep, who was not the rep involved in the discipline, Ms. Lynce and Ms, Lerman.

**8.  Describe who was in the same or similar situation as you and how they were treated.  For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance?  Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination.  For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on.  Use additional sheets if needed.**

Of the persons in the same or similar situation as you, who was treated *better* than you?

| A.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Larry Schepps | white, male, 70, US, Jewish | Staff Pharmacist |

Description of Treatment  Larry Schepps has frequently been rude on the phone, hanging up on nurses, has raised his voice in anger, swore at another employee and has never been formally put into correctove action. he is Jewish as is the dept manager

| B.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Susan Thabit | white, female, 61, | Staff Pharmacist |

Description of Treatment  Ms. Thabit has made errors on the job, has frequent disagreements for fellow employees, raises her voice, throws objects at fellow employees, violates HIPAA patient privacy, but is the eyes and ears of the supervisor

3

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

| A.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|

Description of Treatment

| B.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|

Description of Treatment

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

| A.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|

Description of Treatment

| B.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|

Description of Treatment

**Answer questions 9-12 only if you are claiming discrimination based on disability.  If not, skip to question 13.  Please tell us if you have more than one disability.  Please add additional pages if needed.**

9.  **Please check all that apply:**

☐  Yes, I have a disability

☐  I do not have a disability now but I did have one

☐  No disability but the organization treats me as if I am disabled

**10.  What is the disability that you believe is the reason for the adverse action taken against you?  Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

**11.  Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**

Yes ☐   No ☐

If "Yes," what medication, medical equipment or other assistance do you use?

**12.  Did you ask your employer for any changes or assistance to do your job because of your disability?**

Yes ☐   No ☐

If "YES", when did you ask? _____   How did you ask (verbally or in writing)? _____

Who did you ask?  (Provide full name and job title of person)

Describe the changes or assistance that you asked for:

How did your employer respond to your request?

UH-Dundee 0206

4

**13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| A. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| Adam Gilger | Security Guard | Unknown |

**What do you believe this person will tell us?**

What he was told as his reason for being present in the ante-room during the discipline of 6/26/17. I believ he was there because Ms. Lynce and Ms. Lerman, who blindisded me with this on the day I returned from vacation thought that they could provoke me into saying or doing something actionable. I did nothing of the sort

| B. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| Rebecca Besselman | HR Rep | unknown |

**What do you believe this person will tell us?**

Ms. Besselman was the recipient of the two emails used in the 6/26/2017 final warning discipline. I do not believe that she initiated the discipline over those innocuous phrases. I believe that my emails were targeted by Ms. Lynce and Ms. Lerman, maybe with full knowledge of executive administators, members of the Complinace Department and a Pharmacy Department VP

**14. Have you filed a charge previously in this matter with EEOC or another agency?**   Yes ☑   No ☐

**15. If you have filed a complaint with another agency, provide name of agency and date of filing:**

**16. Have you sought help about this situation from a union, an attorney, or any other source?**   Yes ☐   No ☑
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.** If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. **If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.**

Box 1  ☐ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. **I also understand that I could lose my rights if I do not file a charge in time.**

Box 2  ☑ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.** I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

Verified by PDFfiller
08/19/2017

Frank Dundee
**Signature**

08/19/2017
**Today's Date**

**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1. **FORM NUMBER/TITLE/DATE.** EEOC Intake Questionnaire (9/20/08).
2. **AUTHORITY.** 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a), 42 USC §2000ff-6.
3. **PRINCIPAL PURPOSE.** The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge.
4. **ROUTINE USES.** EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters
5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.** Providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.



## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete the entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, generally within 180 days or in some places 300 days of the alleged discrimination. Upon receipt, this form will be reviewed to determine EEOC coverage. **Answer all questions as completely as possible, and attach additional pages if needed to complete your response(s). If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "n/a." Please Print.**

### 1.   Personal Information

Last Name: Dundee                     First Name: Frank                     MI: D

Street or Mailing Address: 7707 Amberwood Trail                     Apt Or Unit #:

City: Boardman          County: Mahoning          State: Ohio          ZIP: 44512

Phone Numbers: Home: ( 330 ) 7262662          Work: ( 440 ) 2856000

Cell: ( 330 ) 3988274          Email Address: fdundee@gmail.com

Date of Birth: ███ 1953          Sex: Male ☑  Female ☐          Do You Have a Disability? ☑ Yes ☐ No

