IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FRANK DOMINIC DUNDEE, | ) | CASE NO. 1:19 CV 01141 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE JONATHAN D. |
| | ) | GREENBERG |
| UNIVERSITY HOSPITALS | ) | |
| CORPORATION, | ) | |
| | ) | **DEFENDANT'S MOTION FOR** |
| Defendant. | ) | **SUMMARY JUDGMENT** |
| | ) | |

NOW COMES Defendant University Hospitals Health Systems, Inc. ("University Hospitals") and moves this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to grant summary judgment in its favor and against Plaintiff Frank Dundee. For the reasons set forth in the attached Memorandum in Support, University Hospitals is entitled to summary judgment because Plaintiff has failed to present evidence sufficient to support any of his claims. No genuine issues of material fact exist, and University Hospitals is entitled to judgment as a matter of law.

Respectfully submitted,

*/s/ Rachael L. Israel*
Kerin Lyn Kaminski (0013522)
Rachael L. Israel (0072772)
GIFFEN & KAMINSKI, LLC
1300 East Ninth Street, Suite 1600
Cleveland, Ohio 44114
Telephone:    216-621-5161
Facsimile:     216-621-2399
E-mail:         kkaminski@thinkgk.com
                    risrael@thinkgk.com

***Counsel for Defendant University Hospitals Health Systems, Inc.***

## MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff Frank Dundee is employed by University Hospitals as a third-shift Pharmacist at Geauga Medical Center. He has a long history of discipline for performance and behavior issues and of responding to such discipline by filing internal complaints and EEOC/OCRC Charges of Discrimination.[1] Plaintiff claims that he suffered adverse employment actions as a result of making internal complaints and EEOC/OCRC Charges, but the opposite is true. The actual sequence of events, which is set forth in detail below, shows that Plaintiff's complaints consistently ***followed*** the discipline he received; they did not cause it. As a result, his retaliation claim must fail as a matter of law.

Plaintiff's Americans with Disabilities Act ("ADA") claims also fail because he cannot show that he was improperly subjected to a medical examination or discriminated against because of a perceived disability.[2] Plaintiff was referred to University Hospitals's Employee Assistance Program ("EAP") due to his history of conflictive work relationships and inappropriate comments to and about his colleagues. Plaintiff was not subjected to a medical examination, nor was he perceived as having a disability. He was required to attend two EAP counseling sessions for the purpose of discussing his work relationships and conduct. He received no treatment, underwent no tests and was prescribed no medications. Moreover, even if the EAP sessions could be considered

---

[1] Plaintiff sometimes filed his Charges of Discrimination with the Equal Employment Opportunity Commission (EEOC) and sometimes with the Ohio Civil Rights Commission (OCRC).

[2] Plaintiff has a physical disability, for which he has received accommodation. That physical disability is not at issue in this case. *See* 3/10/2020 Deposition of Frank Dundee ("Dundee Depo.") at 6-7 (ECF Doc. 42), excerpts of which are attached hereto as Exhibit 6. All references to Plaintiff's perceived disability relate to his claim that he was regarded by University Hospitals as having a mental disability of some kind.

medical examinations under the ADA, there were not improper because they were directly related to Plaintiff's job and consistent with University Hospitals's business necessity.

## II.  STATEMENT OF FACTS

### A.  Plaintiff's Pattern of Complaints in Response to Performance Reviews and Discipline

Plaintiff was hired as a third shift Pharmacist at Geauga Medical Center in 2010. During his first three years of employment, he praised his supervisors. For example, he stated in January 2013 that "Rachael [Lerman] and Jason [Glowczewski] are both head and shoulders the best managers I've ever worked for."[3] Plaintiff bristled, however, when he received a performance evaluation in March 2013 that contained suggestions for improvement in the areas of "nursing satisfaction with pharmacist customer service" and submitting "ideas to pharmacy manager in a positive and collaborative way."[4] Plaintiff's response to this evaluation states,

> I feel that by all objective and measurable standards of performance of patient care services, that ***I exceed in every category***. The areas where I can show improvement are ancillary and have been given too much weight in this evaluation, comparatively speaking.[5]

This began Plaintiff's pattern of challenging every less-than-perfect performance review, coaching session and Corrective Action. Virtually every time Plaintiff received anything other than stellar feedback from his supervisor Rachael Lerman, he responded by alleging that he was being harassed or discriminated against. Plaintiff contends that none of the criticism and discipline he received during his career with University Hospitals was justified.[6] According to Plaintiff, he is

---

[3] *See* Declaration of Rachael Lerman, Pharm.D., BCPS ("Lerman Decl.") ¶ 6, attached hereto as Exhibit 1, and Ex. 1-A (2013 Staff Self Assessment),.

[4] Lerman Decl. ¶ 7 and Ex. 1-B (3/27/2013 Performance Evaluation).

[5] Lerman Decl. ¶ 8 and Ex. 1-C (3/29/2013 Addendum to Performance Evaluation) (emphasis added).

[6] Dundee Depo. at 73.

not only innocent of any wrongdoing, he is by far the best pharmacist in the entire University Hospitals system.[7] Because Plaintiff believes that all criticism of him is unwarranted, he has interpreted each less-than-perfect performance review and Corrective Action as retaliatory or discriminatory.

In August 2013, Plaintiff had difficulty complying with a new attendance policy implemented for the pharmacy department. He was tardy on multiple occasions in August and September, and he was coached by Lerman for these violations. In October 2013, Plaintiff received a Corrective Action for his continuing tardiness.[8] Copies of all relevant policies were provided to Plaintiff, and Lerman offered Plaintiff an EAP flier. Plaintiff refused the flier and responded to the Corrective Action with a lengthy addendum complaining about Lerman's management and vowing to defend himself "against any action that is harassing in nature, capricious, discriminatory or malicious."[9]

The next day, Lerman placed the EAP flier in Plaintiff's locker, and Plaintiff responded by filing a Charge of Discrimination with the EEOC. In that November 12, 2013 Charge, Plaintiff alleged that placing the EAP pamphlet in his locker constituted age discrimination by Lerman and created a hostile work environment.[10] The EEOC dismissed this Charge immediately.[11]

---

[7] The University Hospitals Health System includes 15 Medical Centers, operates dozens of in-and out-patient health centers and employs 28,000 people, including more than 300 pharmacists. Declaration of Danialle Lynce ("Lynce Decl.") ¶ 4, attached hereto as Exhibit 2.

[8] Lerman Decl. ¶ 10 and Ex. 1-D (10/2/2013 Corrective Action).

[9] Lerman Decl. ¶ 11 and Ex. 1-E (10/3/2013 Addendum to Corrective Action).

