IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FRANK DOMINIC DUNDEE, | ) | CASE NO. 1:19CV01141 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE JONATHAN D. |
| | ) | GREENBERG |
| UNIVERSITY HOSPITALS | ) | |
| CORPORATION, | ) | |
| | ) | **DECLARATION OF RACHAEL** |
| Defendant. | ) | **LERMAN, Pharm.D., BCPS, PURSUANT** |
| | ) | **TO 28 U.S.C. §1746** |
| | ) | |

I, Rachael Lerman, Pharm.D., BCPS, being of sound mind and over the age of eighteen, hereby declare as follows:

1.   I am a Director of Pharmacy Services for University Hospitals, a Doctor of Pharmacy ("Pharm.D.") and a Board Certified Pharmacotherapy Specialist ("BCPS").

2.   Between 2013 and February 2018, I supervised Plaintiff Frank Dundee. During that time, Frank worked as a third-shift pharmacist at Geauga Medical Center.

3.   In addition, Mr. Dundee currently provides pharmacist support to Conneaut Medical Center, Geneva Medical Center and Andover Immediate Care Center during the overnight hours.

4.   The University Hospitals facilities in Conneaut and Geneva have pharmacists on the premises during the day. After hours, the staff at these Centers rely on the Geauga Medical Center pharmacist for medication verification and clinical assistance. The Andover facility does not have a pharmacist on site and always relies on Geauga Medical Center pharmacists.

EXHIBIT 1

5. During the time I supervised Mr. Dundee, I consulted with my HR partner Danialle Lynce regarding Mr. Dundee's behavior and performance on a number of occasions.

6. Initially, my working relationship with Mr. Dundee was positive. For example, in his 2013 Self Assessment, Mr. Dundee stated that I and my colleague Jason Glowczewski were "both head and shoulders the best managers" he had ever worked for. A true and accurate copy of Mr. Dundee's 2013 Self Assessment is attached to this Declaration as Exhibit 1-A.

7. On March 27, 2013, I gave Mr. Dundee his Performance Evaluation for 2012 and included goals for improvement in "nursing satisfaction with pharmacist customer service" and submitting "ideas to pharmacy manager in a positive and collaborative way." A true and accurate copy of the 3/27/2013 Performance Evaluation is attached to this Declaration as Exhibit 1-B. I included these goals based on feedback I had received from Mr. Dundee's nurse colleagues and based on my own experiences with him. Mr. Dundee frequently presents ideas for improvement, but he generally does so in a condescending or threatening way, and I had received complaints from the nursing staff that Mr. Dundee was gruff or impatient with them.

8. In response to this Performance Evaluation, Mr. Dundee claimed that his performance exceeded expectations in every category and his areas for improvement were merely "ancillary" to his excellent performance. A true and accurate copy of Mr. Dundee's 3/29/2013 Addendum to Performance Evaluation is attached to this Declaration as Exhibit 1-C

9. In August 2013, Mr. Dundee had difficulty complying with a new attendance policy I implemented for the pharmacy department. He was tardy on multiple occasions in August and September, and I coached him for these violations.

10. In October 2013, I gave Mr. Dundee a Corrective Action for his continuing tardiness. A true and accurate copy of the 10/2/2013 Corrective Action is attached to this Declaration as Exhibit 1-D.

11. With this Corrective Action, I provided copies of all relevant policies to Mr. Dundee and offered a flier for University Hospitals's Employee Assistance Program ("EAP"). Mr. Dundee refused the flier and responded to the Corrective Action with a lengthy addendum complaining about my management and vowing to defend himself "against any action that is harassing in nature, capricious, discriminatory or malicious." A true and accurate copy of Mr. Dundee's 10/3/2013 Addendum to Corrective Action is attached to this Declaration as Exhibit 1-E.

12. The next day, I placed the EAP flier in Mr. Dundee's locker, and he responded by filing a Charge of Discrimination with the EEOC. In that November 12, 2013 Charge, Mr. Dundee alleged that placing the EAP pamphlet in his locker constituted age discrimination by me and created a hostile work environment.

