Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4              ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

5     FRANK DOMINIC DUNDEE,

6                  Plaintiff,

7          vs.           Case No. 1:19CV01141

8     UNIVERSITY HOSPITALS

9     CORPORATION, et al.,

10                 Defendants.

11             ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

12                  Deposition of

13                FRANK D. DUNDEE

14

15

16

17

18               March 10, 2020

19                  9:30 a.m.

20

21                  Taken at:

22             7707 Amberwood Trail

23               Boardman, Ohio

24

25             Cynthia Sullivan, RPR

Page 6

1    were just sworn in.  It may look like a

2    conversation, but it's different than a normal

3    conversation in a few important ways.  One way

4    that it is different is that you must answer

5    verbally.  A shake of the head or uh-huh or

6    uh-uh is not easily transcribed by our court

7    reporter here, so try to remember to say yes,

8    no, or answer verbally.

9              Secondly, you are under oath, as I

10   mentioned, so that's different than a normal

11   conversation.  Thirdly, a normal conversation

12   is a two-way street.  This deposition is more

13   of a one-way street.  I'll ask questions, and

14   you will answer them.  Do you understand that?

15        A.    I do.

16        Q.    Do you have any questions before we

17   get started?

18        A.    No.

19        Q.    Do you currently have any

20   disabilities?

21        A.    Yes.

22        Q.    What is your disability?

23        A.    I have a motor -- upper motor

24   neuron disease called hereditary spastic

25   paraplegia.

Page 7

1          Q.     Is that disability a part of this
2     lawsuit?
3          A.     It is not.
4          Q.     Does this case here involve any
5     claims of discrimination relating to that
6     disability?
7          A.     It does not.
8          Q.     This case does not involve any
9     claims of failure to accommodate with regard to
10    that disability, correct?
11         A.     It does not.
12         Q.     There is no allegation in this case
13    that University Hospitals failed to engage in
14    the interactive process with regard to that
15    disability; am I right?
16         A.     Correct.
17         Q.     The first claim in your complaint
18    is for retaliation in violation of Title VII;
19    is that correct?
20         A.     Yes, that is.
21         Q.     What protected activity did you
22    engage in?
23         A.     I filed a sexual harassment charge
24    against my immediate supervisor.
25         Q.     Who was that?

Page 9

1   when you first reported your charge of sexual
2   harassment to University Hospitals HR?
3          A.    I'm not sure.  I'm not sure if that
4   is the exact first thing.
5          Q.    Do you think there might have been
6   a report that occurred prior to this email?
7          A.    I'm not sure.
8          Q.    You can set that aside.
9          A.    Sure.
10          Q.    Who retaliated against you for
11   reporting the sexual harassment?
12          A.    It was Jason Glowczeski and
13   Danialle Lynce.
14          Q.    Was there anyone else that you can
15   think of?
16          A.    Not at this moment I can't think of
17   anyone else.
18          Q.    What did Jason do to retaliate
19   against you for reporting the sexual harassment
20   complaint?
21          A.    He threatened me with discharge at
22   a meeting.
23          Q.    Do you recall the date of that
24   meeting?
25          A.    It was August 5th, 2016.

1          Q.    Did he actually discharge you?

2          A.    He did not.  He threatened me.

3          Q.    Did he do anything else that you

4     view as retaliation for engaging in your

5     protected activity?

6          A.    Could you clarify that statement,

7     please?

8          Q.    Sure.  You identified Jason and

9     Danialle as two people who retaliated against

10    you for engaging in protected activity.  I'm

11    asking what did Jason do that in your mind

12    constitutes retaliation.

13         A.    It was his threats.  It was his

14    threats that I perceived as being a material

15    adverse action.

16         Q.    He threatened to terminate you?

17         A.    That is correct.

18         Q.    What exactly did he say as best as

19    you can recall?

20         A.    I think that that is documented in

21    several documents as to what he said, and I

22    think that you have them already, and I would

23    say that those documents are the most accurate

24    description of what transpired at the time.

25         Q.    I understand that.  Can you tell me

1   as you sit here today what you recall?

2        A.    What I recall of that meeting?

3        Q.    What you recall regarding Jason's

4   threats to you.

5        A.    I recall Jason having a time and

6   attendance exception sheet, or at least I was

7   told that's what he had in his hand because I

8   was never presented with it, and he stated that

9   if I ever wrote another note on a sheet like

10  that or any type of note going forward, that I

11  would be subject to termination.

12       Q.    Did he specify the nature of the

13  note or the tone of the note that he did not

14  want you to make in the future?

15       A.    He did not.

16       Q.    What did Danialle Lynce do to

17  retaliate against you?

18       A.    Ms. Lynce had a pile of records

19  from my personnel file on her desk in front of

20  her, and she read from various statements that

21  I had made in past addendums to disciplines or

22  to evaluations that were substandard that were

23  realtime replies to my -- to whatever the

24  discipline was or the substandard evaluation,

25  and she picked sentences out of context, read

Page 12

1    them to me, and said that if I ever made

2    statements like that again, I would be

3    terminated.

4         Q.    Other than that, did she do or say

5    anything else that you view as retaliation?

6         A.    Once again, the most accurate

7    description is in the documents that I did in

8    realtime.  As soon as the meeting was over, I

9    went out to my car, I had a notebook in there,

10   and I started writing down, and I think it was

11   19 points I came up with, each one of those

12   19 points, and I tried to put the exact time

13   that I put them in.

