**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FRANK DOMINIC DUNDEE, | ) | CASE NO. 1:19cv01141 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| UNIVERSITY HOSPITALS CORP, | ) | |
| et al., | ) | |
| | **)** | **REPORT & RECOMMENDATION** |
| Defendants. | ) | (Doc. No. 31, 43) |

This case is before the Court upon a referral for general pretrial supervision, dated July 23, 2019. (Doc. No. 8.)  Currently pending are Cross-Motions for Summary Judgment.  Plaintiff Dominic Dundee's Motion for Summary Judgment (Doc. No. 31) is opposed by Defendant University Hospitals Health System, Inc.  (Doc. No. 44.)  Defendant University Hospital Health Systems, Inc.'s Motion for Summary Judgment (Doc. No. 43) is unopposed.  For the reasons that follow, the Court recommends that Plaintiff Dominic Dundee's Motion for Summary Judgment be DENIED, and Defendant University Hospitals Health System, Inc.'s Motion for Summary Judgment be GRANTED.

## I. Procedural Background

On May 20, 2019, Plaintiff Frank Dominic Dundee ("Plaintiff" or "Dundee") filed a *pro se* Complaint in this Court against Defendants Danialle Lynce, Jason Glowczewski, Shawn Osbourne and Rachael Lerman (the "Individual Defendants"), and Defendant University Hospitals Health Systems, Inc. ("UH," or "Defendant") alleging retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a); medical exams in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 2000e-2(a); and disability discrimination and harassment in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 2000e-2(a).  (Doc. No. 1.)

Defendants filed an Answer on July 19, 2019.  (Doc. No. 4.)  Defendant UH filed a Motion for Judgment on the Pleadings on July 19, 2019.  (Doc. No. 6.)  At the same time, the Individual Defendants filed a Motion to Dismiss for Failure to State a Claim. (Doc. No. 5.)

On December 26, 2019, the Individual Defendants' Motion to Dismiss was granted, and Defendant UH's Motion for Judgment on the Pleadings was granted in part and denied in part. (Doc. No. 29.)  Dundee's claims based on events occurring prior to September 13, 2016 were dismissed as time-barred.  (*Id*.)

## II.  Statement of Facts

Dundee was hired as a third shift pharmacist at Geauga Medical Center in 2010.  (Doc. No. 43 at 3.)

Between Spring 2012 and October 2013, Dundee alleges he was subjected to at least three unwelcome verbal sexual advances by his supervisor, Rachael Lerman ("Lerman").   (Doc. No. 43-24 at 1.)  These alleged advances were comments made when Lerman and Dundee were alone in the lab hallway.  (*Id*.)  Dundee specifically remembered Lerman "called out, 'HEY HANDSOME' or

'HEY GOOD LOOKING.'" (*Id*.)  He perceived the harassment as escalating when the two were alone in the vestibule as Dundee ended his shift and Lerman arrived at work, and she greeted him by saying "'Hi Sexy' and laughed and said 'I could probably be fired for saying that!'" (*Id*.)

In a January 2013 Staff Self Assessment, Dundee stated that his supervisors, "Rachael [Lerman] and Jason [Glowczewski] are both head and shoulders the best managers I've ever worked for; so they can make me more successful by staying in their jobs as long as I am here."  (Doc. No. 43-3 at 1.)

In March 2013, Dundee received a Performance Evaluation for 2012 which described 2012 goals to  "Improve nursing satisfaction with pharmacist customer service" and "Forward ideas to pharmacy manager in a positive and collaborative way."  (Doc. No. 43-4 at 1.)  Both of these goals were listed as "ongoing" for the next year.  (*Id*.)  Dundee responded by asserting:

> I feel that by all objective and measurable standards of performance of patient care services, that I exceed in every category. The areas where I can show improvement are ancillary and have been given too much weight in this evaluation, comparatively speaking.

(Doc. No. 43-5 at 1.)

Beginning in August 2013, a new attendance policy was implemented for the pharmacy department, and Dundee was tardy on multiple occasions in August and September.  (Doc. No. 43-6 at 1.)  He was coached by Lerman on August 27, 2013 for these violations, and on October 2, 2013, Dundee received a Corrective Action for his continuing tardiness.  (*Id*.)  Dundee refused a proffered Employee Assistance Program ("EAP") flier and responded to the Corrective Action with a lengthy addendum complaining about Lerman's management[1] and vowing to "vigorously defend myself

---

[1]  In particular, Dundee was very upset that an HR representative attended the meeting, explaining this made him feel "like I'm some sort of miscreant or like you and I are enemies."

-3-

against any action that is harassing in nature, capricious, discriminatory or malicious." (Doc. No. 43-7 at 1.)  The following day, Lerman placed the EAP flier in Dundee's locker.

On October 1, 2013, Dundee sent Lerman an email entitled "Monday Sept 30 at Ahooooooooooja!!!!! LOL!!!"  (Doc. No. 43-17 at 1.)  He wrote, in part, "Ahoooooooja is like a sharp, younger woman whom a man of weak-will might dally with ('but that ain't me no mo' ....that line is from Raising Arizona!), but I know Geauga is the woman who is good for me, long term!!!" (*Id*.)  Lerman responded, in part, "Hi Frank, this made me laugh - I can hear you saying it!"  (*Id*.)

