**UNITED STATES DISTRICT**

**COURT NORTHERN DISTRICT**

**OF OHIO EASTERN DIVISON**

FILED

JUL 1 3 2020

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

| | | |
|---|---|---|
| FRANK DOMINIC DUNDEE | ) | CASE NO.  1:19 CV 01141 |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| UNIVERSITY HOSPITALS | ) | |
| CORPORATION, et al., | ) | PLAINTIFF'S OBJECTION TO THE |
| Defendants. | ) | MAGISTRATE JUDGE'S REPORT |
| | ) | AND RECOMMENDATION |
| | ) | (Doc. No. 31, 43) |

There are three general standards of judicial review: questions of law, questions of fact, and matters of procedure or discretion.  The Plaintiff's objection to His Honor's (Magistrate Judge Greenberg) Report and Recommendation will focus on questions of law and questions of fact, as the report's recommendation that Plaintiffs' Motion for Summary Judgement be denied rests on numerous factual mistakes and errors of law.

1

## ARGUMENT

Any reasonable person examining His Honor's report will see a theme emerge early and be repeated often.  In spite of the fact that Dundee has had a distinguished, 44 year, career in hospital pharmacy, His Honor's report portrays Dundee as a "malcontent," looking for the smallest excuse to run to UH Compliance, the EEOC, OSHA or the Ohio Civil Rights Commission.*  In this report, His Honor fails to see UH as a corporate entity running amok by rolling over its employees and violating their rights on a regular basis.  His Honor also does not see Dundee as the one employee, out of 28,000, the experience in employee rights from 20 years' experience in a collective bargaining unit and having the courage to stand up against the UH juggernaut.  His Honor also fails to see Dundee as a husband, father of two sons, defending himself against forces that threaten his livelihood and therefore the welfare of his family.  *In fact, His Honor's comments on this point were first stated at the in-person status conference on December 2, 2020.  These comments caused Dundee to refute His Honor's characterization by pointedly telling His Honor, three times, that he was not a "malcontent."  This incident was witnessed by Defense counsel, Doni Bulea and His Honor's term clerk, Martha Rodenborn, who was taking notes.*

His Honor seems to have bought into the false narrative created by the Defendants that paints Dundee as a "bad actor" in the workplace, when, in point of fact, Dundee is the most popular and best pharmacist at UH Geauga Medical Center among the nursing staff and among his peers.  His Honor seemingly ignores Dundee's scrupulous documentation, accumulated over years while enduring a hostile workplace environment, that show the demonstrable falsity and pretext hiding in plain sight.  One has to look no further than the UH Position Statement to the EEOC charge written by Defendant Lynce for the evidence of pretext:

2

- "Ms. Lynce never mentions the critical meeting of 8/5/2016* in the Position Statement, in which the Plaintiff was threatened as a method of retaliation for filing a charge of sexual harassment on 6/26/16." *The meeting of 8/5/2016 was set up by Jason Glowsczewski **under the pretext** that it was a meeting to discuss the sexual harassment investigation.

- "Most damning of all is that Ms. Lynce states, "It is unclear to UH what 'protected activity' Mr. Dundee references in his Charge, but UH has upheld our policies and procedures according to law." What "protected activity" indeed; there is only one "protected activity" that resides in the Plaintiff's personnel file at UH and that would be the relatively recent sexual harassment charge filed with HR on 6/26/2016. Considering Ms. Lynce starts her list of infractions back to October, 2013, a reasonable person would think the "protected activity" might have bit her on the nose as she thumbed through the file."

Ms. Lynce continued her pretext with false testimony in the UH Position Statement when she claimed that it was fellow HR representative, Rebecca Besselman, who took offense at the innocuous phrases, "You're a good kid," "He's a pup with little experience," and "A nice boy, but..," when, in point of fact it was Ms. Lynce and Ms. Lerman who were complicit in scrutinizing Dundee's emails for any excuse to put him into corrective action within the one year limit under UH policy. *The one-year limit was even a pretext since Dundee's last corrective action occurred on 6/14/2016.

