UNITED STATES DISTRICT

COURT NORTHERN DISTRICT

OF OHIO EASTERN DIVISON

| | | |
|---|---|---|
| FRANK DOMINIC DUNDEE | ) | CASE NO.  1:19 CV 01141 |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| UNIVERSITY HOSPITALS | ) | |
| CORPORATION, et al., | ) | MEMORANDUM IN SUPPORT OF |
| Defendants. | ) | PLAINTIFF'S OBJECTION TO THE |
| | ) | MAGISTRATE JUDGE'S REPORT |
| | ) | AND RECOMMENDATION |

The Plaintiff/Pro Se Litigant, Frank Dominic Dundee, respectfully submits a Memorandum in

Support of the Plaintiff's Objection to the Magistrate Judge's Report and Recommendation.

There are three general standards of judicial review: questions of law, questions of fact, and

matters of procedure or discretion.  The Plaintiff's Memorandum will focus on questions of law

and questions of fact.

The Plaintiff asks the Court to notice that it takes His Honor seven pages to reach the date of

June 26, 2016, on which the Plaintiff formally filed his charge of sexual harassment against his

1

immediate supervisor, Rachael Lerman.  The significance is that nearly twenty-five percent of His Honor's report does not directly deal with the Plaintiff's claim before the Court, which is retaliation against a EEOC protected activity in violation of Title VII, perceived disability and unlawful medical examination in violation of the ADA.  A reasonable person might observe that the standard in discrimination cases is for the Defense is to reveal a bright, shiny object, the employee's despicable character, as a distraction from the fact that the employer broke the law. That is more less what the first seven pages of His Honor's report focuses on, instead of focusing on the claim before the Court.

Even if the Plaintiff agreed with the false narrative painted by the Defense concerning his character by stipulating that he, Dundee, is "a blaggard, a scoundrel, a contemptible miscreant," as a matter of law it does not somehow mitigate the fact that Rachael Lerman, Danialle Lynce, Jaso Glowczewski, Shawn Osborne and University Hospitals broke the law.  His Honor seems to have followed the script where, paradoxically, discrimination law, in practice, perpetuates the inequalities it was intended to redress.  The Plaintiff prays that the Court is not distracted as he is forced to defend his character as a matter of form in discrimination cases.

The format for the memorandum will be a page by page comment by the Plaintiff in response to His Honor's remarks on that page.  The Plaintiff's comments deal with questions of fact and questions of law in His Honor's report:

**PAGE 2**

*On December 26, 2019, the Individual Defendants' Motion to Dismiss was granted, and Defendant UH's Motion for Judgment on the Pleadings was granted in part and denied in*

*part. (Doc. No. 29.) Dundee's claims based on events occurring prior to September 13, 2016*
*were dismissed as time-barred. (Id.)*

The EEOC time limit on harassment starts from the last date of harassment and continues as far back as necessary to the first incident of harassment.

### PAGE 3

*In a January 2013 Staff Self Assessment, Dundee stated that his supervisors, "Rachael*
*[Lerman] and Jason [Glowczewski] are both head and shoulders the best managers I've ever*
*worked for; so they can make me more successful by staying in their jobs as long as I am*
*here." (Doc. No. 43-3 at 1.)*

Mr. Glowczewski (JG) was a fair manager. Ms. Lerman (RL) was authoritarian, which an experienced worker knows is not an unusual trait for a manager; however, the Plaintiff had experienced several uncomfortable advances from RL, by that point. His comment was meant to assuage any hurt feelings because he didn't respond in-kind.

RL had also made the comment at an evaluation that was witnessed by HR rep, Rebecca Besselman, that "The nurses love you." Which flies in the face of the Defenses attempt to paint the Plaintiff as an unhinged wild-man.

*He was coached by Lerman on August 27, 2013 for these violations, and on October 2, 2013,*
*Dundee received a Corrective Action for his continuing tardiness. (Id.) Dundee refused a*
*proffered Employee Assistance Program ("EAP") flier and responded to the Corrective Action*

3

*with a lengthy addendum complaining about Lerman's management1 and vowing to "vigorously defend myself*

The EAP pamphlet was never brought up during the meeting **(see attachment A)**. The surprising part of the meeting was that the Head of HR, Danialle Lynce (DL), was present at this surprise meeting. The Plaintiff's past 20 year experience as a union representative knew that a first-step corrective action does not merit the presence of the Head of HR.

The Plaintiff explained to both RL and DL that he had upper-motor-neuron disease, that caused problems with showering and dressing; and he also told them he had issue with defecation and urination.

## PAGE 4

*On November 12, 2013, Dundee filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleged that placing the EAP flier in his locker constituted age discrimination by Lerman and created a hostile work environment. (Doc. No. 34-33 at 25-26, 32.) The EEOC dismissed this Charge immediately. (Doc. No. 43-21.)*

The EEOC expedited the right-to-sue letter because of the backlog of cases due to the government shutdown, from October 1, to October 17, 2013. The EEOC did not "dismiss" the charge immediately.

## PAGE 5

*In November 2014, Dundee met with the UH Compliance Department to report that Lerman had engaged "in a pattern of behavior that has made the work environment intimidating and hostile for several years now." (Doc. No. 1-1 at 4; Doc. No. 43-2, Ex. 2-B.) UH agreed to have*

*Rebecca Besselman, UH Geauga Human Resource Officer, present at all meetings between Dundee and Lerman, and further agreed that Danialle Lynce ("Lynce"), the Regional HR Director, whom -5- Case: 1:19-cv-01141-DAP Doc #: 45 Filed: 06/26/20 5 of 26. PageID #: 720 Dundee accused of bias, would not be present. (Doc. No. 1-1 at 4.)*

This was the second time the Plaintiff sought the help of Compliance. The Plaintiff, in fact, broke down crying because of the stress of having to work in such a hostile work environment.

## PAGE 6

*Between January and April of 2016, Dundee arrived late to work without prior authorization on 20 occasions. (Doc. No. 43-14 at 1.) On May 3, 2016, he was placed on a second PIP for violation of UH's attendance policy. (Id.)*

Did other pharmacy staff arrive late? Yes. Why did they wait until 20 violations? Because the tardiness never negatively impacted operations; it was just a convenient cudgel to wield for RL. Did the Plaintiff ever report off a scheduled shift? No. Did he work OT when there was no coverage because no one else would volunteer to work 3rd shift? Yes, the Plaintiff covered more open shifts than any staff member.

The Plaintiff explained to both RL and Ms. Besselman that he had motor-neuron disease, that caused problems with showering and dressing; and he also told them he had issue with defecation and urination...he did not have a definitive diagnosis yet of Hereditary Spastic Paraplegia, which came about in Spring of 2018 through genetic testing.

*Lerman testified that, in May 2016, reports of Dundee's unprofessional conduct towards other UH employees "intensified." (Doc. No. 43-2 at ¶22-23.) On May 1, 2016, an employee emailed his supervisor with allegations that Dundee's behavior was impacting the employee's ability to*

*work: I have had repeated problems with Frank in Pharmacy. I have spoken to you about him before. He has no level of patience. He speaks to me and others in a very disrespectful and unprofessional manner. He will yell and scream uncontrollably. It does not matter if you are on the phone or speaking with him in person, he has a very angry personality. I have the right to work in a hostile free environment. He repeatedly crosses the line. No other pharmacist behaves this way. I am reluctant to ever speak with him because of his hostile attitude. . . . Please pass this on to his Supervisor. This has to stop.*

His Honor's report is the first time Dundee has been aware of this note from nursing, despite documents showing Dundee asking repeatedly for the reasons for the corrective action of 6/14/2016.  Dundee had to defend himself against phantom accusations as he was never provided specifics of who, what, when and where.  The inference that Dundee's unprofessional conduct "intensified" is part of a false narrative created and promoted by RL and DL.  What are the examples of Dundee's conduct spinning out of control; a reasonable person would think such examples would be listed?