**Please answer each of the next three questions.**   i. Are you Hispanic or Latino? ☐ Yes ☑ No

ii. What is your Race? Please choose all that apply.   ☐ American Indian or Alaska Native   ☐ Asian   ☑ White

☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)?  USA

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: Partricia Dundee                     Relationship: spouse

Address: 7707 Amberwood Trail          City: Boardman          State: OH   Zip Code:   44512

Home Phone: ( 330 ) 7262662     Other Phone: ( 330 ) 5405995

### 2. I believe that I was discriminated against by the following organization(s): (Check those that apply)

☑ Employer   ☐ Union   ☐ Employment Agency   ☐ Other (Please Specify)

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name:  University Hospitals Geauga Medical Center

Address: 13207 Ravenna Road          County: Geauga

City: Chardon          State: OH  Zip:   44024      Phone: ( 440 ) 2856000

Type of Business:  hospital          Job Location if different from Org. Address:

Human Resources Director or Owner Name: Danialle Lynce          Phone:  4402856000

**Number of Employees in the Organization at All Locations:** Please Check (√) One

☐ Fewer Than 15   ☐ 15 - 100   ☐ 101 - 200   ☐ 201 - 500   ☑ More than 500

### 3.  Your Employment Data (Complete as many items as you can)   Are you a Federal Employee? ☐ Yes ☑ No

Date Hired: 05/02/2010          Job Title At Hire: staff pharmacist

Pay Rate When Hired: $55.00/hr          Last or Current Pay Rate: $64.00/hr

Job Title at Time of Alleged Discrimination:  staff pharmacist          Date Quit/Discharged:

Name and Title of Immediate Supervisor: Rachael Lerman

DEFENDANT'S EXHIBIT 6

PENGAD 800-631-6989

UH-Dundee 0208

2

**If Job Applicant,** Date You Applied for Job _____     Job Title Applied For _____

### 4.  What is the reason (basis) for your claim of employment discrimination?

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☐ Race    ☐ Sex  ☐ Age  ☐ Disability    ☐ National Origin ☐ Religion  ☑ Retaliation    ☐ Pregnancy    ☐ Color (typically a

difference in skin shade within the same race)  ☐ Genetic Information; choose which type(s) of genetic information is involved:

☐ i. genetic testing    ☐ ii. family medical history     ☐ iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: _____

If you checked genetic information, how did the employer obtain the genetic information? _____

_____

Other reason (basis) for discrimination (Explain). _____

### 5.  What happened to you that you believe was discriminatory?  Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you.  Please attach additional pages if needed.
*(Example: 10/02/06  - Discharged by Mr. John Soto, Production Supervisor)*

| A)  Date: 06/26/17 | Action:  I was called to HR, by Ms. Lynce and Ms. Lerman, given a final warning discipline, remanded to the EAP program for session on remediation, under UH employee policy |
|---|---|

Name and Title of Person(s) Responsible: Danialle Lynce, Rachael Lerman

B)  Date:                       Action:

Name and Title of Person(s) Responsible: _____

### 6.  Why do you believe these actions were discriminatory? Please attach additional pages if needed.

The employer has no interest in obtaining a diagnosis of a mental health condition; the mandated EAP counseling sessions, which includes a 3 hour psychiatric examination, is neither job-related nor consistent with business necessity. Ms. Lerman and Ms. Lynce, in effect, weaponized the EAP in order to intimidate, harrass and embarrass me; this was expecially egregious when looking at the manufactured reasons for the discipline, which were retaliation for my filing sexual harrassment charges against Ms, Lerman, which amounted an adverse action against an EEO protected activity.

### 7.  What reason(s) were given to you for the acts you consider discriminatory?  By whom? His or Her Job Title?

The reasons were over three innocous phrases that  in two emails to an HR represenative: "you're a good kid", "he's a pup with little experience", and "a nice boy, but.." No reasonable person would find those phrases offensive in any way.  The recipient, who was an HR representative, did not raise an issue with those phrases.  This provides evedence that my emails were targeted.  Mandating me for remediation with multiple EAP sessions, which amounted to a medical exam, as well as a 3 hour psychiatric exam, all under the threat of termination, violate ADA public policy in regrads to allowable medical examinations by an employer.