[10] Dundee Depo. at 103-104 & Ex. 4 (EEOC Charge 532-2014-00108).

[11] Lynce Decl. ¶ 7 and Ex. 2-A (11/19/2013 EEOC Dismissal and Notice of Rights). The EEOC Dismissal is dated November 19, 2013, a week after Plaintiff filed his Charge.

In March 2014, Plaintiff responded to his 2013 Performance Evaluation by claiming that he was "being unfairly targeted and disparaged" by Lerman.[12] He also claimed that her performance evaluation criteria for pharmacists were "demeaning" and reflected "an age bias within the department."[13]

In October 2014, Plaintiff was placed on a 90 Day Performance Improvement Plan ("PIP") for his failure to complete "assigned duties during all shifts to ensure continuity of patient care and to leave minimal work for following shifts."[14] Specifically, Plaintiff had been refusing to check a minimum of 10 EMS boxes or Code Trays per month to ensure that they were properly stocked.[15] All of the pharmacists at Geauga Medical Center were required to check EMS Boxes and Code Trays on a regular basis, and only Plaintiff refused to do his share. For example, in July 2014, other pharmacists checked 75 EMS Boxes and 5 Code Trays, while Plaintiff checked none.[16]

In response to this PIP, Plaintiff accused Lerman of retaliation, creating a hostile work environment and age discrimination, stating,

> I find the entire process [of the PIP] threatening, intimidating and hostile. I am one of the best, if not the best, pharmacists in the entire UH system. It seems that pharmacy management is constantly searching for ways to disparage me and it makes for an extremely uncomfortable work environment, both mentally and physically. I feel that it is a form of retaliation and a form of age discrimination.[17]

---

[12] Lerman Decl. ¶ 14 and Ex. 1-G (3/10/2014 Addendum to Performance Evaluation). For his job performance in 2013, Lerman rated Plaintiff as "Frequently Meets Expectations" and identified several development opportunities, including "Communicate positively with management and his coworkers." Lerman Decl. ¶ 13 and Exhibit 1-F (3/10/2014 Performance Evaluation).

[13] *Id.*

[14] Lerman Decl. ¶ 15 and Ex. 1-H (10/20/2014 PIP).

[15] Lerman Decl. ¶ 16.

[16] Lerman Decl. ¶ 16.

[17] Lerman Decl. ¶ 17 and Ex. 1-I (10/21/2014 Addendum to PIP).

In a November 2014 internal complaint to the University Hospitals legal department, Plaintiff claimed that Lerman had engaged "in a pattern of behavior that has made the work environment intimidating and hostile for several years now."[18]

In January 2015, Lerman noted that Plaintiff's performance had improved and his "PIP has been successfully completed."[19] Nonetheless, Plaintiff drafted an Addendum attacking Lerman and repeating his complaints of retaliation and hostile work environment:

> [T]he PIP is an indictment of Ms. Lerman's suitability to be a manager. She has created a toxic, intimidating, and hostile work environment since she rose to be department manager. . . I have been a target since I had the audacity, due to my age and experience, to raise my hand and constructively question department operations as misdirected; in essence, the emperor has no clothes. At that point, I became a threat to her unquestioned authority. A long pattern of abuse followed, that has caused me, not only physical and mental distress, but also caused me to file charges with the EEOC and retain an attorney.[20]

Plaintiff's attendance problems resurfaced in 2016. Between January and April, Plaintiff arrived late to work without prior authorization on 20 occasions, and he was placed on a second PIP on May 3, 2016, for violation of University Hospitals's attendance policy.[21] Again, Lerman suggested that Plaintiff contact EAP to obtain "more tools to improve [his] attendance issues."[22]

Also, in May 2016, Lerman began to receive increased reports of Plaintiff's unprofessional conduct. During the prior six years, other University Hospitals employees – including pharmacists, pharmacy technicians and nurses – had complained about Plaintiff's brusque demeanor.[23] Indeed,

---

[18] Lynce Decl. ¶ 9 and Ex. 2-B (11/7/2014 Ltr. to Paralegal Katie Perry). All of Plaintiff's internal complaints were investigated, and the results of each investigation were communicated to Plaintiff. None were found to have merit. *Id*. at ¶ 8.

[19] Lerman Decl. ¶ 19 and Ex. 1-J (1/27/2015 PIP 90 Day Follow Up).

[20] Lerman Decl. ¶ 20 and Ex. 1-K (1/26/2015 Addendum to PIP 90 Day Follow Up).

[21] Lerman Decl. ¶ 21 and Ex. 1-L (5/3/2016 PIP).

[22] Lerman Decl. ¶ 21.

[23] Lerman Decl. ¶ 22.

Lerman herself had been the target of Plaintiff's aggressive attacks on so many occasions that the University Hospitals Legal Department required a witness to be present whenever Lerman had to interact with Plaintiff in person.[24] In 2016, a pharmacy technician complained to Lerman that she felt "threatened" by one of Plaintiff's workplace notes and like she was being bullied.[25] Another health care provider sent his manager an email entitled "Angry and hostile Frank from Pharmacy," expressing his concerns about Plaintiff:

> I have had repeated problems with Frank in Pharmacy. I have spoken to you about him before. He has no level of patience. He speaks to me and others in a very disrespectful and unprofessional manner. He will yell and scream uncontrollably. It does not matter if you are on the phone or speaking with him in person, he has a very angry personality.
>
> I have the right to work in a hostile free environment. He repeatedly crosses the line. No other pharmacist behaves this way. I am reluctant to ever speak with him because of his hostile attitude.[26]

Plaintiff's worsening behavior led Lerman to issue yet another Corrective Action on June 14, 2016.[27] Lerman was particularly concerned that Plaintiff's conduct of "yelling at people, notes left in the workplace, rudeness, and a hostile attitude" could jeopardize patient care, since Plaintiff's co-workers had expressed their reluctance to speak with Plaintiff, the only Pharmacist on duty to provide medication counseling to staff at Geauga Medical Center, Conneaut Medical Center, Geneva Medical Center and Andover Immediate Care Center during the overnight hours.[28]

---

[24] Lerman Decl. ¶¶ 48-49.

[25] Lerman Decl. ¶ 23.

[26] Lerman Decl. ¶ 23 and Ex. 1-M (5/1/2016 Email to Gary Fay).

[27] Lerman Decl. ¶ 24 and Ex. 1-N (6/14/2016 Corrective Action).