13. A few months later, I completed Mr. Dundee's Performance Evaluation for 2013. A true and accurate copy of the 3/10/2014 Performance Evaluation is attached to this Declaration as Exhibit 1-F. In this evaluation, Mr. Dundee was rated as "Frequently Meets Expectations" and identified several development opportunities, including "Communicate positively with management and his coworkers." This comment reflected the fact that Mr. Dundee continued in 2013 to interact with me and his colleagues in a condescending or threatening way.

14. Once again, Mr. Dundee responded to this evaluation by claiming that he was "being unfairly targeted and disparaged" by me. He also claimed that my performance evaluation criteria for pharmacists were "demeaning" and reflected "an age bias within the department." A

true and accurate copy of Mr. Dundee's 3/10/2014 Addendum to Performance Evaluation is attached to this Declaration as Exhibit 1-G.

15. In October 2014, I placed Mr. Dundee on a 90 Day Performance Improvement Plan ("PIP") for his failure to complete "assigned duties during all shifts to ensure continuity of patient care and to leave minimal work for following shifts." A true and accurate copy of the 10/20/2014 PIP is attached to this Declaration as Exhibit 1-H.

16. The specific conduct at issue in the PIP was Mr. Dundee's refusal to check a minimum of 10 EMS boxes or Code Trays per month to ensure that they were properly stocked. All of the pharmacists at Geauga Medical Center were required to check EMS Boxes and Code Trays on a regular basis, and only Mr. Dundee refused to do his share. For example, in July 2014, other pharmacists checked 75 EMS Boxes and 5 Code Trays, while Mr. Dundee checked none.

17. Mr. Dundee's response to the PIP accused me of retaliation, creating a hostile work environment and age discrimination, stating,

> I find the entire process [of the PIP] threatening, intimidating and hostile. I am one of the best, if not the best, pharmacists in the entire UH system. It seems that pharmacy management is constantly searching for ways to disparage me and it makes for an extremely uncomfortable work environment, both mentally and physically. I feel that it is a form of retaliation and a form of age discrimination.

A true and accurate copy of Mr. Dundee's 10/21/2014 Addendum to PIP is attached to this Declaration as Exhibit 1-I.

18. Mr. Dundee also made an internal complaint against me to the University Hospitals's Legal Department, claiming that I had made his work environment intimidating and hostile for years.

19. Despite his complaints, Mr. Dundee's performance quickly improved with regard to checking EMS Boxes and Code Trays. I completed a 90 Day Follow Up to the PIP on January

27, 2015, and noted that Mr. Dundee's "PIP has been successfully completed." A true and accurate copy of the 1/27/2015 PIP 90 Day Follow Up is attached to this Declaration as Exhibit 1-J.

20. Mr. Dundee used the completion of his PIP as another opportunity to attack me. In an Addendum to the 90 Day Follow Up, Mr. Dundee stated,

> [T]he PIP is an indictment of Ms. Lerman's suitability to be a manager. She has created a toxic, intimidating, and hostile work environment since she rose to be department manager. . . I have been a target since I had the audacity, due to my age and experience, to raise my hand and constructively question department operations as misdirected; in essence, the emperor has no clothes. At that point, I became a threat to her unquestioned authority. A long pattern of abuse followed, that has caused me, not only physical and mental distress, but also caused me to file charges with the EEOC and retain an attorney.

A true and accurate copy of Mr. Dundee's 1/26/2015 Addendum to PIP 90 Day Follow Up is attached to this Declaration as Exhibit 1-K.

21. In 2016, Mr. Dundee's attendance problems resurfaced. Between January and April, Mr. Dundee arrived late to work without prior authorization on 20 occasions, and I placed him on a second PIP on May 3, 2016, for violation of University Hospitals's attendance policy. A true and accurate copy of the 5/4/2016 PIP is attached to this Declaration as Exhibit 1-L. Again, I suggested that Mr. Dundee contact EAP to obtain "more tools to improve [his] attendance issues."

22. Also in May 2016, I began to receive increased reports of Mr. Dundee's unprofessional conduct. During the prior six years, other University Hospitals employees – including pharmacists, pharmacy technicians and nurses – had complained about his brusque demeanor. Those reports intensified in 2016.