14              I came home with that, and I

15   immediately transcribed it to an email that I

16   sent to the attorney that I was consulting on

17   my sexual harassment charge.  So those are the

18   most accurate documents, and, once again, they

19   are in your possession.

20        Q.    I understand and appreciate that,

21   and I'm going to be asking you a number of

22   questions today without those documents in

23   front of you.  What I'd like you to do is try

24   to focus on what your best recollection is as

25   you sit here today.  I appreciate that there

Page 13

1    are documents that we could consult and we may

2    consult, but unless I ask you to refer to a

3    document, what I'm just looking for is your

4    best recollection today.  Do you understand?

5         A.    Yes, I understand.

6         Q.    Is there anything else that you can

7    think of that Danialle Lynce did to retaliate

8    against you?

9         A.    It was just a promise of increased

10   scrutiny going forward, and at one point I had

11   asked to leave the meeting because the purpose

12   of the meeting, the purported purpose of the

13   meeting the night before when Jason Glowczeski

14   invited me to this meeting that was less than

15   12 hours away that I had no idea about was to

16   discuss my sexual harassment charge, and the

17   interesting thing about that was that all

18   during their investigation, no one ever spoke

19   to me about my sexual harassment charge, and I

20   expressed that to Jason when he called.  I

21   said, Yes, I'd be interested in going to a

22   meeting with you and Danialle Lynce in her

23   office.

24             When I went into her office,

25   Danialle Lynce spent about five minutes saying

Page 14

1    to me that my charge wasn't timely, and I

2    should have come forward sooner with it.  Then

3    after those five minutes, for the approximately

4    next 15 to 20 minutes, she kept going through

5    documents that she had in front of her and

6    telling me that if I ever write anything like

7    whatever she read again, I'm going to be

8    subject to termination.

9              I said to her at the time, I said,

10   Those were addendums that I was allowed to

11   write under UH code of conduct.  I said, You're

12   telling me that I'm not allowed to write

13   something that's allowed, to write an addendum,

14   write my side of the story.  Then at that point

15   I said, I recognize this as pushback against me

16   for filing my charge of sexual harassment, and

17   I would like to leave.  She said, Sit down.

18   I'm not finished yet.

19              So it continued in a badgering

20   manner for the next, like I said, 15 minutes.

21   Mr. Glowczeski was silent during this time.  He

22   was sitting across from me.  Once again, he had

23   a document in his hand, and it was purported to

24   be the time and attendance exception form.  He

25   said that if I ever wrote on that again, that I

Page 15

1   would be subject to termination.  I asked for a

2   copy of that, and Ms. Danialle Lynce said that

3   she would not give me a copy of it.

4              So the meeting lasted, like I said,

5   approximately 20, 25 minutes.  At the end of

6   it, I ran out to my car, and I made

7   contemporaneous notes.  I came home within the

8   hour, wrote to my attorney, transcribed the

9   contemporaneous notes, and that's it.

10       Q.    Other than comments that Danialle

11  made during that August 5th, 2016, meeting, did

12  she take any other action or make any other

13  statements that you view as retaliatory?

14       A.    I can't recall sitting here right

15  now all the statements that she made.  Her

16  demeanor was very threatening.  Just her

17  general demeanor was very threatening

18  especially when she told me that I was not

19  allowed to leave and to sit back down and she

20  wasn't through.

21       Q.    Mr. Dundee, maybe we should have

22  the court reporter read the question back

23  because I don't think you understood what I

24  asked.

25       A.    Go ahead.

Page 16

1          (Record read.)

2          Q.    I'm looking for comments that she

3     made other than or evidence that you have other

4     than the comments that Danialle made during

5     that meeting.

6          A.    Once again, I'd refer to my

7     contemporaneous notes which I don't have in

8     front of me right now, so I can't be

9     100 percent sure if she didn't say something

10    else or she did.  I do recall what I just said.

11    So I'm not saying that my memory of the

12    occasion is as accurate as what my

13    contemporaneous notes say.  So whatever I tell

14    you now, I don't recall her saying anything

15    else, but she may have said something else that

16    I took down in contemporaneous notes.

17         Q.    Other than the August 5th, 2016,

18    meeting, which I'd like you to set aside for

19    this moment, did Danielle Lynce do or say

20    anything that you view to be retaliatory?

21         A.    Could you clarify that?  Like what

22    time period are we talking about?

23         Q.    Anytime after August 5th, 2016.

24         A.    Yes, she did.

25         Q.    What else did she do that was

1   retaliatory?

2        A.    On June 26th, 2017, she called me

3   to her office.  I had just returned from

4   vacation in Florida.  It was 9:00 p.m. at

5   night, and the phone rang.  I had just got off

6   an airplane about an hour earlier, and I had

7   rushed to work.

8           The phone rang, and it was human

9   resources, and Danialle Lynce said that -- once

10  again, I can't -- I may be paraphrasing.  She

11  said that could I come upstairs because I had

12  committed an infraction, and they were going to

13  have a discipline hearing at that time at 9:00

14  at night, and I went upstairs, and that was

15  that.  I went to the discipline hearing, and

16  that was the answer to your question.

17       Q.    What happened at the discipline

18  hearing that was retaliatory?