On November 12, 2013, Dundee filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleged that placing the EAP flier in his locker constituted age discrimination by Lerman and created a hostile work environment. (Doc. No. 34-33 at 25-26, 32.)  The EEOC dismissed this Charge immediately. (Doc. No. 43-21.)

On March 10, 2014, Dundee received his 2013 Performance Evaluation. (Doc. No. 43-8.) Lerman rated Plaintiff as "Frequently Meets Expectations" in the categories of Compassion, Teamwork, Managing Work (includes Time Management), Building Trust, and Patient/Colleague Relations,[2] and Lerman identified several development opportunities, including "Communicate positively with management and his coworkers." (*Id*. at 5.)  Dundee responded with an addendum stating that he "exceed[s] expectations in every area of the evaluation, and to be characterized otherwise I find unconscionable." (Doc. No. 43-9 at 2.) He asserted he was "being unfairly targeted and disparaged" by Lerman, and that her performance evaluation criteria for pharmacists were

---

(Doc. No. 43-7 at 1.)

[2] He was rated "Consistently Meets Expectations" in the categories of Excellence, Diversity, Integrity, and Applied Learning.  (Doc. No. 43-8 at 1-3.)

-4-

"demeaning" and reflected "an age bias within the department."  (*Id*. at 1-2.)  He theorized that the reason for this disparagement was "the fact that I advocate for the operational side of our department which, in my opinion, is second in importance to leadership's emphasis on more academic pursuits." (*Id*. at 2.)

On October 20, 2014, Dundee was placed on a 90 Day Performance Improvement Plan ("PIP") for his failure to complete "assigned duties during all shifts to ensure continuity of patient care and to leave minimal work for following shifts." (Doc. No. 43-10, at 1-2.)  Dundee had not been meeting the expectation to check a minimum of 10 EMS Boxes or Code Trays per month to ensure that they were properly stocked.  (Doc. No 43-10 at 1.)  According to the PIP, in July, August and September of 2014, Dundee had checked no EMS Boxes or Code Trays, while other pharmacists had checked 239 EMS Boxes and 30 Code Trays.  (*Id*.)  Dundee responded to the PIP with an addendum explaining that he believed these duties should be assigned to non-clinical pharmacists, and stating:

> **I find the entire process** [of the PIP] **threatening, intimidating and hostile.** I am one of the best, if not the best, pharmacists in the entire UH system. It seems that pharmacy management is constantly searching for ways to disparage me and it makes for an extremely uncomfortable work environment, both mentally and physically. I feel that it is a form of retaliation and a form of age discrimination.

(Doc. No. 43-11 at 1) (emphasis in original).

In November 2014, Dundee met with the UH Compliance Department to report that Lerman had engaged "in a pattern of behavior that has made the work environment intimidating and hostile for several years now."  (Doc. No. 1-1 at 4; Doc. No. 43-2, Ex. 2-B.)  UH agreed to have Rebecca Besselman, UH Geauga Human Resource Officer, present at all meetings between Dundee and Lerman, and further agreed that Danialle Lynce ("Lynce"), the Regional HR Director, whom

Dundee accused of bias, would not be present.  (Doc. No. 1-1 at 4.)

In January 2015, Lerman noted in a "PIP 90 Day Follow Up" that Dundee's performance had improved and his "PIP has been successfully completed." (Doc. No. 43-12 at 1.) Dundee responded in an addendum that:

> [T]he PIP is an indictment of Ms. Lerman's suitability to be a manager. She has created a toxic, intimidating, and hostile work environment since she rose to be department manager. . . I have been a target since I had the audacity, due to my age and experience, to raise my hand and constructively question department operations as misdirected; in essence, the emperor has no clothes. At that point, I became a threat to her unquestioned authority. A long pattern of abuse followed, that has caused me, not only physical and mental distress, but also caused me to file charges with the EEOC and retain an attorney.

(Doc. No 43-13 at 1.)

Between January and April of 2016, Dundee arrived late to work without prior authorization on 20 occasions.  (Doc. No. 43-14 at 1.)  On May 3, 2016, he was placed on a second PIP for violation of UH's attendance policy.  (*Id*.)

Lerman testified that, in May 2016, reports of Dundee's unprofessional conduct towards other UH employees "intensified."  (Doc. No. 43-2 at ¶22-23.)  On May 1, 2016, an employee emailed his supervisor with allegations that Dundee's behavior was impacting the employee's ability to work:

> I have had repeated problems with Frank in Pharmacy. I have spoken to you about him before. He has no level of patience. He speaks to me and others in a very disrespectful and unprofessional manner. He will yell and scream uncontrollably. It does not matter if you are on the phone or speaking with him in person, he has a very angry personality.
>
> I have the right to work in a hostile free environment. He repeatedly crosses the line. No other pharmacist behaves this way. I am reluctant to ever speak with him because of his hostile attitude.
>
> . . . Please pass this on to his Supervisor.  This has to stop.

-6-

(Doc. No. 43-15 at 1.)