The Court, and any reasonable person, would find it remarkable that the UH Position Statement was never mentioned in His Honor's Report and Recommendation. The evidence of pretext in Ms. Lynce's writing of the Position Statement should color His Honor's view of all the

3

manufactured corrective actions against Dundee as pretextual and false.  Yet, His Honor's report

paints a damning picture of Dundee, while glossing over the pretextual retaliation of the

Defendants.

Dundee suffered "adverse employment action" having to endure a hostile work environment.

The employer, UH, is clever to twist the law to protect itself and not as it was intended, to protect

the employee.  His Honor in his report, is complicit in this Orwellian reversal, contending that

the employer can threaten the employee with discharge and to try to force the employee to resign

or be terminated for failure to comply with a mandated discipline.  His Honor contends that

having to work under constant threat of termination through pretextual corrective actions,

increased scrutiny and surveillance is not an adverse action leading to a hostile work

environment, from which every employee is afforded protected under Title VII.

His Honor espouses a significantly narrower view of what constitutes an "adverse

employment action" than Congress intended when it wrote Title VII and that the Court has

affirmed.  However, even if the Plaintiff agreed with His Honor's narrow view of "a significant

change in employment status, such as hiring, firing, failing to promote," UH committed a

materially adverse action, in violation of Title VII, with the pretextual retaliation against the

Plaintiff in the corrective action of 6/26/17.  In a deposition given to Defense Attorney Rachael

Israel, on March 10, 2020, the Plaintiff stated that UH policy on Corrective Action prohibits the

disciplined employee from bidding on any lateral or promotional positions, throughout the entire

University Hospitals organization, for a period of one year from issuance of the corrective action.

So for the 12 month period following the pretextual corrective action on 6/26/17, Dundee was

prohibited to bid on a lateral transfer to another hospital in the UH system, nor could he advance

4

his career and salary by bidding on any open positions that would have been a promotion in status.

As UH did here, employers will almost always provide a nondiscriminatory reason for the adverse employment action, and thus the plaintiff must attempt to demonstrate that the reason given is unworthy of credence or that unlawful discrimination more likely motivated the employer.  The Supreme Court decided almost 10 years ago that "adverse employment action" was virtually anything that would deter a reasonable person in the plaintiff's shoes from engaging in protected activity.  In plain English, that means "just about anything bad," as long as it isn't really trivial.  A formal discipline counts as an adverse employment action.  Micromanagement, and especially scrutiny/surveillance of work performance (as threatened by Ms. Lynce and Mr. Glowczewski in the critical meeting of 8/5/2016) or attendance, count as adverse employment actions.

His Honor disagrees with that assessment, instead arguing that Dundee suffered no termination or change to his working conditions, therefore he suffered no adverse employment action.  His Honor does not view the outrageous reasons for the corrective action on 6/26/2017, as a retaliatory pretext to either cause Dundee to resign before submitting to the humiliation of a mandated psychiatric examination with EAP Counseling or to be terminated for refusing to submit.

His Honor reaches conclusions that are not supported by the facts or the law regarding what counts as a medical examination under the ADA*, what counts as "perceived disability,  what is a legitimate business purpose/necessity and what counts as retaliation and materially adverse action under Title VII.  Even though both the Plaintiff and the Defense filed motions for Summary Judgement, and each should be viewed in the "most favorable light" of the non-

5

moving party, any reasonable reading would be hard-pressed to find balance in His Honor's report, as the Defense's arguments seem to be viewed by His Honor in the "most favorable light."

*His Honor does not see EAP Counseling as a medical examination, where in case after case, the Court has defined EAP Counseling as a medical examination.*

In Burlington Northern & Santa Fe Railway Company v. White (No. 05-259), the key question before the high court was what constitutes an "adverse employment action" under the anti-retaliation provision of Title VII of the Civil Rights Act of 1964. This is the key which His Honor ignored:  In upholding the jury's verdict in favor of the employee, the Court first held that the anti-retaliation provision "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace."  According to the Court, "[a] provision limited to employment-related actions would not deter the many forms that effective retaliation can take."  Thus, the Court rejected the standard applied by the Courts of Appeals that limited actionable retaliation to so-called "ultimate employment decisions."  This is where His Honor's augment fails.