Note the date of the nursing complaint is May, 1, 2016.  A supervisor receiving such a note would most assuredly reach out immediately to discuss the accusation with the employee.  Ms. Lerman did not reach out because she knew the reputation of the nurse in question; note that that nurse had spoken to Ms. Lerman before.  The nurse in the compliant was terminated shortly after by UH, for "unprofessional conduct."

The Plaintiff was, and still is, considered the best and most popular pharmacist among hospital staff.  Two pharmacy technicians, Tracey Thoms, 29 years seniority, and John Long, 20 years seniority, who were added to 3rd shift in the Summer of 2019, have worked side by side with the plaintiff for 12 consecutive months.  Both veteran technicians have worked with many

6

pharmacists in their career; both have called The Plaintiff the best pharmacist either has ever worked with.

**PAGE 7**

*On June 14, 2016, Lerman gave Dundee another Corrective Action, based on "your documented behavior and complaints from other UH Geauga employees who feel you have bullied them, including but not limited to: yelling at people, notes left in the workplace, rudeness, and a hostile attitude." (Doc. No. 43-16 at 1-2.) The Corrective Action reminded Dundee of the expectation that he "behave professionally and appropriately in all situations." (Id.) Dundee was again encouraged to seek assistance from EAP. (Id.)*

The Plaintiff appealed the corrective action of 6/14/2016 with a PowerPoint presentation that refuted every accusation against him and demonstrated the toxicity and hostility that engulfed him (**see attachment B**).

To this date, the Plaintiff was never permitted to see the accusations levied against him, despite requesting the information multiple times from multiple sources. The Plaintiff documented those examples in his Motion for Summary Judgement, yet His Honor seems to have ignored that evidence. Neither Ms. Lerman nor Ms. Besselman ever offered any concrete examples of Dundee "yelling at people, notes left in the workplace, rudeness, and a hostile attitude." A reasonable person might view the corrective action of 6/14/2016 as pretextual harassment.

7

*The Corrective Action reminded Dundee of the expectation that he "behave professionally and appropriately in all situations." (Id.) Dundee was again encouraged to seek assistance from EAP. (Id.)*

It cannot be overemphasized that the Plaintiff was never encouraged to see the EAP at any time concerning the corrective action of 6/14/2016 or at any follow-up meeting or appeal of that corrective action; that statement is blatantly false and is being used to promote a narrative that justifies Dundee being mandated into the EAP in the corrective action of 6/26/2017.

### PAGE 8

*He believed the meeting would be about the sexual harassment compliant that he had filed. (Id.)*

His Honor seemingly glossed over the important issue that the entire meeting of 8/5/2016 was based on pretext in order to get Dundee to attend in order to threaten and intimidate him for filing a protected activity. In any De Novo review, special attention needs to be paid to the circumstances of this meeting.

In addition, His Honor ignored the fact that Ms. Lynce had no reason to rifle through the Plaintiff's personnel files, yet she had then piled up on the desk during the meeting. His Honor also completely ignored the nineteen contemporaneous notes taken in the Plaintiff's parked car minutes after the meeting and transcribed and sent to the Plaintiff's attorney within minutes of arriving home the same day.

*On June 26, 2017, Lynce issued another Corrective Action to Dundee. (Id. at 9; Doc. No. 31-7.) Dundee was told that he was receiving a "final step warning" because he had violated UH policies on diversity and contributed to a "Conflictive Work Relationship." (Doc. No. 43-33 at*

8

*12.) Dundee also received a mandatory referral to the EAP, and was informed "failure to follow up with EAP in the required time frame can result in further disciplinary action up to and including termination." (Doc. No. 43-32.) Dundee responded in an Addendum to the Corrective Action which alleged retaliation and defamation and threatened legal action. (Doc. No. 43-19.)*

The Corrective Action of June 26, 2017, exposes the pretextual, specious and manufactured nature of the attacks against the plaintiff.  It also demonstrated the desperation and the determination on the part of Ms. Lerman and Ms. Lynce to get the Plaintiff to the last step in the corrective action process, so that the Plaintiff would be forced to attend EAP counseling sessions.  The defendants were well aware from Dundee's reaction years before to Ms. Lerman placing an EAP pamphlet in his locker **(see attachment A)** that he would find such a mandate humiliating and degrading; this was in an effort to either have the Plaintiff resign or be terminated.

His Honor also ignored the fact that the person to whom the emails were sent, Rebecca Besselman, herself an HR representative, did not take offense at the phrases.  Nor was Ms. Besselman present at the corrective action of 6/26/2017.  Though the Plaintiff would request the specifics of "who" took offense at the phrases, he was never told.

His Honor also ignored the innocuous and inoffensive phrases, himself.  Phrases that no reasonable person or jury would find in any way objectionable.

### PAGE 9

*On July 26, 2019, Dundee attended his first required EAP counseling session with David Riccardi at the UH Ahuja Medical Center. (Doc. No. 43-30 at ¶3.) Riccardi performed no tests*

9

*or procedures on Dundee, nor did he use any medical equipment, and their session consisted entirely of discussion. (Doc. No. 43-30 at ¶¶4-6; Doc. No. 43-33 at 19.) He did not diagnose Dundee with a medical condition or mental disability. (Doc. No. 43-30 at ¶8.) At the end of their meeting, Riccardi presented Dundee with medical releases, and recommended he attend a psychiatric assessment. (Id. at ¶10.) He also provided Dundee with a "Compliance Contract," which stated that Dundee was required to "attend evaluation with [a psychologist], follow recommendations, [and] follow up with EAP as scheduled." (Doc. No. 31-12 at 1.) The Compliance Contract informed Dundee that "non-compliance may result in corrective action up to and including discharge." (Id.)*

His Honor ignored the facts that EAP counselors are recognized medical professionals and EAP counseling sessions are recognized by the Court as medical examinations.  Riccardi did make disability-related inquiries that violate EEOC rules during the EAP session, which was at the third stage (after employment begins),  when an employer may make disability-related inquiries and require medical examinations *only* if they are job-related and consistent with business necessity.

His Honor ignored EEOC law regarding mandating medical examinations.  The Plaintiff excelled in performance of his job duties and did not pose a direct threat to anyone by using the phrases, "You're a good kid," "He's a pup with little experience," and "A nice boy, but…"  Any discipline that the employer decides to impose should focus on the employee's performance problems.

10

PAGE 13

*UH argues that none of the conduct in this case rises to the level of a materially adverse action sufficient to support a Title VII retaliation claim. (Doc. No. 43 at 13.) UH argues in the alternative that the temporal proximity of Dundee's June 2016 complaint and his June 2017 Corrective Action is not sufficient to create an inference of causation. (Id. at 16.) Therefore, even if this Court believes there is a genuine issue of material fact whether an adverse employment action occurred, UH asserts that Dundee has failed to show a causal link between the alleged adverse employment actions and the sexual harassment complaint. (Doc. No. 44 at 3-4.) In sum, UH argues that Dundee has presented no direct or indirect evidence to support his claim of retaliation, and summary judgment should be granted. (Id. at 19.)*

In Burlington Northern & Santa Fe Railway Company v. White (No. 05-259). The key question before the high court was what constitutes an "adverse employment action" under the anti-retaliation provision of Title VII of the Civil Rights Act of 1964. This is the key issue which His Honor has ignored in his report: In upholding the jury's verdict in favor of the employee, the Court first held that the anti-retaliation provision "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." According to the Court, "[a] provision limited to employment-related actions would not deter the many forms that effective retaliation can take." Thus, the Court rejected the standard applied by the Courts of Appeals that limited actionable retaliation to so-called "ultimate employment decisions."