### 8. Describe who was in the same or similar situation as you and how they were treated.  For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance?  Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination.  For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on.  Use additional sheets if needed.

Of the persons in the same or similar situation as you, who was treated *better* than you?

| A.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Jill Spuzullo | whiet, female | pharmac tech |

| Description of Treatment | Ms. Spuzullo was mandated to attend multiple EAP sessions even though she had outstanding perfomance in her duties as a pharmacy tech.  Ms. Lerman used the EAP as a means to discourage and degrade Ms. Suzullo, who resigned. |
|---|---|

| B.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |

Description of Treatment

3

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

| A.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |

Description of Treatment

| B.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |

Description of Treatment

**Of the persons in the same or similar situation as you, who was treated *same* as you?**

| A.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |

Description of Treatment

| B.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |

Description of Treatment

**Answer questions 9-12 only if you are claiming discrimination based on disability.  If not, skip to question 13.  Please tell us if you have more than one disability.  Please add additional pages if needed.**

**9.   Please check all that apply:**

☐   Yes, I have a disability

☐   I do not have a disability now but I did have one

☐   No disability but the organization treats me as if I am disabled

**10.  What is the disability that you believe is the reason for the adverse action taken against you?  Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

**11.  Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**

Yes ☐     No ☐

If "Yes," what medication, medical equipment or other assistance do you use?

**12.  Did you ask your employer for any changes or assistance to do your job because of your disability?**

Yes ☐     No ☐

If "YES", when did you ask? _____     How did you ask (verbally or in writing)? _____

Who did you ask?  (Provide full name and job title of person)

Describe the changes or assistance that you asked for:

How did your employer respond to your request?

4

**13. Are there any witnesses to the alleged discriminatory incidents?  If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| A. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| David Riccardi | EAP counselor | 216-286-9980 |

**What do you believe this person will tell us?**

Mr. Riccardi is an EAP counselor.  He can tell the EEO investigaor how UH incorporates the EAP counsleing sessions into the progressive discipline

| B. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| Rebecca Besselman | Hr represenative | 440285600 |

**What do you believe this person will tell us?**

**14.  Have you filed a charge previously in this matter with EEOC or another agency?**     Yes ☑     No ☐

**15.  If you have filed a complaint with another agency, provide name of agency and date of filing:**

**16.  Have you sought help about this situation from a union, an attorney, or any other source?**     Yes ☐     No ☑
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.**  If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws.  **If you do not file a charge of discrimination within the time limits, you will lose your rights.**  If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1.  If you want to file a charge, you should check Box 2.

Box 1   ☐   I want to talk to an EEOC employee before deciding whether to file a charge.  I understand that by checking this box, I have not filed a charge with the EEOC.  **I also understand that I could lose my rights if I do not file a charge in time.**

Box 2   ☑   I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above.  I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.**  I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

*Frank Dundee*                        Verified by PDFfiller
                                      08/23/2017

_____                        08/23/2017
**Signature**                                  **Today's Date**

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1. **FORM NUMBER/TITLE/DATE.** EEOC Intake Questionnaire (9/20/08).
2. **AUTHORITY.** 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a), 42 USC §2000ff-6.
3. **PRINCIPAL PURPOSE.** The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge.
4. **ROUTINE USES.** EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters
5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.** Providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | |
| | ☒ EEOC | 533-2017-01275 |

| Ohio Civil Rights Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Frank D. Dundee | (330) 726-2662 | 1953 |

| Street Address | City, State and ZIP Code |
|---|---|
| 7707 Amberwood Trail, Boardman, OH 44512 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| UNIVERSITY HOSPITALS GEUAGA MEDICAL CENTER | 500 or More | (440) 285-6000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 13207 Ravenna Road,  Chardon, OH 44024 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 06-26-2017  Latest: 06-26-2017

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I have been employed by the above-named Respondent since 2010 as a Staff Pharmacist.  On 6/26/17, I received a final written warning for phrases written in two emails to a HR representative regarding implementation of suggestion for the innovation Summit.   The written phrases were deemed to violate Respondent's Code of Conduct by the Head of HR Danialle Lynce and the Pharmacy Manager, Rachael Lerman.  Both were not recipients of the email.