[28] Lerman Decl. ¶ 24. The University Hospitals facilities in Conneaut and Geneva have pharmacists on the premises during the day. After hours, the staff at these Centers rely on the Geauga Medical Center pharmacist for medication dispensing and counseling. The Andover facility does not have a pharmacist on site and always relies on Geauga Medical Center pharmacists. Id. at ¶ 4.

In this Corrective Action, Plaintiff was reminded of the expectation that he "behave professionally and appropriately in all situations," and he was given "specific examples of problems in this area," including:

- Angry outbursts or yelling at other employees
- Difficulty working collaboratively with others
- Rudeness to other employees
- A hostile attitude, including notes left in the workplace[29]

Plaintiff was again encouraged to seek assistance from EAP to address these problems.

Plaintiff responded to this Corrective Action in the same way he had responded to all prior critiques and discipline from Lerman: he raised allegations of discrimination and harassment against her. In his June 15, 2016 appeal of the Corrective Action, Plaintiff accused Lerman of age discrimination, hostile work environment and – for the first time – sexual harassment.[30] In his subsequent internal complaint to HR, Plaintiff alleged that Lerman had sexual harassed him in 2012 and 2013, but he had not mentioned it at the time "for fear of retaliation."[31] He also claimed that he feared for his safety because Lerman "has a personality disorder and is unstable."[32] University Hospitals investigated Plaintiff's claim but could not substantiate that he had been subjected to any sexually harassing behavior by Lerman.[33]

---

[29] Lerman Decl. ¶ 25 and Ex. 1-N.

[30] Lynce Decl. ¶ 12 and Ex. 2-C (6/15/2016 Appeal).

[31] Lynce Decl. ¶ 14 and Ex. 2-D (6/26/2016 Internal Complaint). For the purpose of summary judgment, University Hospitals does not dispute the truth of Plaintiff's claim. However, it strains credibility to accept that Plaintiff failed to timely raise these sexual harassment allegations because he feared retaliation from Lerman, considering that he felt free to accuse her of harassment, discrimination and retaliation on numerous occasions between 2013 and 2016, both internally and to the EEOC.

[32] Lynce Decl. ¶ 14 and Ex. 2-D.

[33] Lynce Decl. ¶ 15 and Ex. 2-E (8/3/2016 Email to Dundee).

In the meantime, Plaintiff's unprofessional behavior continued. On two occasions in July 2016, Plaintiff wrote snarky comments about a fellow pharmacist on the pharmacy department's Timekeeping log – conduct he had recently been specifically instructed to stop.[34] Although Plaintiff claimed that the notes were jokes, they were interpreted as hostile by his co-worker.[35]

HR Director Danialle Lynce and Pharmacy Manager Jason Glowczewski met with Plaintiff on August 5, 2016, to discuss Plaintiff's continuing inappropriate conduct and the results of University Hospitals's investigation of his sexual harassment complaint.[36] Plaintiff claims that he was threatened in this meeting, and that this meeting links his June 2016 complaint of sexual harassment with his 2017 Corrective Action. No such link exists.[37] Moreover, Plaintiff acknowledges that the only "threats" made at this meeting were that he would be subject to termination if he continued to engage in unprofessional, aggressive or inappropriate conduct.[38]

## B.    Plaintiff's 2017 Corrective Action and EEOC/OCRC Charges

During the year following his 2016 Corrective Action, Lerman continued to receive reports regarding Plaintiff's inappropriate and unprofessional behavior at work.[39] For example, in February 2017, Plaintiff had to be asked repeatedly not to park in a spot designated "Raffle

---

[34] Regarding his colleague Susan Thabit, Plaintiff wrote on the log: "She forced me to sign this! Help!" and "Not sure if she left then. I wasn't at the time clock. She may be lying." (Dundee Depo. at 111-112, Ex. 10 (7/11/2016 Timekeeping Log) and Ex. 11 (7/12/2016 Timekeeping Log).

[35] Lerman Decl. ¶ 27.

[36] Lynce Decl. ¶ 16; Declaration of Jason Glowczewski, Pharm.D., MBA ("Glowczewski Decl.") ¶¶ 4-5, attached hereto as Exhibit 3.

[37] Glowczewski Decl. ¶ 6; Lynce Decl. ¶ 20.

[38] Dundee Depo. at 10-22 (Glowczewski "stated that if I ever wrote another note on a sheet like that or any type of note going forward, that I would be subject to termination" and Lynce "read from various statements that I had made in past addendums to disciplines or to evaluations. . . and said that if I ever made statements like that again, I would be terminated").

[39] Lerman Decl. ¶ 28.

Winner" for an employee who had won the opportunity to park in the spot during a United Way raffle.[40] In March 2017, Plaintiff referred to the youth of a pharmacist colleague in an email to him and touted his own age and experience in a condescending tone.[41] In seeking overtime shifts in May 2017, Plaintiff disparaged another pharmacist, claiming that his performance was "infinitely better" than a colleague's and warned that University Hospitals could face liability if the inferior colleague was permitted to cover a shift rather than Plaintiff.[42]

> Plaintiff also made inappropriate comments to an HR colleague by email, stating:

> I just love saying [your name], real fast. . . your name has the perfect balance and rhythm between first and last names. . . I hope my wife doesn't get the wrong idea if i call out your name in my sleep!![43]

And, in June 2017 emails to this same HR staff member, Plaintiff referred to her as a "good kid" and to a fellow pharmacist as a "nice boy" and "a pup with practically no experience."[44]

> These inappropriate comments and continuing unprofessional behavior led Lerman to issue Plaintiff another Corrective Action on June 26, 2017.[45] Referencing University Hospitals's Professional Behavior Policy and Code of Conduct, Lerman explained that Plaintiff's inappropriate comments "undermine the professionalism of fellow coworkers and are inconsistent with our value of Diversity":

---

[40] Lerman Decl. ¶ 28.

[41] Lerman Decl. ¶ 28.

[42] Lerman Decl. ¶ 28.

[43] Lerman Decl. ¶ 29. This was not the first time Plaintiff made inappropriate comments to his female colleagues with sexual undertones. In October 2013 (during the time he was allegedly being sexual harassed by her), Plaintiff wrote to Lerman regarding a shift he had covered at Ahuja Medical Center: "Ahoooooooja is like a sharp, younger woman who a man of weak-will might dally with. . . but I know Geauga is the woman who is good for me, long term!!!" Lerman Decl. ¶ 30 & Ex. 1-O (10/1/2013 Email to Lerman).

[44] Dundee Depo. at 17-18; Lerman Decl. ¶ 32.

[45] Lerman Decl. ¶ 33 and Ex. 1-P (6/26/2017 Corrective Action).