23. For example, a pharmacy technician complained to me that she felt "threatened" by one of Mr. Dundee's workplace notes and like she was being bullied. Another health care

provider sent his manager an email entitled "Angry and hostile Frank from Pharmacy," expressing his concerns about him:

> I have had repeated problems with Frank in Pharmacy. I have spoken to you about him before. He has no level of patience. He speaks to me and others in a very disrespectful and unprofessional manner. He will yell and scream uncontrollably. It does not matter if you are on the phone or speaking with him in person, he has a very angry personality.
>
> I have the right to work in a hostile free environment. He repeatedly crosses the line. No other pharmacist behaves this way. I am reluctant to ever speak with him because of his hostile attitude

The manager forwarded this email to me, a true and accurate copy of which is attached to this Declaration as Exhibit 1-M.

24. On June 14, 2016, I issued a Corrective Action to Mr. Dundee for unprofessional conduct. I was particularly concerned that Mr. Dundee's aggressive conduct of "yelling at people, notes left in the workplace, rudeness, and a hostile attitude" could jeopardize patient care, since his co-workers had expressed their reluctance to speak with him, the only Pharmacist on duty to provide pharmacy-related services to staff at Geauga Medical Center, Conneaut Medical Center and Geneva Medical Center during the overnight hours. A true and accurate copy of the 6/14/2016 Corrective Action is attached to this Declaration as Exhibit 1-N.

25. In this Corrective Action, I reminded Mr. Dundee of the expectation that he "behave professionally and appropriately in all situations" and gave him "specific examples of problems in this area," including:

- Angry outbursts or yelling at other employees
- Difficulty working collaboratively with others
- Rudeness to other employees
- A hostile attitude, including notes left in the workplace

I also again encouraged Mr. Dundee to seek assistance from EAP to address these problems.

Page 6 of 11

26. In response to this Corrective Action, Mr. Dundee accused me of age discrimination, hostile work environment and sexual harassment. Like all of Mr. Dundee's prior accusations, these had no merit.

27. At the same time, Mr. Dundee's unprofessional behavior continued. On two occasions in July 2016, he wrote snarky comments about a fellow pharmacist on the pharmacy department's Timekeeping log – conduct I had specifically him instructed to stop doing. Although Mr. Dundee claimed that the notes were jokes, they were interpreted as hostile by his co-worker. My colleagues Ms. Lynce and Mr. Glowczewski met with Mr. Dundee in August 2016 to discuss these and other inappropriate statements he had made.

28. Throughout 2017, I continued to receive reports regarding Mr. Dundee's inappropriate and unprofessional behavior at work. For example, in February 2017, he had to be asked repeatedly not to park in a spot designated "Raffle Winner" for an employee who had won the opportunity to park in the spot during a United Way raffle. In March 2017, he referred to the youth of a pharmacist colleague in an email to him and touted his own age and experience in a condescending tone. In seeking overtime shifts in May 2017, he disparaged another pharmacist, claiming that his performance was "infinitely better" than a colleague's and warned that University Hospitals could face liability if the inferior colleague was permitted to cover a shift rather than Mr. Dundee.

29. Mr. Dundee also made inappropriate comments to an HR colleague by email, stating:

> I just love saying [your name], real fast. . . your name has the perfect balance and rhythm between first and last names. . . I hope my wife doesn't get the wrong idea if i call out your name in my sleep!!

30. This was not the first time Mr. Dundee had made inappropriate comments to a female colleagues with sexual undertones. In October 2013, Mr. Dundee wrote me an email

regarding a shift he had covered at Ahuja Medical Center, stating "Ahoooooja is like a sharp, younger woman who a man of weak-will might dally with. . . but I know Geauga is the woman who is good for me, long term!!!" A true and accurate copy of Mr. Dundee's 10/1/2013 Email to Lerman is attached to this Declaration as Exhibit 1-O.

31. This email, and similar comments made by Mr. Dundee over the years made me feel uncomfortable and disrespected.

32. In a June 2017 email to this same HR staff member mentioned above, Mr. Dundee referred to her as a "good kid" and to a fellow pharmacist as a "nice boy" and "a pup with practically no experience."

33. In 2017, as a result of Mr. Dundee's continuing inappropriate comments and unprofessional behavior, I consulted with Ms. Lynce regarding appropriate next steps. Following our discussions, I decided to place Mr. Dundee on another Corrective Action and make a mandatory Tier 2 referral to EAP. A true and accurate copy of the 6/26/2017 Corrective Action is attached to this Declaration as Exhibit 1-P.