19       A.    I was disciplined in a final step

20  over words that I had written in an email to HR

21  representative Rebecca Besselman, in two emails

22  specifically, over phrases.  In the one email

23  referring to Ms. Besselman who was a friend of

24  mine I said you're a good kid, and in another

25  email in which I was referring to a young

1    pharmacist who was assigned to help me

2    implement cost saving suggestions that -- three

3    cost saving suggestions that I had given to

4    University Hospital, and I was explaining to

5    Rebecca in that email that this young man

6    really didn't understand how to implement these

7    suggestions and could she help me.

8              I said he's -- and I didn't want to

9    get him in trouble for saying that.  I said,

10   He's a pup with little experience, a nice boy

11   but -- and they wrote me up for those three

12   phrases.  They said it violated their diversity

13   policy.

14      Q.    Is there anything else that

15   Danialle Lynce did that you view as

16   retaliatory?

17      A.    The promise of increased scrutiny

18   in the meeting of 8-5-16 was an open-ended

19   threat.  So for the entire time period going

20   forward, I felt I was under increased scrutiny

21   because it was promised that I would be under

22   increased scrutiny.

23             So Danialle Lynce didn't have to

24   actually in my opinion do anything to me.  She

25   had put this threat over my head going forward,

1    and it affected every day of my life going

2    forward on the job after that.

3         Q.    Is there anything else that you can

4    think of as you sit here today that Danialle

5    Lynce did or said that is retaliatory?

6         A.    Nothing else.

7         Q.    What about Jason?  Other than

8    statements made at the August 5th, 2016,

9    meeting, is there anything that Jason did or

10   said that you view as retaliatory?

11        A.    No.

12        Q.    We've talked about Jason.  We've

13   talked about Danialle.  Have you thought of

14   anyone else that did or said anything during

15   your employment that you view as retaliatory?

16        A.    Ms. Lerman was part of the

17   discipline hearing on June 26th, 2017, so for

18   her participation in that meeting, I would view

19   it as retaliation.

20        Q.    Is there anything else that Rachael

21   Lerman did other than participate in that

22   June 26th discipline meeting and issue the

23   corrective action to you that you view as

24   retaliatory?

25        A.    At this moment I can't think of

Page 20

1    anything.

2         Q.    With regard to Jason's conduct at

3    the August meeting, why do you believe that

4    there was a connection between your filing of a

5    sexual harassment claim and Jason's conduct?

6         A.    The purported meeting when he

7    called on August 4th, 2016, and he called

8    around 10:00 at night, and he asked if I

9    would -- and I had this on speaker phone, and

10   it was witnessed by a fellow pharmacist, Phil

11   Snyder.  He said, Frank, would you be able to

12   come to a meeting tomorrow morning with

13   Danialle Lynce?  I said, Yes.  I go, But what

14   is the meeting about?  He says, It's about the

15   charge that you filed.  I said, Yes, I would be

16   glad to attend a meeting because I've never met

17   with anybody over it.  I says, I understand

18   that they dismissed it.  Jason said that that

19   was what the meeting was about.

20              When I went in there, like I said,

21   five minutes of the meeting was about

22   discussing the untimeliness of my charge, and

23   then the rest of the meeting was spent

24   threatening me.

25         Q.    So other than the fact that those

Page 21

1   two topics were discussed by Jason in the same

2   meeting, is there anything in your mind that

3   connects his actions with your protected

4   activity?

5          A.    It's all connected to the protected

6   activity because the basis of the meeting was

7   to discuss that protected activity.  So it's

8   all connected to that.  He never said we're

9   going to discuss -- we're going to have a

10  discipline hearing or anything like that.  He

11  just said the meeting was about discussing my

12  charge of sexual harassment against Ms. Rachael

13  Lerman.  There was no discussion at

14  this -- there was no preview that this was

15  going to be any type of meeting in which I was

16  going to be disciplined in any way.

17         Q.    With regard to Danialle Lynce, what

18  is it that creates a connection in your mind

19  between your protected activity and her conduct

20  and comments?

21         A.    I will repeat the same thing that I

22  repeated for Jason.  The meeting was supposed

23  to be about a discussion of my sexual

24  harassment charge, and it turned into for the

25  majority, the vast majority of the time, into a

Page 22

1    meeting, a vitriolic meeting in which I was

2    threatened.

3          Q.    What about Rachael Lerman, what

4    connects her conduct with your protected

5    activity in your mind?

6          A.    Her participation in the June 26th,

7    2017, discipline hearing.

8          Q.    Why is her participation in that

9    meeting connected in your mind to your

10   protected activity?

11         A.    Why is it?  Because it wasn't a

12   coincidence that on June 26th, 2016, I filed

13   the charge of sexual harassment.  It was one

14   year to that date, and that wasn't lost on me.

15   It was also the preposterous nature of what I

16   was being disciplined for.

17         Q.    Now, we've just seen in Exhibit 1

18   that the first time you raised a sexual

19   harassment claim that we have documentary

20   evidence of was on June 23rd, 2016; is that

21   right?

22         A.    I wasn't sure of if that was first

23   or second or what.  I'm not sure of that, so I

24   can't say that for sure.  I know for sure my

25   complete charge was on June 26th where I really

Page 26

1   actors, all of the people who engaged in

2   retaliation, and all of the conduct that you

3   believe was retaliatory?