On June 14, 2016, Lerman gave Dundee another Corrective Action, based on "your documented behavior and complaints from other UH Geauga employees who feel you have bullied them, including but not limited to: yelling at people, notes left in the workplace, rudeness, and a hostile attitude."  (Doc. No. 43-16 at 1-2.)  The Corrective Action reminded Dundee of the expectation that he "behave professionally and appropriately in all situations."  (*Id*.)  Dundee was again encouraged to seek assistance from EAP.  (*Id*.)

On  June 15, 2016, Dundee appealed the Corrective Action, and accused Lerman of age discrimination, creating a hostile work environment, and sexual harassment.  (Doc. No. 43-23 at 1-2.)

On June 26, 2016, Dundee filed a complaint of sexual harassment against Lerman, alleging unwanted sexual advances.  (*Id.,* Ex. 2-D.)   He requested that HR director Lynce recuse herself from the investigation.  (Doc. No. 31-2.)  He alleged that in a time period between Spring 2012 and October 2013 he had been subjected to at least three unwelcome sexual advances by Lerman, which he had not reported for "fear of retaliation, as well as out of concern for [Lerman's] family and marriage."[3]  (Doc. No. 43-24 at 1.)

On August 3, 2016, Lynce informed Dundee, via email, that his sexual harassment allegations against Lerman had been investigated, and could not be substantiated.  (Doc. No. 43-25 at 1.)  She reminded him that "any concerns regarding harassment or discrimination should be reported timely so we can investigate effectively and throughly."  (*Id*.)

On August 4, 2016, during his evening shift as a staff pharmacist at UH Geauga Medical

-7-

Center, Dundee received a call from a supervisor, Jason Glowczewski ("Glowczewski"), asking him to attend a meeting the following morning at 7:00 a.m. at the HR offices.  (Doc. No. 1-1 at 5.)  He believed the meeting would be about the sexual harassment compliant that he had filed.  (*Id.*)

The August 5, 2016 meeting was attended by Dundee, Lynce and Glowczewski.  (Doc. No. 43-20 at ¶16.)   Dundee was provided with examples of "rude, derogatory and threatening comments" in his addendums to Corrective Actions, emails and other written documents, and Lynce informed Dundee that if he "continued to make statements like these" there could be "corrective action up to and including termination."  (*Id.* at ¶17.)

On August 8, 2016, Dundee sent an email entitled "An F.Y.I. to UH Compliance Department regarding EEOC recognized protected activities retaliation" to Ed Soyka, an attorney in the UH Compliance Department who had been present at the November 2014 meeting.  (Doc. No. 31-6.) He detailed the events of the August 5, 2016 meeting and explained why he believed they were a violation of Title VII.  (*Id.*)

On June 26, 2017, Lynce issued another Corrective Action to Dundee.  (*Id.* at 9; Doc. No. 31-7.)  Dundee was told that he was receiving a "final step warning" because he had violated UH policies on diversity and contributed to a "Conflictive Work Relationship."  (Doc. No. 43-33 at 12.) Dundee also received a mandatory referral to the EAP, and was informed "failure to follow up with EAP in the required time frame can result in further disciplinary action up to and including termination." (Doc. No. 43-32.) Dundee responded in an Addendum to the Corrective Action which alleged retaliation and defamation and threatened legal action.  (Doc. No. 43-19.)

On July 10, 2017, Dundee filed charges of retaliation in violation of Title VII with the EEOC, relating to the foregoing events.  (*Id.* at 13.)

-8-

On July 26, 2019, Dundee attended his first required EAP counseling session with David Riccardi at the UH Ahuja Medical Center.  (Doc. No. 43-30 at ¶3.)  Riccardi performed no tests or procedures on Dundee, nor did he use any medical equipment, and their session consisted entirely of discussion.  (Doc. No. 43-30 at ¶¶4-6; Doc. No. 43-33 at 19.)  He did not diagnose Dundee with a medical condition or mental disability.  (Doc. No. 43-30 at ¶8.)  At the end of their meeting, Riccardi presented Dundee with medical releases, and recommended he attend a psychiatric assessment.  (*Id*. at ¶10.)  He also provided Dundee with a "Compliance Contract," which stated that Dundee was required to "attend evaluation with [a psychologist], follow recommendations, [and] follow up with EAP as scheduled."  (Doc. No. 31-12 at 1.)  The Compliance Contract informed Dundee that "non-compliance may result in corrective action up to and including discharge."  (*Id*.)

Dundee never attended this psychological evaluation, and University Hospitals has not taken any action against him for his refusal to do so.  (Doc. No. 43-33 at 20.)   Dundee also declined to sign a release to allow UH to obtain medical records from his physician.  (Doc. No. 43-33 at 21.) UH has not taken any action against him for his refusal to provide this medical release.  (*Id*.)

Dundee asked the UH Compliance Department if his participation in EAP counseling could be suspended until the EEOC ruled on whether it was a violation of Title I of the ADA, as Dundee asserted.  (Doc. No. 1-1 at 15.)  He did not receive a reply to this request.   (*Id.*)

In September 2017, Dundee filed a Charge of Discrimination with the EEOC alleging that his June 2017 Corrective Action was retaliation for engaging in protected activity and that his referral to EAP counseling was a violation of the ADA.  (Doc. No. 43-33 at 27; Doc. No. 43-7.)