An employee, like Dundee, has the courage to report what they reasonably believe is discrimination or harassment against them. Now it is the employers turn to act responsibly or unlawfully.  The employer has committed an unlawful action if they choose to fire, demote or transfer a worker based on a violation of that employees protected rights.  Firing, demoting or transferring an employee are obvious and extreme actions.

However, unscrupulous employers will use other subtle methods when dealing with employees who assert their rights against the company's corrupt and harmful actions.  Corrupt

6

employer negative actions are violations if they make an employee's task and activities more difficult.  Reprimanding a worker for informing human resources, legal representatives, counselors, managers, authorities or the EEO about discrimination, prejudice or harassment in the workplace is exactly what the Plaintiff experienced and is illegal.

Often, the reason an employer gives you for an adverse employment action just doesn't make sense. For example, an employer tells an employee that she didn't get a promotion because "you don't have enough experience managing others," but then she learns that the person selected has never before been a supervisor.  Such "weaknesses, implausibility's, inconsistencies, incoherencies, or contradictions in the employer's reason for its action" may be used as circumstantial evidence to show that the employer's stated reason for its decision is not the real reason.  Similarly, if your employer gives a reason which the employee knows to be false, such as in the UH Position Statement, that evidence can be used to prove that the real reason was unlawful discrimination.

His Honor ignores the fact that disclosing an employee's confidential information can be an adverse action.  In preparation for the pretextual, critical meeting of 8/5/16, Defendant Lynce removed and reviewed Dundee's personnel files without permission and without good reason. Dundee's files were piled on Ms. Lynce's desk, as she read lines out of context in order to threaten and intimidate the Plaintiff.   All of those replies and addendums to Dundee's evaluations and corrective actions are the right of every UH employee under UH policy and procedure.  Dundee wrote those replies and addendums in order to place them in the record.  All of the documents that Ms. Lynce was reading from were years old; if they merited corrective action, which they did not, the action should have been timely to the comment and taken place years earlier.

7

While "petty slights, minor annoyances, [or a] simple lack of good manners" may not automatically count as a deterrence, if the employer's conduct taken as a whole might deter a reasonable person from engaging in protected activity, the materially adverse action standard will be met. Burlington, N. & S. F. R. Co. v. White, 548 U.S. at 68. Suspensions and terminations "are by their nature adverse" actions; for less severe actions, courts ask whether a reasonable person could be deterred from engaging in a protected activity. See Roberts v. Roadway Express, Inc., 149 F.3d 1098, 1104 (10th Cir. 1998), rejecting an employer's argument that written warnings had no adverse effect on the terms and conditions of employment because of a nine-month term on the warnings' validity, when the record indicated that the more written warnings received by an employee, the more likely they were to be terminated for a further infraction. This is exactly where UH took the Plaintiff when they wrote him up for demonstrably false reasons on 6/26/2017.

The key take-away is that few cases have the so-called "smoking gun" evidence of unlawful motive *(The Besselman emails are the "smoking gun" in the Plaintiff's compliant)*, but by looking at all of the circumstances – the whole picture – the Plaintiff, Dundee, has been able establish his claim. His Honor has chosen to narrow his focus so that his report ignores the evidence of unlawful motive on the part of the Defendants.

As previously stated, His Honor's report ignores the "pretextual retaliation" that UH has employed against the Plaintiff. What is pretext? The Merriam-Webster Dictionary defines pretext as "a purpose or motive alleged, or an appearance assumed in order to cloak the real intention or state of affairs." Pretext is essentially a false reason given for an adverse employment action that covers up the employer's true motives.

8

There are many ways an employee can show pretext, but it is most typically done by poking holes in the employer's asserted reason for an adverse material action in such a way that a judge or jury can (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Importantly, once the employee has established sufficient pretext evidence, a judge or jury can infer a discriminatory motive, even without additional evidence of bias.  For example:

## VARYING STATEMENTS AND INCONSISTENT EVIDENCE:

This is illustrated in the Third Circuit Court of Appeals' recent decision in Cullen v. Select Medical Corp., No. 18-2912 (3rd Cir. August 22, 2019).   A plaintiff can also show the defendant's proffered reason is pretextual and "the real reason for the employer's action was intentional retaliation." Imwalle v. Reliance Medical Products, Inc., 515 F.3d 531, 544 (6th Cir. 2007).