The Supreme Court decided almost 10 years ago that "adverse employment action" was virtually anything that would deter a reasonable person in the plaintiff's shoes from engaging in protected activity. In plain English, that means "just about anything bad," as long as it isn't really

trivial. A formal discipline is considered an adverse employment action. Micromanagement, especially scrutiny/surveillance of work performance or attendance is an adverse employment action. The Plaintiff's claim against UH clearly documents the above infractions.

### PAGE 14

*A plaintiff cannot "invoke the protections of the Act by making a vague charge of discrimination." Blizzard, 698 F.3d at 288. Sixth Circuit case law explains that a causal connection is established when the plaintiff "proffer[s] evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." Upshaw v. Ford Motor Co., 576 F.3d 576, 588 (6th Cir. 2009) (quoting E.E.O.C. v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997) ).*

A reasonable person examining all the aspects and <u>very specific documentation</u> in the Plaintiff's claim of retaliation against UH would find it amazing, and possibly outrageous, for His Honor to write that Dundee is making a "vague charge of discrimination."

An important distinction exists in how courts analyze retaliation versus discrimination claims. That is, different definitions of what constitutes an "adverse employment action" apply depending on whether the lawsuit alleges retaliation or discrimination. His Honor ignores that fact and the law when any reasonable person could clearly see that the Plaintiff, Dundee, has documented multiple instances in which the Defendant's proffered reasons for its actions in the claim are pretextual and "the real reason for the employer's action was intentional retaliation." Imwalle v. Reliance Medical Products, Inc., 515 F.3d 531, 544 (6th Cir. 2007).

The demonstrable falsity of the Defendant's actions could not be clearer: a final step warning for writing three phrases that no reasonable jury would find offensive or against workplace

diversity. The Defendant's pretextual actions were a means to an end, to be able to get Dundee to the final step warning, fulfilling the promised threats issued by Danialle Lynce at the critical meeting on 8/5/16.

### PAGE 15

*He testified that, at the August 5, 2016 meeting, Glowszeski and Lynce threatened to fire him if his allegedly inappropriate behavior continued, and Lynce made a retaliatory "promise of increased scrutiny going forward." (Doc. No. 43-33 at 10-13.)*

His Honor's statement is not true, that *Glowszeski and Lynce threatened to fire him if his allegedly inappropriate behavior continued.* The entire meeting of 8/5/2016 was based on pretext, so any arguments presented by the Defense should be viewed in that context: the meeting was based on a lie and any testimony from the Defense characterizing any of the events of the meeting should be viewed as continuing the pretext. His Honor, once again amazingly, ignored the accurate documentation of the meeting of 8/5/2016 that Dundee provided in his Motion for Summary Judgement, (Doc. No. 31, Documents D, E and F).

His Honor overlooks the shifting explanations of the Defendants. His Honor also overlooks that the reasons given for the "threats of termination," for Dundee writing his side of the story to every specious corrective action and evaluation in addendums and comments to be placed in the record of his personnel files. Lynce and Glowczewski threatened Dundee over UH policy that permitted such comments and addendums.

### PAGE 16

*Dundee asserts that an adverse employment action is "virtually anything that would deter a reasonable person in the Plaintiff's shoes from engaging in protected activity" and thus "just*

*about anything bad" will satisfy this element of a Title VII complaint. (Doc. No. 31 at 13.)*
*This is incorrect. To satisfy the adverse employment element of a Title VII claim, a plaintiff*
*must designate evidence showing that, as a result of a decision by the defendant, he suffered*
*"a significant change in employment status, such as hiring, firing, failing to promote,*
*reassignment with significantly.*

His Honor espouses a significantly narrower view of what constitutes an "adverse
employment action" than Congress intended when it wrote Title VII and that the Court has
affirmed. However, even if the Plaintiff agreed with His Honor's narrow view of "a significant
change in employment status, such as hiring, firing, failing to promote," UH committed a
materially adverse action, in violation of Title VII, with the pretextual retaliation against the
Plaintiff in the corrective action of 6/26/17. In a deposition given to Defense Attorney Rachael
Israel on March 10, 2020, the Plaintiff stated that UH policy on Corrective Action prohibits the
disciplined employee from bidding on any lateral or promotional positions, throughout the entire
University Hospitals organization for a period of one year from issuance of the corrective action.
So for the 12 month period following the pretextual corrective action on 6/26/17, Dundee was
prohibited to bid on a lateral transfer to another hospital in the UH system, nor could he advance
his career and salary by bidding on any open positions that would have been a promotion in
status.

In Burlington Northern & Santa Fe Railway Company v. White (No. 05-259). The key
question before the high court was what constitutes an "adverse employment action" under the
anti-retaliation provision of Title VII of the Civil Rights Act of 1964. This is the key issue
which His Honor has ignored in his report: In upholding the jury's verdict in favor of the
employee, the Court first held that the anti-retaliation provision "does not confine the actions and

14

harms it forbids to those that are related to employment or occur at the workplace." According to the Court, "[a] provision limited to employment-related actions would not deter the many forms that effective retaliation can take." Thus, the Court rejected the standard applied by the Courts of Appeals that limited actionable retaliation to so-called "ultimate employment decisions."

The Supreme Court decided almost 10 years ago that "adverse employment action" was virtually anything that would deter a reasonable person in the plaintiff's shoes from engaging in protected activity. In plain English, that means "just about anything bad," as long as it isn't really trivial. A formal discipline is considered an adverse employment action. Micromanagement, especially scrutiny/surveillance of work performance or attendance is an adverse employment action. The Plaintiff's claim against UH clearly documents the above infractions.

His Honor fails to recognize that Dundee was subjected to pretextual retaliation by the Defendants, which make a difference under the law.

### PAGE 17

*Dundee does not assert that he sought promotion, it is undisputed he was not restricted from performing his job duties in any way, and he remains employed by UH with the same duties and at the same rate of pay and benefits5 that he had prior to the meeting. (Doc. No. 43-20 at ¶17; Doc. No. 43-33 at 22.)*

His Honor makes the case for the Plaintiff on the ADA violation regarding allowable medical examinations if they are job related and of legitimate business necessity: *it is undisputed he was not restricted from performing his job duties in any way.*

15

*Without a materially adverse employment action, Dundee cannot establish an essential element of his claim of claim of retaliation under Title VII, and therefore UH is entitled to summary judgment on this claim.*

His Honor's definition of "materially adverse action" far more narrow than Congress intended when it wrote Title VII and far more narrow than the Supreme Court ruled in subsequent cases on the issue. Also, His Honor fails to recognize that Dundee was subjected to pretextual retaliation by the Defendants, which make a difference under the law.

*He further suggests that the "humiliation" of a referral to EAP counseling "might trigger thoughts of suicide in susceptible individuals," suggesting he misunderstands the nature and purpose of such counseling. (Doc. No. 31 at 24.) -1*

As stated previously, Dundee is a very popular member of the staff at UH Geauga Medical Center. A co-worker from another department was aware that Dundee had been mandated into the EAP. That co-worker was also mandated into the EAP and was being harassed by EAP Counselor David Riccardi to attend sessions and to provide personal medical information. The coworker stated that he could see how a person might commit suicide rather than give in to mandatory counseling.