Under threat of termination, I was mandated to attend counseling sessions in the EAP program.  The EAP counseling sessions amounted to a medical examination that was not related to my job nor consistent with the Respondent's business needs under EEO rule and the ADA.

I believe I am being discriminated against in violation of Title I of the Americans with Disabilities Act of 1990, as amended, (ADA).  I also believe I am being retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended, (Title VII) due to my participation in a protected activity.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9-14-19          Charging Party Signature Date | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

RECEIVED
SEP 19 2017
CLFO
EEOC

DEFENDANT'S EXHIBIT

7

CS

PENGAD 800-631-6989

UH-Dundee 0212

**OHIO CIVIL RIGHTS COMMISSION**
**CHARGE OF DISCRIMINATION (EMPLOYMENT)**            ALH

**OCRC Case Number:**  CLE B4 (44821) 08222018

**EEOC Case Number:**

| | |
|---|---|
| Your Name | Company Name |
| Frank Dundee | University Hospitals Geauga Medical |
| Your Street Address | Company Street Address |
| 7707 Amberwood Trail | 13207 Ravenna Rd |
| City, State and Zip | City, State and Zip |
| Boardman. Ohio 44512 | Chardon, Ohio 44024 |
| Telephone Number | County (if located in Ohio) |
| 3303988274 | Geauga |
| Alternate Number (Optional) | Telephone Number |
| 3307262662 | 4402856000 |
| Email Address (Optional) | # of Employees        Date of Hire |
| fdundee@qmail.com | 28.000                  5/1/2010 |

RECEIVED

SEP 0 6 2018

OCRC - INTAKE
CLEVELAND

Dates of Discrimination (MM/DD/YYYY):  3/21/2018 thru 8/21/2018

I was discriminated on the basis of :
　　Race/Color
　　Sex
✔　Disability (DO NOT LIST DISABILITY)
　　Age (over 40 years old only)
　　Religion
　　National Origin/Ancestry
　　Military Status
　　Retaliation (for protesting discrimination)

Please identify how you are a member of the category you marked on the left: (If you marked **AGE**, please list your **BIRTH DATE**. If you have marked **DISABILITY**, **DO NOT IDENTIFY** your disability.)
I have a disability

RECEIVED

AUG 2 2 2018

OCRC - INTAKE
CLEVELAND

**Please read and review the following:**
I have not commenced with any action under sections 4112.14 or 4112.02(N) of the Ohio Revised Code with respect to the subject matter of the affidavit. I understand that upon filing of this charge with the Ohio Civil Rights Commission, I am barred from instituting any such civil action and that any monetary award or financial benefit I may receive may be limited to back pay and/or restoration of employment fringe benefits and may not include other damages to which I may be entitled as a result of such civil action.

　　　　I am filing a charge alleging AGE DISCRIMINATION and I have read and understand the above information.

●　　　I am NOT filing a charge alleging AGE DISCRIMINATION and this does not apply to me.

Page: 1 of 4

DEFENDANT'S
EXHIBIT

8

CS

UH-Dundee 0276

**Charging Party:** Frank Dundee

ALH

**Case Number:** CLE B4 (44821) 08222018

## Act of Discrimination #1

Date of Discrimination (MM/DD/YYYY): 08/21/2018

I was subjected to (mark only one issue):

- a denial of promotion
- a forced resignation
- demotion
- denial of hire
- ● denial of a reasonable accommodation
- different terms and conditions of employment
- discharge/termination
- discipline
- harassment/sexual harassment
- layoff
- other

I believe it was because of my:

- Race/Color
- Sex
- ✔ Disability
- Age
- Religion
- National Origin/Ancestry
- Military Status
- Protected activity (retaliation)

RECEIVED

SEP 0 6 2018

OCRC – INTAKE
CLEVELAND

If you have marked "other", please briefly describe the discriminatory act:

RECEIVED

AUG 2 2 2018

OCRC – INTAKE
CLEVELAND

The reason given by the company for this action is:
The company, University Hospitals, refused to informally discuss my request(s) for a reasonable accommodation, even though my disability is obvious, forcing me to comply with their internal policy which violates Title I of the ADA rules on reasonable accommodation.