> Comments of this nature are unwarranted and add no value in the working relationships. You've made similar disparaging comments in the past, dating back to 2015, and this points to a pattern of actions and behaviors that detract from our values and policies. . .  Your comments and the implications of the meanings have no place in the working environment.[46]

As was his custom, Plaintiff responded to this Corrective Action with an Addendum alleging retaliation and defamation and threatening legal action.[47]

As part of his June 26, 2017 Corrective Action, Lerman gave Plaintiff a mandatory referral to EAP. In consultation with HR, Lerman determined that this referral was warranted based on several factors. First, it was concerning that Plaintiff's pattern of harassing, aggressive and unprofessional behavior had continued, despite previous coaching and discipline for similar conduct in the past. In addition, other employees were complaining that Plaintiff's behavior was creating a hostile work environment for them, which was unacceptable and threatened patient care. And, finally, EAP had been recommended to Plaintiff on several prior occasions as a resource available to assist him. Plaintiff refused to voluntarily utilize EAP, and his unprofessional conduct continued.[48]

Per University Hospital policy, Lerman and Lynce including a written summary with the EAP referral, which stated:

> **Background Information**: Frank works night shift. He is a seasoned pharmacist with many years of experience. He has had significant performance issues with several complaints about Frank by his coworkers and peers, both in and out of the Pharmacy department. He has very strained and challenging working relationships in general. Frank engages in lengthy dialogs, often via email, that are perceived as threatening, hostile, challenging, and/or contentious. His colleagues fear him and are reluctant to engage with him, stating they fear "retaliation."

* * *

---

[46] Lerman Decl. ¶ 34 and Ex. 1-P.

[47] Lerman Decl. ¶ 39 and Ex. 1-Q (6/27/2017 Addendum to Corrective Action).

[48] Lerman Decl. ¶ 35.

**Recent Issue**: Most recently, Frank has made inappropriate comments in email about this coworkers age, saying "you're a nice kid" to an HR colleague. In another email, he wrote about his colleague that he was a "pup with practically no experience. A nice boy, but. . ." The tenor and tone of Frank's emails are concerning as well.[49]

On July 26, 2017, Plaintiff attended an EAP counseling session with David Riccardi, an EAP counselor employed by University Hospitals.[50] Riccardi performed no tests or procedures on Plaintiff during their discussion.[51] At the end of their meeting, Riccardi presented Plaintiff with medical releases and recommended that he attend a psychiatric evaluation. Plaintiff never attended this psychiatric evaluation, and University Hospitals has not forced Plaintiff to submit to such an evaluation or taken any action against Plaintiff for his refusal to do so.[52] Plaintiff also declined to sign a release to allow University Hospitals to obtain medical records from his physician.[53] University Hospitals has not taken any action against Plaintiff for his refusal to provide this medical release.[54]

In September 2017, Plaintiff filed a Charge of Discrimination with the EEOC alleging that his June 2017 Corrective Action was retaliation for engaging in protected activity and that his referral to EAP counseling was a violation of the ADA.[55]

---

[49] Lynce Decl. ¶ 31 and Ex. 2-F (Policy HR-85 – Employee Assistance Program).

[50] Declaration of David Riccardi, LPCC, LICDC-CS, NCC ("Riccardi Decl.") ¶ 3, attached hereto as Exhibit 4.

[51] Riccardi Decl. ¶ 4; Dundee Depo. at 37.

[52] Dundee Depo. at 42.

[53] Dundee Depo. at 43.

[54] Dundee Depo. at 43.

[55] Dundee Depo. at 107 & Ex. 7 (EEOC Charge 533-2017-01275).

On January 10, 2018, Plaintiff attended a follow-up EAP session with Jill Fulton.[56] Fulton is an Employee Assistance Manager and counselor employed by University Hospitals. During her discussion with Plaintiff, Fulton also performed no tests or procedures on him.[57] In April 2018, Plaintiff filed a second Charge of Discrimination repeating the allegations of retaliation and disability discrimination he raised in his September 2018 Charge.[58]

On September 2, 2018, Plaintiff filed another Charge of Discrimination with the OCRC alleging that University Hospitals was discriminating against him on the basis of his disability by refusing to discuss his request for a reasonable accommodation.[59] As noted above, allegations regarding Plaintiff's physical disability are not a part of this lawsuit.[60]

## III.    STANDARD OF REVIEW

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[61] A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[62] Where, as in this case, "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[63]

---

[56] Declaration of Jill Fulton, LISW-S, LICDC ("Fulton Decl.") ¶ 3, attached hereto as Exhibit 5.

[57] Fulton Decl. ¶¶ 4-5; Dundee Depo. at 37.

[58] Lynce Decl. ¶ 37 and Ex. 2-G (OCRC Charge CLE B4 (44538) 03172018).

[59] Dundee Depo. at 108 & Ex. 8 (OCRC Charge CLE B4 (44821) 08222018).

[60] Dundee Depo. at 109.

[61] Fed.R.Civ.P. 56(a).

[62] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

[63] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986) (citations and quotation marks omitted).

## IV.    LAW AND ARGUMENT

### A.    Plaintiff's Retaliation Claim Fails Because He Cannot Establish a Causal Link Between His Protected Activity and Any Materially Adverse Action.

Plaintiff's Title VII retaliation claim must be analyzed under the familiar ***McDonnell Douglas*** burden shifting analysis. Thus, Plaintiff must first establish by a preponderance of the evidence a *prima facie* case claim of retaliation by showing that he engaged in a protected activity known to University Hospitals and that University Hospitals thereafter took a materially adverse action that was causally connected to the protected activity.[64]

Plaintiff's alleges that he engaged in protected activity by making a sexual harassment complaint against Lerman in June 2016. He further alleges that he was retaliated against by Jason Glowczewski and HR Director Lynce on August 5, 2016, when they threatened him with termination if he continued to engage in unprofessional behavior and subjected him to increased scrutiny, and by Lerman when she issued the June 2017 Corrective Action.[65]

### 1.    The Alleged Threats Against Plaintiff Were Not A Materially Adverse Action.

The Sixth Circuit has determined that the type of conduct alleged by Plaintiff does not constitute a materially adverse action sufficient to support a Title VII retaliation claim.[66] Plaintiff

---

[64] ***Laster v. City of Kalamazoo***, 746 F.3d 714, 730 (6th Cir. 2014) (*quoting **Jones v. Johanns***, 264 Fed.Appx. 463, 466 (6th Cir. 2007); ***Rogers v. Henry Ford Health Sys.***, 897 F.3d 763, 775 (6th Cir. 2018).

[65] Dundee Depo. at 10-12.