34. Referencing University Hospitals's Professional Behavior Policy and Code of Conduct, I explained that Mr. Dundee's inappropriate comments "undermine the professionalism of fellow coworkers and are inconsistent with our value of Diversity":

> Comments of this nature are unwarranted and add no value in the working relationships. You've made similar disparaging comments in the past, dating back to 2015, and this points to a pattern of actions and behaviors that detract from our values and policies. . . Your comments and the implications of the meanings have no place in the working environment.

35. I determined, along with UH HR, that Mr. Dundee's mandatory Tier 2 referral to EAP was warranted based on several factors. First, it was concerning that his pattern of harassing, aggressive and unprofessional behavior had continued, despite previous coaching and discipline for similar conduct in the past. In addition, other employees were complaining that his

behavior was creating a hostile work environment for them, which was unacceptable and threatened patient care. And, finally, I had recommended EAP to him on several prior occasions as a resource available to assist him. Mr. Dundee refused to voluntarily utilize EAP, and his unprofessional conduct continued.

36. Because several Geauga Medical Center employees complained that they were afraid of or intimidated by Mr. Dundee, I was concerned that such fear could cause direct patient caregivers and other hospital staff to not seek medication advice when Mr. Dundee was the only pharmacist available.

37. My obligation to provide a safe, harassment free work environment for Mr. Dundee's co-workers and to provide exceptional patient care led to his June 2017 Corrective Action and EAP referral. The EAP referral was made in the hope that Mr. Dundee's behavior and work relationships would improve as a result of his counseling sessions.

38. Upon receipt of his June 2017 Corrective Action and EAP referral, Mr. Dundee was on notice that further inappropriate conduct would result in additional disciplinary action, up to and including termination of his employment.

39. Mr. Dundee responded to this Corrective Action with an Addendum alleging retaliation and defamation and threatening legal action. A true and accurate copy of Mr. Dundee's 6/27/2017 Addendum to Corrective Action is attached to this Declaration as Exhibit 1-Q.

40. I did not make any kind of medical diagnosis of Mr. Dundee.

41. There is no implicit or explicit connection between Mr. Dundee's Tier 2 referral and any medical diagnosis by me or any other University Hospitals employee.

42. I did not have a diagnostic purpose in referring Mr. Dundee to EAP counseling. Rather, my sole purpose in making the referral was to provide support to Mr. Dundee in an effort to enable him to improve his conflictive work relationships and inappropriate conduct at work.

43. I believed and had documented that Mr. Dundee was engaging in inappropriate and overly aggressive behavior at work. I did not, however, ascribe that behavior to any medical condition or perceive Mr. Dundee to be disabled.

44. Mr. Dundee's EAP referral related to an essential function of his position as third-shift Pharmacist for Geauga Medical Center, Conneaut Medical Center and Geneva Medical Center— i.e., his ability to conduct himself appropriately and work effectively with others. His referral and counseling sessions were directly related to the manner in which he was performing his job and interacting with his co-workers, many of whom relied on him for his expertise in the field of pharmacy.

45. One of my biggest concerns and a considerable factor in my decision to refer Mr. Dundee to mandatory EAP counseling was the fact that his co-workers had expressed reluctance to talk to his due to his aggressive and rude behavior. Such reluctance could impair patient care and potentially cause patient harm, since Mr. Dundee's co-workers were afraid to seek his assistance or counsel.

46. I did not perceive Mr. Dundee as having a mental disability, and no one ever informed me that he was mentally disabled.

47. I do not regard Mr. Dundee as being mentally disabled or believe that he is unable to perform his job because of a mental health condition.

48. For many years, Mr. Dundee's behavior towards me has been threatening, aggressive and combative. I have often been frightened to be in his presence, and I became

terrified to be alone with him. Mr. Dundee has engaged in numerous angry outbursts, vicious personal attacks and condescending diatribes.

49. In 2014, the Legal Department put in place a requirement that I always have a witness with me when I had to interact with Mr. Dundee in person.

50. I stopped directly supervising Mr. Dundee in February 2018 after being promoted to a new role at another hospital within the organization. Mr. Dundee's threatening behavior ended at that time, until this lawsuit was filed against me individually. Mr. Dundee is currently supervised by Patricia Tumbush.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 15, 2020.

*Rachael M. Lerman*
Rachael Lerman, Pharm.D., BCPS