4          A.    I'm not sure if we covered

5   everybody.  We've covered everybody that I have

6   in my motion for summary judgment.  There may

7   be other people who were involved behind the

8   scenes that may have been revealed in a

9   deposition.  However, I chose not to depose

10  anybody because I think that all that it would

11  add was noise.  So as far as my summary

12  judgment is concerned, we have discussed the

13  people.

14         Q.    Thank you.  I want to move next to

15  your ADA claim, specifically that your referral

16  to the Employee Assistance Program violates the

17  ADA.  Are you familiar with that claim?

18         A.    Yes, I am.

19         Q.    What is it about your referral to

20  the EAP that you find objectionable?

21         A.    Once again, you want me to state

22  something that's -- that's already stated in my

23  summary judgment and in other documents that I

24  stated more clearly than I'm capable of stating

25  right now.  So anything that I would say right

Page 37

1      Q.    Has your treatment plan changed

2   since 2018 when you performed the genetic test?

3      A.    No, it has not.

4      Q.    Who prescribes the muscle relaxants

5   that you use to treat your HSP?

6      A.    Dr. Bobovnyik.

7      Q.    Does she also prescribe

8   prescription level laxatives or any other

9   medications?

10     A.    No.  Pretty much the laxatives that

11  I would use are all over the counter.

12          MS. ISRAEL:  Off the record for a

13  minute.

14          (Discussion off record.)

15     Q.    During your appointment with David

16  Riccardi, did he perform any tests or

17  procedures on you?

18     A.    No, he did not.

19     Q.    What about during your appointment

20  with Jill Fulton, did she perform any tests or

21  procedures on you?

22     A.    No, she did not.

23     Q.    We talked about the increased

24  effects of your HSP on you after your

25  appointment with David Riccardi, and you

Page 42

1           Then the biggest thing he hit me

2    with was the following week he had me set up

3    for a three-hour psychiatric evaluation, and

4    that floored me.  That, I was surprised that I

5    was able to even get up from the table after

6    that because it was such a shock to my system,

7    and I was just so surprised by it, and it just

8    like -- it just was really very traumatic to

9    hear that I'm going to a three-hour psychiatric

10   examination over those phrases.  I couldn't

11   believe it.

12           Q.    Did you ever attend the three-hour

13   psychiatric evaluation?

14           A.    I did not.

15           Q.    Did University Hospitals ever take

16   any action against you for your refusal to

17   attend the three-hour psychiatric evaluation?

18           A.    To this point University Hospitals

19   has not taken any action, but it hangs over my

20   head since then because they never said that

21   they won't take action.  So I am still

22   concerned about it, that they could say to me

23   at any time you didn't get to these sessions

24   and you didn't go to this psychiatric

25   evaluation.  So I am still concerned over that.

Page 43

1    They never said, oh, you don't have to go to

2    these things.  They never said that.

3         Q.   So the two things that David

4    Riccardi presented you with at the end of your

5    meeting were continued counseling sessions and

6    the three-hour psychiatric evaluation; is that

7    right?

8         A.   And the release forms, yes.

9         Q.   Did you sign the release forms?

10        A.   I signed all the release forms but

11   the one that he wanted to -- once again, like

12   you want to do, he wanted to get my medical

13   release from my doctor, and I refused that.

14        Q.   Did University Hospitals take any

15   action against you for your refusal to sign the

16   medical release form?

17        A.   To this point they have not taken

18   any action against me.

19        Q.   You did not attend any further

20   counseling sessions with David; am I right?

21        A.   That is correct.

22        Q.   I want to turn now to your third

23   claim for relief which is discrimination under

24   the ADA.  Are you familiar with that claim?

25        A.   Yes, I am.

Page 61

1   stated in the request.  If you look at Request

2   for Admission No. 4, the request says, "You

3   were not demoted following your complaint of

4   alleged sexual harassment by Rachael Lerman."

5   Your response was no.

6            Do you mean that you are denying

7   the truth of that or that, no, in fact you were

8   not demoted?

9        A.    No, in fact I was not demoted.  So

10  I guess it should have been yes.  I'm sorry.

11       Q.    That's fine.  That's what I

12  suspected.  I just want to clarify your answers

13  to make sure that I understand what you're

14  indicating.

15       A.    Yeah.

16       Q.    I want to look at Request for

17  Admission No. 6.  You did not experience a

18  reduction in pay or benefits following your

19  complaint of sexual harassment; is that

20  correct?

21       A.    That is correct.

22       Q.    With regard to No. 8, University

23  Hospitals has not restricted you in any way or

24  at any time from performing your job duties; is

25  that correct?

Page 62

1          A.    That is correct.

2          Q.    That's it for that document.  Thank

3    you.  You can set them on a chair or whatever

4    is easiest for you.

5          A.    Thank you.  Do you want me to do

6    them face down?

7          Q.    No.  Next I'm going to hand you

8    what's been marked as Defendant's Exhibit 3.

9                     -   -   -   -   -

10                (Thereupon, Deposition Exhibit 3,

11                the Defendant's First Set of

12                Interrogatories to Plaintiff, was

13                marked for purposes of

14                identification.)

15                     -   -   -   -   -

16         Q.    Do you recognize that document?

17         A.    I kind of don't.

18         Q.    Again, I'll direct you to the

19    answers under each interrogatory in bold and

20    underlined.  Do those look like the answers you

21    provided on this document?