On November 22, 2017, Dundee received a letter in the mail from Shawn Osborne, VP of

Pharmacy Services, stating that Dundee had until December 7, 2017, to meet with the head of EAP for a counseling session.   (Doc. No. 31-16.)   Dundee responded to Mr. Osborne via email, reiterating his assertion that the mandatory evaluation was illegal and expressing his intention to seek a medical exemption.  (Doc. No. 31-17.)

 On January 10, 2018, Dundee attended an EAP counseling session with Jill Fulton, the head of the EAP, at UH Geauga Medical Center.  (Doc. No. 43-31 at ¶ 3;  Doc. No. 43-33 at 19.)  Fulton did not perform any tests or procedures on him, nor did she not use any medical equipment.  Further, their session was limited to discussion.  (Doc. No. 43-31 at ¶¶ 4-6.)  She did not diagnose him with a mental disability or medical condition, nor did she attempt to do so.  (Doc. No. 43-31 at ¶7-8.)

On April 14, 2018, Dundee filed a Charge of Employment Discrimination with the Ohio Civil Rights Commission ("OCRC") claiming that the January 10 counseling session violated Title I of the ADA.  (Doc. No. 43-27 at 1-4.)

On September 2, 2018, Plaintiff filed another Charge of Discrimination with the OCRC alleging that University Hospitals was discriminating against him on the basis of his disability by refusing to discuss his request for a reasonable accommodation.  (Doc. No. 43-33 at 18, 34-37.)

On March 10, 2020, Dundee testified that, following his complaint of sexual harassment, he did not experience a reduction in pay or benefits, and has not been restricted in any way or at any time from performing his job duties.  (Doc. No. 43-33 at 22.)  He remains employed by UH Geauga in the same position that he had prior to making the complaint.  (*Id*.)

### III.  Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides in relevant part that:

A party may move for summary judgment, identifying each claim or defense    or the part of each claim or defense    on which summary judgment is sought. The

> court shall grant summary judgment if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter
> of law.

Fed. R. Civ. P. 56(a).   Rule 56(e) provides in relevant part that "[i]f a party fails to properly support

an assertion of fact or fails to properly address another party's assertion of fact as required by Rule

56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [and] grant

summary judgment if the motion and supporting materials - including the facts considered

undisputed - show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

Summary judgment is appropriate when no genuine issues of material fact exist and the

moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v.

UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).   The burden of showing the absence of any

genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those
> portions of "the pleadings, depositions, answers to interrogatories, and admissions
> on file, together with affidavits," if any, which it believes demonstrates the absence
> of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will

affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct.2505,

91 L.Ed.2d 202 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-

moving party.  The court must afford all reasonable inferences and construe the evidence in the light

most favorable to the non-moving party.  *Cox v. Kentucky Dep't. of Transp*., 53 F.3d 146, 150 (6th

Cir. 1995) (citation omitted); *see also United States v. Hodges X  Ray, Inc*., 759 F.2d 557, 562 (6th

Cir. 1985). However, the non-moving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox,* 53 F.3d at 150.

Summary judgment should be granted when a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249 50 (citation omitted).

An unusual situation is created when cross motions for summary judgment are filed. As the Sixth Circuit has explained, the reviewing court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 592 (6th Cir. 2001)(citing *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 241 (6th Cir. 1991).). Accordingly, "if it is possible to draw inferences in either direction, then both motions for summary judgment should be denied." *Champion Foodservice, LLC v. Vista Food Exchange, Inc.,* 1:13-CV-1195, 2016 WL 4468001 at *4 (N.D. Ohio Aug. 24, 2016) (citing *B.F. Goodrich Co.,* 245 F.3d at 592-593).

## IV. Analysis

### A. Violation of Title VII for Retaliation Against a Protected Activity

Dundee seeks summary judgment on his claim alleging retaliation against a protected activity in violation of Title VII.  He asserts that the June 26, 2017, "Final Step Warning" Corrective Action which he received is clearly related to the "threats of retaliation issued on [August 5, 2016], as well as . . . the protected activity, the sexual harassment charge of [June 26, 2016]."  (Doc. No. 31 at 16.) In addition, he asserts that this Court erred in its earlier Order dismissing all claims based on events occurring prior to September 13, 2016, as time-barred, reiterating his earlier assertion that "the time limit according to the EEOC is waived, since claims of harassment, once filed, go from the most recent claim, back to the beginning of harassment against the employee."  (*Id*. at 18.)

UH also seeks summary judgment on Dundee's retaliation claim.  UH argues that none of the conduct in this case rises to the level of a materially adverse action sufficient to support a Title VII retaliation claim. (Doc. No. 43 at 13.)  UH argues in the alternative that the temporal proximity of Dundee's June 2016 complaint and his June 2017 Corrective Action is not sufficient to create an inference of causation.  (*Id*. at 16.)  Therefore, even if this Court believes there is a genuine issue of material fact whether an adverse employment action occurred, UH asserts that Dundee has failed to show a causal link between the alleged adverse employment actions and the sexual harassment complaint.  (Doc. No. 44 at 3-4.)  In sum, UH argues that Dundee has presented no direct or indirect evidence to support his claim of retaliation, and summary judgment should be granted.  (*Id*. at 19.)