In Jolly v. Northern Telecom Inc., 766 F. Supp. 480, 493-94 (E.D.Va. 1991) , the court held: "Although the defendant then offered a multiplicity of reasons to justify its action, the plaintiff had little trouble proving that none of these explanations was worthy of any credence. To be sure, Jolly did not have too onerous a task, as the defendant's various personnel told so many stories, so totally inconsistent with each other, that they had lost all credibility by the conclusion of the proceedings. Put simply, NTI took more positions than a gymnast on a trampoline." The demonstrable falsity of the explanation can give rise to an inference that the employer is dissembling to cover up an ulterior purpose.

In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000); see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may ... suffice to show intentional discrimination.")

In Stratton v. Dep't for the Aging for New York, 132 F.3d 869, 880-81 (2d Cir. 1997) (holding that evidence of an employer's false explanation for employment action supported the jury's finding of unlawful pretext).

In the case before the Court, the demonstrable falsity of the UH's actions could not be more clear...a final step warning for writing three phrases that no reasonable jury would find offensive or against workplace diversity...it was a means to an end...to be able to get Dundee to the final step warning, fulfilling the promised threats issued by DL on 8/5/16, thus connecting the retaliation to the protected activity of 6/26/2016, a charge of sexual harassment.

A De Novo review of the Plaintiff's Motion for Summary Judgement has numerous, solid examples demonstrating that the Defendant's explanations for their actions lack all credibility and credence, despite the fact that His Honor's report seems to indicate otherwise.

## DISBELIEF OR MENDACITY:

St. Mary's Honor Center v. Hicks: "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." His Honor should have demonstrated disbelief at the Defense's retaliatory pretext for the outrageous

10

mendacity shown by the Defendants by their actions on 8/5/2016 and 6/26/2017, as delineated in the Plaintiff's Motion for Summary Judgement.

## LYING IN WAIT:

Hamilton v. General Electric: "We have held that when an employer … waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext."

The Plaintiff's Motion for Summary Judgement exposes how the Defendant's waited for any reason to materialize in order to retaliate against Dundee; the outrageous reason for the Final Step Warning, on 6/26/17, that mandated Dundee into illegal medical examinations, constitute the very definition of pretext.

## PLAINTIFF'S PERFORMANCE HISTORY:

Smith v. Davis: "While absenteeism may have been what defendants had in mind when they terminated him, there is a genuine issue as to whether this reason was legitimate or pretextual, particularly since there is evidence that Smith performed his duties to the apparent satisfaction of his supervisors for over six years and carried a case load substantially higher than his coworkers."

Watson v. Nationwide Insurance: "Nationwide subjected Watson to differential treatment … by conspiring to create trumped up charges of inadequate job performance …. Watson had previously always received excellent employment ratings …."

11

Kalinoski v. Gutierrez: "Given the uncontroverted evidence of plaintiff's stellar performance reviews, her substantial experience, and her score relative to Mr. Flynn on the objective qualifications evaluation — along with the different rationales offered by defendant for this action as compared with the closely related reassignment action — the Court concludes that plaintiff has come forward with enough evidence to create a genuine issue of material fact about whether defendant's proffered rationale was the real reason defendant declined to select plaintiff for the position."

Causes of Action 2d, Cause of Action under Age Discrimination in Employment Act §24 (2013): "[E]vidence of satisfactory or superior performance evaluations ... may tend to show ... the illegitimate nature of the defendant's articulated reason."

Dundee's performance history at UH is stellar, by any standard. It is verified by his colleagues and fellow staff. His Honor seems to put emphasis onto two corrective actions taken against Dundee for tardiness in order to bolster the Defense's false characterization of Dundee as a problem-child. Dundee was late due to the fact that he is afflicted with upper-motor-neuron disease, which causes him difficulty in getting ready for work, as well as great difficulty with bodily functions, specifically urination and defecation. He explained this to Ms. Lynce and Ms. Lerman. Dundee never had a specific diagnosis for his affliction until the winter of 2018, at which time he learned, through genetic testing, that he has a rare disease, Hereditary Spastic Paraplegia.