As for His Honor's comment *suggesting he* (Dundee) *misunderstands the nature and purpose of such counseling* amounts to no more than an insensitive and flippant conclusion in light of the fact that Dundee, ag 66, and in year 44 of his career as a hospital pharmacist, was there at the beginning, for the adoption of EAP programs by employers (see attachment A). In addition, Dundee's experience as a union representative and his understanding of "pretext" connected to the final warning corrective action of 6/26/2017 leads to the reasonable conclusion that the EAP

16

was used by the Defendants as a weapon, to push him to resign or be terminated.  His Honor finds the Defendant's had a "benign" purpose, to rehabilitate the scoundrel, Dundee.  It would be humorous if it wasn't so destructive.

### PAGE 18

*It is undisputed that there is no direct link between Dundee's June 2016 sexual harassment complaint and the June 2017 Corrective Action. Instead, Dundee argues that the temporal proximity of his sexual harassment claim and the alleged retaliatory conduct establishes the causal link required by Title VII. He acknowledges that UH "waited months after the meeting on 8/5/2016, to file an adverse employment action against the Plaintiff on the one-year anniversary date of the Plaintiff's filing of sexual harassment charges on 6/26/2016 against Ms. Lerman." (Doc. No. 31 at 16.) However he asserts that this one-year gap between the protected act and the alleged retaliation "does not nullify the causal link to prove retaliation," because the "vitriolic threats of increased scrutiny, corrective action and termination" made at the August 5, 2016 meeting made any time limit "irrelevant" to demonstrating temporal proximity.7 (Id. at 17.)*

His Honor's comment about, that "It is undisputed that there is no direct link between Dundee's June 2016 sexual harassment complaint and the June 2017 Corrective Action" draws an incorrect conclusion.  His Honor's use of the term "undisputed" raises red lights for the Plaintiff.  His Honor ignores completely all the falsehoods and pretext committed by the Defendants, from the meeting of 8/5/2016, through the Position Statement authored by Danialle Lynce, to the obfuscation of Shawn Osborne, to the demonstrably false reasons for the final warning, in the Plaintiff's claim.  In fact, a reasonable person might conclude that His Honor is exhibiting bias.  University Hospitals is ubiquitous in Cleveland as one of its largest employers.

UH is operating on its home field against the Plaintiff and may be getting the benefit of the doubt by His Honor, either consciously or unconsciously.

*UH responds by pointing out that Dundee made his initial sexual harassment complaint the day after Lerman issued a Corrective Action, and puts forth evidence showing that this was part of a pattern of behavior on Dundee's part. (Doc. No. 43 at 16.) He repeatedly filed grievances - either EEOC Charges or Internal Complaints - after receiving Corrective Actions. (Id.) UH also cites copious caselaw supporting the proposition that a delay of a year between a protected activity and an adverse employment action is too great to create an inference of causality. (Id. at 17*

His Honor, without any first-person knowledge, portrays Dundee as a "malcontent," looking for the smallest excuse to run to UH Compliance, the EEOC, OSHA or the Ohio Civil Rights Commission.\* In this report, His Honor fails to see UH as a corporate entity running amok by rolling over its employees and violating their rights on a regular basis. His Honor also does not see Dundee as the one employee, out of 28,000, the experience in employee rights from 20 years' experience in a collective bargaining unit and having the courage to stand up against the UH juggernaut. His Honor also fails to see Dundee as a husband, father of two sons, defending himself against forces that threaten his livelihood and therefore the welfare of his family.

\*In fact, His Honor's comments on this point were first stated at the in-person status conference on December 2, 2020. These comments caused Dundee to refute His Honor's characterization by pointedly telling His Honor, three times, that he was not a "malcontent." This incident was witnessed by Defense counsel, Doni Bulea and His Honor's term clerk, Martha Rodenborn, who was taking notes.

The pattern of behavior that His Honor should be referring to in his report is the pattern of pretextual attacks on the Plaintiff by the Defendants over a period of years.

***This argument - that the interval between the two events is somehow irrelevant to establishing a causal connection based on temporal proximity - seems to concede UH's point that the one-year gap is too great to support such a finding.***

The Court has recognized that progressive, corrective actions leading to termination are a form of retaliation.  In Roberts v. Roadway Express, Inc., 149 F.3d 1098, 1104 (10th Cir. 1998), rejecting an employer's argument that written warnings had no adverse effect on the terms and conditions of employment because of a nine-month term on the warnings' validity, when the record indicated that the more written warnings received by an employee, the more likely they were to be terminated for a further infraction.  This is exactly where UH took the Plaintiff when they wrote him up for demonstrably false reasons on 6/26/2017.

His Honor also fails to recognize there wasn't a one-year gap; the retaliation started on 8/5/2016 with threatened corrective action and the threatened corrective action occurred on 6/26/2017.

## PAGE 19

***Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal***

*proximity with other evidence of retaliatory conduct to establish causality. Mickey v. Zeidler*
*Tool and Die Co., 516 F.3d 516, 525-26 (6th Cir. 2008).*

His Honor ignores the fact that the pretext for the meeting of 8/5/2016 was to discuss Human

Resource's investigation into his sexual harassment claim, which Dundee formally filed on

6/26/2016.  His Honor ignores the email that Dundee sent to UH Compliance (Doc. No. 31

attachment F) officer Ed Soyka, titled, "An F.Y.I. to UH Compliance Department regarding

EEOC recognized protected activities/retaliation," sent on 8/8/2016, a mere three days later.  In

the email Dundee states:

- "Prior to this meeting, I had scheduled a meeting with Attorney Nancy Grim, of Kent,

  Ohio, for Friday, 8/12/16, to discuss my claim against Ms. Lerman.  Now that meeting

  will also include a discussion of a claim against both Ms. Lynce and Mr. Glowczewski,

  as UH representatives, for retaliation against me for filing a protected action; my claim of

  sexual harassment against Ms. Lerman, with HR.  As an attorney, I'm sure you are aware

  of the three things, under EEOC rules, that must occur to prove retaliation for

  undertaking a protected activity; the third of which is there must be evidence that an

  adverse action, such as Ms. Lynce's threats of termination, was taken in response to the

  protected activity, my claim.  It includes:

  Casual connection between the protected activity and the adverse action. Evidence that

  the decision was made soon after the protected activity.  I don't know how much sooner

  an adverse action could take place than immediately, within the same meeting discussing

  the protected activity.  That is the definition of "proximity."

*In our case, the two events did not occur close enough in time for their temporal proximity to*
*create an inference of causality.*

His Honor is fixated on some artificial time limit, such as 12 months, that clever employers can exploit by just "lying in wait." If Congress had a time limit in mind when constructing language for Title VII, they would have clearly stated that time limit. Congress did not add that specificity precisely with the fear that employers would lie in wait until the time limit has passed. In Hamilton v. General Electric: "We have held that when an employer … waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext."

The Plaintiff's Motion for Summary Judgement exposes how the Defendants waited for any reason to materialize in order to retaliate against Dundee; the outrageous reason for the Final Step Warning, on 6/26/17, that mandated Dundee into illegal medical examinations, constitute the very definition of pretext.

His Honor also ignores the connection of the corrective action of 6/26/2017 to the proffered threats issued by Mr. Glowczewski and Ms. Lynce at the pretextual meeting of 8/5/2016. It is not like there is a gap between Dundee's filing a charge of sexual harassment on 6/26/2016 and the retaliation on 6/26/2017. The threats issued on 8/5/2016 serve as a bridge connecting the materially adverse action of 6/26/2017 to the protected activity of 6/26/2016, one year to the day earlier.