I was given this reason by (name and position):
Debbi Templin, CPDM, ARM Director, Disability & Occupational Risk Control Services, Heather Harmon, JD, PHR, SHRM-CP, Vice President, Human Resources & Organizational Development University Hospitals

I am aware of others treated more favorably than me including:
Lisa Farah

I believe that this was discrimination because:
I am perceived as a troublesome employee, in spite of the fact that my job performance is exemplary, both objectively and subjectively, when compared across all University Hospitals facilities. I believe this discrimination is retaliation for speaking truth to power; for making a complaint to OSHA and complaints to the EEOC, over a period of years. Because of this, my request for reasonable accommodation was rejected without discussion, through an internal University Hospitals policy.

Page: 2 of 4

UH-Dundee 0277

**Charging Party:**   Frank Dundee                                         ALH

**Case Number:**   CLE B4 (44821) 08222018

## Act of Discrimination #2 (Optional)

Date of Discrimination (MM/DD/YYYY):

I was subjected to (mark only one issue):                I believe it was because of my:

    a denial of promotion                                   Race/Color

    a forced resignation                                     Sex

    demotion                                                 Disability

    denial of hire                                           Age

    denial of a reasonable accommodation                     Religion

    different terms and conditions of employment             National Origin/Ancestry

    discharge/termination                                    Military Status

    discipline                                               Protected activity (retaliation)

    harassment/sexual harassment

    layoff

    other

If you have marked "other", please briefly describe the discriminatory act:

RECEIVED

SEP 0 6 2018

OCRC - INTAKE
CLEVELAND

The reason given by the company for this action is:

RECEIVED

AUG 2 2 2018

OCRC - INTAKE
CLEVELAND

I was given this reason by (name and position):

I am aware of others treated more favorably than me including:

I believe that this was discrimination because:

Page: 3 of 4

UH-Dundee 0278

**Charging Party:**  Frank Dundee

ALH

**Case Number:**  CLE B4 (44821) 08222018

**Please check to Indicate you have read and agreed to the statements below.**

✓  I understand that I will not be able to sign this form on-line.  A copy will be mailed out to me for a notarized signature. An investigation will not begin until the Ohio Civil Rights Commission receives a signed and notarized charge from me.

✓  I declare under penalty of perjury that I have read the above charge and that it is true to the best of my knowledge, information and belief. I will advise the agency/agencies if I change my address or telephone number and that I will cooperate fully in the processing of my charge in accordance to their procedures.

_____
Charging Party

_____
Date

Subscribed and sworn to before me on this ___ day of ___ of 20 __

_____
OCRC Representative or Notary

Philip m. Snyder, Esq.
Attorney At Law, OH 0071672
Notary Public, state of Ohio
my commission has No
expiration date §147.03 R.C.

RECEIVED

SEP 0 6 2018

OCRC - INTAKE
CLEVELAND

RECEIVED

AUG 2 2 2018

OCRC - INTAKE
CLEVELAND

Page: 4 of 4

UH-Dundee 0279

## Cell Phone Dock



Please don't adjust
volume or turn
phone off please
& thank you

This note insults my intelligence and I request that you remove it.

This is the second such note to appear.

If the outpatient pharmacy is having issues missing prescriptions or calls,

the problem lies solely within the outpatient pharmacy.  Your note

infers that the reasons there are issues missing prescriptions or calls

may have something to do with inpatient staff using that phone.

**Who even knows that it's there and why in God's name would we**

**adjust the volume or turn it off?  Maybe you need to request a better phone or**

**examine the process for receiving Rx's.**

I have to tube meds all night long and every time I pass by, I see it.

I find it particularly insulting and irritating, and it distracts me from patient care.

I respectfully ask that the note be removed.  Forever.

**Frank Dundee R.Ph.**



DEFENDANT'S
EXHIBIT
9
PENGAD 800-631-6989

7/2016 - New Policy goes into effect. See memo for 7/10/16 switch to new processes. See Rachael for your blinded emp # for list on door.