[66] *See **Plautz v. Potter***, 156 Fed. App'x 812, 817 (6th Cir. 2005) ("[I]t is well settled in this circuit that a threat to discharge is not an adverse employment action."); ***Russell v. Geithner***, No. 2:09-CV-00975, 2012 WL 5497769, at *11 (S.D. Ohio Nov. 13, 2012), *aff'd sub nom.* ***Russell v. Lew***, 549 F. App'x 389 (6th Cir. 2013) (threat that stated possibility of transfer or discharge did not satisfy adverse employment action requirement); ***Pozsgai v. Ravenna City Sch. Bd. of Educ.***, No. 5:10CV02228, 2012 WL 1110013, at *7 (N.D. Ohio Mar. 30, 2012) (alleged "threat" suggesting that Plaintiff would be terminated was not material adverse change sufficient to support retaliation claim).

was not actually fired following his August 2016 meeting or at any other time.[67] He remains employed by University Hospitals in the same position, with the same duties and at the same rate of pay (increased on a regular basis consistent with University Hospitals policy).[68] Mere threats of termination – in the absence of any action taken with regard to those threats – do not establish retaliation. As the Southern District of Ohio has noted, alleged threats of termination did not support retaliation claim where the plaintiff "was not terminated, demoted or disciplined at or around the time" the threats were made.[69] "Absent evidence of any adverse action undertaken in connection with the comments, those comments were inconveniences that, as a matter of law, are not actionable."[70]

This is especially true where the alleged threat is that the employee will be discharged if he continues to violate the employer's policy. As described by Plaintiff, Glowczewski "stated that if [Plaintiff] ever wrote another note on a sheet like that or any type of note going forward, that [he] would be subject to termination."[71] Similarly, Lynce reviewed inappropriate statements Plaintiff had made in the past and "said that if [Plaintiff] ever made statements like that again, [he] would be terminated."[72] Such a "promise of increased scrutiny" is not retaliatory conduct sufficient

---

[67] Lynce Dec. ¶ 19.

[68] Lynce Dec. ¶ 19.

[69] *Shoup v. McDonald*, No. 3:14-CV-248, 2016 WL 3387309, at *7 (S.D. Ohio June 15, 2016) (granting summary judgment on retaliation claim).

[70] *Id*.

[71] Dundee Depo. at 11.

[72] Dundee Depo. at 11-12.

to establish a prima facie claim.[73]

### 2. There Is No Temporal Proximity Between Plaintiff's June 2016 Sexual Harassment Complaint and June 2017 Corrective Action.

Plaintiff also alleges that his June 2017 Corrective Action was retaliatory, and its timing - occurring one year after his June 2016 sexual harassment complaint – establishes a causal connection between the two events. Plaintiff is wrong on both the facts and as a matter of law.

To establish the causal connection required to support his retaliation claim, Plaintiff must produce "sufficient evidence from which an inference could be drawn that the adverse action would not have been taken" but for his participation in a protected activity.[74] However, as demonstrated above, Plaintiff made his sexual harassment complaint against Lerman **after** she disciplined him. The closest event in time to Plaintiff's sexual harassment complaint is the Corrective Action he received the day before, on June 14, 2016, not the Corrective Action he received a year later for continuing unprofessional conduct. Plaintiff's pattern of making complaints after receiving discipline is clearly illustrated by the following timeline:

---

[73] ***Birch v. Cuyahoga Cty. Prob. Court***, 392 F.3d 151, 169 (6th Cir. 2004) (affirming dismissal of retaliation claim because allegations of "increased scrutiny of her work. . . are not tantamount to adverse employment actions"); *see also **Allen v. Mich. Dep't of Corrections**, 165 F.3d 405, 410 (6th Cir. 1999) (alleged monitoring plaintiff more closely than other employees did not constitute "adverse employment actions" under Title VII); ***Workneh v. Pall Corp.***, 897 F. Supp. 2d 121, 135 (E.D.N.Y. 2012) (granting summary judgment for employer; additional meetings to scrutinize job performance and extensive audits of employee's work day did not constitute adverse employment action); ***Hall v. N.Y. City DOT***, 701 F.Supp.2d 318, 336 (E.D.N.Y. 2010) ("Although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.").

[74] ***Nguyen v. City of Cleveland***, 229 F.3d 559, 563 (6th Cir. 2000).

15



Moreover, a delay of more than a year between Plaintiff's June 2016 complaint and his June 2017 Corrective Action does not create an inference of causation. In some circumstances, a causal connection between protected activity and an adverse action can be inferred through

16

temporal proximity alone, but only when the timing of the two events is extremely close. As the Sixth Circuit explained in ***Mickey v. Zeidler Tool***,

> Where an adverse employment action occurs ***very close in time*** after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But ***where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality***.[75]

In cases where the alleged retaliation is "acutely near in time" to the protected activity, an inference of causation may be found. Examples include termination on the same day that an employer learned of an employee's protected activity or where adverse employment action is taken within two or three months.[76] On the other hand, however, the Sixth Circuit has held that a delay of "almost a year" or more is ***not*** sufficient for a jury to reasonably infer a causation connection.[77] As summarized by the court in ***Vereecke v. Huron Valley***,

> At this point, our case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference.[78]

---

[75] ***Mickey v. Zeidler Tool and Die Co.***, 516 F.3d 516, 525-26 (6th Cir. 2008) (emphasis added).

[76] *Id.* at 525-26 (inferring causation from temporal proximity where employer retaliated the same day he learned of protected activity); ***Asmo v. Keane, Inc.***, 471 F.3d 588, 594 (6th Cir. 2006) (two months between employer learning of employee's pregnancy and employer firing employee sufficed to establish nexus of causation); ***Singfield v. Akron Metro. Hous. Auth.***, 389 F.3d 555, 563 (6th Cir.2004) (temporal proximity of three months constituted "sufficient evidence of a causal connection" to demonstrate prima facie case).

[77] ***Evans v. Prospect Airport Servs., Inc.***, 286 F. App'x 889, 895 (6th Cir. 2008) (summary judgment for employer affirmed where employee was terminated "almost a year after he filed his third EEOC complaint and over seventeen months after the filing of his initial EEOC complaint"); ***Cecil v. Louisville Water Co.***, 301 F. App'x 490, 502 (6th Cir. 2008) (summary judgment for employer affirmed where employee received a raise 10 months after complaint and was terminated 7 months later).

[78] ***Vereecke v. Huron Valley Sch. Dist.***, 609 F.3d 392, 401 (6th Cir. 2010) (affirming summary judgment for employer).