22         A.    Yes, they do look like my answers.

23         Q.    If you could turn the page to

24    Interrogatory No. 2 on page 2, if this case

25    proceeds to trial, what people do you

Page 73

1         A.     Just because of my discussions.

2         Q.     Is there anyone else that you can

3   think of?

4         A.     Firsthand knowledge?  At this

5   moment I can't think of anyone else.

6         Q.     I'd like you to look now at your

7   response to Interrogatory No. 6.  That

8   interrogatory asks you to describe occurrences

9   of being subjected to a hostile work

10  environment.  In this answer you refer to your

11  personnel file and state, "Every

12  formal/informal discipline was a manufactured

13  event intended to harass the plaintiff."

14              Is it your contention that none of

15  the discipline that you've received while

16  employed at University Hospitals was warranted?

17        A.     I would say that none of it was

18  warranted.  I have to make that statement.

19  None of it was warranted.

20        Q.     Setting aside the formal and

21  informal discipline that you received, what

22  else can you tell me about the hostile work

23  environment that you experienced?  What made it

24  hostile?

25        A.     Well, the scrutiny that I was under

1   Jones who was over everybody there and who I

2   had written to in the past about a hostile work

3   environment as well, I may have found out who

4   was complicit in this ever.

5           Once again, when I put my motion

6   for summary judgment in, I didn't want the

7   excess noise.  It didn't matter who was

8   complicit in it I had decided.  That would just

9   be extraneous noise.  I felt I had enough

10  evidence and based on the law that my motion

11  for summary judgment was enough without that

12  other stuff.

13      Q.   Other than the people that we've

14  talked about today, are you aware of anybody

15  else at University Hospitals who was

16  responsible for creating a hostile work

17  environment or retaliating against you?

18      A.   At this moment I'm not aware.

19                  -  -  -  -  -

20              (Thereupon, Deposition Exhibit 4, a

21              Document Bates Labeled UH-Dundee

22              0036, was marked for purposes of

23              identification.)

24                  -  -  -  -  -

25      Q.   I'm going to hand you next what's

Page 104

1    been marked as Defendant's Exhibit 4.  Do you
2    recognize that document?
3         A.    When did I write this?  There were
4    so many things in the beginning.  Yes, I do
5    remember this.  I do remember this.
6         Q.    What is Exhibit 4?
7         A.    It's my charge of -- is this age
8    discrimination?  Yes.  It was an age
9    discrimination lawsuit that I filed -- not
10   lawsuit, an age discrimination complaint I
11   filed with the Cleveland EEOC.
12        Q.    Is that your signature at the
13   bottom?
14        A.    Yes, it is.
15        Q.    This indicates that you submitted
16   this charge on November 12th, 2013.  Is that
17   consistent with your recollection?
18        A.    Yes, it is.
19        Q.    This charge relates to a pamphlet
20   for EAP that you found in your locker in
21   October of 2013; is that right?
22        A.    Correct.  But it also spoke to the
23   hostile work environment as well.
24                    -  -  -  -  -
25                (Thereupon, Deposition Exhibit 5, a

Page 107

1    is that right?

2           A.    That is correct.

3           Q.    Do you know if this intake

4    questionnaire became a formal EEOC charge?

5           A.    It did.

6           Q.    You can set that aside.

7                       -   -   -   -   -

8                 (Thereupon, Deposition Exhibit 7, a

9                 Document Bates Labeled UH-Dundee

10                0212, was marked for purposes of

11                identification.)

12                      -   -   -   -   -

13          Q.    Take a look at Defendant's

14   Exhibit 7, and let me know if you've seen that

15   document before.

16          A.    Yes, I have.

17          Q.    Is that your signature at the

18   bottom?

19          A.    Yes, it is.

20          Q.    What is this document?

21          A.    I filed with the Ohio Civil Rights

22   Commission a charge of discrimination, once

23   again, it's under the Title I of the ADA, for

24   being forced to submit to mandatory EAP

25   counseling sessions.

Page 108

1        Q.    Did you sign and submit this charge
2    of discrimination on September 14th, 2017?
3        A.    I don't think so.  Wait a second.
4    I don't think I did.  I thought this was more
5    in the spring of 2018.  Well, what's that say?
6    9-14-17.
7        Q.    If you want to read silently to
8    yourself so she doesn't have to try to take
9    down your mumbles, that would be helpful.
10       A.    I'm so sorry.  I must have filed
11   this at 9-14-17, yes.
12                   -  -  -  -  -
13             (Thereupon, Deposition Exhibit 8, a
14             Document Bates Labeled UH-Dundee
15             0276 through 0279, was marked for
16             purposes of identification.)
17                   -  -  -  -  -
18       Q.    I'm handing you Defendant's
19   Exhibit 8.  Do you recognize that document?
20       A.    Yes, I do.
21       Q.    What is it?
22       A.    Yeah.  This document doesn't have
23   anything to do with my lawsuit.  This is a
24   document I filed because I felt that the
25   hospital wasn't discussing an accommodation for

Page 109

1   my handicap in good faith, but this has nothing

2   to do with the lawsuit that we're discussing.

3          Q.    Is this your signature on the last

4   page?

5          A.    Yes, it is.

6          Q.    This is a charge of discrimination

7   for disability discrimination signed by you and

8   submitted on September 2nd, 2018; is that

9   right?