Title VII prohibits employers from retaliating against a person for opposing or reporting discrimination. 29 U.S.C. § 623(d), 42 U.S.C. § 2000e-3(a). Ohio law contains a similar prohibition. Ohio Rev. Code § 4112.02(I). To establish a *prima facie* case of retaliation under either federal or

-13-

Ohio law, a plaintiff must show (1) he engaged in a protected activity, (2) the defendant was aware plaintiff had engaged in such activity, (3) defendant took an adverse employment action against plaintiff, and (4) a causal connection between the protected activity and the defendant's adverse action. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012). *See also DePalma v. Sec'y of Air Force*, 754 F. App'x 321, 329 (6th Cir. 2018). A plaintiff cannot "invoke the protections of the Act by making a vague charge of discrimination." *Blizzard*, 698 F.3d at 288. Sixth Circuit case law explains that a causal connection is established when the plaintiff "proffer[s] evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (*quoting E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) ).

Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000). The plaintiff must then show the defendant's proffered reason is pretextual and "the real reason for the employer's action was intentional retaliation." *Imwalle v. Reliance Medical Products, Inc*., 515 F.3d 531, 544 (6th Cir. 2007).

For the purposes of Summary Judgment, UH does not dispute that Dundee's sexual harassment claim constitutes "protected activity,' and that UH knew of this claim. (Doc. No. 31 at 12; Doc. No. 43 at 13.) Therefore, this analysis begins with the third element of a retaliation claim: whether UH took a materially adverse action against Dundee. In order to establish a *prima facie* case, Dundee need only show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714,

719 (6th Cir. 2014), *quoting Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

Dundee identifies two instances of what he asserts was retaliatory conduct: first, he asserts UH threatened to take adverse action against him at a meeting on August 5, 2016; and second, he asserts UH actually took "retaliatory, adverse action" against him at the June 26, 2017 meeting where he was issued a "Final Written Warning" Corrective Action, and referred for EAP counseling. (Doc. No. 31 at 16; Doc. No. 43-33 at 19.)  He testified that, at the August 5, 2016 meeting, Glowszeski and Lynce threatened to fire him if his allegedly inappropriate behavior continued, and Lynce made a retaliatory "promise of increased scrutiny going forward." (Doc. No. 43-33 at 10-13.) The June 2017 Corrective Action noted comments made by Dundee which UH characterized as "disparaging" and identified as "inconsistent with our value of Diversity, and expectations set forth in [our] Professional behavior Policy and our Code of Conduct." (Doc. No. 31-7 at 1.)  In the "Action Plan" section, it stated:

> Frank, as part of the action plan, UH is mandating a referral to the Employee Assistance Program.  You are responsible for contacting the EAP . . . . Failure to follow up with EAP in the required timeframe can result in further disciplinary action up to an [sic] including termination.
>
> Please be aware that additional violations of policy or failure to meet performance expectations will result in corrective action up to and including termination.

(*Id*. at 2.)

### 1. Adverse Employment Element of a Title VII Claim

Neither the warnings given at the August 2016 meeting nor the June 2017 Corrective Action constitute retaliatory conduct.  Both included a threat of termination and promise of increased scrutiny.  As UH noted, "it is settled in this circuit that a threat to discharge is not an adverse

employment action." *Plautz v. Potter*, 156 F. App'x 812, 817 (6th Cir. 2005);[4] *see also  Russell v. Geithner*, No. 2:09- CV-00975, 2012 WL 5497769, at *11 (S.D. Ohio Nov. 13, 2012), *aff'd sub nom. Russell v. Lew*, 549 F. App'x 389 (6th Cir. 2013) ("threats [to terminate employment] cannot qualify as adverse employment actions"); *Pozsgai v. Ravenna City Sch. Bd. of Educ.*, No. 5:10CV02228, 2012 WL 1110013, at *7 (N.D. Ohio Mar. 30, 2012) ("alleged 'threat' suggesting that Plaintiff would be terminated cannot be said to be a material adverse change in the terms and conditions of Plaintiffs employment").  Similarly, to the extent the Corrective Action put Dundee on notice that his interactions with co-workers would be subject to increased scrutiny, this too is not a material adverse action under Sixth Circuit jurisprudence.  *See Birch v. Cuyahoga Cty. Prob. Court*, 392 F.3d 151, 169 (6th Cir. 2004) ("The only other retaliatory conduct to which [plaintiff] points with any specificity is increased scrutiny of her work, but such actions also are not tantamount to adverse employment actions."), *citing Allen v. Mich. Dep't of Corrections*, 165 F.3d 405, 410 (6th Cir. 1999).