His honor also seems to put emphasis on a complaint by person's unknown, that stated:

*"I have had repeated problems with Frank in Pharmacy. I have spoken to you about him before. He has no level of patience. He speaks to me and others in a very disrespectful and unprofessional manner. He will yell and scream uncontrollably. It does not matter if you are on*

12

*the phone or speaking with him in person, he has a very angry personality. I have the right to work in a hostile free environment. He repeatedly crosses the line. No other pharmacist behaves this way. I am reluctant to ever speak with him because of his hostile attitude. . . . Please pass this on to his Supervisor. This has to stop."\**

His Honor's report is the first time Dundee has seen this complaint, though Dundee has requested such information in order to be able to defend himself of the accusations levied at him in the corrective action of 8/16/2016.  This fact it is on record on several documents he submitted with his Motion for Summary Judgement; those requests going to Ms. Lynce, Ms. Lerman, Defendant Shawn Osborn, Mr. Glowczewski, Ms. Henoch and David Riccardi.

\*There was only one person that Dundee can recall who would make such a statement, a male nurse from nursing unit 1 South.  That nurse was subsequently terminated due to being report by a patient who witnessed the nurse being hostile and uncooperative with a patient-transport worker.  The nurse who wrote that had animus towards Dundee because Dundee suspected the nurse of drug diversion and was holding him accountable for missing Federal Legend Drugs.  The accusation levied by this nurse is false; considering the pretext and falsehoods attributed to the Defendants, His Honor should look more critically at their veracity as evidence.

**SEVERE PUNISHMENT:**

13

Stalter v. Wal-Mart : "More compelling is the severity of the punishment in relation to the alleged offense. ... This strikes us as swatting a fly with a sledge hammer. That Wal-Mart felt compelled to terminate Stalter for this offense does not pass the straight-face test ...."

His Honor ignored the outrageous and pretextual issues that landed Dundee into a final step before termination: complimenting a person, Rebecca Besselman by writing, "You're a good kid;"  Showing empathy to a young co-worker's lack of understanding by writing, "He a pup with little experience," "A nice boy, but..."   His Honor also ignored the fact that the emails were discussing the implementation of cost-saving suggestions, sought by his employer, UH.


## INNACURATE STATEMENTS IN EEOC POSITION STATEMENST MAY BE PROOF OF PRETEXT:

Miller v. Raytheon Co., 716 F.3d 138 (5th Cir. 2013). Affirming a seven-figure jury verdict in an age discrimination case partially because "[a]t trial, Miller presented undisputed evidence that Raytheon made erroneous statements in its EEOC position statement." See also Burton v. Freescale Semiconductor, Inc., 798 F.3d 222, 239-40 (5th Cir. 2015) (holding that a jury may view "erroneous statements in [an] EEOC position statement" as "circumstantial evidence of discrimination."); McInnis v. Alamo Comm. College Dist., 207 F.3d 276, 283 (5th Cir. 2000) (reversing summary judgment that had been entered for the employer in a discrimination case partially because the employer's report to the EEOC "contained false statements. . . .")

A De Novo review of the Plaintiff's Claim and  Motion for Summary Judgement makes clear that Ms. Lynce made false statements on the Position Statement to the EEOC regarding Dundee's charge.

14

## COURTS CAN FIND THAT A FAILURE TO FOLLOW COMPANY POLICIES MAY PROVE PRETEXT:

Smith v. Xerox Corp., 371 Fed. Appx. 514 (5th Cir. Mar. 2010).  Affirming jury verdict in a retaliation claim in part because, "Xerox's policies generally state that counseling and coaching of employees should occur prior to the issuance of formal warning letters, yet Xerox offered no documentation supporting Jankowski's claim that he counseled Smith before placing her on probation.

Deviation from policy has been shown in the following decisions:

Kouvchinov v. Parametric Technology: "We agree with the plaintiff that pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices."