**PAGE 20**

*First, UH asserts that the required EAP counseling was not a medical examination. (Doc. No. 44 at 5; Doc. No. 43 at 18-19.) Second, UH argues the counseling was job-related and consistent with business necessity, and therefore would be permissible under the ADA even if*

*the Court believes there is a genuine issue of material fact regarding whether it constituted a medical examination.*

A reasonable person might ask how the mandatory EAP counseling was job related and consistent with business necessity? Was Dundee a violent threat who needed to be removed from the workplace? On the one hand, in shutting down the Plaintiff's claim of retaliation, His Honor states that nothing changed in regard to Dundee's job so there was no materially adverse action; Dundee was allowed by UH to perform his duties the same he always had. Yet His Honor claims the mandated counseling, ordered by Ms. Lynce and Ms. Lerman, was job related and consistent with business necessity without explanation. Dundee did not attend the mandatory psychiatric examination, nor future EAP counseling with David Riccardi.

Again a reasonable person might ask why Dundee was allowed to continue to perform his job duties, as he always had, conflictive work relationships and all, when Ms. Lynce and Ms. Lerman felt that there must be some psychological reason that needed to be ferreted out by counseling and intrusive examination for Dundee's destructive behavior? After all, did not Dundee demonstrate that he was unhinged by using the phrases "You're a good kid," "He's a pup with little experience," and "A nice boy, but..."

### PAGE 21

*The threshold inquiry in this case is whether the referral for EAP counseling resulted in a medical examination. Neither party* **WRONG!!!!** *cited Sixth Circuit authority on this point. UH points to a case from the Eight Circuit, Jenkins v. Medical Laboratories, which has a similar factual scenario. In Jenkins, the plaintiff was referred to mandatory EAP counseling because of her ongoing disputes*

22

His Honor ignores the fact that in the eyes of the Court, and in the eyes of the very organization that represents EAP counselors, that EAP counseling is recognized as a medical examination under the ADA.  The Employee Assistance Professionals Association (EAPA) in its Standards and Professional Guidelines warns that  Situations in which an employer may mandate the use of an employee assistance program (EAP) are rare .  The EAPA indicates, "Employees may voluntarily seek EAP assistance, or they may be referred to the EAP through constructive confrontation. Job security will not be jeopardized as a consequence of seeking or using EAP services, except where mandated by law. Employers are urged to consult with legal counsel when deciding on a standing mandatory EAP referral policy or for use in specific circumstances."

*The threshold inquiry in this case is whether the referral for EAP counseling resulted in a medical examination. Neither party WRONG!!!!  cited Sixth Circuit authority on this point. UH points to a case from the Eight Circuit, Jenkins v. Medical Laboratories, which has a similar factual scenario. In Jenkins, the plaintiff was referred to mandatory EAP counseling because of her ongoing disputes*

His Honor ignores the differences between the matter before the Court and Jenkins: the fact that the Defendants used pretextual retaliation to manufacture an outrageous reason to put Dundee into a final step warning mandating EAP Counseling.

## PAGE 22

*The court therefore granted the defendant summary judgment on this claim, noting the plaintiff "failed to set forth facts establishing that she was sent to EAP counseling due to a*

*perceived disability or that any aspect of EAP counseling qualifies as an action prohibited by the ADA." Id*

*In our case, UH specified that Dundee's EAP referral was for "conflictive work relationships." (Doc. No. 43-23.) UH has produced emails and other records showing that coworkers informed superiors that Dundee's behavior upset and intimidated them, and Dundee acknowledges having a conflictive relationship with his supervisor, Lerman. (Doc. No. 43-2 at ¶¶ 22-23, 36; Doc. No. 43-15.) Therefore, the evidence supports UH's documented rationale for the referral.*

Dundee's last corrective action was for a violation of the "diversity policy" for reasons which were demonstrably false. His Honor fails to recognize that pretext is present in all of Dundee's corrective actions over the years. His Honor also fails to see that Dundee had one corrective action over an 8 year period for "conflictive work relationship" and  that Dundee was never given the specific incidents nor the dates/times of those incidents, nor the people involved. Yet, to a reasonable person, His Honor seems to label the Plaintiff as a miscreant that could not get along with anyone. The conflictive relationship with Ms. Lerman was a result of Dundee not responding in kind to Lerman's sexual advances. Could it be possible that His Honor is saying that Dundee would have been better served by resolving his conflict with Ms. Lerman and giving in to her advances?

*It is undisputed that neither of the counselors Dundee saw - David Riccardi and Jill Fulton - performed physiological or psychological testing. (Doc. No. 43-33 at 37; Doc. No. 43 at 21-22.)*

24

His honor fails to recognize that this was the initial counseling session with the promise of more and unlimited sessions, until the EAP counselor was satisfied…with what, remains the question. EAP Counselor David Riccardi asked probing and humiliating questions regarding medication that Dundee was on, the reason why, if Dundee was compliant. Riccardi also wanted to retrieve more personal medical information, note the release forms offered into evidence in the Plaintiff's Motion for Summary Judgement. Riccardi wasn't seeking that information for no reason. He was going to use that information in unlimited counseling sessions to perform an "evaluation." The evaluation's purpose was to make a diagnosis, up or down, on mental illness or personality disorder. No reasonable person could come to any other conclusion.

***The Jenkins court noted the plaintiff's co-workers were also referred for mandatory EAP counseling in that case. Neither party here has proffered evidence regarding whether the were also referred for counseling.***

The Jenkins court ruled against Jenkins precisely because <u>all</u> the workers were referred for mandatory counseling and Jenkins was not singled out. His Honor again fails to look at the Defendants' pattern of pretext in all of the corrective actions levied against the Plaintiff as it colors every aspect of the Plaintiff's Motion for Summary Judgement. The obvious reason why the ***colleagues with whom Dundee had "conflictive work relationships"*** were not referred for counseling is that there were no such "colleagues." Dundee was and remains that most popular and best pharmacist at UH Geauga Medical Center (see attachment C).

PAGE 23

*Unlike the plaintiffs in the cases that Dundee cites, he was not barred from returning to work, nor was he limited in his duties until the examination was completed. Further, there is no evidence that Dundee ever asked for a formal recision of this.*

His Honor provided further proof that the mandatory medical examinations were neither job related not consistent with business necessity.  It should be also noted that UH never formally rescinded the mandated medical examinations, where Dundee did ask that they be held in abeyance in lieu of the EEOC investigation.  As a matter of fact, if UH wins against the Plaintiff, Dundee may still be mandated into EAP counseling.

His Honor ignores the fact Dundee could be terminated at any time for refusing to go for counseling.  In addition, the EEOC didn't continue the investigation because of the backlog caused by the government shutdown in February 2018.

*Since the evaluation never occurred, and neither the purpose nor the nature of the evaluation was stated on the Compliance Contract, this Court lacks the facts required to establish whether it would have met this standard.*

His Honor offers a whitewash for the actions of the Defendants.  A reasonable person would say that the "intent, made under pretext" met the standard.

*UH acknowledges that this would have been "reasonably viewed as having a 'diagnostic purpose,' which is a primary factor emphasized in the EEOC Guidance." (Doc. No. 43 at 23.) The psychiatric evaluation might have qualified as a medical examination,9 necessitating the further consideration of whether it had a permissible purpose under the ADA. However, when Dundee informed UH that he believed this would constitute an impermissible medical examination, they dropped this requirement, and, as previously noted, took no action against*

26

*him. (Doc. No. 42-33 at 20.) Throughout his briefing, Dundee asserts that UH required this*
*psychiatric evaluation, and places great weight on the fact that this element of the Compliance*
*Contract was never formally rescinded*

The psychiatric examination was part and parcel to the EAP counseling and looked at as an
essential role to inform the EAP counselor in the unlimited sessions that Dundee was mandated
to attend; there in not one without the other. That is exactly how it was set forth as a condition of
employment in the corrective action of 6/262017. Dundee asked Wendy Henoch, of UH
Compliance, to hold all the EAP counseling sessions in abeyance until the EEOC investigation
was finished; Dundee got his answer from Shawn Osborne two days before Thanksgiving, 2017,
threatening Dundee with termination if he did not complete the Compliance Contract. To this
day, UH has not formally rescinded the Compliance Contract.