KRONOS TIMEKEEPING EXCEPTION LOG

Department Name / # _Pharmacy_

130 - 48030
130 - 48000  Rx
130 - 48055

Pay Period Start _____
Pay Period End _____

| DATE | EMPLOYEE NAME | MISSED PUNCH | | OFF-SITE HOURS | | Any other exceptions PTO, Jury Duty, Bereavement, Float, etc. | | APPRO VAL |
|---|---|---|---|---|---|---|---|---|
| | | IN TIME | OUT TIME | IN TIME | OUT TIME | Pay Code | Hours | |
| 7-8-16 | Tina | | | | | | | |
| 7-8-16 | Laura Sarkis | 2 pm | 9:50 pm | | | | | |
| 7-9-16 | Susan | | | | | hi-school/eg | | |
| 7-9-16 | Glenn | | | | | chemo & omni cell No lunch - dinner | | |
| 7-9 | Glenn | | | | | No lunch | | TD |
| 7-11 | Ben | | | | | No lunch (only) | Exercise? | |
| 7-11 | Rich | | | | | No lunch | | |
| 7-11 | Rich | | | | | No lunch | | |
| 7-11 | Susan | | | | | No lunch | | |
| 7-11 | Rich | | | | | No touch | | |
| 7-11 | Susan | | | | | Left at 10:15 | | |
| 7-11 | Susan | | | | | Left at 12:28 | | |
| 7-11 | Tina | | | | | No lunch | | |

She forced me up to sign this.

DEFENDANT'S EXHIBIT
10
PENGAD 800-631-6989

UH-Dundee 0117

7/2016 - New Policy goes into effect. See memo for 7/10/16
switch to new
processes. See Rachael for your blinded emp # for list on door.

KRONOS TIMEKEEPING EXCEPTION LOG

Department Name/# Pharmacy

130-48050   RX
130-48000
130-48055

Pay Period Start _____
Pay Period End _____

| DATE | EMPLOYEE NAME | MISSED PUNCH | | OFF-SITE HOURS | | Any other exceptions PTO, Jury Duty, Bereavement, Float, etc. | | APPRO VAL |
| | | IN TIME | OUT TIME | IN TIME | OUT TIME | Pay Code | Hours | |
| 7-10-16 | Rich | | | | | 6 am in /no 8 am too | | |
| 7 #12 | Glenn | | | | | No Lunching | | |
| 2-12 | Susan | | | | | No Lunch | | |
| 2-12 | Susan | left 10:16 | | | | Not sure clocked + at the truck is us? came in early to help + downtime cleanup NEOMED (knees down) | | |
| 1-13 | Sheri's | No Lunch | | | | | | |
| 1/14 | Mike | | | | | | | |
| 7/13 | Mark Seric | 8:00 | 4:00 | | | | | |
| 7-14 | Sam | | | | | No Lunch | | |
| 7-16-16 | Lawra Sarkis | 2pm | 9:20pm | | | No lunch | | |
| 7-17-16 | Lawra Sarkis 2pm 2pm | | | | | No lunch | | |
| 2-17 | Lisa W | | | | | early so Lawra could leave | | |
| 2-17-19 | Waelyn Derek | | | | | left early 10 min / 5 min end | | |
| 10-7-15 | | PTO 8hr | | | | | | |

7/2016 - New Policy goes into effect. See memo for 7/10/16 switch to new processes. See Rachael for your blinded emp # for list on door.

**KRONOS TIMEKEEPING EXCEPTION LOG**

Department Name/# _Pharmacy_

130 - 48030 Rx
130 - 48000
130 - 48035

Pay Period Start _____
Pay Period End _____

| DATE | EMPLOYEE NAME | MISSED PUNCH IN TIME | MISSED PUNCH OUT TIME | OFF-SITE HOURS IN TIME | OFF-SITE HOURS OUT TIME | Any other exceptions PTO, Jury Duty, Bereavement, Float,etc. Pay Code | Hours | APPRO VAL |
|---|---|---|---|---|---|---|---|---|
| 12-9-16 | Wavelyn | | | | | Punched in at 6:15 | | ✓ |
| 12-9 | Glenn | | | | | no Lunch | | |
| 12-8 | Pub | | | | | no Lunch | | |
| 12-12 | Jeich | | | | | no lunch & no 8 am feed | | |
| 12-9 | Glenn | | | | | N/A Lunch | | |
| 12-11 | Tina | | | | | called in no Lunch | | |
| 12-9 | Glen | | | | | No Lunch | | |
| | | | | | | | | |
| | | | | | | | | |

12/11/16 Frank punch in 2116 extremely hazardous road conditions I feel that UH should pay me for travel-time under the conditions

12/2/16 Found in breakroom @ 930 am - Pulled down and blank
one hung up - Brennan        1/18/16 10am

DEFENDANT'S
EXHIBIT
12
CS

UH-Dundee 0152