An inference of causation would be particularly inappropriate in this case, where Plaintiff has engaged in numerous protected activities during his employment with University Hospitals – including threatening to file and filing several EEOC/OCRC Charges. Given the volume of internal and external complaints Plaintiff has made since 2013, it is nearly impossible to find any significant time period in which one of his complaints was *not* pending. If temporal proximity alone were sufficient to establish a claim of retaliation, Plaintiff could argue that any adverse action taken against him at any point during his employment was causally related to one or more of his protected activities.

Plaintiff has presented no direct evidence of retaliation and no indirect evidence – other than the passing of a year's time – to support his claim. Since making a claim of sexual harassment in 2016, Plaintiff has not been demoted, he has not experienced a reduction in pay or benefits, and he has not been restricted in any way from performing his job duties.[79] University Hospitals is therefore entitled to summary judgment on Plaintiff's retaliation claim.

### B. Plaintiff's ADA Violation Claim Fails Because His EAP Referral Was Not a Medical Examination, but Was Job-Related and Consistent with University Hospitals's Need to Ensure a Safe and Harassment-Free Work Environment.

The ADA prohibits employers from requiring medical examinations of an employee unless the examination is job-related and consistent with business necessity.[80] Plaintiff alleges that his mandatory EAP referral constitutes an impermissible medical examination under the ADA.[81] Analysis of this claim requires two essential inquiries:

---

[79] Dundee Depo. at 61-62.

[80] 42 U.S.C. § 12112(d)(4)(A) (emphasis added).

[81] Plaintiff does not seem to suggest that the EAP referral was improper on the grounds that it was a disability inquiry, but the same analysis set forth below would apply to any such claim.

(1)    whether University Hospitals performed or authorized a medical examination ("the regulated conduct"); and, if so,

(2)    whether the exam was job-related and consistent with business necessity ("the justification").[82]

As explained below, University Hospitals did not perform or require Plaintiff to undergo a medical examination. Plaintiff was referred to an EAP counselor to address his conflictive work relationships, and not any underlying medical or mental health impairment. Moreover, since the EAP referral was directly related to Plaintiff's ability to safely and appropriately perform his job, it was permissible even if it was a medical examination.

### 1.    Plaintiff's EAP Referral was not a Medical Examination.

ADA § 102(d)(4)(A) protects all employees from improper medical examinations, regardless of whether they have a qualifying disability:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, ***unless such examination or inquiry is shown to be job-related and consistent with business necessity***.[83]

The Sixth Circuit has recognized that whether certain conduct constitutes a "medical examination" requires careful examination of the purpose behind the conduct, in light of the relevant caselaw and EEOC guidance. For example, the court has distinguished between "a medical examination consisting of a urine test to determine whether a patient has a health condition" and a urine test given to determine whether an employee has consumed dangerous

---

[82] ***Bates v. Dura Auto. Sys., Inc.***, 767 F.3d 566, 569 (6th Cir. 2014) (reversing judgement as a matter of law for employee and finding question of fact existed as to purpose of employer's drug testing program).

[83] 42 U.S.C. § 12112(d)(4)(A) (emphasis added).

prescription drugs.[84]

Because the ADA does not define the term "medical examination," the Sixth Circuit has looked to the EEOC's Enforcement Guidance, which does define the terms and offers illustrative examples. The relevant EEOC Guidance defines a "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health," and identifies several factors bearing on this determination, including whether the procedure or test is invasive, administered or interpreted by a health care professional in a medical setting, designed to reveal a mental health impairment, measures an employee's performance of a task or measures his physiological responses to performing the task and whether medical equipment is used.[85] Examples of medical examinations include vision tests, blood pressure and cholesterol screening, range-of-motion tests, urine tests to discover alcohol use, disease or genetic markers and diagnostic procedures such as x-rays, CAT scans, and MRIs.[86] The EEOC also considers "psychological tests that are designed to identify a mental disorder or impairment" to be medical examinations.[87]

The EEOC Guidance also provides examples of "procedures and tests employers may require that generally are ***not*** considered medical examinations."[88] Among the examples of non-

---

[84] ***Bates***, 767 F.3d at 569. 42 U.S.C. § 12114(d)(1) specifically provides that a "test to determine the illegal use of drugs shall not be considered a medical examination." For some employees, however, consumption of certain prescription drugs can dangerously impair their performance.

[85] EEOC, Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA), Part B.2 (July 27, 2000), available at https://www.eeoc.gov/policy/docs/guidance-inquiries.html#4 ("Enforcement Guidance").

[86] *Id*.

[87] *Id*.

[88] *Id*. (emphasis added).

medical examinations are "psychological tests that measure personality traits such as honesty, preferences, and habits."[89]

A referral to EAP counseling for assistance with conflictive work relationships is not a medical examination. The court's reasoning in **Jenkins v. Medical Laboratories** persuasively explains why.[90] In that case, Jennifer Jenkins also attempted to argue that her referral to mandatory EAP counseling violated the ADA. The referral had been based on Jenkins's ongoing disputes with two co-workers, and she claimed that it constituted "mental health counseling." The court rejected this argument and held:

> Jenkins failed to show that employer-required EAP counseling is an action prohibited by the ADA. . . [T]he required EAP counseling was dispute resolution counseling intended to understand and resolve the personality conflicts occurring at the Marion location. This type of counseling does not fall under the ADA's prohibition on medical examinations and "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability." 42 U.S.C. § 12112(d)(4)(A).[91]

In this case, Plaintiff was given a mandatory referral to EAP counseling for "conflictive work relationships."[92] The sessions were conducted by David Riccardi and Jill Fulton, two EAP counselors, in their respective offices.[93] No tests were performed (psychological or otherwise), the

---

[89] *Id*. The EEOC's Guidance should be considered by this Court, "to the extent of its persuasive power." **E.E.O.C. v. SunDance Rehab. Corp.**, 466 F.3d 490, 500 (6th Cir. 2006) (EEOC guidance does not receive *Chevron*-type deference, but is entitled to respect to the extent it has the power to persuade), citing **Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.**, 467 U.S. 837, 104 S.Ct. 2778 (1984).

[90] **Jenkins v. Med. Labs. of E. Iowa, Inc.**, 880 F. Supp. 2d 946, 960 (N.D. Iowa 2012), *aff'd*, 505 F. App'x 610 (8th Cir. 2013).

[91] *Id*. at 960.

[92] Fulton Decl. ¶ 2 & Ex. 5-A (EAP Referral Form).