10         A.    Yes, but I withdrew this.

11         Q.    So no formal charges?

12         A.    No.  I withdrew that.  Heather

13  Harmon had made some inroads in our

14  discussions, and I told her because she had

15  shown such good faith that I would drop the

16  charge.

17              MS. ISRAEL:  Let's go off the

18  record for a minute.

19                  (Brief recess.)

20                  -  -  -  -  -

21                  (Thereupon, Deposition Exhibit 9, a

22                  Document Bates Labeled UH-Dundee

23                  0092, was marked for purposes of

24                  identification.)

25                  -  -  -  -  -

1              identification.)

2                    -  -  -  -  -

3        Q.    I'm handing you next Exhibit 10.  I

4   want you to focus on the lower right-hand

5   corner here.  There is a little bit of cutoff,

6   but if you could tell me if you recognize this

7   handwriting here and what does it say.

8        A.    "She forced me to sign this.

9   Help."

10       Q.    Whose handwriting is that?

11       A.    That's me.

12       Q.    You wrote that note on that

13   timekeeping exception log?

14       A.    Yes, I did.

15                    -  -  -  -  -

16              (Thereupon, Deposition Exhibit 11, a

17              Document Bates Labeled UH-Dundee

18              0118, was marked for purposes of

19              identification.)

20                    -  -  -  -  -

21       Q.    I'm going to hand you next

22   Defendant's Exhibit 11 and direct your

23   attention to this highlighted handwriting here

24   in the middle.  If you could take a look at

25   that, and let me know if you can read it.

Page 112

1          A.     Yes.  That's mine.

2          Q.     What did you write on that log?

3          A.     I said, "Not sure if she left then.

4     I wasn't at the time clock.  She may be lying."

5          Q.     Who were you referring to in that

6     note?

7          A.     Susan Thabit.

8          Q.     Okay.  Finally, I'm going to hand

9     you Defendant's Exhibit 12.

10                    -  -  -  -  -

11                (Thereupon, Deposition Exhibit 12, a

12                Document Bates Labeled UH-Dundee

13                0152, was marked for purposes of

14                identification.)

15                    -  -  -  -  -

16         Q.     There is a highlighted typed

17     section here.  If you could read that and let

18     me know if you answered that comment on the

19     log.

20         A.     Let's see what it says.  Where are

21     you showing me?  I'm sorry.

22         Q.     It's no problem.  Here, this

23     highlighted typed section right in the middle

24     of the exhibit (indicating).

25         A.     Yes.  Yes, that would be -- yes,

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 532-2014-00108 |

| Ohio Civil Rights Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Frank Dundee** | **(330) 726-2662** | **08-17-1953** |

| Street Address | City, State and ZIP Code |
|---|---|
| 7707 Amberwood Trail, Boardman, OH 44512 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **UNIVERSITY HOSPITALS** | **500 or More** | **(440) 285-6000** |

| Street Address | City, State and ZIP Code |
|---|---|
| 13207 Ravenna Road, Chardon, OH 44024 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| ~~EEOC~~ CLBG CART UNIT | | |

| Street Address | City, State and ZIP Code |
|---|---|
| NOV 1 3 2013 | |

**RECEIVED**

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN

☐ RETALIATION ☒ AGE ☐ DISABILITY ☐ GENETIC INFORMATION

☐ OTHER (Specify)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **08-26-2013** | **10-04-2013** |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired as a Staff Pharmacist in April of 2010. In the last 18 months, managers have created culture of divisiveness within the department, based on age, that demeans and threatens the role and continued employment of the older, staff pharmacists, as providers of care.

On October 4, 2013, I discovered a pamphlet for the EAP in my locker. Ms. Lerman, with the approval of Ms. Lynce, was responsible. I viewed this action as a grievous personal affront to my dignity and character, and as a method of harassment. The action, along with a pattern of intimidating behavior, has been emotionally damaging. Ms. Lynce, as an agent of the human resource department of UH, was negligent by not stopping such behavior. Ms. Lerman, as my supervisor, is empowered to take tangible employment actions like hiring, firing, promoting, demoting or reassigning employees to significantly different responsibilities.

I believe I have been subjected to different terms and conditions of employment, due to my age, 60, in violation of the Age Discrimination in Employment Act of 1967 (ADEA), as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 11·12·13 _____ T C Dul<br>Date       Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

DEFENDANT'S EXHIBIT 4<br>PENGAD 800-631-6989<br>CS

UH-Dundee 0036

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 533-2017-01275 |

| Ohio Civil Rights Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Frank D. Dundee | (330) 726-2662 | 1953 |

| Street Address | City, State and ZIP Code |
|---|---|
| 7707 Amberwood Trail, Boardman, OH 44512 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| UNIVERSITY HOSPITALS GEUAGA MEDICAL CENTER | 500 or More | (440) 285-6000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 13207 Ravenna Road,  Chardon, OH 44024 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 06-26-2017   Latest 06-26-2017

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I have been employed by the above-named Respondent since 2010 as a Staff Pharmacist. On 6/26/17, I received a final written warning for phrases written in two emails to a HR representative regarding implementation of suggestion for the innovation Summit.  The written phrases were deemed to violate Respondent's Code of Conduct by the Head of HR Danialle Lynce and the Pharmacy Manager, Rachael Lerman.  Both were not recipients of the email.