Dundee asserts that an adverse employment action is "virtually anything that would deter a reasonable person in the Plaintiff's shoes from engaging in protected activity" and thus "just about anything bad" will satisfy this element of a Title VII complaint.  (Doc. No. 31 at 13.)  This is incorrect.  To satisfy the adverse employment element of a Title VII claim, a plaintiff must designate evidence showing that, as a result of a decision by the defendant, he suffered "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

---

[4] *Plautz* addresses material adverse employment actions in the context of a claim of retaliation under the Rehabilitation Act, however, the analysis under Title VII is the same. *Lyons v. Donahoe*, No. 3:14-CV-21, 2016 WL 3667648, at *6 (S.D. Ohio July 1, 2016).

different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also EEOC v. SunDance Rehab. Corp*., 466 F.3d 490, 501 02 (6th Cir. 2006).  No such significant change in employment status is asserted here.  Dundee does not assert that he sought promotion, it is undisputed he was not restricted from performing his job duties in any way, and he remains employed by UH with the same duties and at the same rate of pay and benefits[5] that he had prior to the meeting.  (Doc. No. 43-20 at ¶17; Doc. No. 43-33 at 22.)  He argues briefly that the "indignities inherent in [the EAP referral]" amount to a constructive termination, but the record shows Dundee did not feel the need to "resign or be terminated."[6]  (Doc. No. 31 at 24.)

There is no dispute regarding the facts material to this claim.  Here, the parties disagree on how the law applies.  Summary judgment should be granted when the party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995).  Without a materially adverse employment action, Dundee cannot establish an essential element of his claim of claim of retaliation under Title VII, and therefore UH is entitled to summary judgment on this claim.

## 2. Causal Link Between Protected Act and Alleged Retaliation

UH argues, in the alternative, that it is entitled to summary judgment on the ground that Dundee failed to establish a causal link between his sexual harassment claim and the Corrective

---

[5] UH asserts that Dundee has received raises commensurate with other similarly situated employees since that time, and Dundee does not dispute this.  (Doc. No. 43 at 14.)

[6] He further suggests that the "humiliation" of a referral to EAP counseling "might trigger thoughts of suicide in susceptible individuals," suggesting he misunderstands the nature and purpose of such counseling.  (Doc. No. 31 at 24.)

Action.  (Doc. No. 43 at 16.)  Assuming, *arguendo*, that the June 2017 Corrective Action was an adverse employment action sufficient to constitute a retaliatory act, UH is still entitled to Summary Judgment on this claim.

It is undisputed that there is no direct link between Dundee's June 2016 sexual harassment complaint and the June 2017 Corrective Action.  Instead, Dundee argues that the temporal proximity of his sexual harassment claim and the alleged retaliatory conduct establishes the causal link required by Title VII.    He acknowledges that UH "waited months after the meeting on 8/5/2016, to file an adverse employment action against the Plaintiff on the one-year anniversary date of the Plaintiff's filing of sexual harassment charges on 6/26/2016 against Ms. Lerman."  (Doc. No. 31 at 16.)  However he asserts that this one-year gap between the protected act and the alleged retaliation "does not nullify the causal link to prove retaliation," because the "vitriolic threats of increased scrutiny, corrective action and termination"  made at the August 5, 2016 meeting made any time limit "irrelevant" to demonstrating temporal proximity.[7]  (*Id*. at 17.)

UH responds by pointing out that Dundee made his initial sexual harassment complaint the day after Lerman issued a Corrective Action, and puts forth evidence showing that this was part of a pattern of behavior on Dundee's part.  (Doc. No. 43 at 16.)  He repeatedly filed grievances - either EEOC Charges or Internal Complaints - after receiving Corrective Actions.  (*Id*.)  UH also cites copious caselaw supporting the proposition that a delay of a year between a protected activity and an adverse employment action is too great to create an inference of causality.  (*Id*. at 17.)

The Sixth Circuit has held that temporal proximity between a protected activity and an

---

[7]  This argument - that the interval between the two events is somehow irrelevant to establishing a causal connection based on temporal proximity - seems to concede UH's point that the one-year gap is too great to support such a finding.

adverse employment action is sufficient to create an inference of a causal connection, but only when the two events occur very close in time.  As the Sixth Circuit explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525-26 (6th Cir. 2008).

In our case, the two events did not occur close enough in time for their temporal proximity to create an inference of causality.  The timing of Dundee's grievances instead suggests the inverse of the causal relationship he needs to prove: it creates the inference that UH's Corrective Actions caused Dundee's complaints.  Nor does Dundee proffer other evidence of retaliatory conduct to establish causality.  Dundee has failed provide direct or indirect evidence that the Corrective Action was caused by his EEOC complaint, and causation is an essential element of a Title VII retaliation claim.   Thus, even if the June 2017 Corrective Action constitutes an adverse employment action, UH is entitled to Summary Judgment on this claim.

**B.  ADA Violation**

Dundee alleges that UH violated the ADA when his supervisors gave him a mandatory referral to EAP counseling.  (Doc. No. 31 at 18.)  He asserts that the referral was a *prima facie* violation of the law, as it required him to undergo a medical examination that it was neither job-related nor consistent with business necessity.  (*Id*.)  Therefore, he seeks summary judgment on this claim.

UH also seeks summary judgment on Dundee's ADA claim, asserting he has failed to

establish two essential elements of the claim.  First, UH asserts that the required EAP counseling was not a medical examination.  (Doc. No. 44 at 5; Doc. No. 43 at 18-19.)  Second, UH argues the counseling was job-related and consistent with business necessity, and therefore would be permissible under the ADA even if the Court believes there is a genuine issue of material fact regarding whether it constituted a medical examination.  (*Id*.)