Trustees of Health & Hospitals of Boston v. MCAD: "The fact finder readily could conclude that there was a discriminatory hierarchy in who would be spared from the layoff procedure, with white males at the top, women below them, and African-American women at the bottom."

Dartt v. Browning-Ferris: "[E]vidence that BFI may have deviated from its normal management procedures when it summarily terminated Dartt could support a reasonable inference that BFI had terminated Dartt because of his perceived handicap."

A. Larson, Employment Discrimination §8.04, at 8-81 to 8-82 (rev. ed. 2015): "[P]retext can be shown by demonstrating … irregularities in … the procedures for discharge."

In Southwestern Bell Tel. Co. v. Garza, 58 S.W.3d 214, 229 (Tex. App. – Corpus Christi 2001), aff'd in part, rev'd as to punitive damages, 164 S.W.3d 607 (Tex. 2004), the court of appeals

15

affirmed a verdict for the plaintiff of more than one million dollars, and stated that "[t]he jury heard evidence relating to Southwestern Bell's inexplicable failure to adhere to its own documented policies."

In his report, His Honor ignored the fact that Ms. Lynce had no reason to rifle through the Plaintiff's personnel in preparation for the pretextual meeting on 8/5/2016, files thus violating UH Policy.

His Honor also ignored the fact that Dundee was permitted to write comments/addendums to evaluations and corrective actions, under UH Policy and Ms. Lynce violated UH policy by using those comments/addendums to threaten Dundee with termination.

Also, UH failed to follow company policy by placing Dundee in a "final warning corrective action on 6/26/2017 when his last corrective action on 6/14/2016 was older than one year"

## FALSE REASON/IMPLAUSIBLE BUSINESS JUSTIFICATION:

(use for proving Plaintiff was mandated to the EAP without legitimate business necessity) Although employers are given wide berth to act irrationally, demonstrating that the "legitimate, nondiscriminatory reason" for the adverse employment action is false/implausible/incoherent may nonetheless allow the reasonable fact finder to infer that the employer did in fact discriminate. Dep't of Fair Employment & Housing v. Lucent Techs, Inc., 642 F.3d 728, 746 (9th Cir. 2011). In other words, if you can show that the reason the employer provides for your termination is false or implausible, the factfinder may be able to make the inference that you were discriminated against. (After, of course, you've already established your prima facie case of discrimination.) Essentially, if the employer's reason for the adverse employment action

leaves you thinking, "That makes no sense and can't be true!" then it is likely evidence of pretext. Patrick v. Ridge, 394 F.3d 311 (5th Cir. 2004). In Patrick, the Fifth Circuit found that "a hiring official's subjective belief than an individual would not 'fit in' or was 'not sufficiently suited' for a job is at least as consistent with discriminatory intent as it is with nondiscriminatory intent . . .." Id.at 318.

A De Novo review of the Plaintiff's Motion for Summary Judgement will affirm the assertion that UH's motives for the employment decision, mandating the Plaintiff into illegal medical examinations in the Employee Assistance Program, lacked any business justification and was made through retaliatory pretext; solely by the Plaintiff's supervisor's diagnosis of some "perceived disability" that caused the Plaintiff to behave in a manner that breached UH policy under the broad category of "conflictive work relationship."

His Honor ignored the law and the facts by failing to recognize that the Plaintiff has met the three important pieces of workplace retaliation evidence in his Motion for Summary Judgement:

- **Timing** – Also known as temporal proximity. This is the time between a protected activity and a negative (adverse) action. Proving there was a reasonably short time between the employee's action and the company's action against the employee is extremely beneficial to the case.  How much closer does His Honor require "proximity" to be than at the very meeting on 8/5/2016, called under the pretext of discussing the Plaintiff's sexual harassment charge, Ms. Lynce and Mr. Glowczewski  level threats of termination and increased surveillance, all of which are contemporaneously recorded, with time/date

- **Awareness** – Showing "because of this". The employee needs to prove the individual who is responsible for the adverse action knew about the reporting, complaint or violation

of an employee protected right by the time of the negative action. Ms. Lynce handled the Plaintiff's sexual harassment investigation, even though she was asked to recuse herself due to bias.