*Further, there is no evidence that Dundee ever asked for a formal recision of this requirement,*
*and by substituting a follow-up session with counselor Fulton, UH resolved the issue. Without*
*a medical examination, Dundee cannot establish an essential element of the alleged ADA*
*violation, and therefor UH is entitled to summary judgment on this claim.*

Fulton asked Dundee about scheduling future counseling sessions at several points during his
counseling session and Dundee said he would not attend any more sessions.

### PAGE 24

*Dundee's third claim alleges disability discrimination and harassment in violation of Title I of*
*the ADA. He notes that UH's Policy and Procedure HR-85 ("HR-85") provides for*
*"Mandatory Referral" to EAP as a response to supervisor concerns. He asserts that he is*
*entitled to summary judgment on this claim because "it is implicit of any reasonable reading"*

*of HR-85 "that the employee is 'perceived' or 'regarded' as disabled by the immediate*

*supervisor." (Doc. No. 31 at 23.) UH responds that this interpretation of HR-85 is "inaccurate*

*and unsupported by the evidence," because the mandatory referral is based on an employee's*

*conduct, not a diagnosis of its underlying cause. (Doc. No. 44 at 10.) Further, UH asserts that*

*it is entitled to summary judgment because Dundee has failed to establish that anyone at UH*

*perceived him as disabled,10 which is an essential element of this claim. (Doc. No. 43 at 25.)*

His Honor is wrong in accepting UH stating that the illegal mandatory referral into unlimited

EAP counseling sessions is based on the employee's conduct. The corrective action is based on

the employee's conduct and the untoward behavior can be handled completely by UH employee

conduct policy. The mandatory EAP counseling sessions stand alone as an attempt to diagnose a

"perceived" character flaw, causing the employee's disruptive conduct, as a means to correct that

flaw. Under UH policy HR-85, the employee's immediate supervisor "perceives' the employee

as having this flaw, in violation of the ADA policy on perceived disability.

If His Honor claims that  EAP counseling is automatic, then it is UH, as an entity, that has

put in place a policy that "perceives" any employee who reaches a "final warning" has a

character flaw that can be mitigated by mandatory EAP Counseling, thus violating the ADA

policy on perceived disability.

**PAGE 25**

*In contrast, UH has provided testimony from all of its representatives in this case that they did*

*not regard Dundee as mentally disabled, and were never informed that colleagues suspected or*

*perceived any such disability. (Doc. No. 43-2 at 9-10; Doc.*

In light of all of the examples of the Defendant's false testimony and pretext, it is almost quaint that His Honor would think that *testimony from all of its representatives in this case that they did not regard Dundee as mentally disabled* is the basis for rejecting the Plaintiff's claim of perceived disability.

## CONCLUSION

This Memorandum in Support of the Plaintiff's Objection to the Magistrate Judge's Report and Recommendation is submitted, respectfully, to the Court. It is hoped that the Court will see fit to perform a De Novo review of the Plaintiff's entire claim before the Court, granting the Plaintiff's Motion for Summary Judgement.

Dated this 11th day of July, 2020.

Respectfully submitted,
Plaintiff/Pro Se Litigant,
Frank D. Dundee

7707 Amberwood Trail
Boardman, Ohio 44512
fdundee@gmail.com
330-398-8274

7/9/2020                                          Gmail - Important question



 Gmail                                      Frank Dundee <fdundee@gmail.com>

## Important question
9 messages

**Frank Dundee** <fdundee@gmail.com>                    Fri, Oct 4, 2013 at 10:01 PM
To: "Lerman, Rachael" <rachael.lerman@uhhospitals.org>

  I need to ask you a question; did you put a pamphlet for the Employee Assistance Program in my locker?

  Frank

**Lerman, Rachael** <Rachael.Lerman@uhhospitals.org>        Fri, Oct 4, 2013 at 10:28 PM
To: Frank Dundee <fdundee@gmail.com>

  Yes

  Sent from my iPhone

  > On Oct 4, 2013, at 10:02 PM, "Frank Dundee" <fdundee@gmail.com> wrote:
  >
  > I need to ask you a question; did you put a pamphlet for the Employee Assistance Program in my locker?
  >
  > Frank


  Visit us at www.UHhospitals.org.

  The enclosed information is STRICTLY CONFIDENTIAL and is intended for the
  use of the addressee only. University Hospitals and its affiliates disclaim
  any responsibility for unauthorized disclosure of this information to anyone
  other than the addressee.

  Federal and Ohio law protect patient medical information, including
  psychiatric_disorders, (H.I.V) test results, A.I.Ds-related conditions,
  alcohol, and/or drug_dependence or abuse disclosed in this email. Federal
  regulation (42 CFR Part 2) and Ohio Revised Code section 5122.31 and
  3701.243 prohibit disclosure of this information without the specific
  written consent of the person to whom it pertains, or as otherwise permitted
  by law.

**Frank Dundee** <fdundee@gmail.com>                    Fri, Oct 4, 2013 at 10:38 PM
To: "Lerman, Rachael" <Rachael.Lerman@uhhospitals.org>

  Now, this is very important; why did you do that?
  [Quoted text hidden]

**Frank Dundee** <fdundee@gmail.com>                    Fri, Oct 4, 2013 at 11:15 PM
To: "Lerman, Rachael" <Rachael.Lerman@uhhospitals.org>

  Rachael,





7/9/2020                                    Gmail - Important question

To: Frank Dundee <fdundee@gmail.com>
Cc: "Lerman, Rachael" <Rachael.Lerman@uhhospitals.org>

Hi Frank! I'm sorry for the late reply, I had a 2-day offsite disaster training. Luckily it ended a little early so I can catch up on emails.

The EAP flier was just an FYI for an additional service UH offers employees and it was mentioned in the paperwork. I offer it to staff because it is not a commonly known-about service – the service is completely confidential and a great resource for employees.

I hope this explanation helps. Please have a relaxing week off, enjoy the sunshine and great weather! Please don't hesitate to call/email/text!

R

**Rachael Lerman, Pharm.D., BCPS**

Pharmacy Manager

University Hospitals Geauga Medical Center

13207 Ravenna Road

Chardon, Ohio 44024

☎  440.285.6530 (fax 216.201.4081)

✉  Rachael.Lerman@UHhospitals.org

[Quoted text hidden]
[Quoted text hidden]

---

**Frank Dundee** <fdundee@gmail.com>                    Wed, Oct 9, 2013 at 4:58 PM
To: "Lerman, Rachael" <Rachael.Lerman@uhhospitals.org>

Rachael,

I was totally aware of the EAP program at UH prior to finding the pamphlet in my locker.  The orientation program that I went through at UH back in April of 2010, as a new hire, was very thorough in the explanation of the program.  I'm sure that, as a manager at UH, you are familiar with the orientation process.  In addition, I am aware that there are employee assistance programs at most large organizations as well as every hospital system that I have worked for in at least the last 20 years and UH does an especially good job promoting the EAP on its website and inside Geauga hospital.

Regardless, I remain puzzled as to why you left the EAP pamphlet in my locker?

Frank                                                                                    
[Quoted text hidden]

7/10/2020

EAP Document in locker.jpg

A



EAP Pamphlet in Locker

7/5/2020

---

**Slide 1**

A Human Resource Primer

The Orwellian Workplace:
Where up is down

1

---

**Slide 2**

The Orwellian Workplace:
Where up is down

"War is peace.
Freedom is slavery.
Ignorance is strength."
— George Orwell, 1984

2

---

**Slide 3**

The Orwellian Workplace:
Where up is down

- **The "Empowerment" Paradox**: "In theory there is no difference between theory and practice. In practice there is."
  - Corporations, in theory, talk a good show about "empowering" their employees to maximize productivity and satisfaction in the workplace.
  - In practice, the reality is that employers must want a lobotomized workforce of Stepford-like robots. "They who must obey."