[93] Fulton Decl. ¶ 3; Riccardi Decl. ¶ 3.

sessions were non-invasive and no medical equipment was used in either session.[94] Neither Riccardi nor Fulton sought to identify whether Plaintiff had a mental disability.[95] Rather, the purpose of the session was to discuss with Plaintiff his conflictive behavior and the inappropriate age-based comments that resulted in him receiving the June 2017 Corrective Action.[96]

Considering all the factors outlined above, Plaintiff was not subjected to a "medical examination" when he attended two EAP counseling sessions. Indeed, the non-medical counseling sessions Plaintiff participated in stand in stark contrast to the follow-up psychiatric evaluation that Mr. Riccardi recommended, but Plaintiff refused to undergo. A psychiatric evaluation is reasonably viewed as having a "diagnostic purpose," which is a primary factor emphasized in the EEOC Guidance. Unlike counseling designed to assist with conflictive work relationships, a psychiatric evaluation is more likely to be focused on the "uncovering of [health] defects at an employer's direction," which is "the precise harm that § 12112(d)(4)(A) is designed to prevent."[97] However, when Plaintiff refused to undergo the recommended psychiatric evaluation, University Hospitals dropped the recommendation and took no adverse action against him.[98]

Because University Hospitals did not subject Plaintiff to a medical examination, it is entitled to summary judgment on this claim.

---

[94] Dundee Depo at 37 (neither David Riccardi nor Jill Fulton performed any tests or procedures on Plaintiff); Fulton Decl. ¶¶ 4-6; Riccardi Decl. ¶¶ 4-6.

[95] Fulton Decl. ¶ 7; Riccardi Decl. ¶ 7.

[96] Fulton Decl. ¶ 7; Riccardi Decl. ¶ 7.

[97] *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 819 (6th Cir. 2012).

[98] Dundee Depo. at 42.

## 2. Plaintiff's EAP Referral Was Job-Related and Consistent with Business Necessity.

Even if Plaintiff's EAP referral were considered a medical examination, it did not violate the ADA because it was directly related to – and necessitated by – Plaintiff's on-the-job behavior, and it was consistent with University Hospitals's business necessity.

University Hospitals bears the burden of proving that a medical examination is job related and consistent with business necessity.[99] EEOC Guidance provides that a medical examination of an employee may be job-related and consistent with business necessity when an employer has a reasonable belief, based on objective evidence, that:

> (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or
>
> (2) an employee will pose a direct threat due to a medical condition.

This reasonable belief "must be based on objective evidence obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination. Such a belief requires an assessment of the employee and his/her position and cannot be based on general assumptions."[100] As the Sixth Circuit explained in *Sullivan*, "for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job."[101]

In this case, University Hospitals referred Plaintiff to EAP counseling as a direct result of his conduct at work. Specifically, Plaintiff's long history of conflict with his co-workers had continued and worsened, and the age-based comments Plaintiff made to HR staff demonstrated

---

[99] *Bates*, 767 F.3d at 581.

[100] Enforcement Guidance.

[101] *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999).

poor judgment, age-based biased and unprofessionalism.[102] As the sole pharmacist who provided overnight support to Geauga Medical Center, Conneaut Medical Center, Geneva Medical Center and Andover Immediate Care Center, University Hospitals had a reasonable belief that Plaintiff's ability to perform his essential job functions was being impaired by his conflictive relationships and inappropriate behavior. University Hospitals was concerned that patient care could be negatively impacted by Plaintiff's conflictive relationships. As discussed above, several Geauga Medical Center employees complained that they were afraid of or intimidated by Plaintiff and Lerman was concerned that such fear could cause hospitals staff to not seek medication advice when Plaintiff was the only pharmacist on staff.[103]

University Hospitals's obligation to provide a safe, harassment free work environment for Plaintiff's co-workers and to provide exceptional patient care led to his June 2017 Corrective Action and EAP referral.[104] The EAP referral was made in the hope that Plaintiff's behavior and work relationships would improve as a result of his counseling sessions.[105] Nonetheless, Plaintiff argues that his EAP referral must not have been job related because nothing about the terms and conditions of his employment changed as a result of the referral. This is not the appropriate standard to be applied. Upon receipt of his June 2017 Corrective Action and EAP referral, Plaintiff was on notice that further inappropriate conduct would result in additional disciplinary action, up to and including termination of his employment.[106] The EAP referral and counseling sessions were directly related to the manner in which Plaintiff's was performing his job and interacting with his

---

[102] Lerman Decl. ¶ 35.

[103] Lerman Decl. ¶ 36.

[104] Lerman Decl. ¶ 37.

[105] Lerman Decl. ¶ 37.

[106] Lerman Decl. ¶ 38 and Ex. 1-N.

24

co-workers, many of whom relied on him for his expertise in the field of pharmacy.[107]

As a result, to the extent the EAP referral could be considered a medical examination, it did not violate the ADA because it was related to Plaintiff's job and University Hospitals's business necessity. University Hospitals is therefore entitled to summary judgment on this claim.

### C. Plaintiff's Disability Discrimination Claim Fails Because He Cannot Establish that He Was Discriminated Against Because of Any Perceived Disability.

Plaintiff does not allege that he was discriminated against because of an actual disability. Rather, he argues that University Hospitals regarded him as having a mental impairment and discriminated against him by referring him to mandatory EAP counseling. Plaintiff is wrong on both points.

To establish a prima facie case of "regarded as" disability discrimination under the ADA, Plaintiff must show that:

(1) University Hospitals regarded him as disabled within the meaning of the ADA;

(2) he is otherwise qualified to perform the requirements of his job, with or without reasonable accommodation; and

(3) he suffered an adverse employment action solely because of the perceived disability.[108]

#### 1. Plaintiff was not regarded as disabled by Lerman or anyone else at University Hospitals.

No one at University Hospitals regarded Plaintiff as disabled. "[A]n individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the

---

[107] Lerman Decl. ¶ 44.

[108] **_Pena v. City of Flushing._**, 651 Fed. App'x 415, 419 (6th Cir. 2016) (affirming summary judgment for employer).

individual is perfectly able to meet the job's duties."[109] Lerman, who referred Plaintiff to EAP counseling, did not believe that Plaintiff was unable to perform his job because of a medical condition.[110] Lerman believed (and documented the fact) that Plaintiff was engaging in inappropriate and overly aggressive behavior at work.[111] She did not, however, ascribe that behavior to any medical condition or perceive Plaintiff to be disabled.[112] The same is true for Lynce, the HR Director Lerman consulted in connection with Plaintiff's EAP referral. Lynce does not regard Plaintiff as being disabled or believe that he was unable to perform his job because of a medical condition.[113]

Plaintiff claims that it is "implicit in any reasonable reading" of University Hospitals's mandatory EAP referral policy that the referred employee must be disabled. According to Plaintiff, for a supervisor to refer an employee to mandatory EAP counseling, that supervisor must first diagnose the referred employee as having a mental impairment that substantially limits one or more major life activity. This reading of University Hospitals's policy is inaccurate and unsupported by any evidence.