Under threat of termination, I was mandated to attend counseling sessions in the EAP program.  The EAP counseling sessions amounted to a medical examination that was not related to my job nor consistent with the Respondent's business needs under EEO rule and the ADA.

I believe I am being discriminated against in violation of Title I of the Americans with Disabilities Act of 1990, as amended, (ADA).  I also believe I am being retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended, (Title VII) due to my participation in a protected activity.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Date 9-14-19    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

RECEIVED
SEP 19 2017
CLFO
EEOC

DEFENDANT'S
EXHIBIT
7
CS

PENGAD 800-631-6989

UH-Dundee 0212

## OHIO CIVIL RIGHTS COMMISSION
## CHARGE OF DISCRIMINATION (EMPLOYMENT)

ALH

**OCRC Case Number:**  CLE B4 (44821) 08222018

**EEOC Case Number:**

| | |
|---|---|
| **Your Name** | **Company Name** |
| Frank Dundee | University Hospitals Geauga Medical |
| **Your Street Address** | **Company Street Address** |
| 7707 Amberwood Trail | 13207 Ravenna Rd |
| **City, State and Zip** | **City, State and Zip** |
| Boardman. Ohio 44512 | Chardon, Ohio 44024 |
| **Telephone Number** | **County (if located in Ohio)** |
| 3303988274 | Geauga |
| **Alternate Number (Optional)** | **Telephone Number** |
| 3307262662 | 4402856000 |
| **Email Address (Optional)** | **# of Employees    Date of Hire** |
| fdundee@gmail.com | 28.000          5/1/2010 |

RECEIVED

SEP 0 6 2018

OCRC – INTAKE
CLEVELAND

**Dates of Discrimination (MM/DD/YYYY):**  3/21/2018 thru 8/21/2018

I was discriminated on the basis of :
Race/Color
Sex
✔ Disability (DO NOT LIST DISABILITY)
Age (over 40 years old only)
Religion
National Origin/Ancestry
Military Status
Retaliation (for protesting discrimination)

Please identify how you are a member of the category you marked on the left: (If you marked **AGE**, please list your **BIRTH DATE**. If you have marked **DISABILITY, DO NOT IDENTIFY** your disability.)
I have a disability

RECEIVED

AUG 2 2 2018

OCRC – INTAKE
CLEVELAND

**Please read and review the following:**

I have not commenced with any action under sections 4112.14 or 4112.02(N) of the Ohio Revised Code with respect to the subject matter of the affidavit. I understand that upon filing of this charge with the Ohio Civil Rights Commission, I am barred from instituting any such civil action and that any monetary award or financial benefit I may receive may be limited to back pay and/or restoration of employment fringe benefits and may not include other damages to which I may be entitled as a result of such civil action.

I am filing a charge alleging AGE DISCRIMINATION and I have read and understand the above information.

⬤ I am NOT filing a charge alleging AGE DISCRIMINATION and this does not apply to me.

Page: 1 of 4

DEFENDANT'S
EXHIBIT
8

PENGAD 800-631-6989

UH-Dundee 0276

**Charging Party:**   Frank Dundee                                          ALH

**Case Number:**   CLE B4 (44821) 08222018

## Act of Discrimination #1

Date of Discrimination (MM/DD/YYYY): 08/21/2018

I was subjected to (mark only one issue):

    a denial of promotion

    a forced resignation

    demotion

    denial of hire

●   denial of a reasonable accommodation

    different terms and conditions of employment

    discharge/termination

    discipline

    harassment/sexual harassment

    layoff

    other

I believe it was because of my:

    Race/Color

    Sex

✓  Disability

    Age

    Religion

    National Origin/Ancestry

    Military Status

    Protected activity (retaliation)

RECEIVED

SEP 0 6 2018

OCRC – INTAKE
CLEVELAND

If you have marked "other", please briefly describe the discriminatory act:

RECEIVED

AUG 2 2 2018

OCRC – INTAKE
CLEVELAND

The reason given by the company for this action is:

The company, University Hospitals, refused to informally discuss my request(s) for a reasonable accommodation, even though my disability is obvious, forcing me to comply with their internal policy which violates Title I of the ADA rules on reasonable accommodation.

I was given this reason by (name and position):

Debbi Templin, CPDM, ARM Director, Disability & Occupational Risk Control Services, Heather Harmon, JD, PHR, SHRM-CP, Vice President, Human Resources & Organizational Development University Hospitals

I am aware of others treated more favorably than me including:

Lisa Farah

I believe that this was discrimination because:

I am perceived as a troublesome employee, in spite of the fact that my job performance is exemplary, both objectively and subjectively, when compared across all University Hospitals facilities. I believe this discrimination is retaliation for speaking truth to power; for making a complaint to OSHA and complaints to the EEOC, over a period of years. Because of this, my request for reasonable accommodation was rejected without discussion, through an internal University Hospitals policy.