The ADA prohibits employers from requiring medical examinations of an employee unless the examination is job-related and consistent with business necessity.  In relevant part, the ADA states:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C.A. § 12112 (West 2009). The Sixth Circuit explained that what constitutes a "medical examination" or "disability inquiry" under  42 U.S.C. § 12112(d)(4) sometimes "presents a close question because the ADA leaves these terms undefined."   *Bates v. Dura Auto. Sys., Inc*., 767 F.3d 566, 573 (6th Cir. 2014).  Presented with this ambiguity, the Sixth Circuit looked to the EEOC's enforcement guidance, which defines "medical examination" and "disability-related inquiry" and offers examples, explaining "[w]e defer to these informal administrative interpretations 'to the extent of [their] persuasive power,' *E.E.O.C. v. SunDance Rehab. Corp*., 466 F.3d 490, 500 (6th Cir. 2006) (*citing Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)), acknowledging that our previous cases recognize their 'very persuasive authority.'" *Id.* (citation omitted).

> The relevant EEOC guidance defines "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health," and identifies several factors bearing on this determination:
>
> > (1) whether the test is administered by a health care professional; (2)

-20-

whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.

*EEOC, Enforcement Guidance: Disability Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* Part B.2 (July 27, 2000) (hereinafter "DRI & ME Guidance"), available at http://www. eeoc.gov/policy/docs/guidance-inquiries.html. "In many cases, a combination of factors will be relevant in determining whether a test or procedure is a medical examination," but in others "one factor may be enough." *Id.*

*Id.* at 574-57.  The DRI & ME Guidance list a number of examples, including one that is relevant here: "psychological tests that are designed to identify a mental disorder or impairment."  DRI & ME Guidance, Part B.2.  The DRI & ME Guidance also lists examples of procedures and tests which are generally not considered medical examinations, including "psychological tests that measure personality traits such as honesty, preferences, and habits."  *Id.*

Further, as the Sixth Circuit explained, establishing that an employer mandated a medical examination is not the end of the inquiry, because:

The statute clearly permits medical examinations, but only in certain limited circumstances. The focus is on the nature of job relatedness and what constitutes a business necessity. The interpretative guidelines to the ADA explain that the statute was intended to prevent against "medical tests and inquiries that do not serve a legitimate business purpose." 29 C.F.R. § 1630.13(b) App. (1996).

*E.E.O.C. v. Prevo's Family Market, Inc*., 135 F.3d 1089, 1094 (6th Cir. 1998).

The threshold  inquiry in this case is whether the referral for EAP counseling resulted in a medical examination.  Neither party cited Sixth Circuit authority on this point.  UH points to a case from the Eight Circuit, *Jenkins v. Medical Laboratories*, which has a similar factual scenario.  In *Jenkins*, the plaintiff was referred to mandatory EAP counseling because of her ongoing disputes

-21-

with co-workers.[8]  *Jenkins v. Med. Labs. of E. Iowa, Inc*., 880 F. Supp. 2d 946, 960 (N.D. Iowa 2012), *aff'd*, 505 F. App'x 610 (8th Cir. 2013).  The plaintiff in *Jenkins* argues that the counseling she received due to her referral violated the ADA because it constituted "mental health counseling." *Id*.  The court rejected this argument and held:

> the required EAP counseling was dispute resolution counseling intended to understand and resolve the personality conflicts occurring at the Marion location. This type of counseling does not fall under the ADA's prohibition on medical examinations and "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability." 42 U.S.C. § 12112(d)(4)(A).

*Id*.  The court therefore granted the defendant summary judgment on this claim, noting the plaintiff "failed to set forth facts establishing that she was sent to EAP counseling due to a perceived disability or that any aspect of EAP counseling qualifies as an action prohibited by the ADA."  *Id.*

In our case, UH specified that Dundee's EAP referral was for "conflictive work relationships." (Doc. No. 43-23.)    UH has produced emails and other records showing that co-workers informed superiors that Dundee's behavior upset and intimidated them, and Dundee acknowledges having a conflictive relationship with his supervisor, Lerman.  (Doc. No. 43-2 at ¶¶ 22-23, 36; Doc. No. 43-15.)  Therefore, the evidence supports UH's documented rationale for the referral.  As the *Jenkins* court noted, personality conflicts are not inherently indicative of a disability, and seeking to resolve those conflicts through counseling is a permissible use of EAP under the ADA.  It is undisputed that neither of the counselors Dundee saw - David Riccardi and Jill Fulton - performed physiological or psychological testing.  (Doc. No. 43-33 at 37; Doc. No. 43 at 21-22.)

---

[8]  The *Jenkins* court noted the plaintiff's co-workers were also referred for mandatory EAP counseling in that case.  Neither party here has proffered evidence regarding whether the colleagues with whom Dundee had "conflictive work relationships" were also referred for counseling.

Further, both counselors aver that they were not seeking to identify any mental disability.  (Doc. No. 43-31 at ¶7; Doc. No. 43-30 at ¶7.)  However, as Dundee emphasizes, and UH acknowledges, at the end of his session with Riccardi, Dundee was presented with a "Compliance Contract," which stated that Dundee was required to "attend evaluation with [a psychologist], follow recommendations, [and] follow up with EAP as scheduled."  (Doc. No. 31-12 at 1.)  While UH describes this as a "suggestion," the Compliance Contract informed Dundee that "non-compliance may result in corrective action up to and including discharge."  (Doc. No. 43 at 23; Doc. No. 31-12 at 1.)