- **Reasonable Explanation** – Employer's must be able to show a legitimate reason for taking negative action against the employee. Without this judges and juries find the employer less credible and see the adverse action as the cause. His Honor considers UH threatening the Plaintiff over exercising his rights under the employer's own policy allowing employee comment on evaluations and corrective actions, reasonable (see the meeting of 8/5/2016).

His Honor considers it a reasonable, legitimate reason, for UH to manufacture an outrageous violation of UH policy* on 6/26/2017, out of whole cloth from two emails in order to file a corrective action within a 12-month time limit from the last manufactured corrective action on 6/14//2016, which they failed to do, but made a pretextual .

*Over, of all things, implementation of the Plaintiff's cost-saving suggestions requested by the employer and on the employer's behalf, by scrutinizing emails sent to a third party, an HR representative, who never objected to the phrases.*

His Honor also ignored the fact that the person to whom the emails were sent, Rebecca Besselman, herself an HR representative, did not take offense at the phrases. Nor was Ms. Besselman present at the corrective action on 6/26/2017. The Plaintiff's emails were under surveillance by the Defendants, Ms. Lynce and Ms. Lerman, and the clock was ticking past the 12-month mark where the Plaintiff's past corrective action would be dismissed, and another corrective action would not put the Plaintiff at the last step.

18

Furthermore, there was nothing controversial in the least about the nature of the emails. No reasonable person would find the phrases, "You're a good kid," which is a compliment, and "he's a pup with little experience," and "a nice boy, but..." both phrases made with empathy to a an inexperienced colleague (The person in reference, Derek Frost, was denied a promotion soon after with the stated reason being a lack of experience. Frost was removed from supervision and placed back into a staff position. Dundee and Frost were, and continue to be, friends.)

His honor surely knows that not all the factors and evidence in the Plaintiff's charges against UH need to be present to win a settlement from an employer. The accumulation of partial evidence, employee testimony, social media history and establishing a pattern of employee and employer behavior are just as beneficial.

The corrective action, "final warning" of June 26, 2017, exposes the pretextual, disparaging, specious and manufactured nature of the attacks that Dundee has endured over a period of years while employed at UH Geauga Medical Center. For that reason, a De Novo review should look very critically at the reasons and evidence offered by the Defense for veracity and motive. The facts demonstrates the determination on the part of the defendants to get the Plaintiff to the last step in the corrective action process, so that the Plaintiff would be forced to attend EAP counseling sessions, which Ms. Lerman and Ms. Lynce knew that the Plaintiff found particularly humiliating and degrading, during the first corrective action for tardiness levied at the Plaintiff on October 2, 2013. A reasonable person could infer that Ms. Lerman and Ms. Lynce saw mandatory EAP counseling to an end, in an effort to either have the plaintiff resign or be terminated.

Furthermore the Plaintiff's emails had been under surveillance, and the manufactured corrective action was over phrases in two emails to Rebecca Besselman, herself an HR Rep,

19

regarding cost-saving suggestions that the Plaintiff had submitted by request of UH, discussing the implementation of the cost saving suggestions. There was nothing controversial in the least about the nature of the emails. No reasonable person would find the phrases, "You're a good kid," which is a compliment, and "he's a pup with little experience," and "a nice boy, but…" both phrases made with empathy.

## CONCLUSION

The Plaintiff/Pro Se Litigant, Frank Dominic Dundee, has presented two of the standards of necessary for judicial review: questions of law and questions of fact. The Plaintiff's objection to His Honor's (Magistrate Judge Greenberg) Report and Recommendation is made with all due respect to His honor and to the Court. It is hoped that the Court will see fit to perform a De Novo review of the Plaintiff's entire claim before the Court, granting the Plaintiff's Motion for Summary Judgement.

Dated this 11th day of July, 2020.

Respectfully submitted,
Plaintiff/Pro Se Litigant,
Frank D. Dundee

7707 Amberwood Trail
Boardman, Ohio 44512
fdundee@gmail.com
330-398-8274

: Dundee
1707 Amberwood Tr.
Youngstown, OH
    44512



Clerk of Courts
Thomas D. Lambros Federal Building & U.S. Courthouse
125 Market St.
Youngstown, OH
      44503