3

---

**Slide 4**

The Orwellian Workplace:
Where up is down

- A canary in the coal mine detected toxic fumes in the miner's environment, back in the day
- I am that canary at UH Geauga, **detecting a toxic workplace and possibly a toxic culture**
- My career is exemplary.  I am second to none as a pharmacist and as an employee at UH.

4

---

**Slide 5**

The Orwellian Workplace:
Where up is down

- I work alone, covering three hospitals, while also assisting a new pharmacist at a Ahuja; I provide the patients, doctors and nurses with exceptional service.  There is no one to blame but me if problems arise, **and none ever arise.**
- My record in the 34 years prior to Geuaga was spotless.  No disciplines
- I have been an asset to every organization I have worked for, improving services and leaving them better than they were before I arrived.  I have done the same thing at Geauga

5

---

**Slide 6**

The Orwellian Workplace:
Where up is down

- My character is one of optimism and empathy
- **I strive to provide the customer with solutions to problems and good feelings**
- And everyone is my customer, not just patients: Nurses, Doctors and co-workers.
- It is Orwellian when an employee, such as myself, who has built an exemplary reputation with staff on 3rd shift, is harassed and denigrated to the extent that I have been.  Like the canary, it exposes a toxic environment out of "1984", where excellence is failure.

6

---

1

7/5/2020

## The Orwellian Workplace:
### Where up is down

- Bad companies punish people for thinking or acting differently. It becomes like high school — there are cliques, there are outcasts, there's drama.
- There's one fundamental mistake in both using and looking for culture fit as a model for employee performance: You're assuming that your current culture is healthy and doesn't need to be changed.

7

## The Orwellian Workplace:
### Where up is down

- It's not bad breath or awkward jokes that define bad bosses. It's big-picture issues like communication skills, collaboration and the ability to demonstrate empathy.
- Contrary to what HR managers might believe, executive retreats and PowerPoint decks aren't enough to solve these problems.
  - **\*\*\*\*The worst bosses condemn their people to live in constant fear as they wait for the next wave of bad news, which always seems to hit without warning and at random intervals**

8

## The Orwellian Workplace:
### Where up is down

- Bad bosses contaminate the workplace.
- Regardless of their methods, bad bosses cause irrevocable damage to their companies and employees by hindering performance and creating unnecessary stress.
- 69% of US workers compared bosses with too much power to toddlers with too much power.

9

## The Orwellian Workplace:
### Where up is down

- The **tyrant** thinks of her employees as a criminal gang aboard her ship.
- High achievers who challenge her thinking are treated as mutinous. Those who support her with gestures of loyalty find themselves in the position of first mate.
- For employees attacked by this type of boss, <u>it is likely because they have experience that she lacks.</u>
  - *My age and experience are the major reason that I have been exposed to a pattern of harassment, intimidation, and hostility.  <u>That is age discrimination.</u>*

10

## The Orwellian Workplace:
### Where up is down

- **The #1 cause of unhappiness at work is bad bosses**
  - <u>Never ever accept jerks in management positions.</u> They're extremely toxic.
  - The most damaging and audacious problem occurs when bad bosses are actually enabled by HR departments and by their reporting structure, all the way up to CEO.
  - Bad bosses use the HR discipline process as a cudgel to ensure obedience

11

## The Orwellian Workplace:
### Where up is down

- Telltale sings you might have a bad boss:
- <u>Carson Wells</u>: "Do you have any idea how crazy you are?"
- <u>Anton Chigurh</u>: "You mean the nature of this conversation?"
- <u>Carson Wells</u>: "I mean the nature of you."

  No Country For Old men

12

2



7/5/2020

## The Orwellian Workplace: Where up is down

- Telltale sings you might have a bad boss
  - When multiple staff members not only go to HR with serious issues concerning the boss, but also continue on to the Compliance Department.
  - When the boss fires talented staff members instead of looking for way to retain them and operations are significantly impacted negatively

13

## The Orwellian Workplace: Where up is down

- Telltale signs you might have a bad boss
  - When the staff is exponentially happier and more productive on weekends and when the boss is on vacation
  - When the boss directly confronts an older staff member as to when they plan to retire, in direct conflict with EEOC rules on age discrimination
  - When the boss has complaints written against her with the EEOC and the EPA

14

## The Orwellian Workplace: Where up is down

- Telltale signs you might have a bad boss
  - ***Displaying a total lack of awareness, religious tolerance, and rational behavior, **by scheduling a PIP follow-up meeting after 3rd shift, at 7:00 am, on CHRISTMAS MORNING**
  - When a former colleague of the boss offers an unsolicited opinion that <u>the boss is a bully</u> who should never be in a position of authority

15

## The Orwellian Workplace: Where up is down

- Telltale signs you might have a bad boss
  - ***When the boss makes inappropriate sexual overtures to a staff member calling him, "handsome", "good-looking", and "sexy", following up with, "I could probably be fired for saying that!"
  - When the boss **threatens** staff members who have the temerity to voice concerns about a project, with termination
  - When the boss exhibits the exact behaviors, **such as bullying and emotional outbursts,** that she falsely accuses others of exhibiting

16

## The Orwellian Workplace: Where up is down

- Telltale signs you might have a bad boss
  - When departmental mandates border on the irrational
    - such as food and drink strictly forbidden in one area of the department, but not a wide-open lunch room that shares the same air as the work area, while seeing nothing wrong with lab specimens, **such as blood and stool samples,** being transported in the same containers as patient's medications, through the tube system

17

## The Orwellian Workplace: Where up is down

- So, what creates conflict in the workplace? Opposing positions, competitive tensions, power struggles, ego, pride, jealousy, performance discrepancies, compensation issues, just someone having a bad day, etc.
- Two or more people can view the same event in a totally different way. This mismatch of perceptions can lead to a lot of workplace conflict.

18

3

7/5/2020

---

**The Orwellian Workplace:**
**Where up is down**

- Conflict in the workplace are often fueled by emotion and perceptions about somebody else's motives and character. "We judge others by their actions, but ourselves by our intentions"?
- **I am always conscious to subdue my own story.**  I am a naturally introspective person who reviews my interactions with others as a method of continuous quality improvement.

19

---

**The Orwellian Workplace:**
**Where up is down**

- Two or more people can view the same event in a totally different way. This mismatch of perceptions can lead to a lot of workplace conflict.
- People of different **gender**, backgrounds, upbringings and religions are coming together in tight quarters. These values can sometimes rub up against one another and start fires.
  - Gender differences, such as a male voice, can lead to a misplaced perception regarding emotions

20

---

**The Orwellian Workplace:**
**Where up is down**

- My interactions with others, in or out of the department, are appropriate to the situation
- I am an authoritative parent.  The authoritative parenting style is about **setting limits**, reasoning with kids, and being responsive to their emotional needs. **Warmth mixed with rationality.**  That is how I relate to others in the workplace.  I am empathetic, but set firm limits.
  - Being "authoritative" isn't an all-or-nothing proposition. By its very nature, authoritative parenting occupies a sort of middle ground between granting too much freedom and being too strict. That is the balance that I strive to achieve in my interactions in the workplace.

21

---

**The Orwellian Workplace:**
**Where up is down**

- **I serve the RN's,** and not the other way around.
- Can I please everyone all the time; I might ask, can anyone?
- Can feelings be hurt?  Yes. To expect otherwise is irrational and unreasonable.
- A major concern in hospitals is drug diversion; the pharmacist that doesn't set limits, that acquiesces to cavalier attitudes about missing doses, enables diversion.  He also doesn't serve his employer by being a good steward of the employer's assets.