The purpose of HR-85, University Hospitals's EAP policy, is to recognize "that an employee's job performance may be affected by personal concerns" and provide "a counseling/referral service that is available to all employees and/or their immediate household members to assist them in receiving appropriate professional care for work-related and personal

---

[109] ***Talley v. Family Dollar Stores of Ohio, Inc.***, 542 F.3d 1099, 1106 (6th Cir. 2008).

[110] Lerman Decl. ¶ 47.

[111] Lerman Decl. ¶ 43.

[112] Lerman Decl. ¶ 43.

[113] Lynce Decl. ¶ 35.

concerns."[114] There are several types of referrals available under HR-85, including self-referral (whereby an employee or household member voluntarily contacts EAP to schedule an appointment), critical incident referrals (when an employee has been affected by a traumatic event at work or in the community) and mandatory referrals. A mandatory referral occurs when a supervisor requires that an employee meet with an EAP counselor. There are two types of mandatory referrals:

> **Tier 1** – when an employee is referred by his supervisor for a Fitness for Duty determination, on suspicion of alcohol or drug use or because of "violent, hostile, or reckless behavior" that threatens others; and
>
> **Tier 2** – when an employee is referred by his supervisor for attendance issues, conflictive work relationships or deteriorating job performance that has not been corrected despite counseling by the supervisor.[115]

While a Tier 1 Fitness for Duty determination would usually require a medical examination, there is no requirement in the EAP policy that an employee have an actual or perceived disability or medical condition in order to receive a Tier 2 referral. No supervisor is required to determine that a referred employee has a mental impairment prior to making a Tier 2 referral.[116]

As noted above, Plaintiff's Tier 2 referral was based on "conflictive work relationships."[117] As the EAP pamphlet illustrates, the Resilience Strategies suggested to build strong work relationships are decidedly non-medical and non-diagnostic:

- Enhance communication skills
- Learn boundaries of confidentiality
- Collaborate
- Discuss cases
- Seek inclusiveness and diversity
- Forster a team approach

---

[114] Lynce Decl. ¶ 23 & Ex. 2-F.

[115] Lynce Decl. ¶ 25 & Ex. 2-F.

[116] Lynce Decl. ¶ 27.

[117] Lerman Decl. ¶ 42; Fulton Decl. ¶ 2 & Ex. 5-A.

- Address conflict-resolution proactively
- Strive to be genuine, empathetic and warm[118]

There is no implicit or explicit connection between the Tier 2 referral and any medical diagnosis by Lerman.[119] Indeed, the reasons for which Tier 2 referrals are made (attendance, conflictive work relationships and performance) makes it unlikely that a diagnosis of any kind would be made. As the Sixth Circuit has explained, the fact that an employer expresses concern about an employee's attendance issues, conflictive work relationships or deteriorating job performance, does not require an assumption that the employee must have an underlying disability.[120]

Plaintiff has presented no evidence whatsoever that he was perceived to have a disability, and his disability discrimination claim must fail.

### 2. Plaintiff did not suffer an adverse employment action as a result of his perceived disability.

Plaintiff claims that a "stigma" is associated with a mandatory EAP referral and that such a referral is therefore a discriminatory adverse employment action. Plaintiff is wrong as a matter of law. An adverse employment action is a "materially adverse change in the terms and conditions" of employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[121] An adverse

---

[118] Lynce Decl. ¶ 33 & Ex. 2-H (Excerpt from EAP flier).

[119] Lynce Decl. ¶ 29.

[120] *Sullivan*, 197 F.3d at 811 ("[E]xpressing concern over an employee's job performance does not show that an employer regards an employee as having a disability that substantially limits a major life activity.").

[121] *Weaver v. City of Twinsburg, Ohio*, 580 F. App'x 386, 390 (6th Cir. 2014), quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62, 118 S.Ct. 2257 (1998).

employment action "usually inflicts direct economic harm" and "must be more disruptive than a mere inconvenience."[122]

The Sixth Circuit has never found that an EAP referral is an adverse employment action,[123] and Plaintiff has not identified any change in the terms or conditions of his employment caused by the referral. Plaintiff did not experience any decrease in pay or benefits in connection with the EAP referral, there was no change in his job duties and he suffered no economic harm.[124] As a result, Plaintiff cannot survive summary judgment on his disability discrimination claim.

---

[122] *Id*. at 390.

[123] *Id*. ("Plaintiff fails to cite any case where a court found that an EAP was an adverse employment action."). Nor have other jurisdictions accepted the argument that an EAP referral constitutes an adverse employment action. *See* ***Jenkins***, 880 F. Supp. 2d at 961 (requirement to attend EAP counseling "does not constitute a tangible change in working conditions that produces a material employment disadvantage"); ***Ndzerre v. Washington Metro. Area Transit Auth.***, 275 F. Supp. 3d 159, 166 (D.D.C. 2017) (noting "plaintiff has not cited – and this Court has not found – a single case where a Court has held that referral to an EAP constitutes an adverse employment action. To the contrary, the weight of authority indicates that referral to an EAP does *not* constitute an adverse employment action under Title VII"). Even if the EAP referral is considered a medical examination, such an exam "ordered for valid reasons can neither count as an adverse job action nor prove discrimination." ***Sullivan***, 197 F.3d at 813.

[124] Lynce Decl. ¶ 32.

## V.    CONCLUSION

For all of the reasons set forth above, University Hospitals is entitled to summary judgment and dismissal with prejudice of all of Plaintiff's claims.

Respectfully submitted,

*/s/ Rachael L. Israel*
Kerin Lyn Kaminski (0013522)
Rachael L. Israel (0072772)
GIFFEN & KAMINSKI, LLC
1300 East Ninth Street, Suite 1600
Cleveland, Ohio 44114
Telephone:    216-621-5161
Facsimile:    216-621-2399
E-mail:    kkaminski@thinkgk.com
          risrael@thinkgk.com

**Counsel for Defendant University Hospitals Health Systems, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 18, 2020, a true and correct copy of this *Defendant's Motion for Summary Judgment* was served via Electronic Mail upon the following Parties:

Frank Dominic Dundee
7707 Amberwood Trail
Boardman, Ohio 44512
***Pro Se Plaintiff***

> */s/ Rachael L. Israel*
> Rachael L. Israel (0072772)
> ***Counsel for Defendant University Hospitals***
> ***Health Systems, Inc***

31