Page: 2 of 4

UH-Dundee 0277

**Charging Party:**  Frank Dundee                                      ALH

**Case Number:**  CLE B4 (44821) 08222018

### Act of Discrimination #2 (Optional)

Date of Discrimination (MM/DD/YYYY):

I was subjected to (mark only one issue):                    I believe it was because of my:

    a denial of promotion                                 Race/Color

    a forced resignation                                  Sex

    demotion                                              Disability

    denial of hire                                        Age

    denial of a reasonable accommodation                  Religion

    different terms and conditions of employment          National Origin/Ancestry

    discharge/termination                                 Military Status

    discipline                                            Protected activity (retaliation)

    harassment/sexual harassment

    layoff

    other

If you have marked "other", please briefly describe the discriminatory act:

RECEIVED

SEP 0 6 2018

OCRC - INTAKE
CLEVELAND

The reason given by the company for this action is:

RECEIVED

AUG 2 2 2018

OCRC - INTAKE
CLEVELAND

I was given this reason by (name and position):

I am aware of others treated more favorably than me including:

I believe that this was discrimination because:

Page: 3 of 4

UH-Dundee 0278

**Charging Party:** Frank Dundee

ALH

**Case Number:** CLE B4 (44821) 08222018

Please check to indicate you have read and agreed to the statements below.

✓  I understand that I will not be able to sign this form on-line. A copy will be mailed out to me for a notarized signature. An investigation will not begin until the Ohio Civil Rights Commission receives a signed and notarized charge from me.

✓  I declare under penalty of perjury that I have read the above charge and that it is true to the best of my knowledge, information and belief. I will advise the agency/agencies if I change my address or telephone number and that I will cooperate fully in the processing of my charge in accordance to their procedures.

_____          9 . 2 . 2018
Charging Party                                              Date

Subscribed and sworn to before me on this 2ᴺᴰ day of September of 20 18

_____
OCRC Representative or Notary
Philip M. Snyder, Esq.
Attorney At Law, OH 0071672
Notary Public, state of Ohio
My commission has No
expiration date §147.03 R.C.

RECEIVED

SEP 0 6 2018

OCRC - INTAKE
CLEVELAND

RECEIVED

AUG 2 2 2018

OCRC - INTAKE
CLEVELAND

Page: 4 of 4

UH-Dundee 0279

7/2016- New Policy goes into effect. See memo for 7/10/16 switch to new processes. See Rachael for your blinded emp #- for list on door.

## KRONOS TIMEKEEPING EXCEPTION LOG

Department Name/# Pharmacy

130-48030   Rx
130-48000
130-48055

Pay Period Start _____
Pay Period End _____

| DATE | EMPLOYEE NAME | MISSED PUNCH IN TIME | MISSED PUNCH OUT TIME | OFF-SITE HOURS IN TIME | OFF-SITE HOURS OUT TIME | Any other exceptions PTO, Jury Duty, Bereavement, Float, etc. Pay Code | Hours | APPRO VAL |
|---|---|---|---|---|---|---|---|---|
| 7-8-16 | Tina | | | | | No lunch | | |
| 7-8-16 | Lama Sarkis | 2 pm | 2:50pm | | | Chemo & omni cell No lunch - dinner | | |
| 7-9-16 | Susan | | | | | 1 hr schedule reg | | |
| 7-9/16 | Glenn | | | | | No lunch (Events only) | | |
| 7-9 | Ben | | | | | No lunch | | |
| 7-11 | Rich | | | | | No lunch | | |
| 7-11 | Nich | | | | | No lunch | | |
| 7-11 | Susan | | | | | No lunch | | |
| 7-11 | Rich | | | | | Left at 10:15 | | |
| 7-11 | Susan | | | | | Left at 10:20 | | TD |
| 7-11 | Tina | | | | | No lunch | | |

She forced me up to sign this. 7/2/16!

DEFENDANT'S EXHIBIT 10

UH-Dundee 0117

7/2016 - New Policy goes into effect. See Memo for 7/10/16 switch to new processes. See Rachael for your blinded emp # for list on door.

**KRONOS TIMEKEEPING EXCEPTION LOG**

Department Name/# _Pharmacy_

130-48030   Rx
130-48000
130-48035

Pay Period Start _____
Pay Period End _____

| DATE | EMPLOYEE NAME | MISSED PUNCH | | OFF-SITE HOURS | | Any other exceptions PTO, Jury Duty, Bereavement, Float, etc. | | APPRO VAL |
|------|---------------|----|----|----|----|----|----|------|
| | | IN TIME | OUT TIME | IN TIME | OUT TIME | Pay Code | Hours | |
| 7-10-16 | Rich | | | | | 6 am in / no 8 am seen | | |
| 7 12 | Glenn | | | | | No lunch | | |
| 7-12 | Susan | | | | | No lunch | | |
| 7-12 | Susan | Left 10:16 | | | | No lunch | | |
| 7-13 | Shelia | No Lunch | | | | | | |
| 7/14 | Mike | | | | | Not sure Tues + Wed Clocked Sat was this is us? Came in early to help & clean up Neomed (leave down) | | |
| 7/13 | Mark Soric | 8:00 | 4:00 | | | Neomed (leave down) | | |
| 7-14 | Sam | | | | | NO LUNCH | | |
| 7-16-16 | Laura Sarkis | 2pm | 9:20pm | | | No lunch | | |
| 7-17-16 | Laura Sarkis 2pm 2pm | | | | | no lunch | | |
| 7-17 | Lisa W | | | | | early so Laura could leave | | |
| 7-17-18 | Waverlyn / Derek | | | | | Left early 10 min / Sue Nord | | |
| 10-7-15 | | PTO 8hr | | | | | | |

DEFENDANT'S EXHIBIT 11  CS

UH-Dundee 0118