Had the psychiatric evaluation occurred, UH acknowledges that this would have been "reasonably viewed as having a 'diagnostic purpose,' which is a primary factor emphasized in the EEOC Guidance."  (Doc. No. 43 at 23.)  The psychiatric evaluation might have qualified as a medical examination,[9] necessitating the further consideration of whether it had a permissible purpose under the ADA. However, when Dundee informed UH that he believed this would constitute an impermissible medical examination, they dropped this requirement, and, as previously noted, took no action against him.  (Doc. No. 42-33 at 20.)  Throughout his briefing, Dundee asserts that UH required this psychiatric evaluation, and places great weight on the fact that this element of the Compliance Contract was never formally rescinded.  (*Id*.)  This overlooks the fact that UH responded appropriately to Dundee's reasonable concern, no medical examination took place, and no adverse action was taken against Dundee.  Unlike the plaintiffs in the cases that Dundee cites, he was not barred from returning to work, nor was he limited in his duties until the examination was completed.  Further, there is no evidence that Dundee ever asked for a formal recision of this

---

[9]  Since the evaluation never occurred, and neither the purpose nor the nature of the evaluation was stated on the Compliance Contract, this Court lacks the facts required to establish whether it would have met this standard.

requirement, and by substituting a follow-up session with counselor Fulton, UH resolved the issue. Without a medical examination, Dundee cannot establish an essential element of the alleged ADA violation, and therefor UH is entitled to summary judgment on this claim.

## C. Discrimination Based on Perceived Disability

Dundee's third claim alleges disability discrimination and harassment in violation of Title I of the ADA.  He notes that UH's Policy and Procedure HR-85 ("HR-85") provides for "Mandatory Referral" to EAP as a response to supervisor concerns.  He asserts that he is entitled to summary judgment on this claim because "it is implicit of any reasonable reading" of HR-85 "that the employee is 'perceived' or 'regarded' as disabled by the immediate supervisor."  (Doc. No. 31 at 23.)

UH responds that this interpretation of HR-85 is "inaccurate and unsupported by the evidence," because the mandatory referral is based on an employee's conduct, not a diagnosis of its underlying cause.  (Doc. No. 44 at 10.)  Further, UH asserts that it is entitled to summary judgment because Dundee has failed to establish that anyone at UH perceived him as disabled,[10] which is an essential element of this claim.  (Doc. No. 43 at 25.)

The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

4 42 U.S.C. § 12112(a) (2001).  To establish a *prima facie* case of discrimination under the ADA,

---

[10]  Dundee acknowledges having a physical disability, an upper motor neuron disease called hereditary spastic paraplegia, but testified that his claims in this lawsuit do not relate to that disability.  (Doc. No. 43-33 at 3.)  Therefore, when discussing the "perceived disability" claim, this Court, like the parties, is referring to a perceived mental disability.

a plaintiff must show (1) that he is "disabled" within the meaning of the ADA, (2) that he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) that he suffered an adverse employment action because of the disability. *Henderson v. Ardco, Inc*., 247 F.3d 645, 649 (6th Cir. 2001).

An individual who does not have an actual disability can still be "disabled" within the meaning of the ADA if he is "regarded as having such an impairment." 42 U.S.C. § 12102(2).  An individual is "regarded as" having a disability if "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  *E.E.O.C. v. DaimlerChrysler Corp*., 111 F. App'x 394, 398  99 (6th Cir. 2004), *quoting Sutton v. United Air Lines, Inc*., 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

In order to establish a *prima facie* case of "regarded as" disability discrimination under the ADA, a plaintiff must show that his employer regarded him as disabled within the meaning of the ADA; he is otherwise qualified to perform the requirements of his job, with or without reasonable accommodation; and he suffered an adverse employment action solely because of the perceived disability.  *Pena v. City of Flushing*, 651 F. App'x 415, 419 (6th Cir. 2016).

As discussed *supra*, Dundee has not demonstrated that he suffered a material adverse employment action in this case.  Further, he has proffered no evidence showing that any UH representatives regarded him as disabled.  In contrast, UH has provided testimony from all of its representatives in this case that they did not regard Dundee as mentally disabled, and were never informed that colleagues suspected or perceived any such disability.  (Doc. No. 43-2 at 9-10; Doc.

No. 43-20 at 5; Doc. No. 43-29 at 2; Doc. No. 43-30 at 1; Doc. No. 43-31 at 2.)  Therefore, Dundee

has failed to establish an essential element of the claim of Title I disability discrimination based

upon a perceived disability, and UH is entitled to summary judgment on this claim.

### V.  Conclusion

Accordingly, and for all the reasons set forth above, it is recommended that Plaintiff's

Motion for Summary Judgment be DENIED, and Defendant's Motion for Summary Judgment be

GRANTED as to all claims.


Date:   June 26, 2020                              s/ *Jonathan D. Greenberg*
                                                   JONATHAN D. GREENBERG
                                                   U.S. MAGISTRATE JUDGE


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**