22

---

**The Orwellian Workplace:**
**Where up is down**

- There is nothing wrong with spirited disagreement; a raised voice, should not be confused with yelling
- **In life and death situations, that come up routinely on 3rd shift, sometimes courtesy has to be suspended as action takes precedent:**
  - 05:25 Irma calls needs a stat Epi drip, no order; just a call 05:26; I put epi order in; Megan calls for a stat order for vasopressin drip  no order; just a call; 05:31 I put vasopressin order in; Megan calls again for stat midazolam drip  no order; just a call; 05:37 midazolam order in; Midazolam sent 06:42
- Setting limits should not be confused with hostility
- **I have never in my career worked with better nurses than I work with at Geauga.** I never let disagreements morph into grudges.  The nurses on my shift are the only reason I didn't transfer to Ahuja when I had the opportunity to escape a toxic boss.  **I have made lifetime friends with the staff at Geauga.**

23

---

**The Orwellian Workplace:**
**Where up is down**

- Two terrific techs were fired unreasonably. A young pharmacist, was fired, made the fall-guy for a struggling project, a project that has only performed worse since his dismissal.
  - A note on a phone in the retail pharmacy inferred that inpatient staff was to blame for lowering the "volume" on a phone that would never be used by inpatient staff.  The note was a transparent attempt to continue looking for scapegoats for a struggling project.
  - I left a pointed rebuttal that set a firm limit on the scapegoating effort, asking, respectfully, that the note be removed.

24

4

 7/5/2020

## The Orwellian Workplace: Where up is down

- In a union environment, the grievance procedure exposed bad bosses, often leading to their dismissal
- employees in union shops, contrary to corporate opinion, are vastly more productive and engaged than at-will employees. Why?
  - they work without fear and anxiety...they know they have recourse and system in place to make sure that no matter the issue, they can have their day in court and their lives are not subject to whim of an unfit manager

25

## The Orwellian Workplace: Where up is down

- In a union shop it is a level playing field between employer and employee
- UH, I'm afraid, may think that their policies towards employees are enlightened, but I'm here today to tell you that you're not even close and it shows in how the employees feel
- **The process is deeply flawed in it's inherent bias and lack of transparency. It is Orwellian: the discipline process is McCarthyism masquerading as justice.**

26

## The Orwellian Workplace: Where up is down

- "It is always important to recognize and realize who you're dealing with."
  – Claudia Robinson
- I have over 25 years experience in labor and management relations
  - I was forced to join a union by a decision of the NLRB, in 1978, and I made the best of it. I rose from grievance man, to board member, to become president of the union for a period of 10 years

27

## The Orwellian Workplace: Where up is down

- I participated in many employee discipline hearings. **I know what gets an employee fired more than anyone at UH**
- I participated in many grievances that went to arbitration hearings before a FMCS mediator. **I won decisions that are still on the books and set precedent**
- I negotiated agreements against the best attorney groups in the country
  - I led a sympathy action in 1985, in conjunction with S.E.I.U. local 627, that prevented a strike that would have shut down and entire hospital system

28

## The Orwellian Workplace: Where up is down

- I worked on numerous employee-management committees that led to improved cooperation between the two groups.
- I met with many CEO's, department heads and members of hospital boards
  - **I know that a high-ranking position and a nice suit of clothes can't mask deeply flawed leaders, all the way up the ladder**

29

## The Orwellian Workplace: Where up is down

- One of the greatest honors in my life came at a celebration in December, 1985, after a contract was signed between S.E.I.U. Local 627 and the Western Reserve care system
- In front of 2,000 people, Attorney Anthony Sgambati, one of the most highly respected labor attorneys ever in this country, stood on the dais and said:
  **"If anyone ever tells you that one man cannot make a difference, when everything looks lost, you tell them they are wrong. Frank Dundee, by himself, prevented a strike by convincing his union and the nurses union to support S.E.I.U. Local 627."**

30



7/5/2020

### The Orwellian Workplace:
### Where up is down

- My background in organized labor puts me in a unique position as a consultant, to provide UH with a constructive critique of their efforts in employee relations and how to improve them.
- My background in business and hospital pharmacy put me in a unique position as a consultant to improve services and cost savings across the UH organization.
- **I am a major asset to the UH organization, yet, instead of using my skill-set, I am harassed and denigrated.  That is Orwellian.**

31

### The Orwellian Workplace:
### Where up is down

- If I could not be intimidated at a time in my life when I had small children and a wife who depended on me, how can I be intimidated at age 63, with grown children and a more secure lifestyle?
- *Dragline*: "He was smiling... That's right. You know, that, that Luke smile of his. He had it on his face right to the very end. **Hell, if they didn't know it 'fore, they could tell right then that they weren't a-gonna beat him."**
  – Cool Hand Luke

32

### The Orwellian Workplace:
### Where up is down

- "If you can bear to hear the truth you've spoken Twisted by knaves to make a trap for fools,
- "Or being lied about, don't deal in lies, Or being hated, don't give way to hating,
- "If neither foes nor loving friends can hurt you,
- "Yours is the Earth and everything that's in it,
- "And—which is more—you'll be a Man, my son!"
  – Rudyard Kipling

33

6



Melanie Wesstman
6:27 AM (10 hours ago)

to me

My Dearest Frank,
  BEVE and I are devastated to hear you won't be working with us. YOU ARE AND WILL
ALWAYS BE MY FAVORITE AND THE BEST PHARMACIST ON EARTH AND I AM SO SAD.
LOVE ALWAYS,
THE KITTEN!

Sent from Yahoo Mail on Android

Melanie Wesstman
4:54 PM (24 minutes ago)

to me

Damn straight Frank. I worry when I have someone dying that no one will be able to do what you
did. You saved lives with us. Legend in our eyes.. Phil is a dick and that "sure be right up chick"
is a liar and whoever was down there last night didn't know shit. Lisa's good but not you.

Sent from Yahoo Mail on Android

On Sun, Jul 5, 2020 at 4:11 PM, Frank Dundee
<fdundee@gmail.com> wrote:

Frank Dundee <fdundee@gmail.com>
5:13 PM (16 minutes ago)

Melanie. I can't thank you enough for those words!!!  Coming from you, those words mean
more than anything!!  You save more lives than anyone and I was happy to do my small part to
assist you.  We really could rock and roll together!!  If there's ever a game show where a nurse
and a pharmacist have to team up to save a coding patient, we would win!!!

Melanie Wesstman
5:23 PM (7 minutes ago)

to me



Frank,

Thank you
sooo MUCH for
being awesome tonight!
(Melanie especially says
     thank you )

We can be pretty
needy up here in the
unit & you always
come through for us.

Love,
ICU

Thank You
For

dealing with
my HOT MESS
- ness

Thank you !!
Megan

Thanks
FRANK
Did Not
Need. — MR

Dr Cheres says Thanks
TOO!!!

Frank-
You were correct,
I was the one to
overlook the Norvasc
I mixed it up c̄ the
Amiodarone when taking.
Sincerest apologies +
thank you for all you
do!

　　　-Stefan

Thank you
Thank you
(I did put it in
PEDS - Fart on
a DUCK)

you are the
Best.!

Happy Birthday
Frank !

We love you !

I C U

Kisses and hugs !!
P.S. We want a few more good
years with you !!

F. Dundee
7707 Amberwood Tr.
Youngstown, OH
          44512



Clerk of Courts
Thomas D. Lambros Federal Building & U.S. Courthouse
125 Market Street
  Youngstown, OH
          44503